IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REENA S. MATHEW, | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:23-cv-01494 |
| | § | |
| SANTANDER CONSUMER USA INC., | § | |
|     Defendant | § | |

## COMPLAINT

Plaintiff Reena S. Mathew complains of Defendant, Santander Consumer USA Inc., for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* More specifically, Santander unlawfully discriminated against Mathew because of her sex and her pregnancy, and then unlawfully retaliated against her after she engaged in protected activity by opposing the unlawful discrimination.

### PARTIES

1.    Plaintiff Reena S. Mathew ("Mathew" or "Plaintiff") is a resident of Dallas County, Texas.

2.    Defendant, Santander Consumer USA Inc., ("Defendant" or "Santander") is an Illinois corporation. Its principal place of business is in Dallas, Texas. Defendant may be served with process in this case by serving its registered agent for service of process, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

### JURISDICTION AND VENUE

3.    This court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331.

1

4.      This Court has personal jurisdiction over Defendant because it does a substantial amount of business in Texas, and it has sufficient minimum contacts with the State of Texas to allow this Court to exercise personal jurisdiction over the Defendant in this case.

5.      Venue is proper in this Court pursuant to pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue is also proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein occurred in the State of Texas, and because Mathew would have continued to work in Dallas County (and other counties which comprise the Dallas Division) if not for the unlawful employment practices complained of herein.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Plaintiff has exhausted administrative remedies and complied with all procedural prerequisites to filing this lawsuit by timely filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), and obtaining notice of her right to sue from the EEOC less than 90 days before the filing of this Complaint.

### RELEVANT FACTS

**Mathew Performed Well for Over Five Years**

7.      In January 2011, Mathew began working as an employee of Santander.  At first, her job title was Senior Human Resources Generalist, but this later changed to Human Resources Business Partner ("HRBP").

8.      From October 2012 through August 2015, Mathew's immediate supervisor was Angelina Hullum.  Mathew's performance was good, and her performance reviews were consistently favorable.  During her employment, Santander paid for the training required for Mathew to obtain her PHR certification (Professional in Human Resources).

9.      Santander company policies required supervisors to document performance deficiencies and criticisms, and Mathew had no known documentation of any performance issues until late 2015, after her supervisor learned Mathew was pregnant.

10.      In July 2015, Mathew received a favorable mid-year performance review from Hullum.  In three categories, Hullum commented that Mathew did a "good job," a "great job," and an "excellent job."  The review lists some goals for Mathew to work on, but it lists no negative comments and cites no examples of substandard performance.

11.      Also in July 2015, Mathew was assigned to provide HR support at a second office location, in addition to her full-time duties at her existing location.  For the next several months, Mathew was the only HR employee at her level covering multiple locations, and her workload was substantially heavier than it had been before getting this additional assignment.

**Mathew's New Supervisor, Yessica Adriano**

12.      On September 1, 2015, Yessica Adriano replaced Hullum as the HR Manager over the office where Mathew worked, and Adriano became Mathew's immediate supervisor.

13.      Despite the increased work load, Mathew continued to perform well, and she received positive feedback and compliments from the business people to whom she provided HR support.  For example, Mathew worked on a project to help improve attendance (and decrease absenteeism) of the call center employees who worked in the company's Lewisville, Texas office.  Mathew drafted a proposal, and on October 14, 2015, Adriano emailed the proposal to two of her peers (HR Managers) in other offices, plus the office manager who oversaw the downtown Dallas location.   One of the HR Managers replied to the email stating: "I really like this!!  Amazing job!"  The office manager followed up with a reply stating: "Same here! Great

way to recognize those who adhere to this policy on a consistent basis."  Adriano later forwarded this email chain and the compliments to Mathew, stating: "FYI…good work Reena."

14.     In late October, Adriano approved a request by Mathew to miss a couple of hours of work to attend a doctor's appointment on October 30, 2015.  Mathew was pregnant, and this was her first pre-natal appointment with her obstetrician.

15.     When Mathew returned to work after the appointment, she told Adriano that she was pregnant.  Adriano asked Mathew what her plans were for after the baby was born; Mathew replied that she would not know until closer to the due date.

16.     Meanwhile, despite her workload, Mathew continued to perform well and exceed expectations.  Santander had a points-based rewards program where managers and supervisors could award You-Earned-It points to employees for superior effort or performance.  Mathew regularly received points through this program, and she continued to do so after Adriano became her supervisor.  Point were normally awarded a few hundred at a time, but on November 23, 2015, a company Vice President awarded Mathew 2,500 points in a lump sum.

17.     As for deficiencies in her performance, Mathew received no warnings or documented criticisms of her performance, until December 2015.

**Mathew Receives and Challenges Her Performance Improvement Plan**

18.     On November 30, 2015 (a Monday), Mathew asked Adriano if it would be okay for her to use her paid time off (PTO) and take the day off on Wednesday, December 2, 2015.  Adriano replied "Yes, that would be fine."

19.     The very next day, on December 1, 2015, Adriano met with Mathew ostensibly to go over her annual review.  However, instead of giving Mathew a review, Adriano handed her a 30-day performance improvement plan (a "PIP").

20. The only performance issues listed in the PIP were three vague generalizations, followed by the statement: "See Addendum for specifics."

21. There was no Addendum provided along with the written PIP when Mathew received it from Adriano. Mathew told Adriano that she disagreed with the PIP, and she questioned Adriano about the specifics. Adriano was not able to provide any specifics, leaving Mathew to wonder what she had done to justify the PIP, especially with no prior coaching or written warnings.

22. One of the three criticisms in the PIP was: "Reena continually asks to leave early and struggles to adhere to her work schedule." However, Mathew had never left early or missed scheduled time at work without prior approval from Adriano. For example, just one day before placing Mathew on a PIP, Adriano approved a day-off request without saying anything about attendance being a problem. *See* ¶ 18, *supra*. Now Adriano was now using these *approved* absences as grounds for the PIP.

23. Mathew knew her performance had not suddenly changed in 2015, and she knew if there were problems they should have been at least mentioned before putting her on a PIP. The only thing that had changed was her pregnancy, and Adriano's desire to know what her plans were after the baby was born.

24. Mathew was dissatisfied, and she sought answers from Adriano's supervisors and other senior management. For example, on December 7, 2015, Mathew emailed Christopher Mays, the manager of the company's performance development group. This was a group that provided coaching and training for problem employees, so Mathew believed he would know if her situation was abnormal. Mathew asked May if the company had ever put anyone on a PIP without prior documentation of a performance issue. May replied: "I have never worked on a

PIP without the proper documentation but not sure if there is a case where this has happened with someone else.  It's just like any other disciplinary action you need documentation to validate the PIP."  This response confirmed Mathew's suspicion that something was off, and that she was being discriminated against because of her pregnancy.

25.     On December 9, 2015, Mathew met with a Vice President in Human Resources named Stephen Shaffer, who was over Adriano in her chain of command.  Mathew told Shaffer about her concerns, and he said he would speak to the HR Managers and get back to her.

26.     December 2015 ended without any criticisms or performance issues noted by Adriano, or by anyone else, and Mathew assumed she had successfully completed the PIP and could put this issue behind her.  Mathew was wrong.

**Adriano Puts Mathew on a Second Performance Improvement Plan**

27.     On January 15, 2016, Adriano placed Mathew on a second PIP, this one for 90 days.  This time the PIP had an Addendum attached, a Timeline that listed 31 criticisms going as far back as February 1, 2015, seven months before Adriano took over as Mathew's supervisor.

28.     Due to the PIP, Mathew was disqualified from receiving a raise or getting her year-end bonus.

29.     On January 18, 2016, Mathew emailed Stephen Shaffer seeking to have another meeting.  They met on January 20, 2016, and Mathew explained her most recent concerns about this new 90-day PIP.  Mathew told him that she disagreed with almost everything listed as a criticism in the Addendum, and that none of the criticisms had even been mentioned to her before (contrary to company policy).  For example, the first item on the Addendum alleged that Mathew failed to provide a written summary of an HR presentation she attended in February 2015.  Mathew explained to Shaffer this was not true, that she had in fact provided the written

6

summary.  Mathew later proved what she said by sending Shaffer the summary she emailed to Angelina Turilli (the person who asked for the summary) on February 12, 2015.

30.    Shaffer agreed to reinstate Mathew's raise and bonus, but in all other respects he was unhelpful and seemingly unconcerned with Adriano's failure to follow policy and apparent discrimination due to Mathew's pregnancy.  Shaffer told Mathew not to focus on the specifics, but instead to pay attention to the overall message.  He also asked Mathew to write up the details of what they had just discussed, and send it to him no later than the following Monday morning at 8 a.m.

31.    Before noon the following Monday, Shaffer emailed Mathew chastising her for missing the 8 a.m. deadline he gave her and stating: "This is unacceptable."  Shaffer told Mathew to get the summary to him by noon.

32.    Shaffer emailed again just 21 minutes later to say that meeting his new noon deadline would not excuse the missed 8 a.m. deadline.  By his actions, Shaffer made it clear to Mathew that he was less concerned with the merits of the overall situation and more concerned about documenting her mistakes.

**Mathew's Protected Activities/Santander's Retaliation**

33.    On January 29, 2016, Mathew (through her attorney) engaged in protected activity by sending a letter opposing the discrimination against her because of her pregnancy. More specifically, she sent a letter to the company complaining that she was unlawfully placed on a performance improvement plan because of her pregnancy, and she demanded that Santander prevent further instances of discrimination.  A true and correct copy of this January 29, 2016 letter is attached to this Complaint as Exhibit 1.

34.    Over the next few months, Mathew continued to do her job well.  She consistently received positive feedback from her "customers," the business professionals to whom she provided HR services and support.  However, her HR superiors and upper management, including Adriano and Shaffer, continued to show hostility and find fault in just about anything Mathew did.

35.    For example, although Mathew was no longer required to provide HR support for a second location, Adriano piled on so many additional assignments that Mathew's overall work load increased.  Mathew spoke to Adriano about the size of her own workload in comparison to her peers, hoping things would get balanced out more evenly.  Instead, Adriano added a task: she told Mathew to keep track of her time daily and provide her with a written time study showing all the work she was doing and how much time things were taking.  If Adriano had required all of the HRBPs to do such a study, that would have helped decide how to even out the allocation of assignments.  However, no one except Mathew was forced to take on this busy-work assignment.

36.    Adriano also required Mathew to perform administrative tasks that were not her responsibility, but rather were the responsibility of the HR coordinator for that office.  One such task was reading all emails and hard-copy documents submitted to the HR inbox for her office.  Another such task required Mathew to read emails from the company's Compliance Department simply to authorize them access to one of the HR systems.  Both were low level, but time-consuming, tasks that required no HR expertise.

37.    It seemed clear to Mathew where things were heading, and how they would end.  She had been given two PIPs based on falsehoods and issues so minor they were not even mentioned at the time, and when she reported the apparent pregnancy discrimination she got no

8

support from senior management.  It seemed Shaffer and upper management had decided to fully back and support Adriano's discriminatory and retaliatory actions, indicating to Mathew she would most likely be terminated after the 90-day PIP was over.  This would leave her with no income and no health insurance benefits at a time when she and her unborn child needed them most.  The daily stress caused by Defendant's actions coupled with Mathew's concerns about the well-being of her child was immense.

**Mathew is Terminated**

38.    On April 19, 2016, Mathew was called into Adriano's office and terminated. When she left the office, she was met by a security guard.  He had a box containing Mathew's personal items from her desk, and he walked Mathew all the way to her car.

**Mathew Exhausted Administrative Remedies**

39.    On May 4, 2016, Mathew filed a Charge of Discrimination with the EEOC.  A true and correct copy of this Charge is attached to this Complaint as Exhibit 2.

40.    On April 10, 2023, the EEOC issued a notice to Mathew, a Conciliation Failure and Notice of Rights.  A true and correct copy of this document is attached to this Complaint as Exhibit 3.  This notice states: "The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you."  The document informed Mathew that she had the right to sue, and that she had 90 days to do so.

**Mathew Meets All Requirements to Assert Her Claims**

41.    At all times relevant to this case, Santander was Mathews' "employer" as the term "employer" is defined in 42 U.S.C. § 2000e(b).

42.    At all times relevant to this case, Mathew was an "employee" of Defendant as the term "employee" is defined in 42 U.S.C. § 2000e(f).

43.    At all times relevant to this case, including 2015 and 2016, Santander employed more than 500 employees.

### FIRST CAUSE OF ACTION
### DISCRIMINATION BECAUSE OF SEX AND PREGNANCY

44.    Mathew is a female who became pregnant while employed with Santander.

45.    Mathew was qualified to perform her duties at Santander.

46.    Santander discriminated against Mathew because of her sex and pregnancy, in violation of 42 U.S.C. §2000e(k), by putting her on two performance improvement plans, denying payment of her 2015 year-end bonus and merit pay increase, and terminating her employment.

47.    Santander fired Mathew while retaining lower-performing HRBPs who were not pregnant.

48.    Santander replaced Mathew with a person who was not pregnant.

49.    Because of Santander's violations of 42 U.S.C. §2000e(k), Mathew has suffered and will continue to suffer loss of income and benefits, suffering, mental anguish, inconvenience, loss of personal status and dignity, loss of enjoyment of life, and other damages. Plaintiff is also entitled to attorneys' fees, expert witness fees, and costs incurred in connection with these claims.

50.    Santander's unlawful and discriminatory acts were committed with malice or reckless indifference to Plaintiff's federally protected rights.  Mathew is therefore entitled to, and hereby seeks, punitive damages.

### SECOND CAUSE OF ACTION - RETALIATION

51.    Mathew engaged in protected activity by opposing Santander's unlawful employment practices, the discrimination against her because of her pregnancy.

52.     Santander retaliated against Mathew because she engaged in protected activity by assigning her busy-work tasks and extra duties, subjecting her to daily (or near daily) unwarranted criticisms, and by terminating her employment.  These actions were things that would dissuade a reasonable person from making or supporting a charge of discrimination.

53.     Santander's actions violated the anti-retaliation provisions in Title VII, 42 U.S. C. §2000e-3(a).

54.     Santander's unlawful retaliation damaged Mathew by causing her to suffer loss of income and benefits, suffering, mental anguish, inconvenience, loss of personal status and dignity, loss of enjoyment of life, and other damages. Plaintiff is also entitled to attorneys' fees, expert witness fees, and costs incurred in connection with these claims.

55.     Santander's unlawful retaliatory acts were committed with malice or reckless indifference to Plaintiff's federally protected rights.  Mathew is therefore entitled to, and hereby seeks, punitive damages.

**INJUNCTIVE RELIEF**

56.     Santander intentionally engaged in unlawful employment practices prohibited by Title VII.  Plaintiff therefore asks this Court to enjoin Santander from engaging in such unlawful employment practices, and to order affirmative relief, such as reinstatement of Mathew and other adversely affected and displaced employees, with back pay, and other equitable relief as this Court deems appropriate.

57.     Mathew requests an award of injunctive relief ordering Santander to reinstate her to the position she held at the time of her termination in 2016, with back pay and full restoration of all seniority and benefits of employment.

**ATTORNEY FEES, EXPERT WITNESS FEES, AND COSTS**

58.     Plaintiff requests an award of reasonable attorney fees, expert witness fees, and costs of court.

**JURY DEMAND**

59.     Plaintiff demands a trial by jury on all claims asserted in this Complaint for which a trial by jury is allowed by law.

**WHEREFORE**, Plaintiff requests judgment against Defendant as follows:

a.  Judgment finding that the unlawful actions described in this Complaint constitute violations of Title VII;

b.  Judgment enjoining Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages described in this Complaint;

c.  Judgment awarding Plaintiff all compensable damages, including all economic losses, lost past and future income and benefits of employment, and compensatory damages such as suffering, mental anguish, inconvenience, loss of personal status and dignity, and loss of enjoyment of life;

d.  Judgment awarding all costs of court, expert witness fees, and attorney fees recoverable by law;

e.  Judgment awarding punitive damages;

f.  Judgment awarding such other relief under Title VII to which Plaintiff is entitled by law;

g.  Judgment awarding all pre-judgment and post-judgment interest to which Plaintiff is entitled by law;

h.  Judgment awarding all other and further relief to which Plaintiff is entitled.

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Phone: (214) 725-0260
Fax: (866) 462-6179
don.uloth@uloth.pro
Counsel for Plaintiff

13