**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **REENA S. MATHEW,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 3:23-CV-01494-N** |
| | § | |
| **SANTANDER CONSUMER USA INC.,** | § | |
| | § | |
| *Defendant.* | § | |

# DEFENDANT'S BRIEF IN SUPPORT OF ITS
# <u>MOTION FOR SUMMARY JUDGMENT</u>

Monte K. Hurst
State Bar No. 00796802
Monte.Hurst@hallettperrin.com

Kristen A. Laster
State Bar No. 24076499
KBrumbalow@hallettperrin.com

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142

*Counsel for Defendant
Santander Consumer USA Inc.*

# TABLE OF CONTENTS

*Pages*

I. SUMMARY ...................................................................................................................................1

II. BACKGROUND FACTS ..............................................................................................................3

   A.    Santander ....................................................................................................................3

      1.  Equal Opportunity Employer .....................................................................3

      2.  Anti-Harassment and Anti-Discrimination Policy ....................................3

   B.    Mathew's Employment with Santander .....................................................................4

      1.  Mathew Had Challenges While Under Angelina Hullum ..........................5

      2.  Mathew Starts Reporting to Yessica Perez ...............................................6

      3.  Mathew is Placed on a Performance Improvement Plan ...........................9

      4.  Mathew's Poor Performance Continues ...................................................10

      5.  Mathew Disagrees with PIP and Alleges Wrongdoing by Ms. Perez ......11

      6.  Mathew Receives a 90-Day PIP and Action Plan ....................................12

      7.  Mr. Shaffer Meets with Mathew ..............................................................12

      8.  Mathew Continues to Perform Below Expectations .................................14

      9.  Mathew Fails to Meet Expectations at Her 90-Day Review .....................20

      10.  Santander Terminates Mathew's Employment ........................................22

      11.  Mathew is Replaced by Sabrina Boyd, a Female Colleague ....................23

   C.    Mathew's Charge of Discrimination ........................................................................23

   D.    Mathew Files this Lawsuit .......................................................................................23

III. SUMMARY JUDGMENT PRINCIPLES ...................................................................................24

IV. ARGUMENT & AUTHORITIES ...............................................................................................25

   A.    Mathew's Pregnancy Discrimination Claim Fails ...................................................25

      1.  Neither Ms. Perez's Request that Mathew Complete a Time Study Nor Her Purported Scrutiny of Mathew's Performance Constitutes an Adverse Employment Action ..........................................26

      2.  Mathew Cannot Show that She Was Treated Less Favorably Than Other Similarly Situated Employees Because of Her Pregnancy ............................................................28

      3.  Santander's Legitimate and Nondiscriminatory Employment Decisions ...................................29

      4.  Mathew Cannot Show that Santander's Legitimate and Nondiscriminatory and Nonretaliatory Employment Decisions Were a Pretext for Discrimination or Retaliation .........................................41

   B.    Mathew's Retaliation Claim Fails ...........................................................................48

      *1.*  *Neither Ms. Perez's Request that Mathew Complete a Time Study Nor Her Purported Scrutiny of Mathew's Performance Constitutes an Adverse Employment Action* .............................................49

      2.  Mathew Cannot Show a Causal Link Between Engaging in Protected Activity and Her Termination .......49

      3.  Santander's Legitimate and Nonretaliatory Employment Decisions ......50

PRAYER ..........................................................................................................................................50

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Ajao v. Bed Bath and Beyond, Inc.*,
265 F. App'x 258 (5th Cir.2008) (per curiam) .......................................................................49

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986)..................................................................................................................25

*Boeing Co. v. Shipman*,
411 F.2d 365 (5th Cir. 1969) (en banc) ..................................................................................25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..............................................................................................................24, 25

*Clark County School District v. Breeden*,
532 U.S. 268 (2001)..................................................................................................................49

*Fairchild v. All Am. Check Cashing Inc.*,
815 F.3d 959 (5th Cir. 2016) ..................................................................................................44

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ..................................................................................................43

*Green v. Costco Wholesale Corp.*,
No. 3:15-CV-1868-N, 2017 WL 10110295 (N.D. Tex. May 30, 2017).............................28, 29

*Hamilton v. AVPM Corp.*,
593 F. App'x 314 (5th Cir. 2014) ......................................................................................41, 46

*Hamilton v. Dallas County*,
79 F.4th 494 (5th Cir. 2023) ..................................................................................................27

*Hanks v. Shinseki*,
No. 3:08-1594-G, 2010 WL 3000835 (N.D. Tex. July 28, 2010) .........................................49

*Hernandez v. Yellow Transp., Inc.*,
670 F.3d 644 (5th Cir. 2012) ..................................................................................................48

*Johnson v. UAH Prop. Mgmt., Ltd. P'ship*,
428 F. App'x 311 (5th Cir. 2011) ............................................................................................43

*Kaye v. BNSF Ry. Co.*,
No. 4:17-CV-656-A, 2018 WL 2446594 (N.D. Tex. May 31, 2018)................................24, 25

*Keelan v. Majesco Software, Inc.*,
407 F.3d 332 (5th Cir. 2005) ..................................................................................................26

**Cases (cont.)**

*Lee v. Kan. City S. Ry. Co.*,
    574 F.3d 253 (5th Cir. 2009) ................................................26

*Long v. Eastfield Coll.*,
    88 F.3d 300 (5th Cir. 1996) ................................................48

*Lynn v. Wells Fargo Bank, N.A.*,
    No. 3:13-CV-4721-N, 2014 WL 12834960 (N.D. Tex. Aug. 25, 2014) ................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................25

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)................................................25, 26, 48

*Ortego v. Dep't of Transportation*,
    No. CV 13-836, 2014 WL 12521695 (E.D. La. Feb. 18, 2014) ................................28

*Rachid v. Jack in the Box, Inc.*,
    376 F.3d 305 (5th Cir. 2004) ................................................26

*Reynolds v. Sovran Acquisitions, L.P.*,
    No. 3:14-CV-1879-D, 2015 WL 6501552 (N.D. Tex. Oct. 27, 2015) ................................43, 44

*Taylor v. United Parcel Serv., Inc.*,
    554 F.3d 510 (5th Cir. 2008) ................................................48

*Villa v. Texas Parks and Wildlife Dept.*,
    No. 2:19-CV-00256, 2021 WL 1179271 (S.D. Tex. March 27, 2021)................................45

*Wallace v. Methodist Hosp. Sys.*,
    271 F.3d 212 (5th Cir. 2001) ................................................25

*Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*,
    660 F.3d 211 (5th Cir. 2011) ................................................25

**Other Authorities**

FED. R. CIV. P. 56(c) ................................................24

Federal Rules of Civil Procedure Rule 56(a)................................................24

# I.
## SUMMARY

*"The search for a scapegoat is the easiest of all hunting expeditions."*
*- Dwight D. Eisenhower -*

Defendant Santander Consumer USA Inc. ("Santander") terminated Plaintiff Reena Mathew ("Mathew") for her repeated poor job performance and her unwillingness to perform work she felt was beneath her, yet Mathew still refuses to accept responsibility for anything, and instead seeks to vilify her last manager and the business professionals she would now claim conspired with that manager. Although Mathew cannot recall a single mistake she ever made and the only reason why a manager would express criticism about her work was because she was pregnant, there is simply no evidence to support her fantastic allegations of discrimination and retaliation.

For years, Mathew coasted as an employee in Santander's Human Resources ("HR") department. Then, in 2015, Yessica Perez[1] assumed the role supervising Mathew and started to hold Mathew accountable. Ms. Perez met with Mathew regularly to discuss Mathew's work performance and Ms. Perez took notes regarding her concerns with Mathew. Ms. Perez would applaud instances when Mathew had done a good job and discuss with Mathew the concerns she had in Mathew's job performance. But, Mathew's performance did not improve. Ms. Perez placed Mathew on a 30-day Performance Improvement Plan ("PIP") intended to provide Mathew with written guidance on how she needed to improve her performance.

Instead of accepting the PIP as an opportunity to improve her performance, Mathew instead chose to direct all of her energy into vilifying Ms. Perez by launching allegations that Ms. Perez,

---

[1] Yessica Perez previously went by the name Yessica Adriano. Santander refers to Ms. Perez by her current last name, Perez, throughout this brief.

a young mother herself, was discriminating against Mathew because she was pregnant.  Stephen Shaffer, VP Human Resources Business Partners, conducted a thorough investigation into Mathew's allegations against Ms. Perez, and found no evidence of discrimination.  Mr. Shaffer chose to extend Mathew's PIP to 90 days, to ensure that she would have adequate time to improve her performance.  Mathew was given a detailed 90-day action plan.

Sadly, Mathew, who in her own eyes was a model employee, did not utilize this 90-day action plan as an opportunity to improve her performance.  Despite Ms. Perez and her supervisor, Stephanie Elad (Director, Human Resources), spending extensive time coaching Mathew throughout this 90-day PIP to help her succeed, Mathew's performance simply did not improve.  Mathew's continued poor performance was most clearly evidenced by the complaints that Ms. Perez and Ms. Elad received from the business executives to whom Mathew was responsible for providing HR services.  As a result of Mathew's ongoing poor performance, Santander terminated her employment.

Mathew now alleges that Ms. Perez both discriminated against her because of her pregnancy, and then convinced numerous business professionals and executives at Santander to lie in a conspiracy to cover up Ms. Perez's discrimination.  Mathew's case is based solely on her subjective belief that she was somehow subjected to discriminated and retaliation.  This subjective belief simply cannot carry the day when weighed against the mountain of evidence supporting Santander's decision to terminate Mathew because of her ongoing poor job performance.

To believe that Mathew was somehow subjected to either pregnancy discrimination or retaliation, one would have to disregard the testimony of every other person with knowledge of relevant facts (notably Mathew's supervisors who tried so hard to lead her to success), reject the perspectives of women in the same department who had also been pregnant and were mothers

themselves, and believe that the sole alleged discriminator (who was herself a mother of young children) intentionally discriminated against Mathew because Mathew was pregnant and then convinced everyone else to cover for her discriminatory animus.

Based on the applicable law and the summary judgment evidence, Santander is entitled to summary judgment on Mathew's claims.[2]

## II.
## BACKGROUND FACTS

### A.      Santander

Santander is a consumer finance company focused on vehicle finance and third-party servicing.[3]  Santander is headquartered in Dallas, Texas.[4]

#### 1.      *Equal Opportunity Employer*

Santander is an equal opportunity employer, committed to providing equal opportunity to all persons regardless of race, color, sex, creed, gender (including identity and expression), religion, national origin or ancestry, ethnicity, age, marital status, registered domestic partner status, sexual orientation, disability, physical or mental disability, medical condition including genetic characteristics, veteran status or any other legally protected basis.[5]

#### 2.      *Anti-Harassment and Anti-Discrimination Policy*

In addition to equal opportunity policies, Santander has an Anti-Harassment and Anti-Discrimination Policy.[6]  The policy prohibits unlawful discrimination or harassment of any

---

[2] Mathew took the deposition of Ms. Perez the day before Santander filed its motion for summary judgment, and the transcript was not available at that time.  As a result, Santander envisions that it may have to seek leave of court to include, either in its reply brief or another filing, excerpts from Ms. Perez's deposition that would address arguments or evidence Mathew includes in her response brief.

[3] Defendant's Appendix in Support of Its Motion for Summary Judgment ("APP") at 1, Declaration of Yessica Perez ("Perez Decl."), ¶ 3; APP at 15, Declaration of Sabrina Boyd ("Boyd Decl."), ¶ 3.

[4] APP at 1, Perez Decl., ¶ 3; APP at 15, Boyd Decl., ¶ 3.

[5] APP at 1, Perez Decl., ¶ 4; APP at 15–16, Boyd Decl., ¶ 43; APP at 66–67, Excerpts of the Santander Consumer USA Inc. Associate Handbook, 5–6 (2013) ("Associate Handbook").

[6] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5.

kind.[7]  Furthermore, the policy outlines a complaint procedure for associates who feel they have experienced job-related harassment.[8]  If an associate feels that he/she has been treated in an unlawful, discriminatory manner, he/she should promptly report the incident to his/her manager and/or Human Resources.[9]  Managers are required to immediately report any such claims to Human Resources as well.[10]  Human Resources then investigates the matter, takes the appropriate action if necessary, and is mindful to keep complaints confidential to the extent possible, consistent with Santander's need to conduct the investigation and take any necessary action.[11]  If an associate feels that he/she is experiencing any job-related harassment from a member of Human Resources, he/she is instructed to go immediately to Santander's Legal Department.[12]

Santander's Anti-Harassment and Anti-Discrimination Policy also specifically states that retaliation is prohibited by Santander's policies and the law.[13]  Associates are informed that if they think they have been retaliated against, they may file a complaint with the appropriate agency and that the nearest office can be located at www.eeoc.gov.[14]

### B.    Mathew's Employment with Santander

Mathew came to work at Santander in January 2011, as a Human Resources Business Partner ("HRBP") at Santander's Lewisville, Texas location.  In this role, Mathew was responsible for, among other things, managing employee relations issues, processing employee disciplinary actions, and conducting investigations into employee conduct as necessary.[15]  Mathew reported to

---

[7] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5; APP at 68–70, Associate Handbook, 10–12.
[8] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5; APP at 68–70, Associate Handbook, 10–12.
[9] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5; APP at 68–70, Associate Handbook, 10–12.
[10] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5; APP at 68–70, Associate Handbook, 10–12.
[11] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5; APP at 68–70, Associate Handbook, 10–12.
[12] APP at 2, Perez Decl., ¶ 5; APP at 16, Boyd Decl., ¶ 5; APP at 68–70, Associate Handbook, 10–12.
[13] APP at 2, Perez Decl., ¶ 6; APP at 16, Boyd Decl., ¶ 6.
[14] APP at 2, Perez Decl., ¶ 6; APP at 16, Boyd Decl., ¶ 6.
[15] *Id.*

HR Manager Angelina Hullum for several years.[16]

### 1. Mathew Had Challenges While Under Angelina Hullum

Although Mathew would argue that her job performance under Ms. Hullum was flawless, that is simply not true. While she reported to Ms. Hullum, Mathew exhibited performance deficiencies.[17] Specifically, Ms. Hullum noted the following incidents when Mathew's job performance was either brought into question or failed to meet expectations:

- **January 2015:** Mathew did not process a termination timely. When Ms. Hullum asked her to look into this, Mathew simply stated that she needed to "be more cognizant when Melissa [Lawson] sends those over."[18] As this had been an ongoing issue, Ms. Elad and Jessica Gleason, another Santander Director, Human Resources, made the decision to have Ms. Lawson, an HR Generalist, process all terminations going forward.[19] Ms. Elad advised Ms. Hullum to have a conversation with Mathew about this.[20]

- **April 9, 2015:** Mathew submitted her March recap to Ms. Hullum three days late, and only after Ms. Hullum followed up with her.[21] Mathew's monthly recap reflected significantly less meetings with business personnel than her HRBP ("HRBP") counterparts, and failed to quantify the meetings with business leaders as was requested by Ms. Hullum.[22] The recap reflected that Mathew had participated in only two side-by-side meetings with managers and only four jumpstarts during the month.[23] Mathew also failed to indicate the number of meetings she had that month with business leaders.[24]

- **May 18, 2015:** Mathew submitted a monthly recap which reflected the fact that she did not attend *any* jumpstarts for the month, did not conduct *any* trainings, and the number of meetings with business leaders was again not included.[25]

- **July 1, 2015:** Mathew sends an Instant Message ("IM") to Ms. Hullum at 9:15 a.m. requesting to leave at 1:00 p.m. that day to attend a doctor's appointment,

---

[16] APP at 2, Perez Decl., ¶ 9.
[17] APP at 3, Perez Decl., ¶ 11.
[18] APP at 115–118, E-mail message exchange between Ms. Hullum and Mathew on January 22, 2015.
[19] APP at 21, Declaration of Stephanie Elad ("Elad Decl."), ¶ 6; APP at 115–118, E-mail message exchange between Ms. Hullum and Ms. Elad on January 22, 2015.
[20] APP at 21, Elad Decl., ¶ 6; APP at 115–118, E-mail message exchange between Ms. Hullum and Ms. Elad on January 22, 2015.
[21] APP at 134–137, E-mail message exchange between Ms. Hullum and Mathew on April 9, 2015.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] APP at 138, E-mail message from Mathew to Ms. Hullum on May 18, 2015.

providing a same day notification.[26]

- **July 10, 2015:** Ms. Hullum asked Mathew to support the Credit Card Department at 8585 due to the shortage of staff and unbalanced workload, to which Mathew asked for assistance felt overwhelmed with current duties.[27]

- **August 12, 2015:** Ms. Elad received a call from Scott Dieckmann (SVP Loan Servicing, Consumer Lending) because Mathew sent one of his associates an e-mail message requesting that she acknowledge her receipt and understanding of Santander's Security Policy.[28]   Mr. Dieckmann was upset because Mathew's request was interpreted by the business and associate as if the associate had done something wrong.[29]   In reality, the issue was related to a gap in Santander's processes.[30]   Ms. Elad coached Mathew on this and stated that she has to think critically to evaluate situations and not blindly follow process.[31]

- **August 13, 2015:** Mathew's monthly recap reflected that she held *only one* side-by-side meeting, attended three jumpstarts, and she had over 10 meetings with business leaders, and recapped only one training that she had with a manager.[32]

- **August 2015:** Ms. Hullum asked Mathew to complete a time study to determine what she was spending her time on, in light of her insistence that her workload was too heavy.[33]   Ms. Hullum had to ask Mathew to complete the study twice because Mathew's first attempt did not meet her expectations.[34]   The time study reveals inefficiencies, such as Mathew spending 3 hours and 15 minutes to draft the "July Recap," which was an e-mail message consisting of less than one page.[35]

### 2.    *Mathew Starts Reporting to Yessica Perez*

On September 1, 2015, Yessica Perez took over the HR Manager position at Santander's

Lewisville, Texas office, and became Mathew's direct supervisor.[36]   Shortly after Ms. Perez began

to supervise Mathew, Ms. Hullum shared with Ms. Perez many of the incidents in which Mathew's

---

[26] APP at 139, E-mail message from Kristen Lagunes to Ms. Hullum on July 1, 2015.

[27] APP at 140–141, E-mail message from Ms. Hullum to Mathew on July 10, 2015.

[28] APP at 21, Elad Decl., ¶ 7; APP at 142–145, E-mail message exchange between Mathew to Jeffrey Wiener on August 12, 2015; APP at 195–196, E-mail message from Ms. Elad to Ms. Blackburn on December 10, 2015.

[29] APP at 21, Elad Decl., ¶ 7; APP at 195–196, E-mail message from Ms. Elad to Ms. Blackburn on December 10, 2015.

[30] APP at 21, Elad Decl., ¶ 7; APP at 195–196, E-mail message from Ms. Elad to Ms. Blackburn on December 10, 2015.

[31] APP at 21, Elad Decl., ¶ 7; APP at 195–196, E-mail message from Ms. Elad to Ms. Blackburn on December 10, 2015.

[32] APP at 145–146, E-mail message from Mathew to Ms. Hullum on August 13, 2015.

[33] APP at 147, E-mail message from Mathew to Ms. Hullum on August 19, 2015.

[34] APP at 147, E-mail message from Ms. Hullum to Ms. Perez on December 1, 2015.

[35] APP at 3, Perez Decl., ¶ 11; APP at 148, Mathew's Time Study.

[36] APP at 3, Perez Decl., ¶ 9.

performance did not meet expectations while she was reporting to Ms. Hullum.[37]

Despite Mathew's history of poor performance, Ms. Perez wanted to give her a clean start under her leadership.[38]  For that reason, shortly after Ms. Perez began to supervise Mathew, Ms. Perez met with Mathew one-on-one to discuss her 2015 Mid-Year Review and assess how Ms. Perez could help her in reaching her goals and improving.[39]  As a result, Ms. Perez set up weekly one-on-one coaching meetings with Mathew.[40]

During these one-on-one meetings, Ms. Perez coached Mathew on areas she was performing poorly and provided guidance on how Mathew could improve.[41]

Unfortunately, Mathew's performance did not improve after Ms. Perez began to supervise her, despite Ms. Perez's efforts to coach her.[42]  Rather, Mathew regularly failed to meet performance expectations, as demonstrated in the following incidents:

- **September 17, 2015:** Mathew sends Ms. Perez an IM at 9:29 a.m. asking if she could leave at 1:00 p.m. or 2:00 p.m. that day, providing same day notification.[43]

- **September 28, 2015:** Mathew informed Ms. Perez that she felt overwhelmed with her workload.[44]  Ms. Perez informed her that the HRBP role requires a high level of efficiency.[45]

- **October 29, 2015:** Brad Denetz, the Site Director, went to Ms. Perez's office to discuss having approximately 10 disciplinary actions outstanding that he needed as soon as possible.[46]  When Ms. Perez asked Mathew about those disciplinary actions, she stated that she would have them to Mr. Denetz by that Friday.[47]

- **October 29, 2015:** Mathew again provided last-minute notification that she would

---

[37] APP at 3, Perez Decl., ¶ 11.

[38] APP at 3, Perez Decl., ¶ 12.

[39] APP at 3, Perez Decl., ¶ 12; APP at 153, Outlook calendar appointment between Ms. Perez and Mathew on September 14, 2015.

[40] APP at 3, Perez Decl., ¶ 12; APP at 150–157, Outlook calendar appointments between Ms. Perez and Mathew.

[41] APP at 3, Perez Decl., ¶ 13; APP at 164–170, Ms. Perez's handwritten notes between September 28, 2014 and December 9, 2015.

[42] APP at 4, Perez Decl., ¶ 14.

[43] APP at 4, Perez Decl., ¶ 14; APP at 171, IM conversation between Mathew and Ms. Perez on September 17, 2015.

[44] APP at 4, Perez Decl., ¶ 14; APP at 164, Ms. Perez's handwritten notes on September 28, 2015.

[45] APP at 4, Perez Decl., ¶ 14; APP at 164, Ms. Perez's handwritten notes on September 28, 2015.

[46] APP at 4–6, Perez Decl., ¶ 14; APP at 174, IM conversation between Mathew and Ms. Perez on October 29, 2015.

[47] APP at 4–6, Perez Decl., ¶ 14; APP at 174, IM conversation between Mathew and Ms. Perez on October 29, 2015.

miss work.[48]   Specifically, she informed Ms. Perez in the late afternoon that she has a doctor's appointment in the morning.[49]   This late notice required Ms. Perez to rearrange her schedule to provide coverage at the office.[50]

- **November 2, 2015:** Ms. Elad overheard Mathew and Ms. Boyd spend an inappropriate amount of time on a bereavement request.[51]   Ms. Elad was concerned that their time could have been better spent on more productive matters.[52]

- **November 16, 2015:** Mathew sends Ms. Perez an IM at 9:53 a.m. asking if she could leave at 3:00 p.m. that day, providing same day notification.[53]

- **November 20, 2015:** Mathew informed Ms. Perez that she felt she was extremely busy and needed help with her workload.[54]   She asked Ms. Perez if another HRBP, Hortensia Perez ("Tensya"), could assist her with her workload.[55]   Ms. Perez granted her request, and Tensya took over a pending investigation that was originally assigned to Mathew.[56]

- **November 23, 2015:** On Saturday, November 21, 2015, an associate sent Mathew her resignation notice.[57]   Mathew was responsible for processing the termination first thing the following Monday morning.[58]   Mathew failed to timely process this termination, resulting in a risk event.[59]   Upon reviewing the investigation, Ms. Perez learned that the complaining employee alleged that she could not trust her Assistant Vice President ("AVP") because the AVP was good friends with the manager about whom the complaining employee was making allegations.[60]   When Mathew had assumed the responsibility of conducting the investigation, she obviously ignored the employee's allegation, demonstrated by the fact that Mathew interviewed the complaining employee and the AVP together.[61]   Mathew then

---

[48] APP at 4–6, Perez Decl., ¶ 14; APP at 173, E-mail message from Ms. Perez to Ms. Elad on October 29, 2015.

[49] APP at 4–6, Perez Decl., ¶ 14; APP at 173, E-mail message from Ms. Perez to Ms. Elad on October 29, 2015.

[50] APP at 4–6, Perez Decl., ¶ 14; APP at173, E-mail message from Ms. Perez to Ms. Elad on October 29, 2015.

[51] APP at 4–6, Perez Decl., ¶ 14; APP at 21, Elad Decl., ¶ 10; APP at 175, E-mail message from Ms. Elad to Ms. Perez on November 2, 2015.

[52] APP at 4–6, Perez Decl., ¶ 14; APP at 21, Elad Decl., ¶ 10; APP at 175, E-mail message from Ms. Elad to Ms. Perez on November 2, 2015.

[53] APP at 4–6, Perez Decl., ¶ 14; APP at 176, IM conversation between Mathew and Ms. Perez on November 16, 2015.

[54] APP at 4–6, Perez Decl., ¶ 14; APP at 177, IM conversation between Mr. Dieckmann and Mathew on November 20, 2015.

[55] APP at 4–6, Perez Decl., ¶ 14; APP at 177, IM conversation between Mr. Dieckmann and Mathew on November 20, 2015.

[56] APP at 4–6, Perez Decl., ¶ 14; APP at 177, IM conversation between Mr. Dieckmann and Mathew on November 20, 2015.

[57] APP at 4–6, Perez Decl., ¶ 14; APP at 180–181, E-mail message from Deirdre Crouch on November 21, 2015.

[58] APP at 4–6, Perez Decl., ¶ 14; APP at 187–188, E-mail exchange between Ms. Elad and Holly Hanes on November 25, 2015.

[59] APP at 4–6, Perez Decl., ¶ 14; APP at 187–188, E-mail exchange between Ms. Elad and Holly Hanes on November 25, 2015.

[60] APP at 4–6, Perez Decl., ¶ 14; APP at 184, E-mail message from Ms. Elad to Michelle Whatley on November 24, 2015.

[61] APP at 4–6, Perez Decl., ¶ 14; APP at 199–201, E-mail message from Ms. Perez to Ms. Elad on December 15, 2015.

concluded that none of the complaining employee's complaints was substantiated.[62]

After learning about the inadequacies of the initial investigation conducted by Mathew, Ms. Perez conducted her own investigation, which resulted in substantiating some of the allegations made by the complaining employee.[63]  When discussing the situation with her, Mathew informed Ms. Perez that she (1) did not read the e-mail message sent by the complaining employee in its entirety, and (2) did not believe the complaining employee during the investigation.[64]  In response, Ms. Perez reprimanded Mathew, informing her that she must always investigate complaints with an open and fair mind.[65]

- **November 24, 2015:**  Mathew sent Ms. Perez an IM at 11:19 a.m. informing her that she would be taking a long lunch to go to a doctor's appointment, providing same day notification.[66]

- **November 24, 2015:** Mathew again complained about her workload, asking that someone assist her with a pending project.[67]  When Ms. Perez explains the busy workloads of the rest of the team members and asks what Mathew has going on, she says she overwhelmed and has to leave to go to a doctor appointment.[68]

### 3. *Mathew is Placed on a Performance Improvement Plan*

Due to Mathew's ongoing performance issues, Ms. Perez consulted Ms. Elad about next steps regarding Mathew.[69]  Ms. Elad then consulted with her supervisor, Pamela Blackburn, Executive Vice President of HR.[70]  Ms. Blackburn suggested that Ms. Elad and Ms. Perez place Mathew on a PIP to provide her with another opportunity to improve her performance.[71]  Santander determined that, based on Mathew's poor performance in a number of categories, a PIP was the

---

[62] APP at 4–6, Perez Decl., ¶ 14; APP at 199–201, E-mail message from Ms. Perez to Ms. Elad on December 15, 2015.
[63] APP at 4–6, Perez Decl., ¶ 14; APP at 199–201, E-mail message from Ms. Perez to Ms. Elad on December 15, 2015.
[64] APP at 4–6, Perez Decl., ¶ 14; APP at 199–201, E-mail message from Ms. Perez to Ms. Elad on December 15, 2015.
[65] APP at 4–6, Perez Decl., ¶ 14; APP at 199–201, E-mail message from Ms. Perez to Ms. Elad on December 15, 2015.
[66] APP at 4–6, Perez Decl., ¶ 14; APP at 264, IM conversation between Mathew and Ms. Perez on November 24, 2015.
[67] APP at 4–6, Perez Decl., ¶ 14; APP at 182, E-mail exchange between Ms. Elad and Ms. Perez on November 24, 2015.
[68] APP at 4–6, Perez Decl., ¶ 14; APP at 182, E-mail exchange between Ms. Elad and Ms. Perez on November 24, 2015.
[69] APP at 6, Perez Decl., ¶ 15; APP at 22, Elad Decl., ¶ 11.
[70] APP at 6, Perez Decl., ¶ 15; APP at 22, Elad Decl., ¶ 12; APP at 183, E-mail message from Ms. Elad to Ms. Blackburn on November 24, 2015.
[71] APP at 6, Perez Decl., ¶ 15.

appropriate mechanism by which to manage her performance, as a written warning on her poor performance on a specific category would not capture the bigger picture of how she needed to improve her performance in a number of categories.[72]  On December 1, 2015, I met with Mathew to discuss her poor performance and provide her with the 30-day PIP.[73]

### 4.    *Mathew's Poor Performance Continues*

After receiving this 30-day PIP, Mathew's poor performance continued.  The following are a few examples of that ongoing poor performance:

- **December 8, 2015:** Mr. Dieckmann wrote to Ms. Perez, expressing his concerns with Mathew's performance as his department's HRBP.[74]  Specially, he described Mathew's behavior as "bullying," complained that Mathew did not involve management in areas in which he believed management should have been involved, and explained why he believed her investigation into an employee complaint was flawed.[75]  In particular, in the instance he described, Mathew had told a manager that she was "sure" an event that the complaining employee described occurred, despite having found no corroborating evidence, and in fact being told by witnesses that the event alleged by the complaining employee did not occur.[76]

- **December 28, 2015:** Santander experienced a payroll issue that required an HR professional from every location to assist in resolving the issue.[77]  Ms. Perez asked Mathew to work on this issue.[78]  Mathew was unable to complete this task on her own, resulting in Ms. Perez had to ask Sabrina Boyd, the HR Generalist, to assist with the payroll issue.[79]  Ms. Boyd worked to find a resolution without difficulty.[80]

---

[72] APP at 6, Perez Decl., ¶ 16.

[73] APP at 6–7, Perez Decl., ¶ 17; APP at 189–192, Mathew's 30-day PIP.

[74] APP at 6–7, Perez Decl., ¶ 17; APP at 193–194, E-mail message from Mr. Dieckmann to Ms. Perez on December 8, 2015.

[75] APP at 6–7, Perez Decl., ¶ 17; APP at 193–194, E-mail message from Mr. Dieckmann to Ms. Perez on December 8, 2015.

[76] APP at 6–7, Perez Decl., ¶ 17; APP at 193–194, E-mail message from Mr. Dieckmann to Ms. Perez on December 8, 2015.

[77] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.

[78] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.

[79] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.

[80] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.

### 5. *Mathew Disagrees with PIP and Alleges Wrongdoing by Ms. Perez*

Mathew disagreed with the PIP that she received on December 1, 2015, and complained internally about her annual performance review and the PIP.[81]  Mathew even accused Ms. Perez of issuing the PIP because of her pregnancy and because she is "Brown."[82]  Mr. Shaffer (VP Human Resources Business Partnership) conducted a thorough investigation into Mathew's complaints, including interviewing relevant witnesses and reviewing numerous relevant documents, including those submitted by Mathew.[83]  Mr. Shaffer documented his investigation in a six-page, single-spaced report.[84]

Mr. Shaffer found that Mathew's performance had been lacking, but that, while "there were good intentions by the management team," they had "not done a totally effective job in managing Reena Mathew, especially in holding her accountable for her mistakes and poor performance at times."[85]  In light of his findings, Mr. Shaffer recommended that Santander provide Mathew with a PIP that included a 90-day action plan for her to improve, and have weekly check-in's and monthly reviews.[86]  Mr. Shaffer also found that Mathew should receive a "Meets" rating on her 2015 performance evaluation, and that her PIP would not affect her upcoming bonus or merit.[87]  Mr. Shaffer explained that, while Mathew did have performance gaps, because her management team did not document her performance issues until late 2015, it should not affect her 2015 rating and compensation.[88]

---

[81] APP at 167–169, Ms. Perez' handwritten notes from her meeting with Mathew (December 1, 2015).
[82] *Id.*  Mathew admits that she did accuse Ms. Perez of discriminating against her because of her pregnancy, but denies that she accused Ms. Perez of discriminating against her because she is Brown.  APP at 60, Mathew Dep. 250:16–20.
[83] APP at 234–239, Final Report by Mr. Shaffer.
[84] APP at 234–239, Final Report by Mr. Shaffer.
[85] APP at 238–239, Final Report by Mr. Shaffer.
[86] APP at 238–239, Final Report by Mr. Shaffer.
[87] APP at 238–239, Final Report by Mr. Shaffer.
[88] APP at 238–239, Final Report by Mr. Shaffer.

### 6.   Mathew Receives a 90-Day PIP and Action Plan

Consistent with Mr. Shaffer's recommendations, on January 15, 2016, Ms. Elad and Ms. Perez placed Mathew on a 90-day PIP and provided her with a 90-day action plan.[89]  In this PIP, they identified performance standards for Mathew's job, along with a description of how her performance to date had failed to meet those standards.[90]  The 90-day action plan indicated three areas of focus: attendance; time management/effective work habits; and consulting.[91]  Ms. Elad and Ms. Perez then provided Mathew with tasks associated with each of these areas of focus, along with a description of any support or resources that were available to assist her in making the necessary improvements to her performance.[92]  For example, they offered to provide Mathew with additional training on a number of topics, and asked her to request the training by February 5, 2016.[93]  Additionally, in light of Mathew's continual complaints that her workload was too heavy to handle, they reassigned the work associated with Santander's 8585 location to another member of the team.[94]  Finally, they informed Mathew that she would have biweekly reviews with Ms. Perez to discuss her performance in each of the areas of focus.[95]

### 7.   Mr. Shaffer Meets with Mathew

On January 20, 2016, Mr. Shaffer (VP Human Resources Business Partnership, which was three levels above Mathew) met with Mathew to discuss the 90-day PIP and Action Plan as well as the results of his investigation of her complaints.[96]  During that conversation, Mr. Shaffer explained the following to Mathew:

- The PIP provided to Mathew on December 1, 2015, had been revoked and now

---

[89] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[90] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[91] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[92] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[93] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[94] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[95] APP at 7, Perez decl., ¶ 18; APP at 210–218, PIP with 90 Day Action Plan (January 15, 2016).
[96] APP at 228–233, E-mail exchange between Mr. Shaffer and Mathew on January 25–27, 2016.

should be considered to have served her with notice of her performance deficiencies;

- Consistent with Mathew's input that a 30-day PIP was not sufficient time to accomplish the goals, the 30-day PIP had been revoked and she had been placed on a 90-day PIP with an action plan instead;

- Mathew's PIP was *not* a last resort document, but a documented step to put an action plan in place for her to work to improve her performance;

- Mathew would receive her bonus and merit increase for 2015 because much of the feedback that she received and the consequences that would go along with that feedback were provided late in the review process, and she should not be financially penalized at that point; and

- Mr. Shaffer encouraged Mathew to meet with Ms. Perez, Ms. Hullum and Ms. Elad to discuss her performance and get their feedback.[97]

At the conclusion of this meeting, Mr. Shaffer instructed Mathew to send to him a summary of their conversation by 8:00 a.m. on Monday, January 25, 2016.[98] At 10:58 a.m. on Monday, January 25, 2016, Mr. Shaffer sent Mathew an e-mail message noting that she had not sent him the summary, her failure to timely submit the summary was unacceptable, and he expected to see the summary from her no later than noon that day.[99] At 11:51 a.m., Mathew sent an e-mail message to Mr. Shaffer consisting of five sentences, none of which summarized the meeting she had with Mr. Shaffer on January 20, 2016.[100]

Within an hour, Mr. Shaffer responded to Mathew's e-mail message, informing her that her e-mail message at 11:51 a.m. was not the summary that he had requested and noting that her failure to comply with his request to send a summary of their conversation was an example of the coaching and feedback that she had been receiving regarding her performance.[101] Mr. Shaffer reiterated that her success at Santander was desired and sincerely hoped for, but that she needed to

---

[97] APP at 228–233, E-mail exchange between Mr. Shaffer and Mathew on January 25–27, 2016.
[98] APP at 228–233, E-mail exchange between Mr. Shaffer and Mathew on January 25–27, 2016.
[99] *Id.*
[100] *Id.*
[101] *Id.*

demonstrate the effort and produce the results.[102]  He then asked if her five-sentence e-mail message was her final submission of the summary of their conversation from January 20, 2015.[103] Mathew responded to Mr. Shaffer's e-mail later that day, providing a short summary of their conversation on January 20, 2015.[104]  Mr. Shaffer responded to Mathew, providing extensive responses to her short summary.[105]

### 8.    *Mathew Continues to Perform Below Expectations*

On January 29, 2016, Ms. Perez met with Mathew to discuss her performance at a first biweekly follow-up meeting.[106]  Mathew claimed that she had been properly providing Ms. Perez with 48 hours'-notice before taking time off, which Ms. Perez found met expectations as to the focus area of attendance.[107]  Ms. Perez and Mathew then discussed Mathew's time study, in which Mathew had documented what she did throughout the day and how much time she devoted to each item.[108]  Ms. Perez reminded Mathew that when she received a project, it was important to respond timely.[109]  Further, if she found herself unable to complete an assignment on time, she needed to provide an update or explanation of what occurred, along with a new estimated time of completion.[110]

During the January 29, 2016, meeting, Ms. Perez asked Mathew if she would like to attend any type of class to assist her in meeting her PIP objectives, and asked her to identify any courses she would like to attend no later than February 5, 2016.[111]  Mathew responded by telling Ms. Perez

---

[102] *Id.*
[103] *Id.*
[104] *Id.* Mathew's summary of the January 20, 2015 meeting is the blue text included in the e-mail message dated January 25, 2016.  The red text is Mr. Shaffer's response to her summary of their January 20, 2015 meeting.
[105] *Id.*
[106] APP at 7–8, Perez Decl., ¶ 20; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.
[107] APP at 7–8, Perez Decl., ¶ 20; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.
[108] APP at 7–8, Perez Decl., ¶ 20; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.
[109] APP at 7–8, Perez Decl., ¶ 20; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.
[110] APP at 7–8, Perez Decl., ¶ 20; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.
[111] APP at 8, Perez Decl., ¶ 21; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.

that if she came across any classes she wanted to take, she would let her know.[112]

During the course of the next two weeks, Mathew failed to fully meet Ms. Perez's expectations in completing her work on a timely basis, and in following instructions.[113]   For example, in one instance, Ms. Elad had instructed Mathew to eliminate specific information from an investigation report.[114]   Yet, the investigation report submitted by Mathew contained the very information that Ms. Elad had asked her to not include.[115]   Additionally, the deficient report was submitted late.[116]

Accordingly, on February 17, 2016, Ms. Elad and Ms. Perez met with Mathew to further discuss her performance during a second biweekly follow-up meeting.[117]   In this conversation, Ms. Elad and Ms. Perez conveyed their observations that Mathew was still not completing her work on a timely basis, and that she had failed to follow instructions regarding employee investigations.[118] Ms. Elad and Ms. Perez coached Mathew regarding their expectation that she timely complete her work and that she follow instructions when completing employee investigations.[119]   Ms. Elad and Ms. Perez then further analyzed Mathew's recent failure to follow instructions when she submitted the report containing the very information that Ms. Elad asked her to remove.[120]   They also pointed

---

[112] APP at 8, Perez Decl., ¶ 21; APP at 244, E-mail message from Mathew to Ms. Perez on February 1, 2016.
[113] APP at 8, Perez Decl., ¶ 22; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[114] APP at 8, Perez Decl., ¶ 22; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[115] APP at 8, Perez Decl., ¶ 22; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[116] APP at 8, Perez Decl., ¶ 22; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[117] APP at 8, Perez Decl., ¶ 23; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[118] APP at 8, Perez Decl., ¶ 23; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[119] APP at 8, Perez Decl., ¶ 23; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[120] APP at 8, Perez Decl., ¶ 23; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.

out that Mathew submitted the (deficient) report after the deadline.[121]

Also at the February 17, 2016, meeting, Ms. Elad and Ms. Perez asked Mathew to provide them with more detail when identifying for them how she was utilizing her time.[122]  In particular, they asked that she identify the number of disciplinary actions and investigations that she completes each week, the process that she follows to intake disciplinary actions, and descriptions of other tasks that she completes throughout the week.[123]  This was necessary because Mathew continued to complain, in the meeting, that her workload was too heavy, despite the fact that she had one of the lightest, if not *the* lightest, workload of any of Santander's HRBP's.[124]

After the February 17, 2016, meeting, Ms. Perez asked Mathew to provide her with a written summary detailing their meeting.[125]  Ms. Perez made this request to ensure that Mathew understood and grasped the key takeaways from their meeting.[126]  This practice is not uncommon when administering a performance improvement plan.[127]

Mathew provided to Ms. Perez a very cursory outline of their conversation, which fell below Ms. Perez's expectations.[128]  This outline did not even note the extensive coaching that Ms. Elad and Ms. Perez provided to Mathew regarding timeliness of her work and following

---

[121] APP at 8, Perez Decl., ¶ 23; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[122] APP at 8, Perez Decl., ¶ 24; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[123] APP at 8, Perez Decl., ¶ 24; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[124] APP at 8, Perez Decl., ¶ 24; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[125] APP at 9, Perez Decl., ¶ 25; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[126] APP at 9, Perez Decl., ¶ 25; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[127] APP at 9, Perez Decl., ¶ 25; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[128] APP at 9, Perez Decl., ¶ 26; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.

instructions when conducting an investigation.[129]

Despite the coaching that Ms. Elad and Ms. Perez provided to Mathew regarding timely submitting projects, Mathew continued to miss deadlines.[130]  This untimeliness was not only burdensome to Ms. Perez, but also it impacted the business clients whom they serve.[131]

Ms. Perez also found that, while Mathew was continuing to work on employee investigations as instructed, she was asking Ms. Perez to direct her in her own investigations far more frequently than someone at Mathew's level should have been.[132]  While Ms. Perez appreciated that Mathew was trying to ensure that she did not make any mistakes, Ms. Perez was constantly interrupted by Mathew, each time taking Ms. Perez away from whatever she was working on, to answer questions about investigations that she had expected Mathew to know.[133]  Ms. Perez was overwhelmed by these unnecessary interruptions.[134]  As a result of these interruptions, Ms. Perez was far less productive than she could otherwise be in her own job duties.[135]

On February 26, 2016, Ms. Elad and Ms. Perez met with Mathew to provide her with a 30-day review.[136]  In this meeting, Ms. Elad and Ms. Perez again focused on Mathew's need to improve on her time management and effective work habits.[137]  In doing so, they discussed a recent instance when Mathew failed to submit the information requested of her by the deadline, and how her untimeliness impacted the business that they serve.[138]

---

[129] APP at 9, Perez Decl., ¶ 26; APP at 253–255, E-mail message exchange between Ms. Elad, Ms. Perez and Mathew between February 17–23, 2016.
[130] APP at 9, Perez Decl., ¶ 27.
[131] APP at 9, Perez Decl., ¶ 27.
[132] APP at 9, Perez Decl., ¶ 28.
[133] APP at 9, Perez Decl., ¶ 28.
[134] APP at 9, Perez Decl., ¶ 28.
[135] APP at 9, Perez Decl., ¶ 28.
[136] APP at 9, Perez Decl., ¶ 29.
[137] APP at 9, Perez Decl., ¶ 29.
[138] APP at 9, Perez Decl., ¶ 29.

Also at this February 26, 2016 meeting, Ms. Elad and Ms. Perez discussed with Mathew that she needed to take more initiative when conducting investigations.[139]   In particular, they discussed how Mathew had needlessly interrupted Ms. Perez in her work, prior to performing each of the four investigations that she conducted over the past 30 days.[140]   Ms. Elad and Ms. Perez told Mathew that they expected her to demonstrate more proficiency and confidence in conducting these investigations, and that Ms. Perez would remain available for consultation as needed.[141]   They further noted that, consistent with Mathew's PIP, they had offered her training opportunities, in which Mathew had not even expressed any interest.[142]

Unfortunately, Mathew did not grasp Ms. Elad and Ms. Perez's instruction that she should demonstrate more proficiency and confidence in conducting investigations.[143]   Rather, she continued to go to Ms. Perez seeking guidance at, what seemed to Ms. Perez, every juncture during Mathew's ongoing investigations.[144]

Accordingly, on March 8, 2016, during Ms. Elad and Ms. Perez's third biweekly follow-up meeting with Mathew, they noted that Mathew asked for guidance from Ms. Perez every step of the way while conducting investigations.[145]   They told her that it was their expectation that Mathew would be able to make sound judgment calls on her own, and that she would begin to move toward managing her investigations on her own without constantly asking Ms. Perez for guidance.[146]   In this meeting, they also recognized that Mathew had made some improvements in handling administrative tasks and in being more thorough in investigations.[147]

---

[139] APP at 9, Perez Decl., ¶ 30.
[140] APP at 9, Perez Decl., ¶ 30.
[141] APP at 9, Perez Decl., ¶ 30.
[142] APP at 9, Perez Decl., ¶ 30.
[143] APP at 10, Perez Decl., ¶ 31.
[144] APP at 10, Perez Decl., ¶ 31.
[145] APP at 10, Perez Decl., ¶ 32.
[146] APP at 10, Perez Decl., ¶ 32.
[147] APP at 10, Perez Decl., ¶ 32.

Three days later, on Friday, March 11, 2016, Mathew engaged in behavior which Ms. Perez believe exemplified her poor time-management skills and called into question her integrity.[148]   Specifically, Mathew was working on a project related to rewarding perfect attendance for Santander associates.[149]   As part of that project, Mathew sent an e-mail message to Ms. Elad at 4:28 p.m., in which she told Ms. Elad that she was "partnering" with another department, HRIS, to obtain specific data related to the project.[150]   In this e-mail message, Mathew told Ms. Elad that she wanted to provide Ms. Elad with a "status update" before leaving for vacation that same day.[151]   Mathew asked Ms. Elad if it was okay if she sent Ms. Elad the requested data when she returned from her vacation.[152]   Ms. Elad responded to this e-mail message minutes later, asking if Mathew could get the data to her earlier, as she wanted to get the data to their business client the next week if possible.[153]   Ms. Elad and Ms. Perez later learned that Mathew had not actually "partnered" with HRIS to get the data, as Mathew had represented in her e-mail message.[154]   Rather, Mathew did not request the data from HRIS until *after* she received Ms. Elad's e-mail message requesting her to get the data to her by the next week.[155]

In addition to her poor time management, Ms. Perez found that Mathew did not improve in conducting and managing her own employee investigations.[156]   Rather, despite Ms. Elad and Ms. Perez's continued instruction that she begin to manage her investigations on her own, Mathew continued to constantly seek Ms. Perez's assistance.[157]

---

[148] APP at 10, Perez Decl., ¶ 33.
[149] APP at 10, Perez Decl., ¶ 33.
[150] APP at 10, Perez Decl., ¶ 33.
[151] APP at 10, Perez Decl., ¶ 33.
[152] APP at 10, Perez Decl., ¶ 33.
[153] APP at 10, Perez Decl., ¶ 33.
[154] APP at 10, Perez Decl., ¶ 33.
[155] APP at 10, Perez Decl., ¶ 33.
[156] APP at 10, Perez Decl., ¶ 34.
[157] APP at 10, Perez Decl., ¶ 34.

On March 23, 2016, Ms. Elad and Ms. Perez met with Mathew for their fourth biweekly meeting.[158]  In this meeting, Ms. Elad and Ms. Perez expressed their continued expectation that, as an HRBP, Mathew make independent judgment calls when handling investigations.[159]  They informed Mathew that they expected her to formulate a plan at the beginning of an investigation, and to then make a recommendation to Ms. Perez at the end of the investigation.[160]  They explained to her that, at this point, she was still seeking Ms. Perez's guidance more than they expect for someone at her level.[161]

At the March 23, 2016, meeting, Ms. Elad and Ms. Perez also addressed the situation in which Mathew communicated to Ms. Elad that she had "partnered" with HRIS, when in fact she had not yet contacted that department at all.[162]  When Ms. Elad and Ms. Perez pointed this discrepancy out to Mathew, she did not accept responsibility for her poor time management or her misleading communication.[163]  Instead, Mathew blamed HRIS for not getting the data to her as quickly as she would have liked.[164]

Despite Ms. Perez's continued counseling and coaching, Mathew's performance simply did not improve.[165]  Rather, Mathew continued to seek Ms. Perez's guidance more than was appropriate, failed to timely submit work, and Ms. Perez received negative feedback from their business clients regarding Mathew's work for them.[166]

### 9.    *Mathew Fails to Meet Expectations at Her 90-Day Review*

On April 15, 2016, Ms. Elad and Ms. Perez met with Mathew to provide her with her

---

[158] APP at 11, Perez Decl., ¶ 35.
[159] APP at 11, Perez Decl., ¶ 35.
[160] APP at 11, Perez Decl., ¶ 35.
[161] APP at 11, Perez Decl., ¶ 35.
[162] APP at 11, Perez Decl., ¶ 36.
[163] APP at 11, Perez Decl., ¶ 36.
[164] APP at 11, Perez Decl., ¶ 36.
[165] APP at 11, Perez Decl., ¶ 37.
[166] APP at 11, Perez Decl., ¶ 37.

90-day review.[167]  During this meeting, they discussed with Mathew her overall performance for the past 90 days, focusing on the three areas of focus that were identified in her 90-day action plan: attendance; time management/effective work habits; and consulting.[168]  They informed Mathew that they felt she met expectations as to attendance, but failed to meet expectations as to time management/effective work habits and consulting.[169]  They identified Mathew's performance failures in the following areas: (1) providing detail in the work she submitted;| (2) submitting accurate work product; (3) meeting deadlines; (4) timely following up when working on a project; (5) providing thorough and quality work product; and (6) contributing to the team by completing administrative tasks as needed.[170]  They also informed Mathew that they felt she did not meet expectations in her consulting, as exemplified by her (1) failure to push back on the business when necessary to complete her job, (2) demonstrating a lack of accountability for her own behaviors, and (3) inappropriately addressing the business clients after they provided Ms. Perez with negative feedback regarding her performance, by challenging the feedback the business clients provided to Ms. Perez.[171]

Ms. Elad and Ms. Perez concluded the April 15, 2016, meeting by providing Mathew with some feedback they received from the business clients regarding her performance, which included the following:

- "Limited interactions, but it has been better since January.  I'd rather just go to someone else on the HR team to get it done right.  They are always helpful and on point."

- "I am getting [disciplinary actions] within 2 days.  I never get it within 24 hours though, which is what I thought the expectation was."

---

[167] APP at 11, Perez Decl., ¶ 38; APP at 24, Elad Decl., ¶ 23; APP at 261–263, Mathew's 90-day Review.
[168] APP at 11, Perez Decl., ¶ 38; APP at 24, Elad Decl., ¶ 23; APP at 261–263, Mathew's 90-day Review.
[169] APP at 11, Perez Decl., ¶ 38; APP at 24, Elad Decl., ¶ 23; APP at 261–263, Mathew's 90-day Review.
[170] APP at 11, Perez Decl., ¶ 38; APP at 24, Elad Decl., ¶ 23; APP at 261–263, Mathew's 90-day Review.
[171] APP at 11, Perez Decl., ¶ 38; APP at 24, Elad Decl., ¶ 23; APP at 261–263, Mathew's 90-day Review.

- "I enjoy working with her but notice that with difficult conversations she is timid and struggles. She asked me to sit in on a conversation and when it got difficult she said that I would take over. This wasn't my Associate and I was unprepared."

- "She doesn't like making decisions without checking with her manager. She isn't confident when dealing with issues. She is scared to make decisions."

- "I had to sit in on a term that [Mathew] was supposed to handle. [Mathew] got flustered and turned it back to me to handle. It's obvious that she can't handle conflict."

- "She has had to ask for an extension (beyond 2 days) for a [disciplinary action]."

- "I'm much more comfortable and confident working with others on the HR team because they respond timely and are confident in their decision making process."

- "She is very nice. Just don't ask her for anything."[172]

Throughout this meeting, Mathew was defensive and claimed that she was getting picked on for every mistake.[173] Rather than accept responsibility for any of her actions, she blamed Ms. Perez, accusing her of being a bad manager.[174] Mathew said that Ms. Perez failed to check her work before sending it to Ms. Elad, did not ensure she met her deadlines, and did not often enough help her or remind her of things.[175]

### 10. *Santander Terminates Mathew's Employment*

As a result of Mathew's ongoing performance issues and her failure to improve her performance despite receiving a 90-day action plan and a PIP, Ms. Elad, Mr. Shaffer, and Ms. Perez decided to terminate Mathew's employment.[176] On April 19, 2016, Ms. Elad and Ms. Perez

---

[172] APP at 12, Perez Decl., ¶ 39; APP at 25, Elad Decl., ¶ 24.
[173] APP at 12, Perez Decl., ¶ 39; APP at 25, Elad Decl., ¶ 24.
[174] APP at 12, Perez Decl., ¶ 39; APP at 25, Elad Decl., ¶ 24.
[175] APP at 12, Perez Decl., ¶ 39; APP at 25, Elad Decl., ¶ 24.
[176] APP at 12, Perez Decl., ¶ 40; APP at 24, Elad Decl., ¶ 22.

met with Mathew to inform her that her employment with Santander was terminated because of her ongoing performance issues.[177]

### 11.    Mathew is Replaced by Sabrina Boyd, a Female Colleague

Mathew was replaced by Ms. Boyd, who had been promoted from the position of HR Generalist.[178]   Thereafter, Ms. Boyd consistently met Ms. Perez's expectations as an Employee Relations Consultant (formerly HRBP).[179]

### C.    Mathew's Charge of Discrimination

On or about May 4, 2016, Mathew filed this Charge of Discrimination.[180]   In her Charge, Mathew claims that she was discriminated against because of her gender and pregnancy, and that she was wrongfully retaliated against.[181]

### D.    Mathew Files this Lawsuit

On July 7, 2023, Mathew filed this lawsuit.[182]   Mathew asserts that Santander discriminated against her because of her sex and pregnancy by: (1) placing her on two PIP's; (2) denying her payment of her 2015 year-end bonus and merit pay increase; and (3) terminating her employment.[183]   Mathew also asserts that Santander retaliated against her by: (1) "assigning her busy-work tasks and extra duties;" (2) "subjecting her to daily (or nearly daily) unwarranted criticisms;" and (3) terminating her employment.[184]

Per her sworn deposition testimony, Mathew believes Ms. Perez was the only person at Santander who actually discriminated against her because of her pregnancy, and that Mr. Shaffer

---

[177] APP at 13, Perez Decl., ¶ 42; APP at 26, Elad Decl., ¶ 26.
[178] APP at 13, Perez Decl., ¶ 43.
[179] APP at 13, Perez Decl., ¶ 43.
[180] *See* APP at 64, Mathew's Charge of Discrimination, Charge No. 450-2016-02634.
[181] *See id.*
[182] *See* Pl's Orig. Compl. [ECF No. 1].
[183] *See id.*, at ¶ 46.
[184] *See id.*, at ¶ 52.

(VP of HR Business Partners), Ms. Elad (HR Director) and Ms. Hullum (HR Manager) all simply went along with Ms. Perez because they wanted to support Ms. Perez and/or they wanted to help cover up something that they saw as bad.[185]   Additionally, Mathew claims that three of the Santander employees from the group for which Ms. Perez provided HR services conspired with Ms. Perez to allow Ms. Perez to discriminate against Mathew.[186]

### III.
### SUMMARY JUDGMENT PRINCIPLES

Rule 56(a) of the Federal Rules of Civil Procedure states that the court shall grant summary judgment on a claim or defense if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *Kaye v. BNSF Ry. Co.*, No. 4:17-CV-656-A, 2018 WL 2446594, at *3 (N.D. Tex. May 31, 2018).

The summary judgment movant bears the initial burden of showing that there is no genuine dispute of material fact.  *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986)). The movant can carry this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmovant's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Once the movant has carried its burden under Rule 56(a), the nonmovant must identify specific evidence in the record and articulate the precise manner that creates a genuine dispute of material fact.  *Kaye*, 2018 WL 2446594, at *3; *see also* FED. R. CIV. P. 56(c) ("A party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record...").  A fact is material if it might affect the outcome of the case under the

---

[185] APP at 58, Mathew Dep. 222:1–13.
[186] APP at 61–62, Mathew Dep. 285:4–290:7.

governing law. *Kaye*, 2018 WL 2446594, at *3 (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)). A dispute about a material fact is genuine if the evidence is such that a rational fact finder could resolve the dispute in favor of either party. *Kaye*, 2018 WL 2446594, at *3.

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine dispute for trial and summary judgment is appropriate. *Kaye*, 2018 WL 2446594, at *3 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986)); *see also Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc) (explaining the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict).

## IV.
## ARGUMENT & AUTHORITIES

This Court should grant summary judgment on both of Mathew's claims because the summary judgment evidence demonstrates that there is no genuine issue of material fact, even when viewed in the light most favorable to Mathew. *See Celotex*, 477 U.S. at 322–24.

### A.    Mathew's Pregnancy Discrimination Claim Fails

The *McDonnell Douglas* burden-shifting framework governs claims for discrimination based on pregnancy under Title VII. *See Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219 (5th Cir. 2001). First, Mathew must establish a *prima facie* claim for discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was the subject of an adverse employment action; and (4) she was treated less favorably because of her membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *See Wesley v. Gen. Drivers,*

*Warehousemen & Helpers Local 745,* 660 F.3d 211, 213 (5th Cir. 2011) (citing *Lee v. Kan. City S. Ry. Co.,* 574 F.3d 253, 259 (5th Cir. 2009)); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  Second, if Mathew was successful, the burden of production – but not the burden of proof – shifts to Santander, which must proffer a legitimate, nondiscriminatory reason for the challenged employment action. *See Lee,* 574 F.3d at 259 & n.13 (5th Cir. 2009) (citing *McDonnell Douglas,* 411 U.S. at 802).   Third, if Santander articulates a legitimate, nondiscriminatory reason, Mathew must show that (1) Santander's reason was not true, but is instead a pretext for discrimination; or (2) Santander's reason, while true, is only one of the reasons for its conduct, and another motivating factor was Mathew's sex and/or pregnancy.  *See Keelan v. Majesco Software, Inc.,* 407 F.3d 332, 341 (5th Cir. 2005) (quoting *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004)).

In this case, Mathew's pregnancy discrimination claim should be dismissed because (1) she cannot show that two of the actions on which she bases her discrimination claim were adverse employment actions; (2) she cannot show that she was treated less favorably because of her pregnancy than were other similarly situated employees who were not pregnant, under nearly identical circumstances; and (3) Santander presents a legitimate and nondiscriminatory reason for each of its employment decisions, and she cannot show that reason was pretextual.

### 1.    *Neither Ms. Perez's Request that Mathew Complete a Time Study Nor Her Purported Scrutiny of Mathew's Performance Constitutes an Adverse Employment Action*

Mathew cannot show that Ms. Perez's instruction that she complete a time study or her supposed "scrutiny" of Mathew's work constitutes an adverse employment action.  To plead an adverse employment action, a plaintiff must show that "she was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the 'terms, conditions or

privileges of employment.'"  *See Hamilton v. Dallas County,* 79 F.4th 494, 506 (5th Cir. 2023).

Consistent with the Supreme Court's caution that federal courts are not to "transform Title VII into

a general civility code for the American workplace," the Fifth Circuit has instructed that Title VII

"does not permit liability for de minimus workplace trifles."  *Id.* at 505.

Here, Mathew's pregnancy discrimination claim is based upon the following allegations:[187]

- She was placed on a PIP in December 2015;[188]
- She was placed on a second PIP in January 2016;[189]
- She was criticized for coming to work late/leaving early after getting permission to do so;[190]
- Her work was scrutinized and she was given a heavier workload;[191]
- She was asked to complete a time study;[192] and
- She was terminated by Santander.[193]

Ms. Perez's instruction that Mathew complete a time study did not affect the "terms,

conditions or privileges" of Mathew's employment, despite Mathew's allegation to the contrary.[194]

Mathew does not even criticize her prior supervisor, Ms. Hullum, for having initially instructed

---

[187] Mathew failed to exhaust her administrative remedies with regard to the following two allegations, both of which she claims support her discrimination and retaliation claims: (a) she was given a heavier workload; and (b) she was instructed to complete a time study.  To determine whether Mathew exhausted her administrative remedies as to these two alleged adverse employment actions, the Court must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label" when determining whether those allegations "grow[] out of the charge of discrimination."  *See Lynn v. Wells Fargo Bank, N.A.,* No. 3:13-CV-4721-N, 2014 WL 12834960, at *4 (N.D. Tex. Aug. 25, 2014) (citations omitted).

In her Charge of Discrimination ("Charge"), Mathew alleges the following in support of her discrimination and retaliation claims: (1) she received two PIPs; (2) she was scrutinized; and (3) she was terminated.  *See* APP at 64, Charge of Discrimination.  Mathew never so much as mentions her workload or a time study in her Charge.  *See Lynn,* 2014 WL 12834960, at *4.  Mathew also does not mention being criticized for arriving late or leaving early, although one could conceivably believe that the EEOC's investigation of her Charge may have grown to encompass that allegation by stretching her vague statement in her Charge that she was subjected to "increased scrutiny."  *See id.* Thus, as Mathew's allegations that she was (a) given a heavier workload, and (b) asked to complete a time study are nowhere in her Charge, nor would they reasonably grow out of that Charge, she cannot rely on these allegations in support of her claims.

[188] *See* APP at 55–56, Mathew Dep. 192:23–193:3.
[189] *See id.*
[190] *See* APP at 54, Mathew Dep. 182:17–183:7.
[191] *See* APP at 55–56, Mathew Dep. 192:23–193:5.
[192] *See* APP at 55, Mathew Dep. 192:1–5.
[193] *See* APP at 55–56, Mathew Dep. 192:23–193:12.
[194] *See* APP at 53, Mathew Dep. 179:11–23.

her to complete a time study.[195]  In fact, Mathew admits that Ms. Hullum's instructing her to complete a time study was done with "good intentions."[196]

Mathew can provide no evidence to reconcile how Ms. Perez's instructing her to perform a time study was somehow discriminatory, yet Ms. Hullum's previously asking her to do the same thing was not discriminatory.  It is illogical that the very same instruction—that Mathew complete a time study—would constitute an adverse employment action when made by one supervisor but not by the other.

Mathew's complaint that Ms. Perez scrutinized her work and did not compliment her enough is the exact sort of "de minimus workplace trifle" that the Fifth Circuit excludes from the definition of adverse employment actions.  *See Ortego v. Dep't of Transportation,* No. CV 13-836, 2014 WL 12521695, at *6 (E.D. La. Feb. 18, 2014) (explaining in the context of a retaliation claim, "[w]orkplace criticism and job scrutiny from supervisors do not constitute adverse employment actions.").

### 2. *Mathew Cannot Show that She Was Treated Less Favorably Than Other Similarly Situated Employees Because of Her Pregnancy*

The one individual whom Mathew claims was similarly situated to her and was treated more favorably than she, Ms. Boyd, was actually not similarly situated to Mathew.[197]  Indeed, Ms. Boyd, an HR Generalist, held a less senior position to Mathew and was not held to the same standards.[198]  *See Green v. Costco Wholesale Corp.,* No. 3:15-CV-1868-N, 2017 WL 10110295, at *5 (N.D. Tex. May 30, 2017) (finding the plaintiff failed to establish that other similarly situated individuals outside of her protected class were treated better than she when she failed to show that

---

[195] *See* APP at 53, Mathew Dep. 179:11–17; APP at 50, Mathew Dep. 154:21–156:4 (Angelina Hullum is referred to as "Lina" in Mathew's deposition).
[196] *See id.*
[197] *See* APP at 57, Mathew Dep. 201:10–22; 203:22–204:24.
[198] APP at 9, Boyd Decl., ¶ 9.

the comparator whom she identified "committed similar violations to hers, the same quantity of violations, or that his position in the company was subject to the same standards" her position.). Additionally, Ms. Boyd did not exhibit the ongoing poor performance that Mathew did.[199] *See id.* As Mathew fails to identify a similarly situated employee outside of her protected class who was treated more favorably than she, her claims of pregnancy discrimination based on disparate treatment fails as a matter of law.

It is not surprising that Mathew cannot identify a similarly situated member outside of her protected class who was treated more favorably than she, as a significant number of the individuals within Santander's HR department had been pregnant at or around the time that Mathew was pregnant, and they offer nothing but praise regarding how Santander treated them—both during and after their pregnancies.[200]

### 3.    *Santander's Legitimate and Nondiscriminatory Employment Decisions*

Notwithstanding Mathew's inability to establish a *prima facie* case of pregnancy discrimination, Santander presents a legitimate and nondiscriminatory reason for each of its employment decisions as follows:

#### a.    **Mathew was placed on a PIP in December 2015 due to her ongoing poor performance**

Mathew was placed on a PIP on December 1, 2015, because of her ongoing poor performance.  The PIP specifically identified three categories of performance in which Mathew needed to improve: (1) attendance; (2) timely completion of assignments/relying on the assistance of others; and (3) exemplifying fair and sound judgment.[201]  While Mathew claims that she cannot recall any mistake she has made in her entire career, the evidence clearly shows that her

---

[199] APP at 13, Perez Decl., ¶ 43.
[200] *See* APP at 29–42, Declarations of Tina Mohan, Chistina Stout, Nicole Prior, Whitney Andres, and Fatma Rizvan.
[201] *See* APP at 189–192, Mathew's 30-day PIP.

performance was, at a minimum, not up to her managers' expectations.[202]   The following chart contains a non-exhaustive list of Mathew's performance deficiencies that led to her receipt of a PIP in December 2015.   Each of these performance deficiencies supports one of the three categories of performance in which Mathew needed to improve, as identified in the PIP, and is supported by documentary evidence.[203]

| Performance Deficiency | Documentation Evidencing this Performance Deficiency |
|---|---|
| **Timely Completion of Assignments**<br>In April 2015, Mathew submitted her March recap to Ms. Hullum three days late, and only after Ms. Hullum followed up with her. Mathew's monthly recap reflected significantly less meetings with business personnel than her HRBP counterparts, and failed to quantify the meetings with business leaders as was requested by Ms. Hullum.<br><br>The next column additionally shows, for comparison purposes, HRBP's who were timely submitting their materials.   Also, by reviewing the materials in the Appendix, one can appreciate the better quality of the materials they were submitting. | • *See* APP at 134–137*,* E-mail exchange between Mathew and Ms. Hullum in which Mathew submitted her March 2015 monthly recap three days after the deadline, and only after Ms. Hullum followed up with her. Mathew's March Recap reflects:<br> ○ Two side-by-sides;<br> ○ Four jumpstarts; and<br> ○ Unquantified number of meetings with business leaders.<br><br>• *Compare* APP at 132–133*,* Whitney Andres' March Recap, submitted on the deadline, reflects:<br> ○ Two interviews;<br> ○ Trained five new managers;<br> ○ Attended all Manager CCAP monthly meetings; and<br> ○ Two Call Calibration Meetings.<br><br>• *Compare* APP at 125–126*,* Glenna McDonnel's March Recap, submitted prior to the deadline, reflects:<br> ○ Six side-by-sides;<br> ○ Two jumpstarts;<br> ○ Weekly meeting with Bankruptcy VP and Managers;<br> ○ Customer Care Focus Groups; and |

---

[202] *See* APP at 52, Mathew Dep. 166:12–17.

[203] Of course, Mathew exhibited many other performance deficiencies that were observed by Ms. Hullum and Ms. Perez, but no written documentation was created.   As Mathew testified that she could not recall a single mistake that she made in her career, and will inevitably claim as false any performance deficiency that Santander identifies without providing documentary proof to support it, Santander has limited its list of the performance deficiencies evidencing the necessity of her receipt of the PIP to those for which it has documentary evidence.

| Performance Deficiency | Documentation Evidencing this Performance Deficiency |
|---|---|
| | o Talent Development/Operational Meetings.<br><br>• *Compare* APP at 127–131, Dean Holt's March Recap, submitted prior to the deadline, reflects:<br>o Multiple side-by-sides, including descriptions of two;<br>o Three jumpstarts;<br>o 11+ interviews;<br>o One PIP preparation;<br>o Two job description reviews; and<br>o Two HR trainings. |
| **Attendance:** On July 1, 2015, Mathew sends an IM at 9:15 requesting to leave at 1:00 that day to attend doctor's appointment, providing a same day notification. | *See* APP at 139, E-mail message from Kristen Lagunes to Angelina Hullum of July 1, 2015 transmitting Mathew's last-minute request to leave at 1:00 that day. |
| **Relying on the Assistance of Others:** On July 10, 2015. Ms. Hullum asked Mathew to support the Credit Card Department at 8585 due to the shortage of staff and unbalanced workload.  Mathew then asked for assistance felt overwhelmed with current duties. | *See* APP at 104–141, E-mail message from Ms. Hullum to Mathew on July 10, 2015, informing her of the expectation that she would be taking over the Credit Card Department at 8585; APP at 44–45, Mathew Dep. 48:5–49:6 (Mathew told Ms. Hullum that she felt it was "a lot" when she was assigned to work at 8585). |
| **Timely Completion of Assignments:** In August 2015, Ms. Hullum asked Mathew to complete a time study to determine what she was spending her time on, in light of her insistence that her workload was too heavy. Ms. Hullum had to ask Mathew to complete the study twice because Mathew's first attempt did not meet her expectations.  The time study reveals inefficiencies, such as Mathew spending 3 hours and 15 minutes to draft the "July Recap," which was an e-mail message consisting of less than one page. | *See* APP at 147, E-mail message from Mathew to Ms. Hullum on August 19, 2015, transmitting her time study, including the attached time study which show Mathew spent 3 hours and 15 minutes preparing the July recap;<br><br>*See* APP at 146, E-mail message from Mathew to Ms. Hullum of August 13, 2015 wherein Mathew transmits her July recap, which consists of less than one page of information;<br><br>*See* APP at 147, E-mail message from Ms. Hullum to Ms. Perez on December 1, 2015 transmitting Mathew's August 2015 time study, noting that it was her second request to Mathew to complete the time study. |

| Performance Deficiency | Documentation Evidencing this Performance Deficiency |
|---|---|
| **Attendance:** On September 17, 2015, Mathew sends Ms. Perez an IM at 9:29 a.m. asking if she could leave at 1:00 or 2:00 p.m. that day, providing same day notification. | *See* APP at 171, IM conversation between Mathew and Ms. Perez on September 17, 2015 transmitting Mathew's last-minute request to leave at 1:00 or 2:00 that day. |
| **Timely Completion of Assignments:** On October 29, 2015, Brad Denetz, the Site Director, went to Ms. Perez' office to discuss having approximately 10 disciplinary actions outstanding that he needed as soon as possible. When Ms. Perez asked Mathew about those disciplinary actions, she stated that she would have them to Mr. Denetz by that Friday. | *See* APP at 174, IM conversation between Mathew and Ms. Perez on October 29, 2015 discussing Mr. Denetz going to Ms. Perez' office to follow-up on his time sensitive disciplinary actions, and Mathew's response to the same. |
| **Attendance:** On October 29, 2015, Mathew informs Ms. Perez in the late afternoon that she has a doctor's appointment in the morning, requiring that Ms. Perez rearrange her schedule to provide coverage at the office. | *See* APP at 173, E-mail message from Ms. Perez to Ms. Elad on October 29, 2015 at 4:31 p.m. informing her that Mathew had just informed her that she had a doctor's appointment the next morning, and that, as a result, Ms. Perez would be going to the LEW office location and Ms. Boyd would be going to the 8585 office location to provide coverage. |
| **Exemplifying Fair Judgment/Time Management:** On November 2, 2015, Ms. Elad overheard Mathew and Ms. Boyd spend an inappropriate amount of time on a bereavement request. | *See* APP at 175, E-mail message from Ms. Elad to Ms. Perez of November 2, 2015 describing her dissatisfaction with observing Mathew and Ms. Boyd spend an inappropriate amount of time on a bereavement request. |
| **Attendance:** On November 16, 2015, Mathew sends Ms. Perez an IM at 9:53 a.m. asking if she could leave at 3:00 p.m. that day, providing same day notification. | *See* APP at 176, IM conversation between Mathew and Ms. Perez on November 16, 2015 transmitting Mathew's last-minute request to leave at 3:00 p.m. that day. |
| **Exemplifying Fair Judgment/Time Management:** On Saturday, November 23, 2014, an associate sent Mathew her resignation notice. Mathew was responsible for processing the termination first thing the following Monday morning. Mathew failed to timely process this termination, resulting in a risk event. | *See* APP at 187–188, E-mail message exchange between Ms. Elad and Holly Hanes on November 25, 2015 discussing the risk event caused by Mathew's failure to timely process the termination. |
| **Attendance:** On November 24, 2015, Mathew sends Ms. Perez an IM at 11:19 a.m. informing her that she would be taking a long lunch to go to a doctor's appointment, providing same day notification. | *See* APP at 264, IM conversation between Mathew and Ms. Perez on November 24, 2015 wherein Mathew informs Ms. Perez that she would be leaving for a long lunch shortly, providing same day notification. |

| Performance Deficiency | Documentation Evidencing this Performance Deficiency |
|---|---|
| **Relying on the Assistance of Others:** On November 24, 2015, Mathew sends Ms. Perez an IM asking if the team could split up the five compliance e-mail messages that she just received.  When Ms. Perez explains the busy workloads of the rest of the team members and asks what Mathew has going on, she says she overwhelmed and has to leave to go to a doctor appointment. | *See* APP at 185, E-mail exchange of November 24, 2015 between Ms. Perez and Ms. Elad, including the IM conversation had between Ms. Perez and Mathew wherein Mathew asks for the compliance e-mail messages that she received to be divided among the team. |

As evidenced by the chart above, Santander's decision to place Mathew on a PIP in December 2015 was because of her ongoing performance deficiencies, which is unquestionably a legitimate and nondiscriminatory reason.

### b.   Mathew was placed on a PIP in January 2016 to provide her sufficient time to improve her employment

After receiving this 30-day PIP, Mathew's poor performance continued.  The following are a few examples of that ongoing poor performance, each of which is, again, supported by documentary evidence:

- **December 8, 2015:** Mr. Dieckmann wrote to Ms. Perez, expressing his concerns with Mathew's performance as his department's HRBP.[204]  Specially, he described Mathew's behavior as "bullying," complained that Mathew did not involve management in areas in which he believed management should have been involved, and explained why he believed her investigation into an employee complaint was flawed.[205]  In particular, in the instance he described, Mathew had told a manager that she was "sure" an event that the complaining employee described occurred, despite having found no corroborating evidence, and in fact being told by witnesses that the event alleged by the complaining employee did not occur.[206]

- **December 28, 2015:** Santander experienced a payroll issue that required an HR professional from every location to assist in resolving the issue.[207]  Ms. Perez asked

---

[204] APP at 6–7, Perez Decl., ¶ 17; APP at 193–194, E-mail message from Mr. Dieckmann to Ms. Perez on December 8, 2015.

[205] APP at 6–7, Perez Decl., ¶ 17; APP at 193–194, E-mail message from Mr. Dieckmann to Ms. Perez on December 8, 2015.

[206] APP at 6–7, Perez Decl., ¶ 17; APP at 193–194, E-mail message from Mr. Dieckmann to Ms. Perez on December 8, 2015.

[207] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.

Mathew to work on this issue.[208]  Mathew was unable to complete this task on her own, resulting in Ms. Perez had to ask Sabrina Boyd, the HR Generalist, to assist with the payroll issue.[209]  Ms. Boyd worked to find a resolution without difficulty.[210]

Mathew disagreed with the PIP that she received on December 1, 2015, and complained internally about her annual performance review and the PIP.  Steven Shaffer (VP of Human Resources Business Partnership) conducted a thorough investigation into Mathew's complaints, including interviewing relevant witnesses and reviewing numerous relevant documents, including those submitted by Mathew.  Mr. Shaffer documented his investigation in a six page, single-spaced report.[211]  Mr. Shaffer found that Mathew's performance had been lacking, but that, while "there were good intentions by the management team," they had "not done a totally effective job in managing Reena Mathew, especially in holding her accountable for her mistakes and poor performance at times."[212]  In light of this conclusion, Mr. Shaffer recommended that Santander provide Mathew with a PIP that included a 90-day action plan for Mathew to improve, and have weekly check-ins and monthly reviews.[213]

### c. Mathew's supervisors held her accountable for making last-minute requests to leave early

Mathew was not criticized for coming to work late or leaving early after getting permission to do so; she was criticized for failing to provide advance notice of her need to miss work and her supervisors/colleagues having to then ensure the business needs were met while she was out.  *See* APP 210–218, 90 Day Action Plan ("Reena must provide a minimum of a 48 hr notice (aside from

---

[208] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.
[209] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.
[210] APP at 6–7, Perez Decl., ¶ 17; APP at 204–206, E-mail message exchange between Mathew, Ms. Perez and Ms. Boyd on December 28, 2015.
[211] APP at 234–239, Final Report by Mr. Shaffer.
[212] APP at 237–239, Final Report by Mr. Shaffer.
[213] APP at 237–239, Final Report by Mr. Shaffer.

emergency situations) when requesting time off, late arrivals, or early departures;" and "Reena is responsible for managing her time and her schedule as an exempt Associate and ensuring that the needs of the business are met.").

On numerous occasions, Mathew failed to provide advance notice of her request to arrive late/leave early from work.[214] Ms. Hullum, and then Ms. Perez, granted Mathew's requests, but repeatedly asked that she provide advance notice going forward so that they could ensure the department would be adequately staffed.[215] Mathew's repeated last-minute requests resulted in her colleagues having to stay late and work extra to complete time sensitive tasks that she would have been responsible for completing, had she been at work as she was scheduled to be prior to her last-minute request.[216]

Mathew argues that Ms. Hullum and Ms. Perez granted her requests and did not tell her that she needed to provide advance notice.[217] But, Ms. Hullum and Ms. Perez would recollect that they did tell Mathew that she needed to provide advance notice. Regardless, Mathew, an HR professional, was well aware of the expectations that employees provide ample notice to their supervisor of any need to leave work early or arrive late;[218] yet, she chose instead to abuse her supervisors' kindness by repeatedly making last-minute requests. For example, on February 14, 2014, Mathew sent the following IM to Ms. Hullum at 11:37 a.m., asking to leave at 12:45 p.m./1:00 p.m. that day to get ready for her date that night:

> **Reena Mathew [11:37 AM]:**
> Hey Lina, I know Sabrina is leaving early, but I was going to ask too! I have my daughter's party and wanted to leave early for my date tonight! lol Would it be ok if I left @ 12:45p-1p for the day?

---

[214] *See* APP at 216–218, Timeline Addendum noting that Mathew made a same-day request to leave early/arrive late on July 1, 2015; August 23, 2015; September 3 2015; September 17, 2015; November 16, 2015; and November 25, 2015).

[215] APP at 216–218, Timeline Addendum noting that Mathew made a same-day request to leave early/arrive late on July 1, 2015; August 23, 2015; September 3 2015; September 17, 2015; November 16, 2015; and November 25, 2015).
[216]

[217] *See* APP at 54, Mathew Dep. 182:17–183:7.

[218] *See* APP at 54, Mathew Dep. 183:3–7 ("…And when I asked her for time off, I'm very careful with my job, I'd give her, you know, as – the notice that we're required to do, 24 to 48 hours…").

Mathew's complaint that Ms. Hullum and Ms. Perez should have been more direct with her throughout their management of her regarding their expectations that she obtain advance notice of her need to leave early/arrive late to work does not change the fact that they were more than justified when they included this in her PIP as an area in which she could improve.

### d.    Mathew's workload was reduced by Ms. Perez

Mathew offers nothing more than her subjective opinion that she was "held to a higher standard" and assigned "a heavier workload."  Mathew testified that this "heavier workload" consisted of being asked by Ms. Perez to do a time study,[219] and assist with compliance e-mail messages, which she viewed as administrative work that was beneath her.[220]  Mathew also testified that she was asked to check the HR box to record the disciplinary actions placed in there, which she also viewed as administrative work beneath her.[221]  However, Mathew directly contradicts her own testimony by also testifying that Ms. Perez *never* asked her to assist with the HR box.[222]

While Mathew may harbor a subjective belief that Ms. Perez asked her to do what Mathew would consider administrative tasks that were beneath her and did not ask the same of the others reporting to her, the evidence shows that Ms. Perez asked both Mathew and Tensya Perez ("Tensya"), the other HRBP that Ms. Perez managed, to help out with both the compliance e-mail messages and to check the HR box to record the disciplinary actions.[223]  Even Ms. Perez herself assisted with these tasks, and, between January 1, 2015 and January 18, 2016, she had recorded

---

[219] *See* APP at 55–56, Mathew Dep. 192:23–193:5.

[220] *See* APP at 57, Mathew Dep. 201:15–204:4.

[221] *See* APP at 57, Mathew Dep. 201:15–204:4.

[222] *See* APP 46, at Mathew Dep. 81:9–82:20.

[223] *See* APP at 46, Mathew Dep. 82:25–83:14 (testifying that Ms. Perez supervised Sabrina Boyd, the HR Generalist, and Tensya Perez, who was an HRBP like Mathew); APP at 185–186, E-mail chain between Ms. Perez and Ms. Elad discussing Mathew's request to take a long lunch and have the HR team split up the five compliance e-mail messages that they had just received; APP at 276,  E-mail chain among Ms. Hullum, Ms. Elad and Ms. Perez dated January 18, 2016.

*more than double* the number of disciplinary actions from the HR box than Mathew had.[224]

The evidence is clear that Ms. Perez did not assign Mathew more work than she assigned others in the department, but rather, Ms. Perez substantially *decreased* Mathew's workload.  In July 2015, Ms. Hullum, her supervisor at the time, assigned Mathew to spend one day/week at Santander's office located at 8585 Stemmons Freeway ("8585").[225]  Mathew claims that her going to 8585 one day each week somehow caused her to work longer hours (going from an average of 40 hours/week to 45 hours/week) and to work harder.[226]  In January 2016, in response to Mathew's complaints about her workload, Ms. Perez and Ms. Elad lightened Mathew's workload by reassigning the work at 8585 to another HR professional.[227]  Mathew would no longer have to go to 8585 once/week.[228]

Mathew's claim that she was subject to a "higher standard" and that Ms. Perez "scrutinized" her and never complimented her once after placing her on the PIP on January 15, 2016, is simply untrue.  At her deposition last week, Mathew was presented with an e-mail message showing that Ms. Perez had complimented her.[229]  Mathew had to admit that the e-mail did indeed show that Ms. Perez had complimented her in 2016, sometime after the PIP, but then self-servingly remarked that she failed to recall compliments from Ms. Perez because she received far more complaints about her work.[230]

---

[224] APP at 276, E-mail chain among Ms. Hullum, Ms. Elad and Ms. Perez dated January 18, 2016.
[225] *See* APP at 140–141, E-mail message from A. Hullum to R. Mathew on July 10, 2015.
[226] *See* APP at 48–49, Mathew Dep. 149:22–150:10; 145:13–146:23; and 147:12–148:1.  Interestingly, Mathew testifies that, after she was assigned to work at 8585 in July of 2015, she had "no breaks" and did not recall if she even used the restroom, and had "plenty" of dates that she did not even get to "take a lunch."  *See* APP t 49, Mathew Dep. 150:1–10.  However, the time study that she submitted to Ms. Hullum on August 19, 2015 proves otherwise, as Mathew recorded the following breaks that she took the previous week: 15 minute break on Monday to use the restroom; 15 minutes of empty time on Tuesday and Wednesday; left work at 3:30 p.m. on Friday, and took a lunch break (including a 2 hour team lunch on Tuesday) everyday that week.  APP at 147, E-mail message from Mathew to Ms. Hullum on August 19, 2015, and attached time study.
[227] APP at 209, E-mail chain between Ms. Elad and Ms. Perez dated Jan. 13, 2016.
[228] APP at 209, E-mail chain between Ms. Elad and Ms. Perez dated Jan. 13, 2016.
[229] APP at 55, Mathew Dep. 189:11–191:18.
[230] APP at 55, Mathew Dep. 189:11–191:18.

### e.   Mathew was asked to complete a time study by both Ms. Hullum and Ms. Perez

Mathew was first instructed to complete a time study by Ms. Hullum, which was prior to Ms. Perez becoming her supervisor.[231]  Mathew proclaims that Ms. Hullum's instructing her to complete a time study was not discriminatory at all, but was done with "good intentions."[232] However, Mathew alleges that Ms. Perez's instructing that Mathew complete a time study was somehow discriminatory.[233]

In reality, both Ms. Hullum and Ms. Perez instructed Mathew to complete the time study to assist Mathew, who complained that her workload was too high, to be more efficient by first identifying where her time was being spent and determining areas for improvement in her time management.[234]

While Mathew testified that she was asked by Ms. Perez to do this time study for a "substantial amount of time," this was simply not the case.[235]  In reality, Ms. Perez assigned the time study to Mathew on January 15, 2016, in her 90-day action plan, and agreed to allow Mathew to cease completing the time study on February 22, 2016, after Mathew complained that she found the exercise "insulting."[236]

### f.   Mathew was terminated for her ongoing poor performance

Santander terminated Mathew's employment after she failed to adequately improve her performance during the 90-day Action Plan set forth in her January 15, 2016 PIP.  Ms. Elad and Ms. Perez met with Mathew on January 29, 2016, February 17, 2016, February 26, 2016, March

---

[231] *See* APP at 53, Mathew Dep. 179:11–17; APP at 50, Mathew Dep. 154:21–156:4 (Angelina Hullum is referred to as "Lina" in Mathew's deposition).
[232] *See* APP at 53Mathew Dep. 179:11–17; APP at 50, Mathew Dep. 154:21–156:4.
[233] *See* APP at 53Mathew Dep. 179:11–23.
[234] APP at 250–252, E-mail chain between Ms. Elad, Ms. Perez and Mathew dated Feb. 17-23, 2016.
[235] *See* APP at 53Mathew Dep. 179:4–10.
[236] *See* APP at APP250–APP255, E-mail chain between Ms. Elad, Ms. Perez and Mathew dated Feb. 17-23, 2016.

8, 2016, and March 23, 2016, to discuss her work on the 90-day Action Plan.[237]  Despite this continued counseling and coaching—from her supervisor and her supervisor's supervisor, Mathew's performance simply did not improve.[238]  Rather, Mathew continued to seek Ms. Perez's guidance more than was appropriate, failed to timely submit work, and Ms. Perez received negative feedback from their business clients regarding Mathew's work for them.[239]

On April 15, 2016, Ms. Elad and Ms. Perez met with Mathew to provide her with her 90-day review.[240]  During this meeting, they discussed with Mathew her overall performance for the past 90 days, focusing on the three areas of focus that were identified in her 90-day action plan: attendance; time management/effective work habits; and consulting.[241]  They informed Mathew that they felt she met expectations as to attendance, but failed to meet expectations as to time management/effective work habits and consulting.[242]  They identified Mathew's performance failures in the following areas: (1) providing detail in the work she submitted; (2) submitting accurate work product; (3) meeting deadlines; (4) timely following up when working on a project; (5) providing thorough and quality work product; and (6) contributing to the team by completing administrative tasks as needed.[243]  They also informed Mathew that they felt she did not meet expectations in her consulting, as exemplified by her (1) failure to push back on the business when necessary to complete her job, (2) demonstrating a lack of accountability for her own behaviors, and (3) inappropriately addressing the business clients after they provided Ms. Perez with negative feedback regarding her performance, by challenging the feedback the business clients provided to

---

[237] APP at 261–263, 90 day PIP final Report.
[238] *See Supra* Section IV(A)(3-4).
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] *Id.*
[243] *Id.*

Ms. Perez.[244]

Ms. Elad and Ms. Perez concluded the April 15, 2016, meeting by providing Mathew with some feedback they received from the business clients regarding her performance, which included the following:

- "Limited interactions, but it has been better since January.  I'd rather just go to someone else on the HR team to get it done right.  They are always helpful and on point."

- "I am getting [disciplinary actions] within 2 days.  I never get it within 24 hours though, which is what I thought the expectation was."

- "I enjoy working with her but notice that with difficult conversations she is timid and struggles.  She asked me to sit in on a conversation and when it got difficult she said that I would take over.  This wasn't my Associate and I was unprepared."

- "She doesn't like making decisions without checking with her manager.  She isn't confident when dealing with issues.  She is scared to make decisions."

- "I had to sit in on a term that [Mathew] was supposed to handle.  [Mathew] got flustered and turned it back to me to handle.  It's obvious that she can't handle conflict."

- "She has had to ask for an extension (beyond 2 days) for a [disciplinary action]."

- "I'm much more comfortable and confident working with others on the HR team because they respond timely and are confident in their decision making process."

- "She is very nice.  Just don't ask her for anything."[245]

Throughout this meeting, Mathew was defensive and claimed that she was getting picked on for every mistake.[246]  Rather than accept responsibility for any of her actions, she blamed Ms.

---

[244] *Id.*
[245] *Id.*
[246] *Id.*

Perez, accusing her of being a bad manager.[247]  Mathew said that Ms. Perez failed to check her work before sending it to Ms. Elad, did not ensure she met her deadlines, and did not often enough help her or remind her of things.[248]  Due to Mathew's failure to adequately improve her performance, as evidenced by her failure to complete two of the three components of her 90-Day Action Plan, Santander terminated her employment.[249]

As set forth above, Santander has met its burden to demonstrate its legitimate, nondiscriminatory and nonretaliatory reasons for its actions, including its dissatisfaction with Mathew's job performance, necessitating placing her on a PIP then a 90-Day Action Plan, and, ultimately, terminating her employment.  *See Hamilton v. AVPM Corp.*, 593 F. App'x 314, 321 (5th Cir. 2014) (holding that the employer's dissatisfaction with the plaintiff's job performance was a legitimate and nondiscriminatory reason for terminating her employment).

### 4. *Mathew Cannot Show that Santander's Legitimate and Nondiscriminatory and Nonretaliatory Employment Decisions Were a Pretext for Discrimination or Retaliation*

Mathew cannot show that Santander's legitimate, nondiscriminatory and nonretaliatory reasons for its actions were a pretext for discrimination or retaliation.  Mathew's entire case is built on nothing more than her subjective belief that Ms. Perez was out to get her, and somehow convinced a bunch of business professionals and executives to throw their ethics to the wind to cover up for Ms. Perez's discrimination.[250]

---

[247] *Id.*

[248] *Id.*

[249] APP at 12, Perez Decl., ¶ 40; APP at 24, Elad Decl., ¶ 22.

[250] Mathew testified that she believes Ms. Perez was the only person at Santander who chose to discriminate against her because of her pregnancy, and that Mr. Shaffer (VP of HR Business Partners), Ms. Elad (HR Director) and Ms. Hullum (HR Manager) all simply went along with Ms. Perez's decision to discriminate against her based on her pregnancy because they wanted to support Ms. Perez and/or they wanted to help cover up something that they saw as bad.  *See* APP at 58, Mathew Dep. 222:1–13.  Additionally, Mathew claims that three of the business partners with whom she worked at Santander conspired with Ms. Perez to allow Ms. Perez to discriminate against Mathew. *See id.* at 285:4–290:7.

Mathew's theory that Ms. Perez somehow convinced a number of business professionals and executives, including Ms. Elad, to go along with her decision to discriminate against Mathew based on her pregnancy because they wanted to support Ms. Perez and/or they wanted to help cover up something that they saw as bad simply does not track with the evidence.[251]   Mathew claims that she told Ms. Perez she was pregnant the afternoon of Friday, October 30, 2015.[252]   On Monday, November 2, 2015, Ms. Elad sent Ms. Perez an e-mail message describing her dissatisfaction with the amount of time that Mathew and Ms. Boyd spent evaluating a bereavement leave request.[253]   In this e-mail message, Ms. Elad writes, "We have discussed the concerns with Reena's productivity and I know you are addressing that."[254]   Ms. Elad ends this e-mail message by asking Ms. Perez to not respond until she gets back, and wishes her well in her move.[255]   Thus, for Mathew's conspiracy theory to be true, one would have to believe that, after learning that Mathew was pregnant in the afternoon of Friday, October 30, 2015, Ms. Perez, a mother of young children herself, harbored so much hostility toward Mathew's pregnant status that she quickly fabricated a history of concerns regarding Mathew's productivity, and hurriedly conveyed those fabricated concerns to Ms. Elad (HR Director) over the weekend while preparing for a move.  This scenario is simply preposterous.

The ridiculousness of Mathew's subjective belief that Ms. Perez was out to get her because of her pregnancy is further evidenced by Mathew's own testimony.  When asked why she believed Ms. Perez would discriminate against her because of her pregnancy, Mathew herself could not identify a reason, instead claiming that she came to that conclusion after "connecting the dots:"

---

[251] *See* APP at 58, Mathew Dep. 222:1–13.
[252] APP at 47, Mathew Dep. 108:18–23.
[253] APP at 175, E-mail message from Ms. Elad to Ms. Perez of Nov. 2, 2015.
[254] *Id.*
[255] *Id.*

14 Q.  Do you have any reason as to why Yessica would
15  discriminate against you based on your being pregnant?
16 **A.  No idea.  None.  I honestly thought it was a**
17  **personal like vendetta.  It was so strange.**
18 Q.  Do you think it was a personal vendetta and
19  that it didn't have anything to do with your pregnancy?
20 **A.  Say that one more time.**
21 Q.  Do you think it was a personal vendetta and
22  didn't have anything to do with your pregnancy?
23 **A.  No, because then when I started connecting the**
24  **dots, then it was pregnancy.**
25 Q.  Do you believe Santander as a whole does not

1  like pregnant people or this was a Yessica thing?
2 **A.  Yessica thing.**
3 Q.  Do you know anyone at Santander other than
4  Yessica who you believe doesn't like pregnant people?
5 MR. ULOTH:  Never mind.  I was going to
6  object, but I'm not.
7 **A.  No.** 256

It is well-settled that a plaintiff's subjective belief that they were discriminated or retaliated against is insufficient to establish pretext.  *See Johnson v. UAH Prop. Mgmt., Ltd. P'ship*, 428 F. App'x 311, 312 (5th Cir. 2011).  Mathew's subjective opinion that her performance did not warrant her PIP's or her termination is insufficient to meet her summary judgment burden.  *See Reynolds v. Sovran Acquisitions, L.P.,* No. 3:14-CV-1879-D, 2015 WL 6501552, at *9 (N.D. Tex. Oct. 27, 2015) (quoting *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994)) ("Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.").  Indeed, even if Santander was somehow mistaken in its perspective that Mathew's poor performance warranted a PIP in December 2015, or mistaken in its perspective that Mathew's continued failures in her performance warranted her termination in April 2016, this would not change that Santander has nevertheless set forth a legitimate, nondiscriminatory and non-retaliatory reason for those actions.  *See Reynolds*, 2015 WL 6501552, at *6.  Quite germane here, U.S. District Judge Sydney Fitzwater wrote the following in *Reynolds*:

But mere evidence that an employer made a mistake in terminating an employee does not create a genuine fact issue regarding pretext, because "even an incorrect

---

[256] APP at 58, Mathew Dep. 222:14–223:7.

belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence.  Motive is the issue."

*Id.* (citation omitted).  This entire case is simply Mathew's criticisms that Santander mistakenly issued PIPs and ultimately terminated her employment, when she was a model employee who made no mistakes.  Mathew cannot show that Santander did not have good-faith beliefs as to her competence, or that its motive in any decisions were sinister.

Santander anticipates that Mathew, in an effort to concoct an argument that Santander's legitimate, nondiscriminatory and non-retaliatory reasons for its actions are a pretext for discrimination, will argue the following are somehow evidence of pretext: (1) the temporal proximity between her telling Ms. Perez that she was pregnant (October 30, 2015) and the various actions that she claims were discriminatory (starting December 1, 2015, with the PIP); (2) she had been an HR professional at Santander for approximately five years and had never been "counseled" before Ms. Perez issued the PIP in December 2015; (3) Santander did not follow its Progressive Discipline Policy when it placed her on a PIP before presenting her with formal disciplinary actions; and (4) her receipt of some "You Earned It" points somehow discredits Santander's assessment of her poor performance.  As set forth below, none of these arguments could suffice to meet Mathew's burden to show that Santander's multiple legitimate, nondiscriminatory and non-retaliatory reasons for its employment actions were actually a pretext for discrimination.

### a.    Temporal proximity does not establish pretext

While the temporal proximity between an employer learning of a plaintiff's pregnancy and her termination *may* support a plaintiff's claim of pretext, "such evidence – without more – is insufficient." *Fairchild v. All Am. Check Cashing Inc.,* 815 F.3d 959, 968 (5th Cir. 2016).  Here, the temporal proximity between when Mathew told Ms. Perez of her pregnancy (which Mathew says occurred on October 30, 2015), and the actions upon which she bases her retaliation claim

(starting on December 1, 2015, when she was issued the initial PIP, is, without more, insufficient to establish pretext.  Moreover, in this case, the temporal proximity between Mathew getting a new supervisor (September 2015) and that new supervisor holding her accountable for her performance a short time thereafter is really what was going on.  The fact that Mathew announced her pregnancy a little over one month after that new supervisor took over does not shield Mathew from her new supervisor doing her job and holding Mathew accountable.

> **b.    Mathew's new supervisor held her accountable for her poor performance**

Mathew's assertion that she was never "counseled" prior to receiving the first PIP in December 2015, is not evidence of pretext.[257]  Mathew began to report to Ms. Perez in September 2015.  Ms. Perez was not pleased with Mathew's work and began to hold her accountable for it.[258]  This is not evidence of pretext; it is merely evidence of a new supervisor taking the helm.  Indeed, it "is not uncommon for one supervisor to be pleased with the quality of an employee's work while another supervisor is not."  *See Villa v. Texas Parks and Wildlife Dept.,* No. 2:19-CV-00256, 2021 WL 1179271, at *15 (S.D. Tex. March 27, 2021) (finding no pretext when one supervisor gave the plaintiff a good performance review and the a subsequent supervisor terminated his employment for performance deficiencies, noting that, while the first supervisor may have overlooked the plaintiff's performance deficiencies, the subsequent supervisor was not required to follow suit).  Even if Mathew now recognizes that her supervisor expected more out of her than did her previous supervisor, or held her more accountable than did her previous supervisor, those different management styles would not suggest pretext.  *See Villa,* 2021 WL 1179271, at *15.

---

[257] Mathew claims that, in her opinion, "coaching" must be continuous, instead of telling someone how they can improve their performance.  *See* Mathew Dep. 164:11–165:3.
[258] *See supra* II.B.2.

### c.   Mathew's new supervisor held her accountable for her poor performance.

It would be factually inaccurate for Mathew to argue that Santander did not follow its progressive discipline policy by not first issuing her written warnings or otherwise counseling her before placing her on a PIP.  Santander's progressive discipline policy does not *require* written warnings before placing an employee on a PIP.[259]  Indeed, the progressive discipline policy does not even address PIPs.[260]  Most importantly, the policy clearly provides that Santander reserves the right "to administer discipline in such a manner, as it deems appropriate to the circumstances, and may, in its sole discretion, eliminate any or all of the steps in the progressive discipline procedure."[261]

Assuming *arguendo* that Santander failed to follow its own procedures by not documenting Mathew's poor performance, such failures, without more, would not demonstrate pretext.  "Although an 'employer's failure to follow its own policies may be probative of discriminatory intent,' [the Fifth Circuit] requires discharged employees in discrimination cases to show, in addition, that they were treated differently from non-minority employees."  *Hamilton v. AVPM Corp.*, 593 F. App'x at 321 (citation omitted).  Here, Santander determined that, based on Mathew's poor performance in a number of categories, a PIP was the appropriate mechanism by which to manage her performance, as a written warning on her poor performance on a specific category would not capture the bigger picture of how she needed to improve her performance in those categories.[262]  This decision did not conflict with its progressive discipline policy, which explicitly provides for such judgment calls to be made by the business.[263]

---

[259] APP at 269–275, Santander's Progressive Discipline Policy.
[260] APP at 269–275, Santander's Progressive Discipline Policy.
[261] APP at 269–275, Santander's Progressive Discipline Policy.
[262] APP at 6, Perez Decl., ¶ 16.
[263] APP at 269–275, Santander's Progressive Discipline Policy.

> **d.** **Mathew's receipt of "You Earned It" points is not indicative of overall performance.**

To the extent that Mathew claims that her receipt of "You Earned It" points somehow discredits the extensive history of performance deficiencies that led to her receipt of the PIP and eventual termination, then such an argument would be without credence.  The following facts demonstrate the inconsequential nature of Mathew's receipt of "You Earned It" points:

- Between February 20, 2015, and March 4, 2016, Ms. Boyd, an HR Generalist, received *more than double* the number of "You Earned It" points than Mathew;[264]

- Between February 20, 2015, and March 4, 2016, Whitney Andres, another HRBP, received 24,315 "You Earned It" points compared to Mathew's 15,462 "You Earned It" points.[265]

- Brad Denetz, the Site Director who gave Mathew 2,000 "You Earned It" points on February 17, 2016, also gave 2,000 "You Earned It" points to Ms. Boyd that same day, and, between February 20, 2015, and March 4, 2016 gave out a total of 3,442,200 "You Earned It" points.[266]

- While Mathew testified that the 2,500 points given to her by Greg Vinson was "a lot of points," and that he did not give a lot of people that many points, this is untrue.[267]  Between February 20, 2015, and March 4, 2016, Mr. Vinson gave out a total of 195,076 "You Earned It" points, and gave between 2,500 and 10,000 points to one person at one time on 32 occasions.[268]

- On November 5, 2015, Mathew gave Ms. Perez 500 "You Earned It" points for "being a great leader."[269]

Even if Mathew performed well on a project or an assignment and received "You Earned It" points as a result of her work on that project, the receipt of those points would not evidence her overall performance.  After all, even someone who performs at a low level on most projects can

---

[264] *See* APP at 71–108, Chart of You Earned It Points filtered (Between February 20, 2015 and March 4, 2016, Mathew earned 15,462 "You Earned It" points and Ms. Boyd earned 32,995 "You Earned It" points.)
[265] *See* APP at 71–108, Chart of You Earned It Points.
[266] *See* APP at 71–108, Chart of You Earned It Points.
[267] *See* Mathew Dep. 225:22-226:18.
[268] *See* APP at 71–108, Chart of You Earned It Points.
[269] *See* APP at 71–108, Chart of You Earned It Points.

perform well on specific projects.

Mathew cannot show that any Santander's legitimate and nondiscriminatory reasons for its employment decisions are somehow a pretext for discrimination. As such, the Court must grant summary judgment on Mathew's pregnancy discrimination claim.

### B.   Mathew's Retaliation Claim Fails

As with discrimination claims, the *McDonnell Douglas* burden-shifting framework governs retaliation claims. To establish a *prima facie* retaliation case, Mathew must show that: (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) there was a causal link between the protected activity and the adverse employment action. *See Taylor v. United Parcel Serv., Inc.,* 554 F.3d 510, 523 (5th Cir. 2008). If Mathew is successful in presenting a *prima facie* case, the burden of production shifts to Santander to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See Long v. Eastfield Coll.,* 88 F.3d 300, 304–05 (5th Cir. 1996). If Santander proffers such a reason, "the fact-finder must decide whether retaliation was the but-for cause for the employer's action." *See Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 657 (5th Cir. 2012) (citing *Long,* 88 F.3d at 305 n.4). This means that Mathew "may avoid summary judgment on 'but for' causation by demonstrating 'a conflict in substantial evidence on this ultimate issue.'" *See id.* at 660 (quoting *Long,* 88 F.3d at 308).

In this case, Mathew's retaliation claim should be dismissed because (1) she cannot show that two of the actions on which she bases her retaliation claim were adverse employment actions; (2) she cannot show a causal link between the protected activity and the adverse employment action; and (3) Santander presents a legitimate and non-retaliatory reason for each of its employment decisions, and she cannot show that reason was pretextual.

### 1.   *Neither Ms. Perez's Request that Mathew Complete a Time Study Nor Her Purported Scrutiny of Mathew's Performance Constitutes an Adverse Employment Action*

As set forth in Sections IV(A)(3–4), *supra*, Mathew cannot show that Ms. Perez's request that she complete a time study or her supposed "scrutiny" of Mathew's work constitutes an adverse employment action.

### 2.   *Mathew Cannot Show a Causal Link Between Engaging in Protected Activity and Her Termination*

Mathew cannot show a causal link between her engaging in protected activity and her termination.  At most, Mathew could argue that the temporal proximity between her engaging in protected activity and the actions that she claims were adverse.  But, this too fails as the temporal proximity is not close enough to, standing alone, establish a *prima facie* causal link.  *See Hanks v. Shinseki,* No. 3:08-1594-G, 2010 WL 3000835, at *5 (N.D. Tex. July 28, 2010) (quoting *Clark County School District v. Breeden,* 532 U.S. 268, 273–74 (2001)) ("If the only evidence of a *prima facie* casual link is 'mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action,' then 'the temporal proximity must be very close.'").

Here, Mathew complained of race and pregnancy discrimination on December 1, 2015.[270] Mathew was terminated over four months later on April 19, 2016.  Temporal proximity of four months is insufficient to establish a causal connection.  *See Ajao v. Bed Bath and Beyond, Inc.,* 265 F. App'x 258, 265 (5th Cir.2008) (per curiam) ("[T]emporal proximity of four months is not close enough, without additional supporting summary-judgment evidence, to establish a causal connection between the employment action and the protected conduct.").

---

[270] APP at 167–169, Ms. Perez's handwritten notes from December 1, 2015.

### 3. Santander's Legitimate and Nonretaliatory Employment Decisions

As set forth in Sections IV(A)(3–4), *supra*, Santander had legitimate and nonretaliatory reasons for each of its employment actions with regard to Mathew, and Mathew cannot show that any of these reasons are a pretext for retaliation.

## PRAYER

For the reasons set forth above, Santander respectfully requests that the Court grant its Motion for Summary Judgment, dismiss this case in its entirety, and grant Santander all other relief to which it may be justly entitled.

Respectfully submitted,

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142

By: _Monte K. Hurst_
Monte K. Hurst
State Bar No. 00796802
Monte.Hurst@hallettperrin.com

Clayton S. Carter
State Bar No. 24120750
CCarter@hallettperrin.com

*Counsel for Defendant*
*Santander Consumer USA Inc.*

## CERTIFICATE OF SERVICE

On August 23, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served the following counsel, as follows, electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Mr. Donald E. Uloth
DONALD E. ULOTH, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Don.Uloth@uloth.pro

_Monte K. Hurst_
Monte K. Hurst