IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REENA S. MATHEW, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:23-cv-01494-N |
| | § | |
| SANTANDER CONSUMER USA INC., | § | |
| Defendant | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMRY JUDGMENT**

<div style="margin-left:50%">

Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

</div>

**Table of Contents**

I.   Summary of the Response ……………………………………………….. 1

II.  Background ……………………………………………………………… 1

III. Argument and Authorities ……………………………………………… 15

    A.  The pregnancy discrimination claim …………………………………… 15

    B.  The retaliation claim …………………………………………………… 17

    C.  The pretext analysis …………………………………………………... 19

        1.  Ways the evidence can show pretext ……………………………… 19

        2.  The facts cited as support for the first PIP are pretextual ……………… 22

            a.   The January 2015 a delay processing the end of a contractor's
                    contract was a not an issue at the time …………………………… 22

            b.   False accusation that Mathew failed to send a summary
                    that was requested …………………………………………… 22

            c.   The criticisms of monthly recaps sent to Hullum in 2015
                    do not show a performance problem ……………………………… 23

            d.   There is no evidence that Mathew's absences in 2015
                      burdened others …………………………………………………… 23

            e.   Disputed claim that Mathew was asked to redo the
                    August 2015 time study ………………………………………… 24

            f.   August 2015 – Mathew asked an employee to sign a document … 25

            g.   Disputed claim that Mathew received extensive coaching ……… 25

            h.   Disputed claim about continual reminders ………………………. 26

            i.   Disputed claim that Hullum had to finish Mathew's tasks ………. 27

            j.   Disputed claim that Mathew asked for help with the
                    investigation checklist ………………………………………… 27

            k.   Disputed claim that 10 DAs were late ……………………………. 27

            l.   Disputed claim that Mathew failed to follow an instruction
                    and was coached the next day ……………………………………. 28

            m.  Disputed claim that there was a reminder about attendance
                    on November 17, 2015 …………………………………………… 28

            n.   Hortensia Perez conducted an investigation, but this was
                    not an example of a performance problem ………………………... 29

            o.   Disputed issue about timely processing an employee resignation
                    on November 23, 2015 …………………………………………… 30

            p.   Disputed issues concerning the Mathew's limited involvement
                    with the Deirdre Crouch investigation in October 2016 …………... 30

            q.   Disputed claim that a termination request was vague …………….. 31

            r.   Dispute claims about November 24, 2015 compliance emails ……. 31

        3.  December 1, 2015 through January 15, 2016:
           the facts cited as support for the second PIP ………………………… 31

            a.   Disputed facts regarding a December 8, 2015 email ……………… 31

            b.   Unwarranted criticism about the December 28, 2015

              payroll issue …………………………………………………………… 32

4.  January 15, 2016 through April 19, 2016:
     facts cited as justification for the termination…………………………… 33

     a.    Disputed contention that the January 25, 2016 recap was late ……... 33

     b.    Disputed facts regarding two investigation summaries …………….. 34

     c.    Disputed facts concerning the degree of detail expected in a
         meeting recap …………………………………………………….. 35

     d.    Disputed facts about an email Elad thought was misleading ……….. 37

     e.    Disputed facts about being more independent during employee
         investigations …………………………………………………….. 38

     f.    Disputed facts regarding the talking points Elad asked for …………. 40

     g.    Santander's contentions regarding the Brittany Brodie
         investigation are contrived and unconvincing ……………………... 41

     h.    Disputed issues that were not mentioned when they arose
         and were first presented on April 15, 2016 …………………….…... 42

5.  Posturing the case for litigation as pretext ……………………………… 46

6.  Presenting misleading evidence to the EEOC shows pretext ………………… 47

D.  Flawed Arguments Asserted in Santander's Brief …………………………….. 47

1.  The animus necessary to prove discrimination ………………………… 48

2.  Santander's flawed same-group theory …………………………………… 48

3.  Token examples of employees who had positive experiences during
     their pregnancies is irrelevant …………………………………………… 49

IV.  Conclusion …………………………………………………………………………… 49

**Table of Authorities**

Cases                                                                          Page(s)

Burton v. Freescale Semiconductor, Inc.,
    798 F.3d 222, 231 (5th Cir. 2015) ………………………………….. 15, 19, 20, 21

Boles v. Navarro, No. 3:19-cv-2367-X, 2022 U.S. Dist. LEXIS 222080
    (N.D. Tex. Dec. 9, 2022)………………………………………………………….. 18

Bostock v. Clayton County,
    590 U.S. 644 (2020)……………………………………………………………….. 48

Boyd v. State Farm Ins. Cos.,
    158 F.3d 326 (5th Cir. 1998)……………………………………………………… 20

Brown v. Wal-Mart Stores E., L.P.,
    969 F.3d 571 (5th Cir. 2020)……………………………………………………… 19

Burlington N. & S. F. R. Co. v. White,
    548 U. S. 53 (2006)………………………………………………………………... 18

Connecticut v. Teal,
    457 U.S. 440 (1982)……………………………………………………………... 49

Davis v. Dallas Area Rapid Transit,
    383 F.3d 309 (5th Cir. 2004)……………………………………………………... 17

Diaz v. Kraft Foods Global, Inc.,
    653 F.3d 582 (7th Cir. 2011)……………………………………………………... 49

Evans v. City of Houston,
    246 F.3d 344 (5th Cir. 2001)…………………………………………………... 18, 20-21

Goudeau v. Nat'l Oilwell Varco,
    793 F.3d 470 (5th Cir. 2015)……………………………………………………... 19

Hamilton v. Dallas County,
    79 F.4th 494 (5th Cir. 2023)……………………………………………………... 16

Harrison v. Brookhaven Sch. Dist.,
    82 F.4th 427 (5th Cir. 2023)…………………………………………………… 15, 16

iv

Jazayeri v. Avaya, Inc., No. 2:19-cv-06003-JDW,
    2021 U.S. Dist. LEXIS 101008 (E.D. Pa. May 28, 2021)……………………………… 48

Laveglia v. TD Bank, N.A., No. 19-cv-01917-JDW,
    2020 U.S. Dist. LEXIS 85659 (E.D. Pa. May 15, 2020)……………………………... 49

Laxton v. Gap, Inc.,
    333 F.3d 572 (5th Cir. 2003)…………………………………… 15, 16, 20, 21, 33, 45

Lee v. Kan. City S. Ry.,
    574 F.3d 253 (5th Cir. 2009)…………………………………………………………… 17

LeMaire v. Louisiana,
    480 F.3d 383 (5th Cir. 2007)…………………………………………………………… 17

Miller v. Raytheon Co.,
    716 F.3d 138 (5th Cir. 2013)…………………………………………………………… 47

Oncale v. Sundowner Offshore Servs., Inc.,
    523 U.S. 75 (1998)……………………………………………………………………… 48

Reeves v. Sanderson Plumbing Products, Inc.,
    530 U.S. 133, 145 (2000)…………………………………………………………… 20, 33

Riley v. Napolitano,
    537 F. App'x 391, 392 (5th Cir. 2013)……………………………………………... 18

Russell v. McKinney Hosp. Venture,
    235 F.3d 219 (5th Cir. 2000)…………………………………………………………… 19

Shackelford v. Deloitte & Touche, LLP,
    190 F.3d 398, 409 (5th Cir. 1999) …………………………………………………… 20

Tex. Dep't of Cmty. Affairs v. Burdine,
    450 U.S. 248 (1981) …………………………………………………………………… 15

Walther v. Lone Star Gas Co.,
    952 F.2d 119 (5th Cir. 1992) ………………………………………………………… 49

Statutes

42 U.S.C. § 2000e ……………………………………………………………………… 15, 17

## I.  Summary of the Response

About four weeks after Reena Mathew told her supervisor, Yessica Adriano, that she was pregnant, her supervisor and her boss, Stephanie Elad, wanted Mathew gone.  Elad told one of her supervisors, Pamela Blackburn, they should offer Mathew a severance, and Adriano began to paper the file with previously undocumented criticisms to make it appear to support termination.

Blackburn was not in favor of offering severance, so they put Mathew on a 30-day performance improvement plan (a PIP) followed by a 90-day PIP.  One of the stated reasons for the second PIP was to paper the file for termination.  Blackburn said a PIP with documented weekly check-ins would stack up in the company's favor if the dispute wound up in litigation.

During the second PIP, Mathew's supervisors documented every negative they could think of, embellishing the truth, and in some cases criticizing her performance based on falsehoods.  Mathew was then terminated for poor performance.

The EEOC issued a determination finding cause on the pregnancy discrimination claim. Based on the summary judgment evidence in this case, if the case were tried, a reasonable jury could find both pregnancy discrimination and retaliation.

## II.  Background

Mathew worked for Santander as a salaried employee in Human Resources from February 1, 2011 until April 19, 2016.  App. 002 (Mathew Declaration).

For the last few years, her title was Human Resources Business Partner ("HRBP"), and she worked at the company's office in Lewisville, Texas.  Her immediate supervisor also worked there (Angelina Hullum, a Human Resources Manager) and a Human Resources Generalist (Sabrina Boyd) who mostly handled administrative tasks.  App. 002.

1

All of Mathew's annual performance reviews were positive and indicated she was meeting or exceeding expectations.  App. 002.  In her 2014 annual review (completed by her manager March 12, 2015), Mathew's supervisor noted that she had a strong relationship with the business people to whom she provided HR support, and she provided timely feedback to their inquiries plus follow up when necessary.  App. 048.  She also said Mathew was not afraid to push back on the business when needed, and: "She does her due diligence when working on DAs, investigations and terminations to ensure she has a clear picture prior to making recommendations."  App. 060.  In a November 2, 2015 email, Elad described Mathew as "an amazing detective."  Def's App. 175.

Mathew had a heavier workload than most of the other HRBPs, but she put in the time and did the work.  Her workload was increased in July 2015 when her manager assigned her primary HR responsibilities for more than 60 employees at another location, and she began working at the other location one day a week while still being responsible for almost 600 employees at the Lewisville location.  App. 79-80 (July 10, 2015 email assigning the additional duties); App. 4-5 (Mathew Declaration discussing her workload); App. 387-462 (headcount spreadsheets, showing the total headcount for Mathew and seven other HR employees in the Dallas area offices). .

Santander had an employee recognition program called You Earned It.  Any employee could award Your Earned It points to another employee for exemplary work, or going above and beyond on something.  Mathew regularly received points from the business side managers and officers she supported, and the amount of points she received is at least some evidence that she was performing well.  App. 2-3.

The fact that she received substantially more of these points than all but one other HRBP (for whom the data is available) is also significant.  Santander's brief and appendix show Mathew received 15,462 points during the period covered by the chart it relies on (February 20, 2015 through March 4, 2016).  For the same period, the chart shows what each of the following HRBPs received (App. 386-387):

|                  |        |
|------------------|--------|
| Misty Donnell    | 10,300 |
| Susan Haynes     | 2,821  |
| Tina Mohan       | 8,671  |
| Jonathan Morse   | 6,397  |
| Hortensia Perez  | 1,124  |
| Russell Tookes   | 305    |

On or about September 1, 2015, Yessica Adriano replaced Hullum as the Human Resources Manager at the Lewisville, Texas office, and Adriano became Mathew's new supervisor.  App. 003 (Mathew Declaration); App. 81-82 (an email announcing this change).  They had a couple of meetings to get acquainted, but thereafter all one-on-one discussions between Adriano and Mathew were about work and issues they were handling.  Adriano and Mathew never discussed Mathew's 2015 mid-year performance review, they did not discuss her 2015 goals, and they did not discuss how Adriano could help Mathew reach her goals and improve.  App. 003.

From September 1, 2015 through December 1, 2015, Adriano and Mathew never had a one-on-one meeting about Mathew's performance, and Adriano never coached Mathew or said there were areas in which she was performing poorly.  If any such discussion occurred, then according to a company policy, Adriano was required to make a keep a written record of it.  App. 3-4 (Mathew Declaration); App. 39-45 (2013 Progressive Discipline Policy).

Santander consistently followed this Progressive Discipline Policy, using it to train and/or discipline to produce a change in specific behaviors.  App. 004 (Mathew Declaration) and

3

App. 41 (section 5.1.1, in the definition of Progressive Discipline).  The steps described in this policy were: a coaching, a verbal warning, a written warning, and a final warning.  The policy required a verbal warning to be maintained in the associate's personnel file, and it required the associate's manager to make a keep a written record of any coaching or other type of warning.  App. 42-43.  The HR employees consistently preached to the business managers the need to follow this policy, and they worked with the managers to determine the appropriate level of discipline, document the discipline, and to make sure the manager communicated with the associate about any performance issue in question so the associate could improve.  App. 004.

The HR employees collectively referred to these coachings and warnings as disciplinary actions (DAs).  Every DA was reduced to writing and reviewed, and then entered into a software program that was used to track them.  App. 408 (Deposition of Sabrina Boyd, explaining disciplinary actions).  Before December 1, 2015, no one at Santander ever provided Mathew with a coaching or a warning, and this includes purely oral conversations that were not documented – there were none.  App. 004.

On October 30, 2015, Mathew told Adriano she was pregnant.  During their brief discussion, Adriano asked Mathew what her plans were for after the baby was born.  Mathew said she did not yet know for certain.  App. 005.

Adriano's immediate supervisor was Stephanie Elad, a Director of Human Resources.  She also worked at Lewisville, and their offices were all close together.  Mathew's relationship with Adriano and Elad changed right after Adriano was informed that Mathew was pregnant.  Before, both would usually say hello in the morning and exchange greetings, but that stopped.  Their attitudes changed from being friendly to being cold and distant.  App. 005.

4

By the end of November, Elad decided she wanted Mathew separated and removed from the company. On November 24, 2015, she sent two emails, one to Michelle Watley, and one to Pamela Blackburn, suggesting that Santander offer Matthew a severance agreement. App. 96-97.

That same day, Adriano sent an email to Elad expressing skepticism regarding Mathew's claim that she had a heavy workload. Adriano knew, or should have known, Mathew's workload was heavier than other HRBPs, she had access to the information, but her message to Elad conveyed a picture of a problem employee. She told Elad she would start building documentation showing past performance problems, and she even said she was going to contact Mathew's prior supervisor in search of incidents before September 1, 2015 that she could add to the documentation. App. 98-99.

Santander claims Pamela Blackburn suggested that Mathew should be placed on a PIP rather than offered severance. Def's brief, p. 9. There is no contemporaneous documentation of this, but it is undisputed that on December 1, 2015, Mathew was placed on a PIP.

Mathew had a meeting scheduled with Adriano on December 1, 2015 to go over her 2015 annual performance review, which Mathew expected to be positive. In this meeting, Adriano told Mathew she planned to give her a negative performance review that would say she was not meeting expectations. Adriano said she was putting Mathew on a 30-day performance improvement plan ("PIP"), and she handed Mathew a written PIP. App. 006 (Mathew Declaration); App. 100-102 (the PIP).

In three places, the PIP said: "See Addendum for Specifics," but there was no Addendum attached. Mathew reminded Adriano that it was standard operating procedure to document performance issues before putting an employee on a PIP, and Mathew asked Adriano for any

5

documentation supporting the decision to impose the PIP.  Adriano seemed surprised, and she had no supporting documentation.  App. 006.

Mathew lost her composure and cried through most of this meeting.  She was beyond upset by this, and she remembers feeling her stomach clench.  Her stomach muscles remained tight throughout this meeting, and for a while thereafter.  Mathew felt completely blindsided and betrayed, she could not believe this new Manager was placing her on a PIP without any type of prior notification of negative performance issues.  A negative performance review and a PIP would disqualify Mathew from receiving her annual bonus, and it would prevent her from getting her next scheduled pay raise.  Mathew had been doing a good job, and Adriano cited no facts showing otherwise.  Mathew's job was now in jeopardy, and this made her fear the loss of income and loss of benefits to cover the medical bills she would incur for the birth of her child.  This anxiety was overwhelming, and it was with her daily throughout the month of December, like trying to walk on eggshells without breaking them.  App. 006.

After the meeting, Mathew started contacting people in the chain of command above Adriano to let them know what was going on, and to express her view that a negative performance review and PIP were unwarranted.  App. 007.  Mathew began with an email that day to Elad.  App. 104.[1]

In her email to Elad, Mathew said she had never had any formal coaching or discussion about her performance, and she had always received positive employment reviews.  Mathew asked about attendance issues Adriano raised in the meeting and how her attendance differed from anyone else's.  Elad never answered that question.  Mathew also said: "I was completely

---

[1] The time stamp on this and many of the emails produced are off by several hours, which may have something to do with the fact that Santander is owned by a company in Spain.

shocked and upset and working in HR I know that an associate shouldn't be surprised let alone have first time discussions about issues during a review." App. 104.

On December 3, 2015, Mathew sent an email to the top HR professional in the company, Michelle Watley. App. 105. After that, Mathew sent an email to a supervisor two steps up from Elad, Pamela Blackburn (Executive Vice President Human Resources). App. 110.

On December 7, 2015, Mathew sent an email to Christopher Mays, asking "have we ever put anyone on a PIP without clear cut/written documentation, for example, say the Manager said they coached the associate but there are no notes/dates etc.?" Mays was a manager in charge of talent development, which involved developing and improving the skills and talent of Santander's employees. Mathew thought if anyone knew the answer to this question, it would be him. Mays responded: "I have never worked on a PIP without the proper documentation but not sure if there is a case where this has happened with someone else. It's just like any other disciplinary action you need documentation to validate the PIP." App. 106.

On December 9, 2015, Mathew had a long phone call with Elad's immediate supervisor, Stephen Shaffer. Mathew told him that in theory, every employee can improve, but a manager needs to tell the employee that there is a problem and try to resolve it before putting an employee on a PIP. Mathew let him know that she felt betrayed and blindsided, because she had been working under Adriano and Elad for months, and neither one of them said anything to her about having performance problems. To go from no coaching or documentation to being on a PIP was unprecedented at Santander. Mathew had never seen or heard of that being done during her almost five years working there. App. 008.

Mathew never told Shaffer that 30 days was not enough time for a PIP, or that she wanted a longer PIP – not in this conversation, or any other that they had. No one wants a longer PIP,

7

and certainly Mathew did not – she wanted the PIP rescinded and gone so things could get back to normal.  App. 008.

After the call, Mathew sent Shaffer an email thanking him for taking the time to talk to her.  Mathew said: "If these are areas of opportunity that I need to work on, I can accept that but I don't accept them being brought to my attention as areas of concern for the first time during my review, let alone being placed on a PIP."  App. 112.

Normally during a PIP, a manager has regular and ongoing conversations with the employee to make sure all expectations are clearly communicated, and any deviation from expectations is pointed out promptly so the employee knows what to do and what not to do.  In December 2015, Mathew did not have a single conversation with Adriano about her performance or an alleged failure to meet expectations.  They had discussions about pending work issues, but Adriano never said Mathew's performance was anything less than expected, and she never told Mathew there were any issues or concerns about her performance. App. 8-9.

Being placed on a PIP was unwarranted, demeaning, and it felt like a betrayal.  Adriano gave Mathew nothing but positive feedback before Mathew's pregnancy announcement. Mathew felt like she did not even know who Adriano was.  Mathew was sick to her stomach every day, not knowing what else she would come across. Mathew physically felt sick most of the time, and she sometimes would physically shake with the thought of the unknown. App. 009.

As December was ending, Mathew started to look forward to the end of the PIP.  She had not heard anything negative about her performance, so she believed this would soon all be behind me.  Mathew was also told that her review would show she was meeting expectations, and she would receive her annual bonus.  Things seemed to be getting back on track.  App. 009.

Meanwhile, Shaffer did some investigation.  He spoke to Mathew's current and former supervisors (Adriano and Hullum), and Adriano's supervisor, Elad.  However, he did not speak to any of Mathew's peers or other coworkers, and none of the business-side employees Mathew supported.  Shaffer also spoke to three other Human Resources Managers about performance improvement plans and how those were normally used.  All three told him a PIP was a last straw, to be used only when prior documented attempts to improve performance had failed.  App. 123-132 (Final Report for HR).

Shaffer wrote a report, and he reviewed his impressions with Blackburn.  They both agreed the first PIP was not warranted, primarily due to the absence of any prior documentation of performance issues.  They agreed Mathew would receive an annual performance review indicating she meets expectations, and she would receive her annual bonus.  App. 139 (Blackburn's email).

Shaffer and Blackburn were nevertheless convinced by Adriano and Mathew that something was wrong, and something needed to be done.  Adriano and Elad both insisted that Mathew was a problem, and even without documentation, they convinced Shaffer her performance had been a problem and needed improvement.  App. 139.

At this point, policy and procedure, if followed, could have prevented an outcome the parties are still contesting after more than eight years.  First, there should have been an independent investigation by a disinterest investigator.  App. 398-399 (Deposition of Yessica Perez, describing what HR is supposed to do when there is a complaint of discrimination).  As a supervisor over all interested parties, Shaffer may have been reluctant to conclude that his more senior supervisors (Elad and Mathew) were wrong, so he was not truly neutral.  Furthermore, unlike other investigation summaries in the record, Shaffer's Final Report does not address or

make any findings concerning Mathew's complaint of pregnancy discrimination.  This seems inconsistent with Santander's assertion that it takes all complaints seriously and investigates them.  See, e.g., Def's brief p. 4 ("Human Resources then investigates the matter"); App. 398 (describing how HR investigates complaints of discrimination).

Second, if Shaffer and Blackburn thought there were performance issues that needed correction, the company had a policy for that.  The first step in the Progressive Disciplinary Policy was a coaching.  Shaffer and Blackburn ignored standard operating practices and decided that another performance improvement plan was in order.

In its brief, Defendant argues that a PIP at this point was more appropriate than a written warning because a written warning "would not capture the bigger picture of how she needed to improve her performance in a number of categories."  Of course it would, if that is what they chose to write in the written warning.  Going from no documented coaching or warning to a PIP was unprecedented for any employee at Santander based on Mathew's experience.  She never saw or heard of that being done during almost five prior years working there.  App. 008.

In his Final Report, Shaffer wrote that the first PIP should be rescinded, as if it never happened.  He recommended placing Mathew on a new performance improvement plan to run 90 days, and he recommended including more "SMART" objectives ("Specific, Measurable, Achievable, Results-oriented, and time bound").  He recommended weekly check-ins, and monthly reviews.  His report recognized the ongoing application of the Progressive Discipline Policy during the second PIP, stating that if Mathew failed to show improvement, "her management will move to provide her a documented verbal warning indicating where she is falling short, where she can improve, and the time frame to improve."  App. 127.  He did not

10

explain why a PIP was the way to go at this point in time rather than following policy and starting off with a warning.

On December 31, 2015, Blackburn sent an email to Elad explaining what she and Shaffer decided.  The first PIP would be extended (not rescinded) to the end of Q1 2016, "with weekly check-ins that will be documented."  She said the PIP should include specific measures, such as requiring Mathew to take a time management course.  Like Shaffer, Blackburn acknowledged that the PIP would not supplant the Progressive Discipline Policy.  She told Elad that if Mathew's performance warranted a disciplinary action, it should be documented in accordance with that policy.  Blackburn added that doing things this way "would stack up in our favor in Arbitration or open hearing."  App. 139.

Shaffer and Blackburn then left it to Adriano and Elad to draft the PIP.  App. 144 (email from Adriano to Elad sending drafts of the PIP documents she drafted).  It was Adriano and Elad whose criticisms of Mathew triggered the first PIP, which Mathew complained was motivated by pregnancy discrimination.  A clear PIP with measurable goals is not what Adriano and Elad drafted.

On January 15, 2015, Adriano and Elad met with Mathew and presented her with the documents, a 90-Day PIP (with an attached Timeline of Events), and a 90 Day Action Plan.  App. 145-153.  The PIP documents did not align with instructions from Shaffer and Blackburn.  Both of these senior managers said the PIP should have weekly check-ins, but the 90 Day Action Plan given to Mathew called for biweekly meetings.  App. 152.  As it later turned out, they did not stick to this schedule, and fewer meetings took place.  This could be an indication that the true purpose of the PIP was something other than improved performance.

11

Shaffer and Blackburn emphasized the need for specifics, but the PIP did not specify a time management class as Blackburn instructed.  Instead, the 90 Day Action Plan PIP told Mathew to "Manage time and hours efficiently," and they said Mathew should let them know if she wanted to take any training classes.  App. 152.  The only SMART objectives given were for attendance (give 48 hours' notice when requesting time off), responding to all inquiries from the business within 24 hours, and completing Disciplinary Action forms within 48 hours.  App. 152. Other expectations were vague, such as:

- "Provide support in all areas of the business to include administrative tasks."  App. 152.  The action plan gave three examples of such tasks, but it did not set a measurable objective on how much administrative support Mathew was supposed to provide.

- "Provide accurate and clear answers to business clients."  The action plan said if Mathew thought she needed "additional development in this area," she could shadow another HRBP.  Mathew was never told to shadow anyone, and in fact Mathew was a recognized leader amongst the HRBPs.  Her 2014 review noted her strengths in this area, stating: Mathew "has the most tenure and has a lot of knowledge and experience to share across all sites," "Reena is a tenured HRBP and shares her knowledge and experience with others on the team.  Reena has been instrumental in assisting with the onboarding of our new HRBPs"; "She is an excellent mentor to our HRGs and new HRBPs.  App. 51-52, 60.

Adriano and Elad said the three of them would meet every two weeks, and within 48 hours of each meeting, Mathew was supposed to send an email to Adriano recapping the discussion.  They did not say the recap needed to be detailed and needed to include every item of subject matter they discussed.  App. 009.

Santander claims Mathew wanted a longer PIP, but her reaction to the second PIP (as later described by Adriano in an email) suggests otherwise.  According to Adriano, Mathew became upset and questioned why she was now being placed on a second PIP, and she said why not just fire her now if they wanted her out of here.  App. 154.

12

Once again, Mathew believed a PIP was improper.  She did not agree that her past performance showed a need for improvement, and she knew being put on a PIP over issues that were never raised with and discussed with her was not consistent with Santander's policies and regular business practices.  App. 10.

Mathew went through the timeline that was attached to the PIP, and she saw that it was not an accurate description of the events.  For example, it incorrectly stated that both Hullum and Adriano had coached Mathew on things such as attendance issues.  Mathew typed her comments into the timeline, and she sent it to Stephen Shaffer on January 18, 2016.  App. 156-163.

Meanwhile, Mathew and Santander both retained lawyers.  On January 29, 2016, Mathew's lawyer sent a letter to Santander's lawyer accusing the company of pregnancy discrimination in violation of Title VII.  App. 172-174.  Santander's lawyer replied on February 5, 2016, saying he was investigating and would get back in touch thereafter.  App. 179.

After expressing her disagreement with the second PIP, Mathew resolved to move forward.  Mathew met with Adriano and Elad for biweekly meetings on January 29, 2016, and on February 17, 2016, followed by a 30-day review on February 26, 2016.  App. 21-24 (Mathew Declaration) App. 175 (Mathew recap of the January 29, 2016 meeting); App. 209-211 (summaries of the February 17, 2016 meeting); App. 217-225 (30 Day Review).  Adriano also promised to provide more written feedback by sending a response to each of Mathew's meeting recaps within 48 hours.  App. 209.

Adriano did not keep this promise.  There were only two more biweekly meetings after Adriano sent her email promising to respond within 48 hours.  The third biweekly meeting was on March 8, 2016, Mathew sent her recap the same day, and Adriano did not send her response until March 22, 2016 (14 days later).  App. 244-245.  The fourth biweekly meeting was on

13

March 23, 2016, Mathew sent her recap on March 24, 2016, App. 246, and Adriano did not provide a response until April 15, 2016 (22 days later).  App. 263-265.

Contrary to instructions from Shaffer and Blackburn, who said there should be monthly reviews, Adriano and Elad skipped the 60-day review.  A 90-day review was scheduled to take place on April 15, 2016.

On April 13, 2014, Elad and Shaffer talked, and they agreed Mathew would be terminated.  App. 261 ("as we agreed yesterday we should move to termination").  This decision was confirmed in emails they exchanged on April 14, 2015. App. 261.  Nevertheless, for reasons known only to Santander, they went forward with the 90-day review meeting on April 15, 2016.

During the prior 90 days, there had been some discussions about specific issues, but none of them resulted in formal discipline under the Progressive Discipline Policy.  Shaffer and Blackburn both emphasized the need for documented warnings if there were any performance problems during the PIP, and no documented warnings were given during the 90 days.  In the April 15, 2016 meeting, Mathew received six pages of criticisms, many of which had never been discussed before.  App. 263-265 (March 23, 2016 meeting recap given to Mathew at the meting); App. 266-268 (90 Day Review).

On April 19, 2016, Adriano and Elad informed Mathew of the decision to terminate her employment.  Adriano brought a box to her desk, and a security guard walked her out to her car. App. 32.

Mathew filed a Charge of Discrimination, App. 280, and almost six years later, the EEOC issued a Determination.  App. 308-309.  The EEOC found reasonable cause to believe Mathew was discriminated against because of her pregnancy by terminating her employment, but no findings were made on other aspects of the discrimination claim, and no findings were made

regarding the retaliation claim.  App.309.  These claims are now before this Court as the subject of Defendant's motion for summary judgment.

The facts are disputed, and this is not a case where the employer has proved as a matter of law that Mathew was fired for poor performance.  There is more than a scintilla of evidence from which a jury could find Santander's allegations to be pretext to conceal discrimination and retaliation.  This Court should therefore deny the motion and allow a jury to weigh the evidence and decide the outcome.

### III.  Argument and Authorities

### A.      The pregnancy discrimination claim

Plaintiff is suing for pregnancy discrimination in violation of 42 U.S.C. § 2000e, et seq. A pregnancy discrimination claim is analyzed like any other Title VII discrimination claim. *Laxton v. Gap, Inc.*, 333 F.3d 572, 577 (5th Cir. 2003).  To establish a prima facie case, plaintiff must present some facts showing that at the time of the actions complained of: (1) she was a member of a group that is protected under Title VII; (2) she was qualified for the position at issue; (3) she was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group, or she was treated less favorably than other similarly situated employees outside her protected group." *E.g., Harrison* at 429.  This creates a rebuttable presumption that the employer unlawfully discriminated against the employee. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

To rebut this presumption of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for its decision. *Id.*  Poor performance is an adequate reason "when coupled with specific examples." *Burton v. Freescale Semiconductor, Inc.,* 798 F.3d 222, 231 (5th Cir. 2015).

In the third stage of the analysis, the plaintiff must show the employer's proffered reason is a pretext for unlawful discrimination. *Laxton* at 578. "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Id.* The inquiry at this point is whether the reasons relied on by the employer are truly what motivated the actions in question. *Id. at 579*.

Santander does not dispute the first two elements of the prima facie case. Regarding the second element, Santander argues that two discreet actions, plucked from the overall set of facts, would not alone constitute an adverse action, but Santander does not dispute that being placed on PIPs and being terminated are adverse actions. Furthermore, after the Fifth Circuit's decision in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023), the proper inquiry is whether the facts as a whole show discrimination affected a plaintiff's "terms, conditions, or privileges" of employment. *Hamilton* at 502-3.

In *Harrison*, 82 F.4th 427 (5th Cir. 2023), the Fifth Circuit adopted the Sixth Circuit's *de minimus* standard to differentiate workplace trifles from injuries worthy of consideration as compensable Title VII claims. *Harrison* at 431-2. The facts in this case show the allegedly discriminatory actions complained of had more than a *de minimus* effect on Mathew.

On December 1, 2015, Mathew was about to receive an employment review that she believed would be favorable, and after the year ended, she expected to receive a substantial bonus and a pay raise. She had health insurance that would cover most of the medical bills she would be incurring for her prenatal care and the delivery of her child, expected in June 2016. She believed she was a valued employee who was respected by her managers, her peers, and by the business-side employees she supported.

16

Before the day was over, Santander had shattered her self-worth and her optimism about the future.  In the meeting with Adriano, she lost her composure and cried through the meeting. She began to experience the kinds of insult, injury, and disrespect for which Title VII allows recovery of compensatory damages.  On these facts, Plaintiff satisfies the second element of the prima facie case of pregnancy discrimination.

The last element of the prima facie case can be established in more than one way.  Given the unique facts of this case and the volume of alleged incidents of poor performance, it would be impossible to find comparators who were treated more favorably under "nearly identical" circumstances, as required by cases such as *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 261 n.25 (5th Cir. 2009).  However, because Santander claims a non-pregnant employee (Sabrina Boyd) replaced Mathew, this satisfies the fourth element of the prima facie case, and comparator evidence is unnecessary.

**B.      The retaliation claim**

Plaintiff also asserts a retaliation claim under Title VII alleging a violation of 42 U.S.C. § 2000e, et seq.  A similar burden-shifting analysis applied to Title VII retaliation claims.  To establish a prima facie claim of retaliation, a plaintiff much show "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  If the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision. *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007).  If the employer meets its burden, the burden shifts back to the employee to show that the employer's reason is really a pretext for retaliation.  *Id.* at 388-9.

17

In this case, plaintiff's protected activity was opposition, not participation, and opposing an unlawful practice is a protected activity. *Riley v. Napolitano*, 537 F. App'x 391, 392 (5th Cir. 2013). Defendant does not dispute that Mathew complained of pregnancy discrimination beginning December 1, 2015, and it does not contest that her complaints were protected activities. Santander's partial attack on aspects of the first element (arguing that two underlying facts, considered alone, are not adverse actions) implicitly concedes that being placed on a second PIP and then terminated are sufficiently adverse actions under *Burlington N. & S. F. R. Co. v. White*, 548 U. S. 53 (2006). The first element of the prima facie case is therefore not in dispute.

Regarding the second element, Santander claims temporal proximity should be measured from (a) December 1, 2015, when she first complained of pregnancy discrimination, to April 19, when she was terminated. Context, however, matters, and this Court should consider the intervening facts. On December 31, 2015, Elad announced the decision to put Mathew on a second PIP, which set in motion a continuous series of events that resulted in her termination. Thus, for purposes of the present case, the temporal proximity should be measured from December 1, 2015 to December 31, 2015, just 31 days.

The Fifth Circuit has noted that a period of four months between the two events can satisfy the causation element for summary judgment purposes. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). The decision maker's knowledge of the protected activity is also probative. *Boles v. Navarro*, No. 3:19-cv-2367-X, 2022 U.S. Dist. LEXIS 222080, at *10 (N.D. Tex. Dec. 9, 2022). By the end of December 2015, both Shaffer and Elad, the decision makers with respect to the second PIP, knew Mathew was opposing what she reasonably believed to be pregnancy discrimination.

18

On these facts, Mathew has established the necessary elements of her prima facie case.

**C.    The pretext analysis**

There is no meaningful difference (and arguably no difference) between the pretext analysis of the discrimination claim versus the retaliation claim.  Events that occurred before Mathew first engaged in protected activity are not relevant to the retaliation claim, but with that clarification, the following discussion of the facts is equally applicable to both claims.

**1.    Ways the evidence can show pretext**

"Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020).  The following are some of the more fact-specific ways of proving pretext, and all apply to the evidence in this case:

- Evidence showing the employer deviated from policies and procedures that are normally followed.  *See, e.g., Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000) (reversing judgment as a matter of law in part because employer had not followed its own corrective action plan procedures); *Goudeau v. Nat'l Oilwell Varco*, 793 F.3d 470, 477 (5th Cir. 2015) (reversing summary judgment for the employer where, among other things, the employer failed to follow its own disciplinary policy).

In this case, Santander failed to follow the 2013 Progressive Discipline Policy, its usual practices for conducting investigations, and the requirement of prior documentation before using a PIP as a last straw.

- Creating a paper trail after the decision to terminate has been made.  *See Burton* at 236-37 ("Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext. … [A]fter deciding to fire [the employee, defendants] acted to create an exculpatory paper trail. … [Defendant] directly solicited [the employee's supervisors to provide 'documentation.'").

19

The evidence shows Elad's mind was made up on or before November 24, 2015 when she sent two emails suggesting the company should offer Mathew severance. Adriano was in lock-steo with Elad, and the paper trail that was subsequently created was meant to justify a decision that had already been made.

- A lack of contemporaneous documentation. In *Laxton v. Gap*, Gap fired a manager based in part on employee complaints. Yet, at trial, "Gap produced no contemporaneous written documentation of any employee complaints, despite testimony that the corporation abides by rigorous record-keeping policies." Id. at 580.

The evidence in this case suffers from an extensive lack of contemporaneously-created documentation, as noted repeatedly throughout this brief.

- Finding fault on a matter that was not even one of the employee's duties. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 145 (2000) ("[Plaintiff] similarly cast doubt on whether he was responsible for any failure to discipline late and absent employees. [He] testified that his job only included reviewing the daily and weekly attendance reports, and that disciplinary write-ups were based on the monthly reports, which were reviewed by Caldwell. . . . Sanderson admitted that Caldwell, and not [plaintiff], was responsible for citing employees for violations of the company's attendance policy.").

Mathew does not dispute that it was reasonable she should assist with administrative tasks, as needed, but the record in this case shows that she did so whenever a clear expectation was communicated. With respect to the December 28, 2015 payroll issue, however, Santander is guilty of placing fault on Mathew because she, and several other HRBPs, were unable to complete the Kronos audit required to resolve the issue.

- Temporal proximity plus. In *Burton*, quoting from other cases, the court stated: "'Timing standing alone is not sufficient absent other evidence of pretext.'" *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 330 (5th Cir. 1998). "'[T]he combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.'" *Evans*, 246 F.3d at 356 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). In *Evans*, the court noted that a

20

gap of four months, coupled with other evidence of pretext, could still be close enough in time to support a finding of pretext. *Evans* at 354.

Plaintiff relies on temporal proximity, but not solely. In conjunction with all other evidence, there is ample evidence in the record to find pretext and deny Defendant's motion for summary judgment.

To prove pretext, it is not necessary for an employee to disprove every fact the employer relies on as a justification for the termination. For example, in *Burton*, it was undisputed that the employee broke a wafer, but: "Because the broken wafer was not proffered as an independent basis for termination, however, this single substantiated shortcoming does not doom Burton's endeavor to show pretext." *Burton* at 234. This court may therefore be persuaded that one or more instances of poor performance is proved as a matter of law, but that would not end the inquiry.

The overall question, for purposes of the pretext analysis, is whether Santander has proved as a matter of law that its overall assessment of poor performance was the true reason for the PIPs and the termination. *See Laxton* at 578 ("Our inquiry is whether [Gap's] perception of [Laxton's] performance, accurate or not, was the real reason for her termination."). If there is more than a scintilla of evidence calling this into doubt, then the case should proceed to trial where a jury can weigh the evidence and decide. *Id.* at 585.

In the following discussion, Plaintiff will address all facts identified by Defendant as justifications for the adverse actions in question. The facts are addressed in three parts: (1) facts supporting the first PIP, (2) subsequent facts cited as support for the second PIP, and (3) the facts from January 15, 2016 through April 19, 2016 that allegedly justified termination.

### 2.      The facts cited as support for the first PIP are pretextual

Santander claims it had legitimate reasons for placing Mathew on the first PIP, but the evidence shows reason for doubt.  One of the reasons given is demonstrably untrue, and all others are genuinely disputed.

#### a.      The January 2015 a delay processing the end of a contractor's contract was a not an issue at the time

Santander began using a new procedure for processing data when a contractor's assignment ended, and there were problems.  In this instance, Mathew did not see that she was supposed to do the data entry to note that a contractor's assignment had ended, which caused a delay making the necessary changes in the computer records.  It was an ongoing problem for other HRBPs as well.  Elad decided the oversight did not warrant disciplinary action.  In an email to Hullum she said: "I would just have a conversation with Reena. This is a new process so I know we are going to have a few bumps."  App. 72.

#### b.      False accusation that Mathew failed to send a summary that was requested

On February 11, 2015, Hullum asked Mathew to provide a summary of what she learned from an HR lunch presentation Mathew attended the day before.  App. 75.  Mathew complied by emailing her summary to Hullum the next day.  App. 74-75.

Santander later claimed that Mathew never provided the summary Hullum asked for, and Adriano included this in her Timeline of Events as an example of poor performance.  App. 149 (the first item on the first page).  After learning of this false accusation in January 2016, Mathew located the email she had sent a year earlier and forwarded it Stephen Shaffer on January 20, 2016.  App. 74.  This incident does not provide any factual support showing poor performance.

### c.    The criticisms of monthly recaps sent to Hullum in 2015 do not show a performance problem

Three times during 2015, Hullum asked her direct reports to send her an email summarizing things they did during the prior month.  She asked them to include the number of "Side-by Sides with HR and the Business," the number of "jumpstarts," and the number of meetings with business leaders.  Def's App. 134.

There was no policy or rule requiring HRBPs to do a certain number of these things, and Hullum never set an expectation about what she wanted the HRBPs to do.  The HRBPs did these things when and as needed.  It was therefore common for one HRBP to do more monthly side by sides, jumpstarts, and/or business leader meetings than others did.  App. 11.

If Hullum thought Mathew needed to do more of anything, she could have said something to Mathew and she would have done it.  Hullum never gave Mathew any feedback on any of the monthly recaps she submitted.  Hullum never questioned why Mathew had not done more of any one thing, and she never told Mathew to do more.  App. 11.  In the absence of proof that a prior expectation was set, and Mathew failed to meet it, Santander's criticisms about these recaps do not illustrate a performance deficiency.

### d.    There is no evidence that Mathew's absences in 2015 burdened others

Defendant claims Mathew was criticized for giving short notice of schedule changes because her supervisors and colleagues had to cover for her so that the needs of the business were met while she was out.  If Santander supported this assertion with evidence, then the criticism could be an example of a performance issue.  However, with only one small exception discussed in the next paragraph, there is no such evidence.

On November 16, 2015, Adriano gave Mathew permission to leave early that day. Fifteen minutes later Mathew remembered something she was supposed to help with at 5 p.m.

that day.  Santander had a new-hire class coming in for orientation and paperwork, and Sabrina Boyd and Mathew were going to help collect and make copies of driver's licenses and social security cards.  Mathew asked Adriano if she could assist Boyd, and Adriano replied "yes no issue, what time is that."  Adriano said she would be at work until 6 that day anyway.  App. 89 (instant messages between Mathew and Adriano).

This is the only example in the summary judgment record of a task that another employee had to complete because Mathew was absent, and this incident does not show a performance problem because Adriano agreed to cover the task.  If it was unacceptable for Mathew to leave early that day, Adriano could have said no.  Having said yes, Santander cannot retroactively turn this into an example of poor performance.

> **e.** **Disputed claim that Mathew was asked to redo the August 2015 time study**

In August 2015, Hullum asked Mathew to track what she did each day in 15-minute increments, and then send a document at the end of the week showing everything she did.  Mathew did as requested and submitted the time study.  App. 14.

Hullum never told Mathew the time study was vague, nor did she ask Mathew to do it a second time.  App. 14.  Defendant has no contemporaneous evidence showing that Hullum asked Mathew to do the study a second time, and there is only one time study in the summary judgment record, not two.  As proof of a second request, Santander cites an email Adriano sent six months later, on February 15, 2016, claiming she'd been told by Hullum it had to be requested a second time.  A reasonable jury might be skeptical of this claim; it is contained in an email from Elad to Shaffer where she defends the decision to put Mathew on a PIP by listing, and arguably embellishing, prior performance issues.

### f.   August 2015 – Mathew asked an employee to sign a document

As Defendant's brief states, the issue here was a gap in Santander's processes, not a performance issue on Mathew's part.  Def's brief, p. 6 ("In reality, the issue was related to a gap in Santander's processes.").  The brief says Elad coached Mathew on this, but there is no contemporaneous documentation of a coaching.  The pages cited as support for this alleged coaching consist of (a) Elad's unsigned declaration (Def's App. at p. 21, ¶ 7) and an email Elad sent to Shaffer on December 10, 2015 where she defends her decision to put Mathew on a PIP. Elad tells Shaffer she coached Matthew, and Mathew disputes this.  App. 10.

### g.   Disputed claim that Mathew received extensive coaching

Defendant contends that Hullum, Adriano, and Elad all provided coaching to Mathew about her performance prior to December 1, 2015.  There is no contemporaneous documentation to support this, which is significant because Santander followed a policy requiring any coaching to be documented.  In her declaration, Mathew explains this policy was diligently followed to foster communication between managers and employees and thereby improve performance. App. 004.

In one of its few fact-specific claims about alleged coaching, Santander asserts that Adriano met with Mathew one-on-one to go over her 2015 mid-year review, and Adriano subsequently set up weekly coaching meetings with Mathew.  Def's App. 004.  Mathew denies these allegations.  App. 003.

As evidence of these coaching meetings, Santander cites six Outlook calendar appointments indicating one-on-one meetings were scheduled.  However, nothing in these documents indicates the meetings were coaching sessions.  Mathew contends that any one-on-one meetings she had with Adriano were discussions of ongoing business matters, not coaching.

App. 003.  On these facts, a fair-minded jury could conclude Santander did not coach or warn

Mathew about poor performance at any time before December 1, 2015.

### h.       Disputed claim about continual reminders

Santander claims that Hullum "continually reminded [Mathew] to work full shifts and

provide sufficient notice when requesting to leave early."  App. 149 (the second item under July-

August 2015).  Mathew denies these allegations.  App. 14.  Santander has no documentary

evidence, contemporaneous or otherwise, indicating Hullum ever said these things to Mathew.

Santander claims that in the July-August 2015, Mathew was "advised of the importance

in submitting DA's to the business in a timely manner, and addressed on not leaving all DA

entries solely to the generalist, everyone needed to assist with the workload."  App. 149 (the third

item under July-August 2015).  There is no email, instant message, text message, or other form

of written communication to Mathew on any of these things.  Mathew denies these allegations.

App. 14.

Regarding DAs, the evidence indicates Mathew was processing more DAs than other

HRBPs.  *See* Def's App. 125-138.  The sample size is small, but these pages show:

> ➢ Mathew processed 105 DAs in March, and 77 in April.  Def's App. 140, 144.
> ➢ Glenna McDonnell processed 47 in March. Def's App. 132.
> ➢ Dean Holt processed 26 in March. Def's App. 136.
> ➢ Whitney Andres processed 70 in April. Def's App. 139.

There is no evidence that Mathew failed to submit DA's to the business in a timely

manner, and no evidence she left DA's solely to the generalist, the person whose actual job duty

was doing the data entry required to process the DAs.  *See* App. 255, an April 1, 2016 email from

Adriano to Elad listing Sabrina Boyd's duties.

### i.   Disputed claim that Hullum had to finish Mathew's tasks

The company also claims: "Manager constantly stepped in to finalize pending DA's and process terminations."  App. 149 (fourth item under July-August 2015).  These are conclusory assertions, and there is no evidence that either of these things ever happened.  In her declaration, Mathew states that Hullum never stepped in to finalize one of her DA's or to process one of her terminations.  App. 14.

### j.   Disputed claim that Mathew asked for help with the investigation checklist

Santander contends that on October 12, 2015, Mathew asked for help with an investigation checklist.  App. 150.  There is no contemporaneous or subsequent documentation of this.

The investigation checklist was a project that Mathew and some other HRBPs started working on near the start of 2015.  By October 12, 2015, the HRBPs were finished, and Adriano went over the final documents with Elad and other Human Resources Managers.  Adriano told Mathew that Elad wanted one thing changed, and Adriano said she would do that herself.  App. 15.  Mathew disputes the allegation that she asked for help on the checklist on or about this date.

### k.   Disputed claim that 10 DAs were late

On October 26 and 27, 2015 (Monday and Tuesday), Mathew was out of the office at a conference.  On Wednesday, she saw ten requests to HR asking for help with DAs, and so far no one else had done anything about them.  Mathew therefore sent an email to the AVP over each of the three departments from which these requests originated.  She let them know she had been out, but she now had these DA requests, and they would be ready no later than Friday.  That way, if one was needed sooner, it would get expedited processing.  No one said any of the DAs were needed sooner.  App. 15; App. 87 (the email).

On Thursday, October 29, 2015, Brad Denetz came into the HR offices, but he did not some to discuss the status of the DAs, he came about an issue with an employee named Rhonda. While he was there, he talked with Adriano and Mathew.  During the conversation, he asked about the status of the ten DAs, but he did not say he needed them ASAP.  App. 15.

Later that day, in an instant message conversation with Adriano, Mathew updated Adriano on the status of the DAs.  Adriano responded "ok thank you."  App. 88.  If the DAs were needed sooner, then logically her response would have been something like: *be sure to get those done ASAP like Brad wanted*.

No one, not Adriano, Denetz, or any of the three AVPs, said that any of the DAs were needed ASAP.  There was not a conversation where Adriano advised Mathew that DAs were time sensitive.  Mathew does recall that Adriano said to let her know if Mathew was ever behind, so others could assist.  App. 15.

> **l.**     **Disputed claim that Mathew failed to follow an instruction and was coached the next day**

Defendant claims that Mathew failed to comply with an instruction from Elad about a bereavement request, and that Adriano discussed this failure with her the next day.  Both facts are disputed.

On November 6, 2015, Sabrina Boyd was reviewing an employee's request for time off due to a death in the family.  Sabrina came to Mathew's office and said she was suspicious about the request.  Mathew did a quick Google search, and they confirmed there was good reason to be suspicious.  It was about ten minutes.  App. 15.

Elad then came into Mathew's office and told them to quit spending time on this, so Mathew and Boyd stopped. App. 15-16.  Adriano did not provide any feedback the next day on this issue specifically, or on time management in general.  App. 16.

28

**m.    Disputed claim that there was a reminder about attendance on November 17, 2015**

Adriano claims that on November 17, 2015, she: "reminded Mathew of the importance of prior notification when wanting to leave early, as it impacts the team.  Advised how team came in early and stayed late to cover, advised if in the future work is pending leave requests will be denied."  App. 149.  Mathew disputes that this conversation ever happened.  App. 16.

A reasonable jury could doubt the veracity of the part about the team coming in early.  This reminder about leaving early allegedly took place the day after Mathew asked, at 9:53 a.m., if she could leave early that day.  App. 89 (see the message Mathew sent at 9:53).  Because of the timing, this could not have been the cause of anyone coming in early that day.

A reasonable jury might also doubt that anyone had to stay late because Mathew left early.  Adriano said she was already planning to stay until 6 that day, App. 89 Adriano's message at 10:17 a.m.), so helping Boyd with for ten minutes starting at 5 that afternoon would not have required her to stay late.

**n.    Hortensia Perez conducted an investigation, but this was not an example of a performance problem**

It is true that Mathew asked if another HRBP, Hortensia Perez, could handle an investigation, but this does not show poor performance on Mathew's part.

On November 20, 2015, Mathew got a call from a manager at 8585 in Dallas.  He needed someone from HR to talk to an employee and take such further actions as may be necessary.  Hortensia Perez was the on-site HRBP at 8585, so it made sense for her to speak to the employee since she was already there.  Mathew spoke to Adriano and cleared that plan with her.  Otherwise, Mathew would have handled it.  App. 16.

o.   **Disputed issue about timely processing an employee resignation on November 23, 2015**

On November 21, 2015 (a Saturday), Deirdre Crouch resigned.  Santander claims: "Mathew was responsible for processing the termination first thing the following Monday morning."  Brief, p. 32.  There is no evidence this was required or expected of her.

The standard expectation for processing employee resignations was to process them no later than the next business day after the resignation, not first thing in the morning.  Mathew would have met this expectation, but Adriano processed the resignation herself.  App. 16. Nothing about this event shows poor performance on Mathew's part.

p.   **Disputed issues concerning the Mathew's limited involvement with the Deirdre Crouch investigation in October 2016**

Mathew discusses this in detail in her Declaration.  App. 17-18.  An Assistant Vice President asked Mathew to sit in on a meeting between Crouch and the AVP, and Mathew did as requested.  Mathew is accused of wrongdoing here because Crouch had previously said in an email that she was not comfortable with this AVP, so Santander says it was poor judgment to interview these two together.  Mathew was not doing an interview, and she did not make the decision Santander is now questioning.  App. 17.

When the meeting ended, Mathew's involvement with Crouch's issues were over. Another HRBP was assisting the AVP, so there was no further need for Mathew to be involved or follow up.   After Crouch resigned, Mathew was asked for a summary of her meeting, and she provided it.  *See* App. 86.  Mathew did not tell Adriano she had not read Crouch's entire email. Mathew did not tell Adriano she didn't believe Crouch or that her allegations were unsubstantiated.  App. 18.  Hullum later wrote an email about the events and she describes how the situation was handled poorly, but she does not place any of the blame with Mathew.  App. 94.

30

**q.      Disputed claim that a termination request was vague**

Defendant claims that on November 23, 2015, Mathew submitted a termination that was vague.  App. 151.  The best evidence of this would be the termination request itself, but Defendant has not included the termination request in the summary judgment evidence. Defendant does not explain how the termination request was vague.  Conclusory statements such as this are not proper summary judgment evidence.

Defendant's contention is also disputed.  Mathew recalls this was a termination for falsification of time, and her termination request clearly stated that this was the basis for termination.  It was not vague.  Adriano later asked Mathew for her notes from a meeting, and Mathew sent them, but Adriano did not ask Mathew to revise and resend the termination request. Regarding the fact that Mathew and two others met with the associate, Adriano said nothing about that to Mathew at the time.  App. 18.

**r.      Dispute claims about November 24, 2015 compliance emails**

As evidence of poor performance, Defendant claims that Mathew notified her manager of an issue and asked to get others involved to address it.  Def's brief, p. 33.  If the tasks at hand were solely Mathew's responsibility, that might suggest a performance concern.  However, the tasks (five compliance emails) were not Mathew's responsibility.  Mathew was willing to chip in and help, but she sought to spread out the work so she could focus on her core responsibilities. App. 19.  A reasonable jury could find that this incident does not demonstrate poor performance.

**3.      December 1, 2015 through January 15, 2016:
the facts cited as support for the second PIP**

**a.      Disputed facts regarding a December 8, 2015 email**

In its brief, Santander describes an email from Scott Dieckmann dated December 8, 2015 expressing some concerns about Mathew.  At this point, Mathew had been placed on a PIP to

improve her performance.  If there was a complaint about Mathew's performance, especially during a PIP, her manager should have told her about it and discussed ways to do better.

However, Adriano did not mention this email, or the underlying issue.  Mathew first learned of the alleged issues on January 15, 2016, when she reviewed the timeline that was attached to the PIP.   App. 19.

Mathew recalls that she helped a manager in the credit cards group, Jeff, with some employees who were bickering with each other.  Mathew suggested transferring one of the employees, which is something the company often did in such situations.  Jeff agreed, and it solved the problem.  App. 19.

Mathew handled the matter start to finish.  If the manager or his AVP (Dieckmann) had asked to have a different HR member review and finalize the case, normally this would have been done, but in this instance that did not happen.  App. 19.

### b.    Unwarranted criticism about the December 28, 2015 payroll issue

 On December 28, 2015, an HRBP named Whitney Andres alerted Mathew to an issue concerning payroll.  To resolve the issue, someone needed to complete an audit in the Kronos time software.  This was an HR Generalist responsibility to be completed every other Monday, before pay day Fridays.  *See* App. 255, an email listing as one of Sabrina Boyd's duties: "Kronos Audit follow up (Payroll Mondays)." Due to a scheduling error on the part of Adriano and the other HR Managers, all of the HR Generalists were off that Monday, and none of the other HR employees working that day had been trained to complete the Kronos audit.  App. 20.

Adriano was off that day.  Adriano did not get Mathew involved as Santander claims, Whitney Andres or Paula Blayney did, as shown by the email chain that day about Holiday Pay. App.  133-135.

When Adriano became aware of the situation, she asked Sabrina Boyd to help.  The issue could not have been resolved without one of the HR Generalists.  The fact that Mathew and the other HR employees on duty that day could not complete the work does not show poor performance because the audit was not one of their job responsibilities, and they had not been trained on how to do the audit.  App. 20-21.  Faulting an employee for failing to complete a task the employee is not responsible for is likely a pretextual excuse for the employer's adverse actions.  *Reeves* at 145-146.

### 4.     January 15, 2016 through April 19, 2016: facts cited as justification for the termination

Santander claims Plaintiff's ongoing poor performance during the second PIP justified her termination.  It contends that no reasonable jury could find the performance issues alleged by Santander during this period were pretextual excuses for discrimination and retaliation.  However, if there is more than a scintilla of evidence suggesting discrimination or retaliation motivated the termination, summary judgment must be denied.  *See, e.g., Laxton* at 585 (where there is more than a scintilla of evidence from which a jury could infer discrimination: "It is the province of the jury to judge the credibility of witnesses and resolve conflicts in the evidence, and we will not second-guess its rejection of [the employer's] proffered justification.").

### a.     Disputed contention that the January 25, 2016 recap was late

On January 20, 2016, Mathew met with Shaffer to explain why she disagreed with the second PIP.  After reviewing the timeline of events attached to the PIP, she knew more about the accusations against her and she could now rebut the specifics.  Mathew also argued that even if they accusations were true, a second PIP was unjustified and contrary to policies that Santander consistently followed.

On January 21, 2016, Shaffer sent an email asking Mathew to summarize the meeting in writing, and to send it to him "by Monday, January 25, 2016." App. 164.

On Monday, January 25, 2016 at 11:19 a.m. Shaffer sent Mathew an email accusing her of missing the 8 a.m. deadline to send him the summary. App. 171. He set a new deadline of noon that day, only 41 minutes away, and followed-up with an email saying a summary by noon would not excuse the missed 8 a.m. deadline. App. 170-171. Mathew replied explaining that she was still working on it, and she later emailed her summary. App. 165-168.

A jury considering this evidence might notice that: (a) Shaffer's Monday deadline morphed into a Monday 8 a.m. deadline, and (b) rather than asking Mathew how she was coming along on this task, Shaffer sent two aggressive emails accusing her of wrongdoing by missing his deadline. A jury might also question whether Shaffer's responses, and the criticisms therein, were consistent with the stated purposes of the PIP, to improve Mathew's performance.

### b.   Disputed facts regarding two investigation summaries

In February 2016, Mathew investigated a confrontation between call center employees, Monisha Hughes-Trigg and John Leavell. Mathew submitted two investigation summaries, one specific to each employee. Santander claims the Monisha summary was late, and that Mathew failed to follow a specific instruction from Elad about the John summary.

The Monisha summary was due on Monday, February 15, 2016, and Mathew had it ready to submit by 9:57 that morning. Before sending it to Elad, Mathew wanted Adriano to clarify one aspect of a new process the company was using. Mathew sent an instant message to Adriano at 9:57 a.m. asking a question about the process, thinking it was better to get it right the first time instead of having to fix it later. Mathew sent a follow-up question at 10:13, and she did not get a response for over an hour, so she followed up with another message at 11:37. Adriano answered

the question at 11:42, App. 182, and Mathew emailed the investigation summary at 12:43 p.m. on the day it was due.  This was not a missed deadline.

Regarding the John Leavell investigation summary, Mathew sent it to Elad on February 10, 2016.  App. 180-181.  On February 12, 2016, Mathew met with Adriano and Elad.  Elad asked Mathew to me to move some text ("email from John Leavell's wife") from "Confirmed Allegations" to the "Unconfirmed Allegations" section of the summary.  App. 22.  Mathew made the change, and she sent the revised summary to Elad on February 16, 2016.  App. 186-187.  Elad replied the next day, stating "Approved."  App. 186.

Six days later, in her response to one of Mathew's PIP meeting recaps, Adriano wrote that Mathew failed to follow Elad's instruction.   App. 210.  Adriano's accusation was wrong in two ways.  First, she said the text in question was in the Monisha investigation summary.  However, the Monisha summary did not mention a wife's email, whereas the John Leavell summary did.  Second, Elad's instruction was to move the text from one section of the summary to another, which Mathew did.  Adriano incorrectly claimed the instruction was to exclude the text.  App. 210.  Several times during the PIP, Adriano used this incident to falsely accuse Mathew of failing to follow Elad's instruction, and she claimed this was an example of Mathew's lack of attention to detail and inability to follow instructions.  To the contrary, however, Mathew's conduct in this situation was an example of proper performance and meeting the expectations of an HRBP.

### c.     Disputed facts concerning the degree of detail expected in a meeting recap

Santander claims Mathew sent an email in February that was not sufficiently detailed.  A jury could disagree with this as an example of poor performance because Adriano had not previously set an expectation about the specificity she wanted in the email.

At the start of the second PIP, Mathew was told there would be biweekly meetings with Adriano and Elad to talk about how she was doing.  Adriano asked Mathew to send her a written recap of these discussions within 48 hours after each meeting.  Adriano said nothing about being detailed and specific.  App. 23.

On February 2, 2016, Mathew sent a recap of the first biweekly meeting.  It was a brief overview of the discussion.  For example, Mathew said: "Just as a side note, we also discussed my perspective on things and how PIP had been handled in my case."  She did not go into detail about what was discussed.  App. 175.

In the second biweekly meeting, there was no discussion about providing greater detail in the next meeting recap.  App. 23.  Therefore, on February 17, 2016, Mathew sent a recap of the second biweekly meeting that was like her first recap, an overview of the discussion.  App. 201.

On February 19, 2016, Adriano responded, saying "this summary is not what was requested or expected" because it "does not capture the main points or our discussion."  Adriano told Mathew to "add significantly more detail and submit to me no later than Monday, February 22 by 10 am."  App. 203.

Mathew forwarded these emails to Elad as an example of a recurring problem – Adriano fails to state her expectations, and the criticizes when her expectations are not met.  App. 206.  Rather than stepping in to resolve things and try to prevent further miscommunications, Elad joined Adriano in criticizing Mathew for her lack of detail.  App. 205-206.

On February 22, 2016, Adriano sent an email explaining her expectations on this issue going forward.  App. 209.  After this clarification, there was no subsequent criticism concerning a lack of detail in the meeting recaps.  This incident shows Mathew was able to meet

expectations when they were properly communicated, not poor performance that justified termination.

### d.      Disputed facts about an email Elad thought was misleading

In March 2016, Elad came to believe that Mathew intentionally misled her about the status of a project she was working on.

Santander wanted to recognize and reward employees for perfect attendance.  Mathew and others were putting together the details – defining what was meant by perfect attendance, what kinds of absences were excused, things like that.  On and off for the last year, she frequently had to request attendance data from another department, Human Resources Information Services (HRIS).  App. 24-25.

On March 10, 2016, one of the corporate officers Mathew as working with sent an email to Mathew and Elad.  He wanted to know how many employees had perfect attendance during the last three months of 2015.  Mathew replied: "I will get that count for you."  App. 227.

March 11, 2016 was Mathew's last day in the office before her vacation the following week, and she knew she knew it would probably take HRIS some time to get the data together. She emailed Elad letting her know she would be out the next week "but will have those numbers when I return if that's ok."  She added: "I am also partnering with HRIS to assist but wanted to give you a status update before I left."  App. 229-230.  Elad replied asking if it could be done sooner.  App. 229.  Less than 20 minutes later, Mathew emailed HRIS asking for the data and telling them to send it to Elad and Adriano the following week.  App. 231-232.

Elad later found out that when Mathew sent the email stating "I am also partnering…" Mathew had not yet sent an email asking HRIS for the data.  Elad thought the way the email was worded was misleading.  Mathew explained she did not mean to be misleading, she only meant

that she had partnered with HRIS before and her intent was to do so again, which she did

minutes after the "partnering" email to Elad.  App. 26.

Whether this is an example of intentional misconduct of poor performance is for a jury to

decide.

### e.    Disputed facts about being more independent during employee investigations

Santander claims Mathew was unable to comply when she was asked to exercise more

independent judgment during the course of her employee investigations.  The record does not

support this contention.

All of the HRBPs regularly conducted employee investigations.  Employees complained

about each other and their managers, and managers complained about their employees.  HR got

involved to assist and to determine an appropriate course of action, which often required

employee interviews, document review, things like that.  The HRBP was then expected to write

an investigation summary and send it to one of their supervisors.

The standing expectation was for HRBPs to work closely with their supervisor, the HR

Manager, during all phases of each investigation.  For example, on November 15, 2015, Adriano

sent an email to eighteen HR employees.  She sent three forms to be used when conducting

investigations, and in her email, she said: "Remember to **partner with your HRM** prior to

commencing and **while handling investigations**."  App. 119 (emphasis added).  Mathew

followed this instruction and communicated regularly with her HRM, Adriano, during the course

of her employee investigations.

Adriano acknowledged Mathew's compliance with this expectation in an email she sent

on February 22, 2016.  This was Adriano's feedback about the second biweekly meeting that

took place on February 17, 2016.  Adriano wrote: "We have met prior to each investigation and

38

decided upon action plans, this has worked out well, let's continue."  App. 210.  In the 30-Day Review, Adriano wrote: "During these past 30 days, you have lead four investigations each of which we have discussed and agreed upon course of actions to take- this has worked out well, and we will continue this strategy."  App. 217.

On March 8, 2016, a new expectation was communicated.  Adriano and Elad told Mathew start acting more independently and make more decisions on their own during the course of employee investigations.  App. 26.  Adriano later wrote, in an email, that this was now the expectation for HRBPs.  App. 244.  Mathew expressed some hesitation because she was on a PIP, and she was afraid this could backfire on her App. 244.  However, the instruction having been given, Mathew complied going forward.  In all of the subsequently-created PIP documents, the meeting recaps and the 90 Day Review, there is nothing indicating Mathew fell short of this new expectation.

With no supporting evidence, Santander claims Mathew "constantly interrupted" Adriano with questions about investigations, which "overwhelmed" Adriano, making her far less productive.  Def's brief, p. 17.  A reasonable juror might think that with so many interruptions, Santander could point to a specific date, a specific employee investigation, a single question Mathew interrupted Adriano by asking, and maybe a single example of the impact such interruptions had on Adriano's productivity.  There is, however, no such evidence in the summary judgment record.  This issue does not illustrate poor performance, but using this as an example of poor performance does indicate that Santander is making up pretextual excuses for terminating Mathew.

### f.      Disputed facts regarding the talking points Elad asked for

On April 1, 2016, Santander claims Mathew missed a deadline, in part due to an alleged failure to properly prioritize her time during the work day.  Mathew disputes these contentions.

The deadline in question was communicated on March 28, 2016.  Elad sent an email to Mathew, cc to Adriano, about the perfect attendance program she was working on, stating: "I'd like to provide the business with talking points to introduce and cascade this program. Please put something together for my review by EOD Friday.  Yessica should review and provide input prior to sending to me.  This communication will go to the Associate level."  App. 248.

On Friday, April 1, 2016, Mathew knew she had plenty of time to prepare the talking points.  However, Adriano told her to prioritize an employee investigation for one of the managers, Jorge Munoz, instead of working on the talking points.  Mathew did the work on the investigation, and then closed her door to work on the talking points.  Mathew was also reviewing some attendance data that Elad wanted, and at this point she did not have a lot of time left in the day.  App. 27.

Adriano left early that day without telling Mathew, and without checking on the status of the talking points, even though she knew she was supposed to review something that day before Mathew sent it to Elad.   Mathew was able to reach Adriano by phone and review the talking points she had written, and then Adriano emailed the talking points to Elad at 7:17 p.m.  App. 252.  Mathew stayed late and put in the extra work required to get this to Elad on the day it was due.  App. 27.

Elad, however, accused Mathew of missing the deadline.  That day, at 5:11 p.m., Elad sent an email to Shaffer claiming Mathew missed a deadline.  In her email, she told Shaffer the deadline was "EOB" that day, so here at 5:11 p.m. "I consider this a missed deadline."  App. 251.

The actual deadline stated in her earlier email was "EOD" (end of day) not "EOB" (end of business) as she told Shaffer.

Shaffer replied, telling Elad she should have been more specific and said it was due at 5:00 pm.  App. 251.  A reasonable jury could easily disagree and see this as a contrived effort to twist the facts to try and justify the termination.  Adriano later criticized Mathew for poor time management, arguing that she should have prioritized completing the talking points over working on the investigation.  App. 264.

> **g.   Santander's contentions regarding the Brittany Brodie investigation are contrived and unconvincing**

Santander claims Mathew took too long to complete an employee investigation and submit her investigation summary, and it criticizes Mathew's final work product.  The facts show the investigation summary could not have been sent any sooner, and the criticisms of the final product are misplaced.

The week of April 4, 2016, Adriano and Mathew both investigated a situation involving an employee named Brittany Brodie.  Mathew's portion of the investigation summary was finished on Wednesday, April 6, 2016, and she sent an instant message to Adriano asking if her part was finished so Mathew could submit the final report.  Adriano said she had not finished, so they agreed Mathew could submit the final report the next day.  App. 256.  Adriano did not provide her part of the investigation until Friday, April 8, 2016.  App. 28.

Another reason for delay was the fact that on Thursday, April 7, 2016, an Assistant Vice President asked Adriano and Mathew to interview another witness, which Mathew did that afternoon.  On Friday, April 8, 2016, she still had not received Adriano's portion of the report, so Mathew sent her a draft of the report to Adriano with a reminder to add her portion in the body of

the report.  App. 28; App. 391-392 (Mathew's email stating, a red font: "Yessica, could you pls fill this part in?).

Instead of responding to Mathew so she could finalize and send the report to Elad, Adriano added her part of the investigation and sent it to Elad.  Adriano later blamed Mathew for failing to include her interview notes as an attachment to the email that Mathew sent her that day. App. 30.  This criticism is misplaced because the interview notes must be attached to the final summary, and the email to Adriano was only a draft.

Santander also claims Mathew's investigation summary was defective because something was missing, a section summarizing the employee's prior DA history.  This criticism is misplaced because there was no rule or requirement to include such a section, as the following facts show.

First, the new template the HRBPs were using for investigation summaries did not include a section for the employee's DA history.  App. 30.  Second, a few weeks earlier, Adriano sent one of her investigation summaries to Mathew and told her to use it as a guide for her own summaries.  The summary Adriano sent as a guide did not include a section for DA history.  App. 167-178.

### h.  Disputed issues that were not mentioned when they arose and were first presented on April 15, 2016

In addition to the foregoing, there is a laundry list of complaints that were never discussed with Mathew until April 15, 2015, when they were presented to her in writing.  *See* App. 263-268, two documents given to Mathew at the April 15, 2016 meeting.  By this time, Santander had already decided to terminate her.  Attached in the appendix at page 261 are emails between Elad and Shaffer on April 14, 2016 which show they reached a decision on April 13, 2016, and confirmed it in this email exchange on April 14, 2016.  The subsequent criticisms presented to Mathew on April 15, 2016 therefore came too late to be of any help achieving the

stated goal of improving performance, which could lead a reasonable juror to wonder why they were presented at all. That juror might then conclude Santander's actions and criticisms on April 15 were a pretext, documentation intended to conceal discrimination and retaliation.

In the first document, March 23, 2016 Meeting Recap, Adriano went on at length about the alleged misrepresentation on March 11, 2016, and she added even more criticisms about the incident that had not been mentioned at all during the one-month plus since then. First, she said Mathew waited too long to contact HRIS to ask for the information the officer wanted, and she should have asked "much sooner." App. 264. The officer asked for the information on a Thursday, and Mathew asked HRIS for the information the next day, so it could not have been done "much" sooner. At the time, Elad did not see a problem with the fact that Mathew did it the next day. App. 249, "what am I missing."

Second, Adriano falsely accused Mathew of blaming HRIS and the officer for delays getting the information from HRIS. App. 264. There is no evidence that she blamed them for delay. Adriano, Elad and Mathew all expressed frustration about the process for getting the information, App. 233, ("Sheesh!" and "a nightmare") but Mathew never blamed HRIS or the officer for anything. App. 29.

Third, Adriano claimed Sabrina Boyd had to step in, and she identified and overcame obstacles when Mathew could not. This too was false. At Mathew's request (made while she was out on vacation) Boyd sent an email to HRIS asking if they were working on Mathew's March 11 request for information. App. 239. Boyd later reviewed the data HRIS provided and sorted the data according to directions that Mathew gave her, but Mathew was otherwise responsible for all aspects of the communications to get the data needed from HRIS. App. 29. If Boyd had actually identified issues Mathew had not, and overcame obstacles Mathew was unable

43

to overcome, Santander could present specific facts, or at least specify one such issue or obstacle. It has not.  If Mathew was so clearly a poor performer deserving of termination, Santander would not need to exaggerate Boyd's work on this matter to justify its actions.

Regarding "timely follow up," one of the documents presented to Mathew on April 15, 2015 says: "DA's being completed within 24 hours."  App. 266.  If this is intended to be an accusation that Mathew was failing to meet this expectation, Mathew disputes this.  App. 31. Defendant has not identified a single DA that took her longer than 24 hours to complete, and there is no evidence this claim was previously discussed with Mathew as a problem during the 90-day PIP.

In "Thoroughness and Quality of Work," Adriano added new criticisms about the talking points Mathew sent to Elad on April 1, 2016.  Back in March, Elad asked Mathew to "put *something* together for my review."  App. 248 (emphasis added).  Mathew did that, and Adriano approved what she had written before they went to Elad.  Now, more than two weeks later, Adriano criticized the "something" that was sent for the following reasons: "The perfect attendance talking points document had to be revised in the following ways in order to be business presentable: inserted introduction, added program objective, included sub topics (objective, eligibility, and rewards), reworded and expanded rules of the program, and changed format/font."  App. 267.  However, because Elad did not ask Mathew to give her talking points in a specific format or using a specific font, these criticisms are unwarranted.

The next point about teamwork in completing administrative tasks (App. 267) had not been discussed since the March 8, 2016 meeting where Adriano acknowledged that Mathew was doing more of these tasks.  After that, there is no evidence that Mathew failed to meet this expectation.

Furthermore, the statement in this document about the total number of DAs at the Lewisville location is not credible. The document says there were 568 DAs for this site in March/April. App. 267. If true, that would mean that more than two-thirds of the employees at this location were issued a disciplinary action during a two-month period. Mathew contends this volume of DAs would have been unprecedented. App. 31. There is no document in the summary judgment evidence providing this underlying data about the DAs during this two-month period.

Santander's final piece of documentation is the eight anonymous comments from business clients. App. 267-269. There is no evidence of who made the comments, no evidence linking seven of them to Reena Mathew as opposed to some other employee, no facts indicating whether Adriano hand-picked individuals to seek feedback from, or were these unsolicited comments, we do not know if the statements were communicated in writing (which would beg the question – why weren't any of the underlying communications, emails or otherwise, provided to this Court as evidence) or were they oral statements, subject to lapses of memory before being reduced to writing. The comments are analogous to the alleged employee complaints made against the plaintiff in *Laxton v. Gap*. In the absence of contemporaneous documentation to vouch for the authenticity and accuracy of the alleged complaints, the jury that heard the evidence in that case could have found this to be a false accusation against Laxton. *Laxton* at 580. As in Laxton, there is reason to doubt that these comments were a genuine reason supporting Mathew's termination. Coupled with all of the foregoing dubious allegations, Mathew has produced substantial evidence that the allegation of poor performance was a pretext for discrimination and retaliation.

45

**5.      Posturing the case for litigation as pretext**

Defendant claims it put Reena on a second PIP due to ongoing performance issues, Def's brief pp. 33-34, but there is evidence of a different motive. In the email she sent on December 31, 2015, Pamela Blackburn indicates that she and Stephen Shaffer decided on "extending PIP to Q1 with weekly check-ins that will be documented." She adds: "This would stack up in our favor in Arbitration or open hearing." App. 139. In other words, a second PIP would allow Santander time to create documentation on a weekly basis to shore up its defense to a lawsuit.

No later than January 29, 2016, Santander retained outside counsel, and Mathew's attorney send a letter to Santander's attorney opposing what Mathew reasonably believed to be pregnancy discrimination. App. 172-174. Santander's attorney replied, stating that he was investigating and would be reaching back out thereafter. App. 179.

On February 15 and 16, 2016, Adriano and Shaffer sent multiple emails to an in-house attorney named Catessa Malone to bring her up to speed. App. 192-200. On February 23, 2016, Adriano asked Malone to provide her with feedback about what to say in the written 30-Day Review she was preparing. App. 212. Malone replied the next day asking if outside counsel should review and comment as well, and Adriano said yes. App. 212.

On February 24, 2016, Holly Hanes began assisting. App. 213. According to her LinkedIn profile, Hanes' duties at the time included managing legal investigations and claims. App. 390. On February 26, 2016, Elad joined the "legal group" working with the attorneys. 215. At this point, Elad and Adriano were immersed in the legal group's work to defeat claims that night arise, while also purportedly supporting Mathew in a good-faith effort to improve her performance. The lines were blurred enough to call into question the motive behind every

46

decision and every action, which weighs heavily against Santander's assertion that there is no evidence of pretext.

In March 2016, when Adriano was drafting her response to Mathew's recap of their March 8, 2016 meeting, Adriano sent Hanes a draft of her comments, and Hanes set up a call with the attorneys.  App. 241-243.  On April 14, 2016, Adriano sent a draft of the 90 Day Review she was preparing for her meeting with Mathew the next day, and she told Hanes to have the legal team review.  App. 260.  Because Santander's decision to terminate Mathew's employment was made on April 13, 2016, the sole purpose in having Hanes and the legal team work on the 90 Day Review would have been to better posture the case for litigation.

**6.      Presenting misleading evidence to the EEOC shows pretext**

A jury may view "erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination." *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013).  Santander's position statement in this case stated that on or about two dates (November 17, 2015, and February 17, 2016), Mathew had the lightest workload of any HRBP who reported to Adriano.  App. 288, 293.  By January 11, 2016, Santander knew this was not true.  Emails show that Elad looked at the headcount spreadsheet circulated in a weekly email, and then she and others saw that Mathew's workload was heavier even that that of Whitney Andres, who was doing "double duty."  App. 141-142.  Thus, these statements to the EEOC were knowingly false.

**D.      Flawed Arguments Asserted in Santander's Brief**

At various points in its brief, Santander makes three arguments that are contrary to well-established Title VII principles.

47

### 1.      The animus necessary to prove discrimination

Santander's brief implies that to prove her case, Mathew must prove Adriano harbored

hostility for Mathew's pregnant status.  Def's brief, p. 42.  However, an employer can take

adverse action because of pregnancy even in the absence of hostility for the pregnant.  *See, e.g.,*

*Bostock v. Clayton County*, 590 U.S. 644, 663 (2020) (a lack of animosity is no defense where

adverse decisions are taken against an individual because of his or her membership in the

protected class).

### 2.      Santander's flawed same-group theory

Santander also suggests that mother could not have discriminated against an employee for

pregnancy, but the superficial logic of this argument has been thoroughly rejected.  As the United

States Supreme Court has stated: "Because of the many facets of human motivation, it would be

unwise to presume as a matter of law that human beings of one definable group will not

discriminate against other members of their group."  *Oncale v. Sundowner Offshore Servs., Inc.*,

523 U.S. 75, 78 (1998).

In *Jazayeri v. Avaya, Inc.*, No. 2:19-cv-06003-JDW, 2021 U.S. Dist. LEXIS 101008 (E.D.

Pa. May 28, 2021), a party asked the court to draw conclusions based on a supervisor's Indian

heritage and Hindu religion. The court condemned his argument "in the strongest possible

terms," adding:

> Justice should be blind. Courts do not draw conclusions about anyone—not
> lawyers, not parties, and not witnesses—based on their membership in a protected
> class. Instead, courts make determination about the people who appear before
> them based on the evidence they muster and the way that they behave. That is,
> they make judgments about people as individuals, not as members of a group.
> This should be true in every case, and it should be apparent to every lawyer that
> appears before the Court.

*Id.* at \*17-18. *See also Laveglia v. TD Bank, N.A.,* No. 19-cv-01917-JDW, 2020 U.S. Dist. LEXIS 85659, \*8 (E.D. Pa. May 15, 2020) (noting that accepting such an argument "would make the Court complicit in discrimination in its own right"). For these reasons, it would be improper for this Court to stereotype Adriano and Elad, and assume how they would act based solely on their membership in a group known as working mothers.

### 3.    Token examples of employees who had positive experiences during their pregnancies is irrelevant

Santander also relies on declarations from other employees who had positive experience working for the company during their pregnancies, but such evidence is irrelevant.  First, none of these employees worked under Adriano or Elad.  Second, there "is no token exception to anti-discrimination law." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 588 (7th Cir. 2011); *see also Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir. 1992). Title VII focuses on "the protection of the individual employee, rather than the protection of the minority group as a whole." *Connecticut v. Teal,* 457 U.S. 440, 453–54 (1982).  Title VII does not "give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Id.* at 455.

### Conclusion

The foregoing analysis of the record permits a reasonable inference that Santander's proffered reasons for its actions are pretextual excuses intended to conceal pregnancy discrimination and retaliation.  Plaintiff respectfully requests that the notion for summary judgment be denied.

Respectfully submitted,


/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-0260
Email: don.uloth@uloth.pro
Counsel for Plaintiff


### CERTIFICATE OF SERVICE

I certify that on September 20, 2024, I am filing this motion electronically using the Court's ECF filing system, which will email a file-marked copy of this motion to all counsel of record.

/s/ Donald E. Uloth
Donald E. Uloth