**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| REENA S. MATHEW, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:23-cv-01494-N |
| | § | |
| SANTANDER CONSUMER USA INC., | § | |
| | § | |
| *Defendant.* | § | |

# DEFENDANT'S APPENDIX IN SUPPORT OF ITS MOTION TO STRIKE PLAINTIFF'S DECLARATION AND BRIEF IN SUPPORT THEREOF

# TABLE OF CONTENTS

| Document | Page(s) |
|---|---|
| Declaration of Sabrina Boyd (Oct. 11, 2024) | APP001–APP002 |
| Declaration of Reena Mathew (Sept. 20, 2024), ECF No. 36 | APP003–APP037 |
| Excerpts from the Deposition of Reena Mathew (Aug. 8, 2024) | APP038–APP043 |
| Instant Message Exchange Between R. Mathew and Y. Perez (Oct. 29, 2015), Pl.'s App.088, ECF No. 36 | APP044 |
| E-mail message exchange between R. Mathew and S. Shaffer (Jan. 18, 2016), Pl.'s App.156–163, ECF No. 36 | APP045–APP052 |
| Instant Message Exchange Between R. Mathew and S. Boyd (Mar. 8, 2016) | APP053–APP056 |
| E-mail message exchange between S. Elad, Y. Perez, and H. Hanes (Mar. 15, 16, and 29, 2016), Pl.'s App.249, ECF No. 36 | APP057 |

Respectfully submitted,

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142


By:   *Monte K. Hurst*
      Monte K. Hurst
      State Bar No. 00796802
      Monte.Hurst@hallettperrin.com

      Clayton S. Carter
      State Bar No. 24120750
      CCarter@hallettperrin.com

      *Counsel for Defendant*
      *Santander Consumer USA Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that, on October 11, 2024, I served the foregoing document on Plaintiff's counsel, as follows, electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Mr. Donald E. Uloth
DONALD E. ULOTH, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Don.Uloth@uloth.pro


*Monte K. Hurst*
Monte K. Hurst

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **REENA S. MATHEW,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 3:23-cv-01494-N** |
| | § | |
| **SANTANDER CONSUMER USA INC.,** | § | |
| | § | |
| *Defendant.* | § | |

# <u>DECLARATION OF SABRINA BOYD</u>

I, Sabrina Boyd, declare that the following statements are true and correct, based on my personal knowledge:

1.  My name is Sabrina Boyd.  I am over 18 years of age, of sound mind, and have never been convicted of a felony.  I am personally acquainted with the facts stated herein based on my employment with Santander Consumer USA Inc. ("Santander"), and my review of the business records of Santander related to Reena Mathew ("Mathew"), and I affirm that the following is true and correct.

2.  Each of the documents included in Defendant's Appendix in Support of Its Motion to Strike Plaintiff's Declaration and Brief in Support Thereof, pages APP053–APP056, were made and kept in the regular course of Santander's business.  It was the regular practice of Santander to make each record. Each record was made at or near the time of the event it records.  Each record was made by, or from information transmitted by, a person with knowledge acting in the regular course of Santander's business.

MTS APP001

Docusign Envelope ID: C15FD3B8-1161-4FEC-BD7E-670D762BB814

My name is Sabrina Boyd.

My date of birth is     March 11, 1980.

My address is        3125 Dawn Oaks Drive.

                    Denton, Texas 76208.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in __Denton_____ County, State of Texas, on the __11th___ day of October, 2024.

Signed by:

*Sabrina Boyd*

F023D26C561A49F...

SABRINA BOYD

MTS APP002

## DECLARATION OF REENA S. MATHEW

1.       My name is Reena S. Mathew.  I am over twenty-one (21) years of age, and I am competent to make this Declaration.  I have personal knowledge of the facts set forth herein, and they are all true and correct.

My Work as an HRBP

2.       I worked for Santander as a salaried employee in Human Resources from February 1, 2011 until April 19, 2016.

3.       For the last few years of my employment, my title was Human Resources Business Partner ("HRBP"), and I worked at the company's offices in Lewisville, Texas.  My immediate supervisor also worked there – Angelina Hullum, a Human Resources Manager.  Another HR employee working there was Sabrina Boyd, a Human Resources Generalist who handled administrative tasks.

4.       Santander did annual written performance reviews on all employees.  My reviews were always positive, and they all indicated that I was meeting or exceeding expectations.  The only annual performance review that I still have in my possession is for 2014.  A true and correct copy of this performance review is attached hereto, the pages are numbered App. 46-63.  I have a mid-year review for the first half of 2015, but it does not include an overall score.  A true and correct copy of this mid-year review is attached hereto, the pages are numbered App. 67-71.  The comments are generally favorable, and Angelina Hullum included some goals and things to work on during the second half of the year.

5.       Santander had an employee recognition program called You Earned It.  Any employee could award Your Earned It points to another employee for exemplary work, or going

1

MTS APP003

above and beyond on something.  I regularly received points from the business side managers and officers I supported.

6.      On or about July 10, 2015, Hullum asked me to take on HR responsibilities for 67 employees who worked at another location that we referred to as 8585, because of its street address on Stemmons Freeway in Dallas.  I discussed this with Hullum because there were fewer employees total at 8585 than there were in Lewisville, and an HRBP named Hortensia Perez already worked there full time.  To me it made more sense to me for Perez to handle these employees, but Hullum assigned the 67 extra employees to me anyway.  *See* App. 79-80, which is a true and correct copy of an email from Hullum sent to me on July 10, 2015 confirming this additional responsibility.

7.      Regarding the issue Elad described in paragraph 7 of her declaration, she did not discuss this issue with me in August 2015.  Elad did not coach me on this or any other issue ever.

Adriano Became my Supervisor

8.      On or about September 1, 2015, Yessica Adriano replaced Hullum as the Human Resources Manager at the Lewisville, Texas office, and she became my supervisor.  Adriano was also put in charge of 8585.  Attached as App. 81-82 is a true and correct copy of an email sent on August 24, 2015 describing Adriano's new duties.

9.      I had a couple of meetings with Adriano to get acquainted.  Thereafter, all one-on-one discussions we had were about work, and issues we were handling.  Adriano and I never discussed my 2015 mid-year performance review, we did not discuss my 2015 goals, and we did not discuss how Adriano could help me reach my goals and improve.

10.     From September 1, 2015 through December 1, 2015, Adriano and I never had a one-on-one meeting about my performance, and Adriano never coached me or said there were areas in which I was performing poorly.  If we had, then according to company policy, Adriano

MTS APP004

was required to make a keep a written record of it.  *See* the 2013 Progressive Discipline Policy.  A true and correct copy of this policy is attached as App. 39-45.

11.     Santander consistently used this Progressive Discipline Policy to train and/or punish in order to produce a change in specific behaviors.  App. 41 (section 5.1.1, in the definition of Progressive Discipline).  The steps described in this policy were: a coaching, a verbal warning, a written warning, and a final warning.  The policy required a verbal warning to be maintained in the associate's personnel file, and it required the associate's manager to make a keep a written record of any coaching or other type of warning.  App. 42-43.  In HR, we consistently preached to the business managers the need to follow this policy, and we worked with the managers to determine the appropriate level of discipline, to document the discipline, and to make sure the manager communicated with the associate about any performance issue in question so the associate could improve.

12.     The HR employees collectively referred to these coachings and warnings as disciplinary actions (DAs).  Every DA was reduced to writing and reviewed, and then entered into a software program that was used to track them.  Before December 1, 2015, no one at Santander ever provided me with a coaching or a warning, and this includes purely oral conversations that were not documented – there were none.

13.     In 2015 and 2016, I had a much heavier workload than most other HRBPs.  The factor that most affected my workload was employee headcount, the number of employees for whom I had primary HR responsibilities.  An HR employee named Nicole Heinicke kept and regularly updated a Headcount by Department spreadsheet that showed the total headcount I and 7 other HR employees at three Dallas area locations were responsible for.  Almost every week, Heinicke emailed out a link to this spreadsheet to other HR employees.  The weekly spreadsheets

MTS APP005

that have been produced in this case show that from September 16, 2015 through April 11, 2016, I consistently had the highest or second-highest headcount of any other HRBP – it was always Whitney Andres or me who was highest.  My headcount varied from a low of 646 to a high of 904, and Whitney's headcount shows a low 666 and a high of 706.  Below Whitney and me were HRBPs with under 415 employees.  *See* App. 310-385.  I sometimes mentioned my heavy workload to Adriano and/or Elad hoping for a reprieve.  However, no changes were made to balance out my heavy workload with the much lighter workload of other HRBPs.

<u>Things Changed After I Told Adriano I Was Pregnant</u>

14.     On October 30, 2015, I told Adriano I was pregnant.  I remember because I had an appointment that day with my obstetrician/gynecologist for a checkup.  I was 39 years old at the time, and because of my age, this was considered a high-risk pregnancy.  This was my first appointment with the OB-GYN during this pregnancy, and I was anxious to find out if everything was okay.  The doctor confirmed that everything was going well, so I planned to tell Adriano that I was pregnant when I got back to the office.

15.     When I got back to work after the appointment, I went into Adriano's office and told her I was pregnant.  During this brief discussion, Adriano asked me what my plans were for after the baby was born.  I told her I did not yet know for certain.

16.     Adriano's immediate supervisor was Stephanie Elad, a Director of Human Resources.  She also worked at Lewisville, and our offices were all close together.  My relationship with Adriano and Elad changed right after I told Adriano that I was pregnant.  Before, we would usually say hello in the morning and exchange greetings, but that stopped.  Their attitudes changed from being friendly to being cold and distant.

MTS APP006

December 1, 2015 – The First of Two PIPs

17.    On December 1, 2015, I had a meeting with Adriano to go over my 2015 annual performance review.  I was expecting a positive review, but in this meeting, Adriano told me she planned to give me a negative performance review that would say I was not meeting expectations. She told me she was putting me on a 30-day performance improvement plan ("PIP"), and she handed me a written PIP.  A true and correct copy of this PIP is attached to this declaration, App. 100-102.

18.    There were three places in the PIP where it said: "See Addendum for Specifics," but there was no Addendum attached.  I reminded Adriano that it was standard operating procedure to document performance issues before putting an employee on a PIP, I asked Adriano to show me any documentation supporting her decision to put me on a PIP.  She seemed surprised by my comments, and she had no supporting documentation.

19.    I lost my composure and cried through most of this meeting.  I was beyond upset by this, and I remember feeling my stomach clench and the muscles remained tight throughout this meeting and for a while thereafter.  I felt completely blindsided and could not believe this new Manager was placing me on a PIP without any type of prior notification of any negative performance issues.  A negative performance review and a PIP would disqualify me from receiving my annual bonus, and it would prevent me from getting my next scheduled pay raise.  I had been doing a good job, and Adriano cited no facts showing otherwise.  My job was now in jeopardy, and this made me fear the loss of an income and loss of benefits to cover the medical bills I would incur for the birth of my child.  This anxiety was overwhelming, and it was with me daily throughout the month of December, like trying to walk on eggshells without breaking them.

MTS APP007

20.     After the meeting, I started contacting people in the chain of command above Adriano to let them know what was going on, and to express my views that a negative performance review and a PIP were unwarranted.  I started with an email that day to Adriano's immediate supervisor, Stephanie Elad.  A true and correct copy of this email is attached to this declaration, App. 104.

21.     In my email to Elad, I told her I had never had any formal coaching or discussion about my performance, and I had always received positive employment reviews.  I asked her about the attendance issues Adriano raised and how my attendance differed from anyone else's.  Elad never answered that question.  I also said: "I was completely shocked and upset and working in HR I know that an associate shouldn't be surprised let alone have first time discussions about issues during a review."  App. 104.

22.     On December 3, 2015, I sent an email to the top HR professional in the company, Michelle Watley.  App. 105.  After that, I sent an email to Pamela Blackburn (Executive Vice President Human Resources).  App. 110-111.

23.     On December 7, 2015, I sent an email to Christopher Mays asking "have we ever put anyone on a PIP without clear cut/written documentation, for example, say the Manager said they coached the associate but there are no notes/dates etc.?"  Mays was a manager in charge of talent development, which involved developing and improving the skills and talent of Santander's employees.  I thought if anyone knew the answer to this question, it would be him.  Mays responded: "I have never worked on a PIP without the proper documentation but not sure if there is a case where this has happened with someone else. It's just like any other disciplinary action you need documentation to validate the PIP."  A true and correct copy of these emails is attached, App. 106.

MTS APP008

24.     I dispute Santander's contention stating a reason why a PIP was more appropriate than a written warning.  Santander claims a written warning "would not capture the bigger picture of how she needed to improve her performance in a number of categories."  Of course it would, if that is what they chose to write in the written warning.  Going from no documented coaching or warning to a PIP was unprecedented for any employee at Santander based on my experience.  I had never seen or heard of that being done during almost five years working there.

25.     On December 9, 2015, I had a long phone call with Stephen Shaffer.  I told him that in theory, every employee can improve, but a manager needs to tell the employee that there is a problem and try to resolve it before putting an employee on a PIP.  I let him know that I felt betrayed and blindsided because I had been working under Adriano and Elad for months, and neither one of them said anything to me about having performance problems.  To go from no coaching or documentation to being on a PIP was unprecedented at Santander.

26.     I never told Shaffer that 30 days was not enough time for a PIP, or that I wanted a longer PIP – not in this conversation, or any other that we had.  No one wants a longer PIP, and certainly I did not – I wanted the PIP rescinded and gone.

27.     After the call, I sent Shaffer an email thanking him for taking the time to talk to me.  In my email I said: "If these are areas of opportunity that I need to work on, I can accept that but I don't accept them being brought to my attention as areas of concern for the first time during my review, let alone being placed on a PIP."  App. 112.

28.     Normally during a PIP, a manager has regular and ongoing conversations with the employee to make sure the expectations are clearly communicated, and any deviation from expectations is pointed out promptly so the employee knows what to do and what not to do.  In December 2015, I did not have a single conversation with Adriano about my performance or an

MTS APP009

alleged failure to meet expectations.  We had discussions about pending work issues, but she never said my performance was anything less than expected, and she never told me there were issues or concerns about my performance.

29.     Being placed on a PIP was unwarranted, demeaning, and it felt like a betrayal. Adriano gave me nothing but positive feedback before my pregnancy announcement. I felt like I did not even know who Adriano was.  I was sick to her stomach every day, not knowing what else she would come across. I physically felt sick most of the time, and I sometimes would shake with the thought of the unknown.

30.     As December was ending, I started to look forward to the end of the PIP.  I had not heard anything negative about my performance, so I believed this would soon all be behind me.  I was also told that my review would show I was meeting expectations, and told that I would receive my annual bonus.  Things seemed to be getting back on track.

<u>January 2016 – The Second PIP</u>

31.     In early January 2016, I had another conversation with Shaffer.  He told me I was being placed on another PIP, this one for 90 days.  I knew this was unwarranted and contrary to company policy.

32.     On January 15, 2016, I met with Adriano and Elad.  They handed me two documents: (1) a Performance Improvement Plan (this one had the Addendum attached, which was a timeline of events), and (2) a 90 Day Action Plan.  True and correct copies of these documents are attached as App. 145-151, and App. 152-153, respectively.  Adriano and Elad said the three of us would meet every two weeks, and within 48 hours of each meeting, I was supposed to send an email to Adriano recapping our discussion.  They did not say the recap needed to be detailed and should include every item of subject matter we discussed.

MTS APP010

33.     Once again, I believed a PIP was improper.  I did not agree that my past performance showed a need for improvement, and I knew putting me on a PIP over issues that were ever raised with and discussed with me was not consistent with Santander's regular business practices.

34.     When I went through the timeline that was attached to the PIP, I saw that it was not an accurate description of the events, and it incorrectly stated that both Hullum and Adriano had coached me on things such as attendance issues.  I typed my comments into the timeline, and I sent it to Stephen Shaffer on January 18, 2016.  True and correct copies of my email and the attached timeline are attached to my declaration as App. 156 and App. 159-163, respectively.  My comments included some of the following points.

Santander's Examples of Poor Performance

35.     January 2015.  Santander began using a new procedure for processing data when a contractor's assignment ended, and there were problems.  In this instance, I did not see that I was supposed to do the data entry to note that a contractor's assignment had ended, which caused a delay making the necessary changes in the computer records.  It was an ongoing problem for other HRBPs as well.  Elad decided the oversight did not warrant any disciplinary action.  On January 22, 2015, in an email to Hullum, Elad said: "I would just have a conversation with Reena. This is a new process so I know we are going to have a few bumps." App. 72.  Elad never coached me about this incident.

36.     February 11, 2015.  The first item on the timeline is false.  She said I failed to send Hullum a summary of an HR luncheon I went to, but that's not true.  The luncheon took place on February 10, 2015, and I emailed my summary to Hullum on February 12, 2015.  A true

9

and correct copy of this February 10 email is attached to my declaration, App. 74-75.  I later forwarded this email to Shaffer so he had proof that I had sent the summary.  App. 74.

37.     Monthly recaps (April 9, 2015, May 18, 2015, and August 13, 2015).  For a few months in 2015, Hullum asked her HR employees to send her an email providing certain information on things we had done during the preceding month.  Among other things, she asked about meetings with business leaders, training, and activities that we referred to as "side by sides," "jumpstarts."

38.     There was no policy or rule requiring HRBPs to do a certain number of these things, and Hullum never set an expectation about what she wanted us to do.  So we did them when and as needed.  It was common for one HRBP to do more monthly side by sides, jumpstarts etc. than others did.  If Hullum thought I needed to do more of anything, she could have said something to me, and I would have done it.  Hullum never gave me any feedback on any of the monthly recaps I sent her.  She never questioned why I had not done more of any one thing, and she never told me to do more.

39.     Attendance issues:  Several entries in the timeline point to times I asked for and got approval to arrive late, take a longer lunch, or leave early.  I never did so without prior approval, and if my request was denied, I worked my normal schedule.  No one ever told me I needed to give more advance notice of such requests.  No one ever said these deviations from the routine adversely affected my coworkers, or the business-side employees that we served.  The facts about these attendance issues are as follows:

a.  July 1, 2015.  I emailed a coworker to let her know I was leaving for a doctor's appointment at 1 pm and I asked if she was ok with that.  App. 78.  I did not need her permission, but I wanted to make sure she was okay with me leaving in case

10

maybe there was something important going on that I did not know about, in which case I would have stayed.  She told me it was ok if I left at 1 pm and worked remotely after the appointment.

b.  <u>August 23, 2015</u>.  I asked Hullum if it would be ok if I was a little late the next day, and she told me it would be no problem.

c.  <u>September 3, 2015</u>.  I emailed Adriano asking to use some of my accrued paid time off (PTO), including a half-day off the next day, and some full days later in the month.  Hullum replied: "Hi Reena, that is fine, may you please input the dates into my calendar."  A true and correct copy of this email exchange is attached, App. 83.

d.  <u>September 4, 2015</u>.  Adriano had approved this as a half day, but the timeline says I worked longer, until 2 pm.  App. 149-150.  I completed all of my work before leaving, and there was nothing left undone that someone else had to cover.

e.  <u>September 17, 2015</u>.  I never left early without my manager's knowledge and approval, and this day was no exception.

f.  <u>October 29, 2015</u>.  I told Adriano that I had a doctor's appointment the next morning.  It was an important appointment (first OB-GYN appointment of my pregnancy), but I did not tell Adriano I couldn't miss it.  To the contrary, after Adriano and I talked about things going on at work that day, I offered to reschedule the appointment, and I called the doctor's office to reschedule.  The only available times were several days out, and I spoke to Adriano again.  She told me to keep the appointment and I could arrive late the next morning.  App.

11

MTS APP013

161 (my January 18, 2016 comments on the timeline).  I would have rescheduled the appointment if Adriano didn't approve the late arrival in advance.

g.  <u>November 16, 2015</u>.  In an instant message conversation, I asked Adriano if I could leave around 3 pm, and I asked if she would be able to help Sabrina Boyd with a short ten-minute task at 5 pm.  This was a new-hire class, and we needed to collect and make copies of driver's licenses and social security cards.  Adriano told me "yes no issue."  A true and correct copy of these messages is attached, App. 89.

h.  <u>November 25, 2015</u>.   The timeline is wrong about the date here.  On November 24, 2015, I let Adriano know that I had a doctor's appointment during my lunch and I might be gone for a little more than an hour.  Adriano did not object.  If she had, I would have rescheduled the appointment.  A true and correct copy of this instant message conversation is attached, App. 95.

40.  <u>July 2, 2015</u>.  Angelina Hullum asked me if I could work on a task that was not even my job.  I was busy, so instead of promising to do things I might not have time to do that day, I asked her if this could be assigned to someone else to handle.

41.  <u>July 10, 2015</u>.  This is when I was assigned 67 employees at 8585.  Hullum asked me to do it, and I complied with her request.

42.  <u>August 23, 2015</u>.  I got prior approval from Hullum to arrive slightly later the next day, and I would not have come in late without her prior approval.

43.  <u>July-August 2015</u>.  I have the following clarifications about the four paragraphs in this portion of the timeline:

MTS APP014

a.  "Stated the work load …"  With the additional responsibilities for the employees at 8585, I was very busy.  Hullum said she thought it might help if I kept track of my daily activities in 15-minute increments, which I did. She was no more specific than that.  She did not show me an example of what she meant, nor did she describe the level of detail she was seeking.  It was difficult to track things in 15-minute increments because I rarely worked on a single thing for 15 minutes without having to deal with something else, like answering a call or responding to an email.  Hullum did not ask me to do the time study a second time, and she never told me the time study I submitted was vague.

b.  "Continually reminded …"  Hullum never told me I needed to work full shifts, and she never told me to provide more notice when requesting to leave early.  I needed no such warnings or reminders, because I got my work done, and I did it well.  The only time someone else ever had to do something for me because of an absence was the ten-minute task on November 16, 2015 (discussed above).

c.  "Strongly advised …"  This sentence is not true, Hullum and I never had such a conversation.

d.   "Manager constantly stepped in …"  This sentence is also not true.  Hullum never had to take over a DA I was working on to finalize it.  Hullum never had to take over a termination that I was handling and process it.

44.  <u>September 28, 2015</u>.  The HRM referenced here is Yessica Adriano, and we never had a conversation like the one she describes here.  She never told me that my job required a high level of efficiency.  It did, but she didn't ever tell me that.

13

45.     <u>October 12, 2015</u>.  The investigation checklist was a project that I and several other HRBPs started working on about ten months earlier.  By October 12, 2015, the project was finished.  Adriano went over the final documents with other Human Resources Managers and the HR Director, Stephanie Elad.  Adriano told me Elad wanted one thing changed, and she would do that herself.  It's not true that I asked Adriano for assistance with the investigation checklist.

46.     <u>October 29, 2015</u>.  "Brad, site Director …"  This was a Thursday.  On Monday and Tuesday of this week, I was out of the office attending a conference sponsored by SHRM (Society for Human Resource Management).  On Wednesday, I saw that three separate business units had asked HR to prepare some DA's, and so far no one had done anything about them.  I sent an email to the AVP over each department letting them know I'd been out for two days, but the requests have been received and they would be ready no later than Friday.  A true and correct copy of my email to the AVPs is attached, App. 87.  On October 29, 2015, Brad Denetz came into the HR offices to discuss something unrelated to the DAs, and he talked with Adriano and me.  During the conversation, he asked about the status of the DAs, but he did not say he needed them ASAP.  Later that day, in an instant message conversation with Adriano, I updated Adriano on the status of the DAs.  App. 88.  She did not say that any of the DAs needed to be done ASAP.  She did not advise me that DA's are time sensitive.  I do recall her telling me to let her know if I was ever behind so others could assist.

47.     <u>November 6, 2015</u>.  Sabrina Boyd was reviewing an employee's request for time off due to a death in the family.  Sabrina came to my office, and she told me she was suspicious about the request.  I did a quick Google search, and we confirmed there was good reason to be suspicious.  It was less than ten minutes.  Elad then came into my office and told us to quit

MTS APP016

spending time on this, so we did.  The statement about not following Elad's instruction and wasting additional time is false.  When she said stop, we stopped.

48.    <u>November 9, 2015</u>.  No such feedback was provided.  The first time I heard that there was a concern about this issue was on January 15, 2016, when Adriano put me on a PIP and I saw this entry in the timeline.  It had not been discussed before that.

49.    <u>November 17, 2015</u>. The first paragraph for this date in the timeline is false. Adriano never reminded me about prior notification about leaving early.  As the documents show, I always gave such notification and either got approval or did not take off.  Adriano never told me "the team" had to do anything to cover for me.  There is some truth to the second paragraph, I did at times say the workload was overwhelming, but Adriano never did anything to balance out the workload amongst the HRBPs.

50.    <u>November 20, 2015</u>.  Late in the day I got a call from Jeff, a manager at 8585 in Dallas.  He had an issue with an employee at that location.  He needed someone from HR to talk to the employee, and to follow up if necessary.  Hortensia Perez was the on-site HRBP at that location, so it made sense for her to speak to the employee since she was already there.  I spoke to Adriano and cleared that plan with her.  Otherwise, I would have handled it.

51.    <u>November 23, 2015</u>.

   a.  The standing rule for processing employee resignations was to have them done by the end of the business day following the resignation.  I learned of this employee's resignation Monday morning when I checked my email, and I planned to process the termination that day.  Before I did so, Adriano told me she would do it.

15

MTS APP017

    b.  Regarding the last sentence in this first paragraph, "the situation was mishandled and was not followed up on," I was not at fault in how the earlier situation was handled.  Here is the background on this.

        i.  On October 19, 2015, an AVP named Tara Stewart asked me to sit in on a meeting the next day with an employee named Deirdre Crouch.  Stewart was already working on this issue with Misty Donnell, an HRBP at the North Richland Hills location, so my involvement was limited to this one meeting.

        ii.  Stewart led the meeting and asked questions.  She was able to identify a few discreet issues, and she assured Crouch that she would follow up and try to resolve the conflicts she had with her manager.  The meeting lasted over an hour, and it ended with Crouch stating that she felt better.  That was the end of my involvement, Stewart did not ask me to do anything else.  I also knew that Misty Donnell was working with her, so there was nothing further for me to do.  I later wrote a summary of this meeting.  App. 86.

        iii.  After Crouch resigned a month later, Adriano later did an investigation and wrote a summary.  App. 120-122.  It says I should not have met with Stewart and Crouch together because Crouch had previously mentioned her discomfort with Stewart.  I had no say over who was going to be at this meeting, I was just doing what an AVP asked.  This criticism is baseless.

MTS APP018

iv.  I did not assume the responsibility of conducting the investigation.  I did only what Stewart asked me to do, and I knew she was working with another HRBP on the matter.

v.  I dispute the contention that I concluded none of Crouch's complaints were substantiated.  The investigation summary I wrote does not include this conclusion, and I never said this to Adriano.

vi.  I never told Adriano that I did not read Crouch's entire email, and I did not tell her that I did not believe Crouch.  Adriano also says there was no follow up.  Because the matter was being handled by others, there was nothing further required of me.  If this had been my investigation and I failed to follow up, this could be a valid criticism, but given my limited role with this employee's issues it is not.

vii.  There is evidence indicating that whoever was in charge of this investigation could have done better.  For example, in an email dated November 24, 2015 describing the events, Hullum said: "There were too many hands in this situation, with the confusion as to who was handling what/based on location/departments. Jodi, Misty and I were on one page, and Reena and Tara were on another page. In the end, I believe Tara ended up making her own decision and placing the Associate on the DA, which I thought was a Final."  A true and correct copy of this email is attached, App. 94.

viii.  Adriano did not reprimand me, or tell me I must investigate with an open and fair mind.

17

52.     <u>November 23, 2015</u> (second paragraph).  This was a termination due to

falsification of time, and my termination request clearly stated the basis for termination.  It was

not vague.  Adriano did later ask me for my notes from a meeting, and I sent them, but she never

asked me to revise and resend the termination request.  Regarding the fact that I and two others

met with the associate, Adriano said nothing about that to me at the time.

53.     <u>November 24, 2015</u>.  I saw that another part of the HR department was asking us

for help with some compliance issues – paperwork we needed to do to comply with regulations

that applied to Santander because we did consumer lending.  This was not a part of my job.  I

was willing to pitch in and help, but I did not want to do all of them myself because it would take

me away from doing things that I was responsible for.  In an instant message, Adriano asked me

what else I had going on.  I did not respond in detail right then because I had to leave for a

doctor's appointment, so I suggested we discuss it when she had time.  A true and correct copy of

these messages is attached, App. 95.

54.     <u>December 8, 2015</u>.  Adriano did not mention this to me in December, I saw the

comments about this in the timeline for the first time in January 2015.  I had helped a manager in

the credit cards group, Jeff, with some employees who were bickering with each other.  I

suggested transferring one of the employees, which is something we often did in such situations.

He agreed with my suggestion, and it solved the problem.  I handled the matter start to finish.  If

the manager or his AVP had asked to have a different HR member review and finalize the case,

normally this would have been done, but in this instance that did not happen.  I don't know what

the timeliness issue mentioned here was, Adriano never told me.

55.     <u>December 22, 2015</u>.  I wish I knew which "Senior leadership members" Adriano

is talking about here so I might know what Adriano thinks I did.  But without the specifics, it's

18

impossible to defend against her accusations here.  All I can say is that I never spoke to one of the business leaders or managers about anything they said about me to my supervisors.

56.     <u>December 28, 2015</u>.  On this issue, Adriano claims that I should have done something that was not possible.  Here are the facts:

a.  Pay day at Santander was every other Friday.  All time had to be entered into Kronos (a software program) and audited by close of business on Monday before pay day.  December 28, 2015 was a Monday preceding payday.  That afternoon, another HRBP, Whitney Andres, realized we had a problem.  For several employees who had worked on Christmas, their time was not coded correctly in Kronos, and there were several steps that needed to be performed to correct it, or these employees wouldn't be paid for working on a holiday.  Andres sent an email, and I got busy working on the issue along with some of the other HR professionals at the other affected locations.  Adriano did not ask me to work on this issue.  She was off that day.

b.  One of the steps that needed to be completed involved the time audit in Kronos.  This is something only the HR Generalists did, and none of the HRBPs were trained on this.  All of the HR Generalists at the locations affected were off that day, which should not have ever happened on a Monday preceding pay day.

c.  Adriano claims that I should have worked with peers and found a solution, but that was not possible.  I did not have the proper training to do the Kronos audit, and no one else working that day had such training either.  Adriano (who was also off that day) spoke to Sabrina Boyd.  To her credit, Boyd stepped in and did all

<div align="center">19</div>

the work in Kronos necessary for the payroll to be corrected in time. A true and correct copy of emails we all exchanged that day is attached, App. 133-135.

d.  Adriano never told me I should have handled this differently.  If she had, and we had discussed it, she might understand why she is wrong about this issue.  At the time, Adriano said nothing to me about the way I handled things except for an email saying "Thank you Reena!!" A true and correct copy of this email is attached, App. 136.

The Second PIP Begins

53.     After expressing my disagreement with the second PIP, I resolved to move forward.  The PIP and the 90 Day Action Plan offered me the option of taking training classes, but it was not mandatory, and no courses were specified or recommended.  I was always interested in ongoing training and improvement and did training when possible, so I was open to suggestions, but no suggestions were provided.

57.     In the 90 Day Action Plan, it said I could shadow another HRBP if I wanted to, but no one ever asked me or told me to do this.  App. 153.  I question this suggestion because I was the one who helped teach and train the other HRBPs.  In my 2014 Annual Performance Review, my HR Manager (Hullum) noted in her comments that I was good at helping/training other HRBPs.  App. 51-52, 60.

58.     The first PIP said I had difficulty meeting deadlines, which I disagreed with.  No examples were provided, but from December 1, 2015 going forward I was attentive to this.

The First Biweekly Meeting, and Subsequent Events

59.     On January 29, 2016, I met with Adriano and Elad.  This was the first biweekly meeting required as part of the PIP.  They had no criticisms to share, and the meeting was

20

uneventful.   As previously instructed, I wrote a recap of the meeting and sent it to Adriano within 48 hours.  App. 175.

60.     In early February 2016, I investigated a confrontation between employees named John and Monisha.  On February 10, 2016, I sent an investigation summary about John to Adriano by email.  A true and correct copy of this email is attached, App. 180-181.

61.     On February 12, 2016, I talked to Adriano and Elad about the two investigations. Elad asked me to move some text ("email from John Leavell's wife") from "Confirmed Allegations" to the "Unconfirmed Allegations" section of the summary.  I made the change Elad requested, and I sent the revised summary to her on February 16.  App. 187.

62.     I had the Monisha investigation ready to send on Monday morning, February 15, 2016.  We were following new procedures for termination requests and investigation summaries, and before I sent everything to Elad I needed clarification from Adriano about the process.  I sent her an instant message at 9:57 a.m. asking her a question, thinking it was better to get it right the first time instead of having to fix it later.  App. 182.  After Adriano answered my question, I sent the Monisha investigation summary to Elad at 12:43 p.m.  App. 184-185.  I would have sent it Monday morning, but the delay getting an answer from Adriano pushed it into early afternoon.

The Second Biweekly Meeting

63.     On February 17, 2016, we had our second biweekly meeting.  Elad and Adriano asked me a few questions about a time study I turned in, but they did not give me any instructions to do the time study differently or to include more detail.  Rather, Adriano told me I could stop doing the time study, and she later confirmed this in writing.  App. 225.

64.     In place of the time study, they assigned yet another task: to do a weekly email providing information about the disciplinary actions and investigations I had worked on during

21

the week, and send it to Adriano by 5 p.m.  App. 225.  Unlike some other instances, this deadline was specific, and I always met it.

65.    We also discussed the Monisha and John investigation summaries, and they claimed I submitted the Monisha summary late.  I explained the delay waiting for an answer from Adriano, but they insisted it was still a missed deadline, and we left it at that.  There was no extensive coaching regarding the timeliness of my work.

66.    Elad and Adriano did not provide extensive coaching about following instructions when conducting an investigation.  Adriano brought this up as an issue later, after the meeting.  In my meeting recap, I mentioned Elad's February 12 request asking me to move a piece of text.  App. 210.  In her response, Adriano claims the instruction was to remove the text, and I failed to follow that instruction.  App.  210.  Adriano was wrong about the instruction.  I did exactly as instructed, and when I sent the revised meeting summary to Elad, she replied with an email stating "Approved."  App. 184.

67.    In the February 17, 2016 meeting, Adriano did not ask me to provide an increased level of detail in my next meeting recap.  I dispute her assertion that she asked me for "a written summary detailing [our] meeting."  It's true that in an earlier meeting, Adriano asked me to send her a recap of our meetings no later than 48 hours afterwards.  On February 17, however, there was no additional discussion about providing a new level of detail in the meeting recaps.  Therefore, after the meeting, I wrote and sent a recap that was similar to the first recap, which was a general overview of what we discussed. App. 201.

68.    Adriano responded on February 19, 2016 by claiming I failed to meet expectations that she never set about the level of detail for the recap, and she told me to redo the recap and add significantly more detail.  App. 203.  I forwarded the emails to Elad hoping she

22

could help us avoid future miscommunications about expectations, App. 206, and I redid the recap to include all the specifics of everything we discussed.  App. 209-211.

69.     It was only afterwards that Adriano clarified her expectations about the level of detail to include in these recaps.  She explained her expectations in an email dated February 22, 2016.  App. 209.  If she had given me these instructions before I sent the second recap, I would have complied and sent a detailed summary.  Going forward, I did what she asked, and it was never an issue again.

70.     In this same email, Adriano said she would send me a response to each one of my recaps within 48 hours after she received my recap.  App. 209.  Adriano did not keep this promise even once.  We had two more biweekly meetings after this.  Our third biweekly meeting was on March 8, 2016.  I sent my meeting recap to Adriano that same day, and Adriano did not send her response until March 22, 2016 (14 days later).  App. 244-245.  We had a fourth biweekly meeting on March 23, 2016.  I sent my meeting recap on March 24, 2016, App. 246.  Adriano did not provide a response until she handed it to me during our last meeting on April 15, 2016 (22 days later).  App. 263-265.  By this time, Santander had already made the decision to fire me, so the comments were too late to be of any assistance with the stated goal of improving my performance.

The 30-Day Review

71.     On February 26, 2016, I met with Elad and Adriano, and they gave me a written 30-Day Review.   App. 217-225.  There were no new criticisms.  In the section titled Consulting, it stated: "During these past 30 days, you have lead four investigations each of which we have discussed and agreed upon course of actions to take-this has worked out well, and we will continue this strategy."  App. 217.

MTS APP025

The Third Biweekly Meeting

72.     On March 8, 2016, I met with Elad and Adriano for the third biweekly PIP meeting.  They acknowledged my attendance was good and not an issue.  They acknowledged that time management was good, and in her subsequent recap Adriano thanked me for helping with administrative tasks.  Neither supervisor said I needed to improve with respect to time management or with effective work habits.  App. 244-246.

73.     With respect to consulting, Adriano announced a change of direction for HRBPs doing investigations.  Instead of partnering with her during an investigation, she asked me to act more independently and make my own decisions on some things.  I said I was willing to do so if that was the direction we were moving in, but I was hesitant to start this while I was on a PIP because it might backfire on me.  Adriano responded to this as follows: "We stated we understood your hesitation, however the expectation of our HRBPs as consultants is to work independently in anticipating and making judgment calls as necessary, and work with management in escalated situations."  App. 244.

74.     Neither supervisor said anything in the March 8 meeting about me constantly interrupting Adriano during investigations.  Neither supervisor said anything to me about training opportunities in this meeting.

The March 11, 2016 "Misrepresentation"

75.     Elad later accused me of misrepresenting something to her in an email I sent on March 11, 2016.  Understanding this requires a little background.

76.     For almost one year, I had been working on a project intended to reward employees for perfect attendance.  Every month or two, I sought assistance from HRIS (Human Resources Information Systems) to get information concerning attendance.

24

77.     This proved to be difficult, because the computer systems Santander used could not automatically provide the information we wanted.  Over time, we tweaked and narrowed the criteria we would use to determine perfect attendance, and HRIS made some technical progress to help get that information from our timekeeping software.  I was the main point of contact between (a) the HR and business managers designing the project, and (b) and the HRIS employees getting us the data.

78.     On March 10, 2016, an officer working on the design of the project asked Stephanie Elad and me to tell him how many employees had perfect attendance during the last three months of 2015.  I said I would find out.  App. 227.

79.     On March 11, 2016, I sent an email to Elad saying that I was partnering with HRIS to assist getting the information.  App. 229-230.  A few minutes later, I emailed HRIS asking them for the specific data.  App. 231-232.

80.     I later learned that Elad construed my statement "I am also partnering with HRIS" as a false representation that I had already asked HRIS for the data, before sending her this email.  She told me this was misleading.  I apologized for the miscommunication, and explained I was and had been partnering with HRIS for months, and would do so again to get this information as well, and that's all I meant when I emailed her that I was partnering.  I was not trying to make it sound like I had already asked for the information.

Fourth Biweekly Meeting

81.     On March 23, 2016, I had my fourth biweekly meeting with Elad and Adriano. As with the last meeting, they had no criticisms about two of the three categories, attendance and time management.  App. 263.

MTS APP027

82.     With respect to the third area, consulting, they reiterated points made in the last meeting about starting to exercise more independent judgment during investigations.  App. 263. They did not say I was falling short in this area.  Adriano did not claim I had been interrupting her too much with questions, and she did not say I was impairing her productivity.

83.     It was in this meeting that I learned of Elad's belief that I tried to mislead her on March 11 when I said I was partnering with HRIS.  Elad never allowed the possibility that we miscommunicated, and she brought this up yet again at the next meeting we had.

The Talking Points for the Perfect Attendance Program

84.     On March 28, 2016, Elad sent me an email about the perfect attendance program I was working on, stating: "I'd like to provide the business with talking points to introduce and cascade this program. Please put something together for my review by EOD Friday.  Yessica should review and provide input prior to sending to me.  This communication will go to the Associate level."  App. 248.

85.     That Friday, April 1, 2016, I had set aside time to prepare the talking points Elad wanted.  However, Adriano insisted that I prioritize an issue for one of the managers, Jorge Munoz, instead of working on the talking points.  I did the work on the investigation, and then I closed my door to work on the talking points.  I was also reviewing some attendance data that Elad wanted, so there was a lot to finish by the end of the day.

86.     Adriano left early that day without telling me or checking on the status of this project, even though she knew she was supposed to review it that day before I sent it to Elad.  I was able to reach her by phone and have her review the talking points I had written, and then I sent it to Elad at 7:17. App. 252.  I stayed late and put in the extra work required to get this to Elad on the day it was due.

26

87.     Elad nevertheless sent an email to Stephen Shaffer accusing me of missing the deadline.  Her email she said the deadline was "EOB" (end of business) instead of "EOD" (end of day), which was not true.  App. 251.  Elad misrepresented the facts to Shaffer to make it sound like I missed a deadline.  Shaffer replied telling her she should have been more specific and said it was due at 5:00 pm.  App. 251.

The Brittany Brodie Investigation

88.     The week of April 4, 2016, Adriano and I both investigated a situation involving an employee named Brittany Brodie.  My portion of the investigation summary was finished on Wednesday, April 6, 2016, and I sent an instant message to Adriano asking if she had her part finished so I could submit the final report.  She said she had not finished, so we agreed that I could submit the final report the next day.  App. 256.  Adriano did not provide her part of the investigation until Friday, April 8, 2016.

89.     On Thursday, April 7, 2016, an Assistant Vice President asked us to interview another witness as part of this investigation, which I did that afternoon.  On Friday, April 8, 2016, I still had not received Adriano's portion of the report, so I sent her a draft of the report with a reminder in red text to add her portion in the body of the report.  App. 391-392 (see the comment: "Yessica, could you pls fill this part in?).

Our Last Meeting – 4/15/16

90.     Adriano never responded to my recap of our March 23, 2016 meeting, and I thought that no news was good news.  However, in our next meeting, which proved to be our last, I learned I was wrong, and things had been simmering unmentioned for weeks.

91.     On April 15, 2015, I met with Elad and Adriano for a 90 Day Review.  Adriano handed me a document that said, at the top: "March 23, 2016 Meeting Recap."  A true and

27

correct copy of this document is attached, App. 263-265.  I was also given a document that said

90 Day Review at the top.  A true and correct copy of this document is attached, App. 266-268.

92.     In the first document, the meeting recap, there was nothing negative noted

regarding attendance or time management.  App. 263.

93.     Under the category of consulting, Adriano went on at length about the alleged

misrepresentation on March 11, 2016, and she added more criticisms about that incident that had

not been mentioned at all during the one-month plus since then.  She said I waited too long to

contact HRIS to ask for the information the officer wanted, I should have asked "much sooner."

App. 264.  The officer asked for the information on a Thursday, and I asked HRIS for the

information the next day.  I could not have done it "much" sooner, and even Elad did not see a

problem with the fact that I did it the next day.  App. 249.  Adriano falsely accused me of

blaming HRIS and the officer for delays getting the information from HRIS.  App. 264.  I never

blamed them for delay.  Adriano, Elad and I all expressed frustration about the process for

getting the information, App. 233, but I never blamed HRIS or the officer for anything.  Adriano

also claimed Boyd had to step in, and she identified and overcame issues that I could not.  App.

264.  This too was false.  At my request (made via email while I was out on vacation) Boyd sent

an email to HRIS asking if they were working on my March 11 request for information, App.

239, and she sorted some of the information from HRIS according to my instructions.  But I was

otherwise responsible for all aspects of the communications to get the data we needed from

HRIS.

94.     Another issue mentioned for the first time in this document was the accusation of

missing Elad's EOD deadline to send the talking points, a deadline I had not missed.  Adriano

accused me of poor time management because I worked on an investigation that day before the

28

talking points were finished.  App. 264.  I did so only because she told me to make the

investigation the top priority that day, so if it was poor judgment to prioritize the investigation, it

was Adriano's poor judgment, not mine.

95.      Yet another issue raised for the first time in this document concerned the Brittany

Brodie investigation.  Adriano claimed I should have submitted my investigation summary

sooner, App. 265, but I could not have done it any sooner.  As discussed above, I had everything

done on a Wednesday, but I had to wait for Adriano before I could finalize and send the

summary.  Then the next day, we had to interview an additional witness.  On Friday I sent

Adriano a draft of the investigation summary that was as close to final as I could get it without

Adriano's input, and she never responded to me.  I wanted her to add her portion to the body of

the summary and send it back to me along with her notes; only then would I have been able to

write the final summary and then send it to Elad with both her notes and mine attached.  Instead

of responding to me, Adriano finished writing the summary, and she emailed it to Elad.  Adriano

claimed I erred by failing to submit my investigation notes when I sent her my summary, but that

is only something we do when sending a final investigation summary.  What I sent Adriano was

only a draft, because she did not have her piece ready yet.  Plus, I had previously sent my

investigation notes to Adriano, so there was no reason to send them again as an attachment to the

draft of the summary.

96.      Adriano also wrote that the summary was defective because it did not include a

section describing the employee's prior DA history.  App. 265.  However, the new template we

were using for investigation summaries, which she approved, did not include such a section.

Furthermore, several weeks earlier, Adriano sent me an investigation summary she wrote, and

MTS APP031

she told me I should use it as a guide when drafting my summary.  This guide she sent me did not include a section for the employee's prior DA history.  App. 176-178.

97.     The 90 Day Review said I met expectations with respect to Attendance.  App. 266.

98.     Under time management/effective work habits: (a) Adriano reiterated erroneous criticisms concerning the Monisha and Brittany investigations; and (b) she again said I missed the deadline for the Monisha investigation (ignoring her delay answering my question that morning) and missed the EOD deadline for the talking points which I didn't miss.  App. 266.

99.     Regarding "timely follow up," she discussed some things I have previously addressed.  App. 266.  It also says: "DA's being completed within 24 hours."  App. 266.  If she meant to say I was not meeting this expectation, she is wrong, I was meeting this expectation.  At no point during the PIP before now had anyone claimed I took longer than 24 hours to a DA.

100.     In "Thoroughness and Quality of Work," Adriano repeats the false accusation about failing to follow an instruction concerning the Monisha summary (it was the Leavell summary, and I followed the instruction) and she again accused me of mistakes regarding the Brittany Brodie summary that were not mistakes.  App. 267.  The next part about changes that needed to be made to the talking points "to make them business presentable" (App. 267) is a fabrication.  Stephanie asked me to get her "something," which I did, had Adriano review, and I submitted.  No one said I needed to send something to Elad in a certain format or a certain font.

101.     The next point about teamwork in completing administrative tasks (App. 267) had not been discussed since the March 8 meeting where Adriano acknowledged that I was doing more and thanked me for it.  It's not true that I failed to meet an expectation in this area at any time thereafter.

MTS APP032

102.    Furthermore, the statement in this document about the total number of DAs at the Lewisville location is not credible.  The document says there were 568 DAs for this site in March/April.  App. 267.  If true, that would mean that more than two-thirds of the employees there were issued a disciplinary action during a two-month period.  During all the years I worked at Lewisville, there were consistently fewer than 100 DAs in any given month, far fewer than 100 in most months.

April 19, 2016

103.    On April 19, 2016, I sent an email to Pamela Blackburn once again asking for her to intervene.  I attached the documents handed to me at the April 15 meeting, to which I had added my notes and comments.  A true and correct copy of this email is attached, pages are marked App. 269-279.

104.    Later that day, Adriano and Elad told me my employment was being terminated.  I went back to my desk and Adriano handed me an empty box.  A security guard walked me outside and all the way to my car.

Final Observations

105.    My performance was as good as or better than any other HRBP in the company, but other HRBPs were treated better than I was.  From December 1, 2015 through April 19, 2016, no other HRBP was put on a PIP and falsely accused of things that were not true, and none were fired except me.  I was the only HRBP that was pregnant during this period.

106.    Santander claims that Sabrina Boyd replaced me.  Sabrina Boyd was not pregnant at the time of my termination, so if this is true, I was replaced by an employee who was not pregnant.

31

107.    Santander claims that several female employees were treated well during their pregnancies.  Maybe they were, but none of them worked for Adriano or Elad during their pregnancies, so the positive experiences of those other employees seem irrelevant.

108.    In Defendant's brief, it says Elad and Adriano "identified Mathew's performance failures in the following areas."  Taking these one at a time:

    a.  "providing detail in the work she submitted."  This might be a reference to the termination request they criticized as vague, but that issue (discussed above in paragraph 52) was not discussed at all on April 15.

    b.  "submitting accurate work product."  We had no discussion about this on April 15.

    c.  "meeting deadlines."  Possibly a reference to the Monisha and Brodie summaries, already discussed.

    d.  "timely following up when working on a project." We had no discussion about this on April 15.

    e.  "providing thorough and quality work product." We had no discussion about this on April 15.

    f.  "contributing to the team by completing administrative tasks as needed."  There was no discussion of this issue at the April 15 meeting.  This was not discussed again after the March 8 meeting when they acknowledged I was meeting expectations in this area.

109.    Next, the brief says that in the April 15, 2016 meeting, "They also informed Mathew that they felt she did not meet expectations in her consulting, as exemplified by:

32

a.  "failure to push back on the business when necessary to complete her job." We had no discussion about this on April 15, and I have no idea what they might be referring to here.

b.  "demonstrating a lack of accountability for her own behaviors."  We had no discussion about this on April 15.  Furthermore, with respect to the times where I agreed I could have done better, I admitted to it and accepted responsibility (see the Timeline, November 6, 2015 and November 23, 2015, first paragraph).

c.  "inappropriately addressing the business clients after they provided Ms. Perez with negative feedback regarding her performance, by challenging the feedback the business clients provided to Ms. Perez."  Elad and Adriano accused me of this in the January 15, 2016 earlier meeting, but it was not discussed on April 15. When the accusation was first brought up, I disputed it and I asked who had I supposedly approached.  They never gave me a name.

110.    Next, the brief talks about feedback they received from business clients.  They did not say who made these comments or when.  I was doing all of my DAs within 24 hours, so I dispute the comment about getting them in 48 hours, if that person was talking about me.  These are not valid or accurate criticisms of my performance.  Without more details I can't refute the specifics, but Santander has not given me any details about these comments even though I asked them to do so in discovery.

111.    Santander claims I was defensive in the April 15, 2016 meeting, but I was not.  In all meetings after December 1, 2015, I resolved to maintain my composure and stick to the facts. In many instances I pointed out that things they were saying were not true, but I was calm and stuck to the facts.  I never claimed I was getting picked on.

33

MTS APP035

112.    I accepted responsibility for my actions when the criticisms aligned with the facts, but I did not accept their false and misleading accusations.  I never said Adriano was a bad manager.  I never said she failed to check my work, that she did not ensure I met my deadlines, and I did not say that she did not often enough help me or remind me of things.

**[signature page follows]**

MTS APP036

I declare under penalty of perjury that the foregoing is true and correct

Executed on September 20, 2024

Reena S. Mathew

35

MTS APP037

ORAL AND VIDEOTAPED DEPOSITION OF REENA MATHEW

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

REENA S. MATHEW,            )
                           )
          Plaintiff,        )
                           )
VS.                         ) CIVIL ACTION
                           )
SANTANDER CONSUMER USA      ) NO. 3:23-CV-01494-N
INC.,                       )
                           )
          Defendant.        )
                           )


----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

REENA S. MATHEW

AUGUST 8, 2024

----------------------------------


        ORAL AND VIDEOTAPED DEPOSITION OF REENA S. MATHER

produced as a witness at the instance of the Defendant,

and duly sworn, was taken in the above-styled and

numbered cause on August 8, 2024, from 9:36 a.m. to 5:48

p.m., before Nita G. Cullen, CSR in and for the State of

Texas, reported by machine shorthand, at the law offices

of Hallett & Perrin, P.C., 1445 Ross Avenue, Suite 2400,

in the City of Dallas, County of Dallas, State of Texas,

pursuant to the Federal Rules of Civil Procedure.

MTS APP038

ORAL AND VIDEOTAPED DEPOSITION OF REENA MATHEW

Page 109

1    Q.  What did you think?
2    A.  I didn't think she was a good manager.  I
3  didn't think she was a good fit.  I didn't think she
4  could cut it, from what I've seen.
5    Q.  What about Stephanie Elad?  Thought she was
6  good?
7    A.  I thought she was okay.
8    Q.  When did you start having a problem with
9  Stephanie?
10    A.  After the PIP Yessica gave.
11    Q.  So you didn't have an issue with Stephanie
12  until December 1st, 2015.
13    A.  Not so much on that day, but what transpired
14  afterwards.
15    Q.  I didn't say it happened on that day.  I was
16  saying, you didn't have an issue with Stephanie Elad
17  until sometime after December 1st, 2015, correct?
18    A.  Work-wise, we got things completed.
19    Q.  And you enjoyed working with her, right?
20    A.  That's a strong word.  I don't know.
21    Q.  Well, did you enjoy working with her when she
22  took you out for your lunch?
23    A.  I enjoyed coming to work, and I thought, you
24  know, we had a cohesive group.
25    Q.  And was that a nice gesture on her part, to

Page 110

1  take you for out lunch?
2    A.  That was a very nice gesture, yes.
3    Q.  Did that signal to you that she liked you?
4    A.  I'm so jaded in the corporate world, you don't
5  know.
6    Q.  So you are jaded.
7    A.  I'm not jaded, meaning I can't tell you whether
8  or not.  That's a -- you know, that's a -- that's hard
9  to, you know, quantify.  That's hard to quantify whether
10  someone's good, whether someone's honest, whether, you
11  know, we have a good relationship.  That's hard to
12  quantify because I don't know these people, I just work
13  with them.
14    (DEPOSITION EXHIBIT 3 MARKED.)
15    Q.  (By Mr. Hurst) Would you agree that you were
16  responsible for conducting yourself in an honest manner
17  in your position at Santander?
18    A.  Yes.
19    Q.  And would you agree that your honesty should
20  set a good example for honesty for the rest of the
21  workforce?
22    A.  Yes.
23    Q.  Would you agree that it's fair for an employer
24  to evaluate an employee based on whether she conducts
25  herself in an honest manner?

Page 111

1    A.  Yes.
2    Q.  Would you agree that it was important for you
3  to demonstrate reliability and responsibility in your
4  performance of your job duties?
5    A.  Can you say that one more time?
6    Q.  Sure.  It was important for you to demonstrate
7  reliability and responsibility --
8    A.  Yes.
9    Q.  -- in your performance of your job duties.
10    A.  Yes.
11    Q.  Would you agree that a professional employee is
12  one who admits to mistakes or oversights and assumes
13  responsibility?
14    A.  Yes.
15    Q.  Do you believe you were good about admitting to
16  mistakes or oversights and assuming responsibility when
17  you worked for Santander?
18    A.  If I truly made them, yes.  Not if they were
19  made up, no.
20    Q.  Do you recall any instance where you admitted
21  to a mistake or oversight and assumed responsibility?
22    A.  There was one.
23    Q.  One time?
24    A.  Yeah.
25    Q.  In five-and-a-half years?

Page 112

1    A.  Yes.
2    Q.  What was that one time?
3    A.  And not to say there weren't any small ones,
4  but ones to substantiate, you know, a PIP, coaching, you
5  know.
6    Q.  What was the one time?
7    A.  The one time -- I don't even recall.
8    Q.  You can't recall the one time you admitted to a
9  mistake or an oversight?  Have you ever been told that
10  you have trouble admitting to mistakes and assuming
11  responsibility?
12    A.  Never.  Never.
13    Q.  Not even in one of your meetings at Santander?
14    A.  Never.  Yessica probably mentioned it that -- I
15  don't know, but never.
16    Q.  And because Yessica mentioned it -- Yessica
17  mentioned it, you wrote it off.  You didn't think it was
18  right.
19    A.  Not wrote it off because of the lies that were
20  being told.  That's why I didn't -- you know, I'll take
21  ownership when someone's honest.
22    Q.  And Yessica's the dishonest one in this room,
23  from your perspective, is that right?
24    A.  Yes.  Yes.
25    Q.  And you testified that you never had any one on

MTS APP039

ORAL AND VIDEOTAPED DEPOSITION OF REENA MATHEW

Page 201

1  **Absolutely.**
2  Q.  Okay.  Look at that, we come to an agreement on
3  something.  Any other ways you felt -- feel like
4  Santander discriminated against you because of your
5  pregnancy?
6  **A.  Just -- I mean, just those double PIPs.**
7  Q.  We got those.
8  **A.  Yeah, we got those.  Other than the stuff that**
9  **I mentioned, I can't think of anything.**
10  Q.  Can you identify anyone at Santander who was
11  not pregnant and you believe was treated more favorably
12  than you?  Someone who was in a similar position to you?
13  **A.  Similar position?  I mean, I honestly, because**
14  **we were just Lewisville, I mean, the only person I saw**
15  **every day was Yessica and Sabrina.  Sabrina was treated,**
16  **you know, and that's where a lot of my issues came,**
17  **because I was, you know, she was making me do admin, you**
18  **know, administrative stuff.**
19  Q.  Yessica was.
20  **A.  Yessica was.  And that was Sabrina's job.  And**
21  **Sabrina was kind of coasting while I felt like I was**
22  **getting the brunt of all the work.**
23  Q.  So, what administrative work do you say that
24  you were being made to do?
25  **A.  Those were the e-mails that I had asked about,**

Page 202

1  **those compliance e-mails.  That's totally**
2  **administrative.  Checking an HR box.  That's**
3  **administrative.**
4  Q.  Checking what?
5  **A.  Checking the HR box.  We had an HR box outside**
6  **of HR, you know, with like letters.  You know, it's**
7  **like, if I'm here to strategize, why am I checking a**
8  **mailbox?**
9  Q.  So, checking the HR box.  What else did you say
10  before that?
11  **A.  Compliance e-mails, which were very time**
12  **consuming.  We had to go back and forth with our legal**
13  **department and, you know, just as far as like -- I don't**
14  **even know how to put it in words, but just compliance.**
15  Q.  How about disciplinary actions?
16  **A.  Disciplinary actions, entering those in.  She**
17  **was asking me to do that.  Disciplinary actions that was**
18  **primarily a function of where the business would come to**
19  **the HR business partner, we would partner, look at**
20  **everything, I would write up the DA, get it back to the**
21  **business, have them sign it, and then they would return**
22  **it, put it in that HR box.**
23  Q.  Then somebody had to input it into the
24  computer.
25  **A.  Somebody had to enter it, and she was asking me**

Page 203

1  to do that, when Sabrina all along was doing that.
2  Q.  Were there so many that it couldn't get done
3  just with one person?
4  **A.  No.  No way.**
5  Q.  Is that right?
6  **A.  And I saw the number in that e-mail that was**
7  **incorrect.  They said something like 4,000.  We had**
8  **3,500 employees, how could that even be?**
9  Q.  A lot of people complaining.  So, Yessica would
10  say that she didn't ask anyone to do anything that she
11  wasn't doing herself, all hands on deck kind of thing.
12  Do you disagree?
13  **A.  Categorically, yes.**
14  Q.  So, you claim that you were asked to enter the
15  DAs into the computer.
16  **A.  (Witness nods head affirmatively.)**
17  Q.  Was she entering DAs in the computer?
18  **A.  Possibly a handful, just to show that she was**
19  **doing something, but when I tell you, I don't know what**
20  **she did, I don't know what she did all day except**
21  **scrutinize me.**
22  Q.  Sabrina was, you say, coasting, what does that
23  mean?
24  **A.  Meaning, you know, she had a good gig, because**
25  **here I am having to help her with her own job, and it's**

Page 204

1  like I'm begging for a break being pregnant.
2  Q.  You saw a lot of those things as Sabrina's
3  responsibilities.
4  **A.  Yes.**
5  Q.  And were you asked to do them because Sabrina
6  just wasn't as efficient as you, from your perspective?
7  **A.  Possibly.  And I think that's what backfires**
8  **for a lot of employees.  If you're efficient, you get**
9  **more work.**
10  Q.  Is Sabrina not efficient?
11  **A.  I believe she's efficient, but, you know, we**
12  **have a very demanding business, and if they want things**
13  **now, they want things now, there's no excuses.**
14  Q.  Okay.  So, would you say that Sabrina was
15  treated more favorably than you?  I mean, I know y'all
16  weren't in the same position.
17  **A.  Yes.**
18  Q.  And you gave me the example of that.
19  **A.  Yes.**
20  Q.  Anyone else in HR that you believe was treated
21  more favorably than you that was in a similar position?
22  **A.  I mean, we were the only ones that reported to**
23  **Yessica, so I couldn't tell you.  But from what I saw,**
24  **who was reporting to her, yes, Sabrina.**
25  Q.  Okay.  Now, multiple women in the HR department

MTS APP040

ORAL AND VIDEOTAPED DEPOSITION OF REENA MATHEW

Page 205

1   were pregnant at or around the time that you were
2   pregnant, true?
3       A. At the time?  I mean, I know there were --
4   yeah, I know of like two, yes.
5       Q. Who were those?
6       A. Tina and -- oh, my goodness, I forgot her name.
7   There were so many people that turned over.  May have
8   been Whitney.  Whitney or -- Whitney or -- Christine, I
9   think her name was.
10      Q. Christina Stout?
11      A. I believe.
12      Q. Did you ever get a chance to work with her?
13      A. No.  But there were -- yeah, there were.
14      Q. So you would agree that multiple women in the
15  HR department were pregnant at or around the time you
16  were pregnant.
17      A. Yeah.  Yeah, yes and Tina -- I'm sorry.
18      Q. No.  Right now, you can think of two of them.
19      A. Yes.
20      Q. I didn't mean to interrupt you, go ahead.
21      A. I was just going to say Tina actually, you
22  know, she wasn't put under the scrutiny that I was put
23  under, but she had a -- I'm like blanking out on the
24  word -- you know, when the -- unfortunately, the baby
25  comes early, a pre-term.

Page 206

1       Q. Premature?
2       A. Premature, yes.  And the baby, we did keep in
3   touch after I left the company, and her baby had to stay
4   in the NICU for six months, if not longer, because of
5   complications.
6       Q. Gosh.  I'm sorry to hear that.  Wow.
7       A. But I tell you that just so you know just --
8   you know, the job itself was hard, but then to be put
9   through that kind of --
10      Q. Multiple women in the HR department had been
11  pregnant while working at Santander and had young kids
12  at the time you were pregnant, right?
13      A. (Witness nods head affirmatively.)
14      Q. Correct?
15      A. I believe so, yeah.  Yes.
16      Q. Okay.  Wasn't Yessica one of them?
17      A. I don't know the age of her kids, but she did
18  have children, yes.
19      Q. Anyone else you can think of in the HR
20  department?
21      A. Sabrina had one son.  I mean, they're all
22  older, now, but -- yeah.
23      Q. Yeah, I just had one graduate from college.
24  How's that for sobering?
25      A. Can't wait for that.

Page 207

1       Q. Are you being sarcastic?
2       A. No.  Really.  That will be nice.  I can get a
3   job and be self sufficient.
4       Q. I hear ya.  Well, I miss how old -- you don't
5   have to give me names, but how old is your oldest?
6       A. 16.
7       Q. Yeah, by then, they're already gone, but I
8   really -- I really miss the eights and tens and -- that
9   was a fun time.  Anyway, I digress.
10          Yessica, Sabrina, who else had been
11  pregnant while working at Santander and had young kids
12  at the time?
13      A. Young kids?  I can't think of anyone else.  I
14  think everyone else -- Tina may have had -- Tina had
15  other children, but -- yeah.  As far as the others, I
16  think it was like their first.  Yeah.  I think Whitney
17  and Christine, I believe that was their first.
18      Q. You communicated to a bunch of people at
19  Santander that you were pregnant, in late October, early
20  November.
21      A. Communicated?  I mean, what do you mean
22  "communicate"?
23      Q. You told a bunch of people you were pregnant.
24      A. I don't know that -- no, I did not.  When I
25  started to show, yes.  There were probably questions

Page 208

1   around it.
2       Q. Okay.
3       A. But no, I did not voluntarily.  I only told
4   Yessica at week eight, and other people if there started
5   to be a bump and asked, you know, yeah.  But I didn't go
6   out telling people, I'm pregnant, I'm pregnant.
7       Q. You told Sabrina.
8       A. I don't recall with Sabrina what I did.  I
9   mean, at some point, yeah, of course I did.
10      Q. So I don't know when exactly you told
11  everybody.
12      A. Right.
13      Q. Or anybody.
14      A. Yes.
15      Q. What I'm getting at is, you told or had the
16  discussion, even if they asked you first, you had the
17  discussion that you were pregnant, with many people at
18  Santander.
19      A. I wouldn't say "many".  I would say -- I would
20  limit it to Lewisville and a couple of other people
21  outside of that.  Now, if we had -- now, we did have
22  like a Christmas -- like an end of the year outing, I
23  remember we went to -- I want to say it was like Hard
24  Eight or something.
25      Q. Well, I mean, however many people you talked

ORAL AND VIDEOTAPED DEPOSITION OF REENA MATHEW

Page 221

1    **A. Stephanie.  I sent her an e-mail.**
2    Q.  And did Stephanie dignify it?  Did she say,
3    hey, no, it's not because of that?
4    **A. She responded, and then, you know, again spoke**
5    **to Yessica, and I think, based on what Yessica said, you**
6    **know, I'm not sure -- I can't speak for her of if she**
7    **looked into it or not, but she certainly went by**
8    **Yessica's word.**
9    Q.  Okay.  Have you told me as best as you could
10   about all of the reasons why you believe you were
11   discriminated against because of your pregnancy and
12   retaliated against?
13   **A. Yes.  I'm trying to make sure I didn't forget**
14   **anything, but I believe so, yes.**
15   Q.  Do you believe that any other Santander
16   employee was discriminated against because of her
17   pregnancy?
18   **A. Not that I know of.**
19   Q.  Do you believe that there is anyone at
20   Santander who feels that she was mistreated because of
21   her pregnancy, other than you?
22   **A. No.  Not that I'm aware of, no.**
23   Q.  The people, person who you feel discriminated
24   against you because of your pregnancy is Yessica.
25   **A. Ultimately, yes.**

Page 222

1    Q.  I understand your testimony that you believe
2    Stephen Shaffer, Stephanie Elad and --
3    **A. Lina.**
4    Q.  -- Lina, Angelina Hullum, went along with
5    Yessica's decision to discriminate against you based on
6    your pregnancy because they want to support Yessica
7    and/or they want to help cover up something that they
8    saw that was bad.
9    **A. That's what I believe, yes.**
10   Q.  But you don't believe those three people
11   actually chose to discriminate against you because of
12   your pregnancy.
13   **A. Correct.**
14   Q.  Do you have any reason as to why Yessica would
15   discriminate against you based on your being pregnant?
16   **A. No idea.  None.  I honestly thought it was a**
17   **personal like vendetta.  It was so strange.**
18   Q.  Do you think it was a personal vendetta and
19   that it didn't have anything to do with your pregnancy?
20   **A. Say that one more time.**
21   Q.  Do you think it was a personal vendetta and
22   didn't have anything to do with your pregnancy?
23   **A. No, because then when I started connecting the**
24   **dots, then it was pregnancy.**
25   Q.  Do you believe Santander as a whole does not

Page 223

1    like pregnant people or this was a Yessica thing?
2    **A. Yessica thing.**
3    Q.  Do you know anyone at Santander other than
4    Yessica who you believe doesn't like pregnant people?
5    MR. ULOTH:  Never mind.  I was going to
6    object, but I'm not.
7    **A. No.**
8    Q.  (By Mr. Hurst)  We asked you in one of the
9    interrogatories, and I'm happy to put it in front of
10   you, Exhibit No. 9.
11   (DEPOSITION EXHIBIT 9 MARKED.)
12   Q.  (By Mr. Hurst)  We asked you in Interrogatory
13   No. 6 for you to identify -- for you to describe in
14   detail each communication you've had with anyone other
15   than your attorney relating to the subject matter of
16   this lawsuit, and we identified the categories of
17   information that we were seeking in this answer, and
18   you've provided a substantial answer.
19   My question to you is, have you visited
20   with anyone about the subject matter relating to this
21   lawsuit, in addition to those whom you've identified?
22   **A. No.**
23   Q.  If I've asked you this already, my apologies.
24   Where is Greg Vinson, now?
25   **A. I don't know.  I really don't know.**

Page 224

1    Q.  Where is Mitzie Jefferson?
2    **A. I couldn't tell you.  Yeah, it's -- I think**
3    **everyone's just parted ways.  I think Tensya's no longer**
4    **there.  Demetrice is no longer there.  Greg's definitely**
5    **not there.  Mitzie, I'm not sure about.**
6    Q.  And you haven't spoken to any of these people
7    in seven, eight, nine years.
8    **A. Demetrice and even Tensya, I do keep in touch**
9    **with, but to your question, as far as if anyone knows**
10   **about this lawsuit, no one knows.**
11   Q.  So you have nothing to add to this particular
12   interrogatory answer?
13   **A. No.**
14   Q.  When I asked you earlier about why you didn't
15   say something to Lina about your belief that you felt
16   you were being discriminated against based on your
17   pregnancy, or felt like you were getting picked on
18   unwarrantedly, you said it wouldn't have done any good
19   and you didn't want to tell anyone else, but yet, you
20   told Greg Vinson and Mitzie Jefferson two days after you
21   were written up, and they weren't even in HR, were they?
22   **A. No.**
23   Q.  So why is it that you told Mitzie and Greg but
24   you didn't tell Lina, someone who is in HR?
25   **A. Because at that time, because Jessica had**

MTS APP042

ORAL AND VIDEOTAPED DEPOSITION OF REENA MATHEW

Page 301

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION
3   REENA S. MATHEW,          )
                              )
4       Plaintiff,            )
                              )
5   VS.                   ) CIVIL ACTION
                              )
6   SANTANDER CONSUMER USA      ) NO. 3:23-CV-01494-N
    INC.,                   )
7                           )
        Defendant.          )
8                           )
9
10   ----------------------------------
11          DEPOSITION CERTIFICATE
12             REENA S. MATHEW
13             AUGUST 8, 2024
14   ----------------------------------
15
16          I, Nita G. Cullen, Certified Shorthand
17   Reporter in and for the State of Texas, hereby certify
18   to the following:
19          That the witness, REENA S. MATHEW, was
20   duly sworn by the officer and that the transcript of the
21   oral deposition is a true record of the testimony given
22   by the witness;
23          I further certify that pursuant to FRCP
24   Rule 30(f)(1) that the signature of the deponent:
25          ___ was requested by the deponent or a

Page 302

1   party before the completion of the deposition and is to
2   be returned within 30 days from date of receipt of the
3   transcript.  If returned, the attached Changes and
4   Signature Page contains any changes and the reasons
5   therefor;
6          ___ was not requested by the deponent or a
7   party before the completion of the deposition.
8          I further certify that I am neither
9   attorney or counsel for, nor related to or employed by,
10   any of the parties or attorneys to the action in which
11   this deposition was taken.  Further, I am not a relative
12   or employee of any attorney of record in this case, nor
13   am I financially interested in the outcome of the
14   action.
15          Subscribed and sworn to on this 12th day of
16   August, 2024.
17
18
19   _____
     NITA G. CULLEN, Texas CSR #1563
20   Expiration Date:  08-31-2024
     BRADFORD COURT REPORTING, L.L.C.
21   Firm Registration No. 38
     7015 Mumford Street
22   Dallas, Texas  75252
     (214) 931-2799
23
24
25

**From:** "Yessica Adriano" <YADRIANO@santanderconsumerusa.com>
**To:** "Yessica Adriano" <YADRIANO@santanderconsumerusa.com>, "Reena Mathew"
<rmathew@santanderconsumerusa.com>
**Subject:** Conversation with Yessica Adriano
**Date:** Thu, 29 Oct 2015 17:19:55 +0000
**Importance:** Normal

---

**Yessica Adriano [9:46 AM]:**
  HI Reena, do you know where we keep personnel files, looking for Delmar Tillis Pip
**Reena Mathew [9:46 AM]:**
  Hi Yessica! I just responded to your email :) It's in Optika....
**Yessica Adriano [9:46 AM]:**
  just saw your response thanks
**Reena Mathew [9:46 AM]:**
  NP, let me know if you need any help!
**Reena Mathew [11:07 AM]:**
Hi Yessica! AVP Sam Akins sent over a term request for a LEW associate and the associate is in the office today.....how
would you like us to handle?
**Yessica Adriano [11:07 AM]:**
  is it for attendance?
**Reena Mathew [11:08 AM]:**
  Yes...
**Yessica Adriano [11:08 AM]:**
  ok i can process it today
**Reena Mathew [11:08 AM]:**
  K, did you need me to do anything?
**Yessica Adriano [11:09 AM]:**
  did we get all approvals
**Reena Mathew [11:09 AM]:**
  Just from Brad....I can send over the term request if that helps?
**Yessica Adriano [11:10 AM]:**
  yes please and ill get the other docs ready, does he want him termed immediately or end of day-
**Reena Mathew [11:11 AM]:**
  Sounds good--let me check...
  Wow that was LONG!
**Yessica Adriano [11:21 AM]:**
  it was
**Yessica Adriano [11:48 AM]:**
Hi Reena, Brad just came into the office, he said they have like 10 pending DAs, im not sure on the validity, but are you
working on them? He stated he needs them asap.
**Reena Mathew [11:49 AM]:**
  Yes, and I emailed the AVP's yesterday that we would have them no later than Friday due to me being out on Mon/Tues
**Reena Mathew [12:16 PM]:**
  Sam said 3p should work.... :)
**Yessica Adriano [12:17 PM]:**
  ok thank you
**Reena Mathew [12:17 PM]:**
  np

APP174
MTS APP044

**From:** "Reena Mathew" </O=D6ORG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=REENA MATHEW0CB>
**To:** "Stephen Shaffer" <sshaffer@santanderconsumerusa.com>
**Bcc:** "reenasara@hotmail.com" <reenasara@hotmail.com>
**Subject:** RE: Meeting you requested
**Date:** Mon, 18 Jan 2016 17:32:23 +0000
**Importance:** Normal
**Attachments:** ==Time_Line_of_Events--Reena's_Notes.docx==

---

Will do—==I was also provided a timeline on Friday.== I had mentioned to you Stephen that my concern was that anyone can come up with a timeline (the issue is whether what is stated is accurate and there isn't any acknowledgment from the other side).

==Upon reviewing it, I found several statements that were very concerning and wrote my side in red.==

Again, no one has ever sat me down to let me know there were any performance gaps and all I have received up until now is a timeline with alleged issues from a year ago (which I never even knew were issues).

Please see the attached and we can discuss when we meet.

Thanks,
Reena

**From:** Stephen Shaffer
**Sent:** Monday, January 18, 2016 11:12 AM
**To:** Reena Mathew
**Cc:** Stephen Shaffer
**Subject:** RE: Meeting you requested

Great.  Please send me a meeting request for an hour. You can select or reserve a room.

Thanks

**Stephen Shaffer**
Santander Consumer USA Inc.
VP Human Resources Business Partnership

PHONE     214.722.4580
MOBILE    469.236.5931
EMAIL     sshaffer@santanderconsumerusa.com
WEB       www.santanderconsumerusa.com

**From:** Reena Mathew
**Sent:** Monday, January 18, 2016 9:53 AM
**To:** Stephen Shaffer
**Subject:** RE: Meeting you requested

That's fine. Let's do 10am then.

SC004169
MTS APP045

---

**From:** Stephen Shaffer
**Sent:** Monday, January 18, 2016 9:18 AM
**To:** Reena Mathew
**Cc:** Stephen Shaffer
**Subject:** RE: Meeting you requested

Hi Reena,

Either 10am or 2pm would work for me.  I have to move a lunch meeting from downtown to Lewisville which is ok, but I told the gentleman I would meet him around 11:30am

Let me know which works better.  I can also do 9am or 3pm if neither of these works.

Thanks

## Stephen Shaffer
Santander Consumer USA Inc.
VP Human Resources Business Partnership

| | |
|---|---|
| PHONE | 214.722.4580 |
| MOBILE | 469.236.5931 |
| EMAIL | sshaffer@santanderconsumerusa.com |
| WEB | www.santanderconsumerusa.com |

---

**From:** Reena Mathew
**Sent:** Monday, January 18, 2016 9:09 AM
**To:** Stephen Shaffer
**Subject:** RE: Meeting you requested

HI Stephen,

Wednesday works for me.

Does 11am work for you?

Thanks,
Reena

---

**From:** Stephen Shaffer
**Sent:** Monday, January 18, 2016 9:05 AM
**To:** Reena Mathew
**Cc:** Stephen Shaffer
**Subject:** Meeting you requested

Good morning Reena,

I responded to your request for a follow-up meeting last week, indicating I could come to LEW on Wednesday of this week.
To do so, I do need to move a couple of appointments.

SC004170

Case 3:23-cv-01494-N  Document 36  Filed 09/20/24  Page 131 of 377  PageID 956

Can you confirm that you want to meet this week on Wednesday, and if so, what time?

Thank you

**Stephen Shaffer**
Santander Consumer USA Inc.
VP Human Resources Business Partnership

PHONE    214.722.4580
MOBILE   469.236.5931
EMAIL    sshaffer@santanderconsumerusa.com
WEB     www.santanderconsumerusa.com

SC004171
MTS APP047

<div style="text-align:center; color:red;">

**Addendum**
**Timeline of Events**

</div>

**February 11, 2015**
-   Was asked to provide a summary of information from an HR luncheon attended, summary never received—I did provide a summary, just need access to my Sent folder. If this was an issue, how come I was never asked about it till a year later?

**April 9, 2015**
-   March Recap: Reflected 2 side by sides and 4 jumpstarts for the month, number of meeting with business leaders was not quantified. ?? What does this mean? Was never told anything when this was submitted.

**May 18, 2015**
-   April Recap: Jumpstarts were not attended for the month, trainings not conducted, and number of meetings with business leaders was not quantified ?? Same as above.

**July 1, 2015**
-   Requests to leave half day to attend doctor's appointment, same day notification ?? What is the point of listing these? Everyone in the office at some point left early due to unforeseeable events; this was for child that was sick and Dr could see them that day.

**July 2, 2015**
-   Asked by HR Manager (HRM) to correct onboarding discrepancies in WD, asked if this could be assigned to another dept. Had an extremely heavy load as well as Sabrina did—this was an admin tasks. Why would this be an issue if we needed a little extra help? I barely ask for help when I was undertaking an extremely heavy load.... I had the heaviest one out of all the HRBP's so why am I being penalized for asking for help on something the HRG's should be doing either way?

**July 10, 2015**
-   Asked by HRM to support the Credit Card Department at 8585 due to the shortage of staff and unbalanced workload, asked for assistance felt overwhelmed with current duties False statement—I did it and I did it without any issues at either site. At times, I did state I was extremely busy but who wouldn't be with that kind of workload? Not unbalanced......I took over what an NRH BP had been doing previously. Was doing it effectively and even when we were site specific, I still was over the department without any complaints.

**August 13, 2015**
-   July Recap: One side by side held, attended 3 jumpstarts, stated 10+ meetings attended with the business, and recap of training held with one manager—What does this mean??

**August 23, 2015**
-   Texts manager to advise of late arrival for the next day, HRM had to rearrange her schedule to provide site coverage—Texted this day before as it was my daughter's first day of Kindergarten—HRM said, 'Sure, no problem' (I have text message). If it was an issue, I should've been coached or told no.

**July-August 2015**
-   Stated the work load was heavy, asked by HRM to provide a time study to pinpoint where her time was being allocated to. Due to the lack of specifics, was asked twice to complete assignment—Did not know

<span style="color:red">what this was for; HRM gave me no direction, just asked me to list what I did on a daily basis and then gave me specifics (every 15 minutes) the next time and never followed up on the time study.</span>

- Continually reminded to work full shifts and provide sufficient notice when requesting to leave early <span style="color:red">?? When??</span>
- Strongly advised of the importance in submitting DA's to the business in a timely manner, and addressed on not leaving all DA entries solely to the generalist, everyone needed to assist with the workload<span style="color:red">?? Untrue, when???? Never had this type of conversation.</span>
- Manager constantly stepped in to finalize pending DA's and process terminations—<span style="color:red">Took pre-approved time off and rarely called in--when did you step in????</span>

<div align="center"><span style="color:red">**September 1, 2015- Transitioned to New HRM**</span></div>

**September 3, 2015**
- Requested to leave half day on Friday, September 4 due to traveling, advised she could leave early but needed to provide a greater notification, and needed do her best to work most of her shift. <span style="color:red">Completed all my work before I left and only left closer to 3:45/4p. What did you have to cover?</span>

**September 4, 2015**
- Came in at 9 am and left at 2 pm.

**September 17, 2015**
- Same day notification to leave early, had flight the next day <span style="color:red">??? Did not travel this day so don't know what you are referring to.</span>

**September 28, 2015**
- Discussed work load with HRM, Reena feels overwhelmed and there isn't enough time- had long conversation on how the HRBP level requires a "high level of efficiency" <span style="color:red">Never did we have a 'long conversation' if we did, where is the documentation on this because I would like to see this. At times I did feel overwhelmed, but how is that an issue for a PIP? Should've provided me with help.</span>

**October 12, 2015**
- Discussed workload with HRM, and  asked what was consuming her time, she did not quantify, asked for assistance with investigation checklist <span style="color:red">This is a completely false statement; I informed HRM that the checklist was taking longer than anticipated (almost 10 months due to initial team being let go (3 HRBP's) and Tina was asked to step in for Back Office feedback and HRM stated there still needed to be one change made per HRD. HRM had just consulted with other HRM's about final input and said HRD wanted one last change and HRM stated she would make the last change and submit it since that was the only thing pending. Tina and I had worked on the whole thing by ourselves until it came time to get HRM input. HRM **volunteered** to take it from there and make change and submit so it wouldn't go back and forth one more time and we could finally get it done.</span>

**October 29, 2015**
- Brad, site Director, notifies HRM that they have 10 DA's pending from Reena, upon speaking with her she states she was behind and had asked the AVPs to give her until Friday. Advised DA's are time sensitive and if she is behind she needs to let me know, so we can assist in getting those out. <span style="color:red">***Never was behind*—** attended SHRM conference and sent email to AVP's stating I would have the DA's by Friday of the week as we were offsite. AVP responded and said that was fine (I have email and response from AVP). HRM mentioned to me on Thursday, 10/29 that she was speaking to Brad about Rhonda (separate issue where Rhonda had to be addressed about taking situation into her own hands) and that he had also in</span>

- conversation asked for an update on the DA's which I got to them in a timely manner. Making it seem like he came to HR to specifically complain which is untrue.
- Also requests to arrive to work late for tomorrow, Friday October 30th, she had a doctor's appointment and could not miss it.  HRM had to rearrange schedule to provide coverage for site. She arrives to the office at noon. Advised understood emergencies/life happens but in circumstances where a greater notification can be given, it needs to be done. This was first appointment for baby and HRM had been out for some time (one week) due to her move and I had no idea she was working from home Friday. I informed her it was a very important appointment and I stated I would try and get it rescheduled. Called doc office and it was a while before I could be seen so I let HRM know and she stated that was fine that she would come in. Never seemed like it was an issue and that Friday is the day I told her I was pregnant and that is why I had to go to appt. and she said it was ok and seemed very happy/excited for me.

**November 6, 2015**
- Received specific instruction from HR Director on how to communicate to the business the denial of a bereavement request, instruction not followed and additional time and resources spent on the issue—We let department know, but we may have let them know more than HRD wanted us to give. I will take ownership of that and have learned not to do that.

**November 9, 2015**
- Upon HRM's return, was provided feedback on time management, provided example of bereavement request—Time mgmt.—I literally spent 5 minutes looking up a picture for a false bereavement doc HRG asked me about. We in turn found it was fake. Literally was 5 minutes though and if we hadn't found it was fake, we would've allowed associate to get away with 3 possibly (1 for sure) fake bereavement requests. How is that an issue vs the opposite (if we hadn't looked into it and continually let associate get away with falsification of time)?

**November 16, 2015**
- Same day notification on needing to leave early, later asked for assistance with NH class, team had to stay later to cover workload.—It was a matter of picking up DL's/S/SS cards which takes all of 10 minutes. Sabrina and I split all of the documents the next day to enter in Red Carpet which is what is very time consuming. I also have IM convo where HRM was completely ok with request and didn't let me know otherwise.

**November 17, 2015**
- Reminded her of the importance of prior notification when wanting to leave early, as it impacts the team. Advised how team came in early and stayed late to cover, advised if in the future work is pending leave requests will be denied.
- Stated she felt overwhelmed with work load, when asked what is consuming her time she mentioned DA's (5),  filling out the info forms for TA (7), emails, and just overall busy.?????????
-
**November 20, 2015**
- Contacted HRM stated she was extremely busy, asked if Ten could help her. Ten handled the pending investigation—HRM/HRG took the day off and left me completely alone on a payday Friday which was extremely busy and we had 2 investigations going on already. There should never be one person at a site on a payday Friday.  Jeff called at the end of the day with this new issue and there wasn't any way I could assist being alone and asked Ten if she could assist since she was at 8585 and she had no issue at all. Another reason why 8585 should've been site specific and not covered by HRBP at LEW.

**November 23, 2015**

App.161

SC004174

MTS APP050

- Reena received Deidra's resignation on Saturday, November 21st and did not process termination. The termination was not conducted until late in the afternoon Monday, November 23rd by HRM. Upon reviewing situation, employee had brought forth concerns in previous months- the situation was mishandled and was not followed up on. I take ownership of this one; I could've handled situation better but was going off of what information I was given.
- Provided term recommendation which was vague stating (see AVP notes below) explained the importance of summarizing and had her resend- which she did.  In addition, asked for the surrounding circumstances of incident, upon review advised her three people questioning one employee was overwhelming and we need to safeguard objectivity of the room. ?? AVP had already met with associate along with manager and had notated all the info—it was a black and white situation (falsification of time) so I stated 'please see below' in my notes. AVP/Manager and I met with associate since they had met prior and wanted to get all of the information since it had just happened that morning. Was never coached on that—was just asked to resend notes with my statement.

**November 24, 2015**
- Asked for assistance with 5 info security issues, advised her everyone's pending workload and asked for clarification on what she was doing. She stated she would like to discuss further –Another administrative task that is very time consuming; HR Compliance sent so many all at once and had a lot going on; per HRM stating if I needed help (when DA issue occurred), I asked for help so that we wouldn't be behind since these take a good amount of time to do. Why am I being penalized for asking for help if we are a team?

 **November 25, 2015**
- Same day notification of Dr.'s appointment, took a longer lunch. Advised again, that a greater notification must be given- same day notices impacts the team and workload. I took Dr's appointment on my *lunch* and it was for a baby appt. How is this an issue when I am exempt and I used my lunch and am covered by FMLA? It was 15 mins over my lunch, how does that impact the business? I thought I was being courteous by using my lunch to go.

**December 8, 2015**
- Receive concerns from the VP and SVP for the credit cards group in regards to Reena's timeliness and questioned how she was handling an investigation.  They felt she had already reached a conclusion prior to looking into the matter. They requested another HR member review and finalize the case. Never heard about timeliness of anything? HRM stated that I shouldn't let business know what I was thinking upfront until investigation was completely finished. I stated I understood. However, after my recommendation of moving associate to a different team after I had done investigation, Jeff has never had an issue after that with either associate. Prior to finding a resolution, it was a constant disruption to the team. We finally came to the right conclusion as this had been escalating for a while and could've really taken a turn for the worse.

**December 22, 2015**
- Senior leadership members advise that Reena had approached them questioning the concerns they had brought forward, they stated they felt uncomfortable and surprised by this action. HRM in previous meeting regarding first PIP had mentioned I received complaints from Greg Vinson, Mitzie Jefferson and Jorge Munoz which I knew were false statement as we had excellent relationships. I asked Jorge if I was getting DA's to him on time and he said yes and that he jokes about things but doesn't mean anything by them (jokes about getting DA's etc when he walks into HR). Jorge asked me was everything ok and if he needed to let HRM know that I get things done on time and I said no, everything was fine.

**December 28, 2015**

- HR Generalist had to be called in on their time off to gather, organize, and help solve payroll discrepancies in order to meet deadline. As an HRBP and tenured employee, it is expected that Reena proactively work with other peers and departments to reach consensus and find solutions during these situations. This is not true—HRM's inadvertently allowed all HRG's to be off on the same day (that was the real issue) and no one had sent out Kronos audit. Sabrina logged in to get that out and later in the day and compiled list for Customer Servcie Holiday pay and I had finished up LEW Servicing and HRM had shown appreciation for us getting the information out. Nothing else was mentioned.

**From:** "Sabrina Boyd" <SBOYD@santanderconsumerusa.com>
**To:** "Sabrina Boyd" <SBOYD@santanderconsumerusa.com>, "Reena Mathew"
<rmathew@santanderconsumerusa.com>
**Subject:** Conversation with Sabrina Boyd
**Date:** Tue, 08 Mar 2016 18:59:32 +0000
**Importance:** Normal

---

**Sabrina Boyd [9:13 AM]:**
Holly just said to me....
Did you see the look on Jessica's face when I asked her if she's preggers....LOL!  Holly thinks she is just becuase of the lookon her face
**Reena Mathew [9:14 AM]:**
LMAO!!!!!
Dude, at this point, you never know!
**Sabrina Boyd [9:15 AM]:**
Right
**Reena Mathew [9:15 AM]:**
I did see that look too though!
**Sabrina Boyd [9:16 AM]:**
HA!!  Yessica LOVES Jessica
Cant you tell how she just lights up
have you noticed
OMG
**Reena Mathew [9:21 AM]:**
LOLOL!!! YES, totally agree!!!
Girl crush!
**Sabrina Boyd [9:38 AM]:**
Boots
dont start with us this morning
**Reena Mathew [9:38 AM]:**
lmao, I know!!
I thought we were supposed to go to the VP's!
Now he wants to know
lol
**Sabrina Boyd [9:39 AM]:**
BAHAHAHAH!!  I think he's in a power strike now!
I mean now he's telling us how to do our schedules
and now wants to know what's goingon
**Reena Mathew [9:39 AM]:**
Someone is feeling left out!
hahaha
EXACTLY
Too many pieces to these investigations
**Sabrina Boyd [9:40 AM]:**
HAHAHA!!  "Left Out"
**Reena Mathew [9:40 AM]:**
Geesh
lol
**Sabrina Boyd [9:40 AM]:**
Send me the info and I can open the case for this one...Or is it considered investigation?
**Reena Mathew [9:41 AM]:**
I think Yessica has this one......

SC001799

MTS APP053

**Sabrina Boyd [9:41 AM]:**
  Oh, ok!
  Well she'll prob not answer for a while
**Reena Mathew [9:42 AM]:**
  LOL, probably!
**Sabrina Boyd [9:42 AM]:**
  Geesh!
  You and I will not have a day alone until Thurs
  LOL
**Reena Mathew [9:43 AM]:**
  lawd!!!!!!!!!!!
  Who's here tomm?
**Sabrina Boyd [9:43 AM]:**
  You're WFH, right?
**Reena Mathew [9:43 AM]:**
  Yes....
  Thank God!
**Sabrina Boyd [9:43 AM]:**
  LOL
**Reena Mathew [9:43 AM]:**
  lol
**Sabrina Boyd [9:43 AM]:**
  So Thurs
**Reena Mathew [9:44 AM]:**
  k, cool
  I'm going to swing by Boots' office
**Sabrina Boyd [9:44 AM]:**
  ok, now? why?
**Sabrina Boyd [10:06 AM]:**
  GIRL...IDK why but I yesterday I was sooooo tickled when YA told me that she had to carpool with SE...It was the funniest thing to me!
  OMG
  dont let me forget to tell you about this darn mtg we had yesterday
**Reena Mathew [10:07 AM]:**
  That is hilarious!!!!!!!!!!!! It really was....
  I can just see them in the car together
  Too funny
  Ok--yes looking forward!
  Dam*, my hair is a hot mess!
**Sabrina Boyd [10:08 AM]:**
  GIRL no it is not
  it's cute curling up on the ends
**Reena Mathew [10:08 AM]:**
  LOL, ok! Hope it's not too bad--I feel like a poodle
  Speaking of
  lol
**Sabrina Boyd [10:08 AM]:**
  OMG no!  SE's is actually puffy
**Reena Mathew [10:08 AM]:**
  LOL, really!??
**Sabrina Boyd [10:08 AM]:**
  She needs some product
**Reena Mathew [10:09 AM]:**
  Ok, I need to look when she comes out
  I wonder if they shared an umbrella! lmao

SC001800

MTS APP054

**Sabrina Boyd [10:09 AM]:**
and she keeps flicking it sie to side!  You know that thing she does???
**Reena Mathew [10:09 AM]:**
YEEEEEEEEEEEEEEEEEEEEEEEEEEEEEEEEEES
It's like c'mon now!
lol
**Sabrina Boyd [11:08 AM]:**
OMG
**Reena Mathew [11:08 AM]:**
w
What?
**Sabrina Boyd [11:08 AM]:**
GIRL
hold on
**Reena Mathew [11:08 AM]:**
k
**Sabrina Boyd [11:08 AM]:**
the freaking intern
SE just suggested to YA to have the person come to me!
SHe said "I would just have her to sit with Sabrina"
WTH
I aint got time for that
**Sabrina Boyd [11:17 AM]:**
Sorry to bother...Can you tell me if they decided to rescind a DA for Sharlet Reed?  Orland sent you an email on 02/03 for a Verbal...You sent me the call but the DA is not in WD
**Reena Mathew [11:31 AM]:**
Sorry, just saw you other IM!
LOL
So we have one??
I'm not surprised!!!
Yes, he rescinded the Sharlet one.....
**Reena Mathew [12:39 PM]:**
Hey S, can you pls print out any Insubordination DA's for Monisha?
**Sabrina Boyd [12:40 PM]:**
yep
**Reena Mathew [12:45 PM]:**
Thank you Darling!
**Sabrina Boyd [12:46 PM]:**
OMG
Guess who ELSE is preggers but has not made the announcement yet
in HR
**Reena Mathew [12:46 PM]:**
What the helllllllllllllllllll
Are you serious?
Who????
**Sabrina Boyd [12:46 PM]:**
Fatma
**Reena Mathew [12:46 PM]:**
OMGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGG
I can't even deal
**Sabrina Boyd [12:46 PM]:**
BAHAHAHA
It's the year of HR babies
**Reena Mathew [12:46 PM]:**
SE and PB are going to be pissed!

SC001801
MTS APP055

lmao!

**Sabrina Boyd [12:46 PM]:**
BAHAHAHAHAH
Right
No coverage
Oh well

**Reena Mathew [12:47 PM]:**
EXACTLY
Yep!
They'll have to figure something out early
That is insane!

**Sabrina Boyd [12:47 PM]:**
So it's:

Reena
Tina
Fatma
Christina
Whitney

**Reena Mathew [12:47 PM]:**
WOOOOOOOOOOOOOOOOOOOW!
Crazy!

**Sabrina Boyd [12:47 PM]:**
And possibly Jessica

**Reena Mathew [12:47 PM]:**
lmao!
yep
We shall see
That was some look, huh?

**Sabrina Boyd [12:47 PM]:**
LOL
Can she be any louder

**Reena Mathew [12:48 PM]:**
You're making me laugh in here!
It's her hubby
lolol!

**Sabrina Boyd [12:56 PM]:**
What the heck is she rattling in there....sounds like a little mouse trying to get into food!
BAHAHAHA

**Reena Mathew [12:57 PM]:**
LOLOLOL!
Who know with her!

**Sabrina Boyd [12:57 PM]:**
Right

**Reena Mathew [12:57 PM]:**
Remember the keys in the fridge?
lol!!!

**Sabrina Boyd [12:57 PM]:**
OMG yes
weirdo

**Reena Mathew [12:57 PM]:**
lmaoooooooooooooooooooooooo

**From:** Stephanie Elad <selad@santanderconsumerusa.com>
**To:** Holly Hanes <hhanes@santanderconsumerusa.com>
**Subject:** FW: Attendance Report
**Date:** Tue, 29 Mar 2016 17:43:24 +0000
**Importance:** Normal

---

Request sent to HRIS at 5:07pm on March 11.

**From:** Yessica Adriano
**Sent:** Wednesday, March 16, 2016 4:25 PM
**To:** Stephanie Elad <selad@santanderconsumerusa.com>
**Subject:** RE: Attendance Report

Tony submitted the request Thursday morning (8:25 am), and she submitted the request to HRIS on Friday at 5 pm- so two business days

**From:** Stephanie Elad
**Sent:** Wednesday, March 16, 2016 4:17 PM
**To:** Yessica Adriano
**Subject:** RE: Attendance Report

How long did she wait from the time Tony requested it until she asked HRIS for the info? Sounds like about 24 hours, but maybe I'm missing something.

**From:** Yessica Adriano
**Sent:** Wednesday, March 16, 2016 1:21 PM
**To:** Stephanie Elad
**Subject:** FW: Attendance Report

FYI..

**From:** Reena Mathew
**Sent:** Wednesday, March 16, 2016 10:59 AM
**To:** Yessica Adriano
**Subject:** Fwd: Attendance Report

Hi Yessica,

Geesh, I don't know why it takes them so long to respond. I sent the initial email on Friday.....or at least just give us instructions on how to pull the info.

Sent from my iPhone

Begin forwarded message:

**From:** Reena Mathew <rmathew@santanderconsumerusa.com>
**Date:** March 15, 2016 at 7:51:31 PM CDT
**To:** Paula Blayney <pblayney@santanderconsumerusa.com>, Maria Cruz <MACRUZ@santanderconsumerusa.com>, Nelda Flores <NFLORES@santanderconsumerusa.com>

SC000657

MTS APP057