**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| REENA S. MATHEW, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:23-cv-01494-N |
| | § | |
| SANTANDER CONSUMER USA INC., | § | |
| | § | |
| *Defendant.* | § | |

# DEFENDANT'S SUPPLEMENTAL
# APPENDIX IN SUPPORT OF ITS
# <u>MOTION FOR SUMMARY JUDGEMENT</u>

## TABLE OF CONTENTS

| Document | Page(s) |
|---|---|
| Declaration of Sabrina Boyd (Oct. 11, 2024) | APP279–APP280 |
| Excerpts from the Deposition of Reena Mathew (Aug. 8, 2024) | APP281–APP285 |
| R. Mathew's 2012 Annual Objectives | APP286–APP289 |
| E-mail message from R. Mathew to A. Hullum (July 30, 2015) | APP290 |
| HR Org. Change Announcement from S. Elad (Aug. 24, 2015) | APP291–APP292 |
| E-mail message from R. Mathew to Y. Perez (Nov. 23, 2015) | APP293–APP294 |
| E-mail message from R. Mathew to Y. Perez (Nov. 24, 2015) | APP295–APP296 |
| E-mail message exchange between S. Elad, S. Shaffer, A. Hullum, and Y. Perez (Jan. 11, 2016) | APP297–APP299 |
| Instant Message Exchange Between R. Mathew and S. Boyd (Mar. 8, 2016) | APP300–APP303 |
| E-mail message from R. Mathew to Y. Perez (Apr. 8, 2016) | APP304–APP305 |

Respectfully submitted,

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142


By:    *Monte K. Hurst*
       Monte K. Hurst
       State Bar No. 00796802
       Monte.Hurst@hallettperrin.com

       Clayton S. Carter
       State Bar No. 24120750
       CCarter@hallettperrin.com

       *Counsel for Defendant*
       *Santander Consumer USA Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that, on October 11, 2024, I served the foregoing document on Plaintiff's counsel, as follows, electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Mr. Donald E. Uloth
DONALD E. ULOTH, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75248
Don.Uloth@uloth.pro


*Monte K. Hurst*
Monte K. Hurst

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| REENA S. MATHEW, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:23-cv-01494-N |
| | § | |
| SANTANDER CONSUMER USA INC., | § | |
| | § | |
| *Defendant.* | § | |

## DECLARATION OF SABRINA BOYD

I, Sabrina Boyd, declare that the following statements are true and correct, based on my personal knowledge:

1.  My name is Sabrina Boyd.  I am over 18 years of age, of sound mind, and have never been convicted of a felony.  I am personally acquainted with the facts stated herein based on my employment with Santander Consumer USA Inc. ("Santander"), and my review of the business records of Santander related to Reena Mathew ("Mathew"), and I affirm that the following is true and correct.

2.  Each of the documents included in Defendant's Supplemental Appendix in Support of Its Motion for Summary Judgments, pages APP286–APP305, were made and kept in the regular course of Santander's business.  It was the regular practice of Santander to make each record.  Each record was made at or near the time of the event it records.  Each record was made by, or from information transmitted by, a person with knowledge acting in the regular course of Santander's business.

APP279

My name is Sabrina Boyd.

My date of birth is     March 11, 1980.

My address is     3125 Dawn Oaks Drive.

     Denton, Texas 76208.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in ___Denton___ County, State of Texas, on the __11th__ day of October, 2024.

Signed by:

*Sabrina Boyd*

F023D26C561A49F...

SABRINA BOYD

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

REENA S. MATHEW,                    )
                                    )
            Plaintiff,              )
                                    )
VS.                                 ) CIVIL ACTION
                                    )
SANTANDER CONSUMER USA              ) NO. 3:23-CV-01494-N
INC.,                               )
                                    )
            Defendant.              )
                                    )

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

REENA S. MATHEW

AUGUST 8, 2024

-----------------------------------


        ORAL AND VIDEOTAPED DEPOSITION OF REENA S. MATHER

produced as a witness at the instance of the Defendant,

and duly sworn, was taken in the above-styled and

numbered cause on August 8, 2024, from 9:36 a.m. to 5:48

p.m., before Nita G. Cullen, CSR in and for the State of

Texas, reported by machine shorthand, at the law offices

of Hallett & Perrin, P.C., 1445 Ross Avenue, Suite 2400,

in the City of Dallas, County of Dallas, State of Texas,

pursuant to the Federal Rules of Civil Procedure.

Page 109

1    Q. What did you think?
2    A. I didn't think she was a good manager. I
3  didn't think she was a good fit. I didn't think she
4  could cut it, from what I've seen.
5    Q. What about Stephanie Elad? Thought she was
6  good?
7    A. I thought she was okay.
8    Q. When did you start having a problem with
9  Stephanie?
10   A. After the PIP Yessica gave.
11   Q. So you didn't have an issue with Stephanie
12 until December 1st, 2015.
13   A. Not so much on that day, but what transpired
14 afterwards.
15   Q. I didn't say it happened on that day. I was
16 saying, you didn't have an issue with Stephanie Elad
17 until sometime after December 1st, 2015, correct?
18   A. Work-wise, we got things completed.
19   Q. And you enjoyed working with her, right?
20   A. That's a strong word. I don't know.
21   Q. Well, did you enjoy working with her when she
22 took you out for your lunch?
23   A. I enjoyed coming to work, and I thought, you
24 know, we had a cohesive group.
25   Q. And was that a nice gesture on her part, to

Page 110

1  take you for out lunch?
2    A. That was a very nice gesture, yes.
3    Q. Did that signal to you that she liked you?
4    A. I'm so jaded in the corporate world, you don't
5  know.
6    Q. So you are jaded.
7    A. I'm not jaded, meaning I can't tell you whether
8  or not. That's a -- you know, that's a -- that's hard
9  to, you know, quantify. That's hard to quantify whether
10 someone's good, whether someone's honest, whether, you
11 know, we have a good relationship. That's hard to
12 quantify because I don't know these people, I just work
13 with them.
14       (DEPOSITION EXHIBIT 3 MARKED.)
15   Q. (By Mr. Hurst) Would you agree that you were
16 responsible for conducting yourself in an honest manner
17 in your position at Santander?
18   A. Yes.
19   Q. And would you agree that your honesty should
20 set a good example for honesty for the rest of the
21 workforce?
22   A. Yes.
23   Q. Would you agree that it's fair for an employer
24 to evaluate an employee based on whether she conducts
25 herself in an honest manner?

Page 111

1    A. Yes.
2    Q. Would you agree that it was important for you
3  to demonstrate reliability and responsibility in your
4  performance of your job duties?
5    A. Can you say that one more time?
6    Q. Sure. It was important for you to demonstrate
7  reliability and responsibility --
8    A. Yes.
9    Q. -- in your performance of your job duties.
10   A. Yes.
11   Q. Would you agree that a professional employee is
12 one who admits to mistakes or oversights and assumes
13 responsibility?
14   A. Yes.
15   Q. Do you believe you were good about admitting to
16 mistakes or oversights and assuming responsibility when
17 you worked for Santander?
18   A. If I truly made them, yes. Not if they were
19 made up, no.
20   Q. Do you recall any instance where you admitted
21 to a mistake or oversight and assumed responsibility?
22   A. There was one.
23   Q. One time?
24   A. Yeah.
25   Q. In five-and-a-half years?

Page 112

1    A. Yes.
2    Q. What was that one time?
3    A. And not to say there weren't any small ones,
4  but ones to substantiate, you know, a PIP, coaching, you
5  know.
6    Q. What was the one time?
7    A. The one time -- I don't even recall.
8    Q. You can't recall the one time you admitted to a
9  mistake or an oversight? Have you ever been told that
10 you have trouble admitting to mistakes and assuming
11 responsibility?
12   A. Never. Never.
13   Q. Not even in one of your meetings at Santander?
14   A. Never. Yessica probably mentioned it that -- I
15 don't know, but never.
16   Q. And because Yessica mentioned it -- Yessica
17 mentioned it, you wrote it off. You didn't think it was
18 right.
19   A. Not wrote it off because of the lies that were
20 being told. That's why I didn't -- you know, I'll take
21 ownership when someone's honest.
22   Q. And Yessica's the dishonest one in this room,
23 from your perspective, is that right?
24   A. Yes. Yes.
25   Q. And you testified that you never had any one on

Page 201

1  Absolutely.
2      Q.  Okay.  Look at that, we come to an agreement on
3  something.  Any other ways you felt -- feel like
4  Santander discriminated against you because of your
5  pregnancy?
6      A.  Just -- I mean, just those double PIPs.
7      Q.  We got those.
8      A.  Yeah, we got those.  Other than the stuff that
9  I mentioned, I can't think of anything.
10     Q.  Can you identify anyone at Santander who was
11 not pregnant and you believe was treated more favorably
12 than you?  Someone who was in a similar position to you?
13     A.  Similar position?  I mean, I honestly, because
14 we were just Lewisville, I mean, the only person I saw
15 every day was Yessica and Sabrina.  Sabrina was treated,
16 you know, and that's where a lot of my issues came,
17 because I was, you know, she was making me do admin, you
18 know, administrative stuff.
19     Q.  Yessica was.
20     A.  Yessica was.  And that was Sabrina's job.  And
21 Sabrina was kind of coasting while I felt like I was
22 getting the brunt of all the work.
23     Q.  So, what administrative work do you say that
24 you were being made to do?
25     A.  Those were the e-mails that I had asked about,

Page 202

1  those compliance e-mails.  That's totally
2  administrative.  Checking an HR box.  That's
3  administrative.
4      Q.  Checking what?
5      A.  Checking the HR box.  We had an HR box outside
6  of HR, you know, with like letters.  You know, it's
7  like, if I'm here to strategize, why am I checking a
8  mailbox?
9      Q.  So, checking the HR box.  What else did you say
10 before that?
11     A.  Compliance e-mails, which were very time
12 consuming.  We had to go back and forth with our legal
13 department and, you know, just as far as like -- I don't
14 even know how to put it in words, but just compliance.
15     Q.  How about disciplinary actions?
16     A.  Disciplinary actions, entering those in.  She
17 was asking me to do that.  Disciplinary actions that was
18 primarily a function of where the business would come to
19 the HR business partner, we would partner, look at
20 everything, I would write up the DA, get it back to the
21 business, have them sign it, and then they would return
22 it, put it in that HR box.
23     Q.  Then somebody had to input it into the
24 computer.
25     A.  Somebody had to enter it, and she was asking me

Page 203

1  to do that, when Sabrina all along was doing that.
2      Q.  Were there so many that it couldn't get done
3  just with one person?
4      A.  No.  No way.
5      Q.  Is that right?
6      A.  And I saw the number in that e-mail that was
7  incorrect.  They said something like 4,000.  We had
8  3,500 employees, how could that even be?
9      Q.  A lot of people complaining.  So, Yessica would
10 say that she didn't ask anyone to do anything that she
11 wasn't doing herself, all hands on deck kind of thing.
12 Do you disagree?
13     A.  Categorically, yes.
14     Q.  So, you claim that you were asked to enter the
15 DAs into the computer.
16     A.  (Witness nods head affirmatively.)
17     Q.  Was she entering DAs in the computer?
18     A.  Possibly a handful, just to show that she was
19 doing something, but when I tell you, I don't know what
20 she did, I don't know what she did all day except
21 scrutinize me.
22     Q.  Sabrina was, you say, coasting, what does that
23 mean?
24     A.  Meaning, you know, she had a good gig, because
25 here I am having to help her with her own job, and it's

Page 204

1  like I'm begging for a break being pregnant.
2      Q.  You saw a lot of those things as Sabrina's
3  responsibilities.
4      A.  Yes.
5      Q.  And were you asked to do them because Sabrina
6  just wasn't as efficient as you, from your perspective?
7      A.  Possibly.  And I think that's what backfires
8  for a lot of employees.  If you're efficient, you get
9  more work.
10     Q.  Is Sabrina not efficient?
11     A.  I believe she's efficient, but, you know, we
12 have a very demanding business, and if they want things
13 now, they want things now, there's no excuses.
14     Q.  Okay.  So, would you say that Sabrina was
15 treated more favorably than you?  I mean, I know y'all
16 weren't in the same position.
17     A.  Yes.
18     Q.  And you gave me the example of that.
19     A.  Yes.
20     Q.  Anyone else in HR that you believe was treated
21 more favorably than you that was in a similar position?
22     A.  I mean, we were the only ones that reported to
23 Yessica, so I couldn't tell you.  But from what I saw,
24 who was reporting to her, yes, Sabrina.
25     Q.  Okay.  Now, multiple women in the HR department

Page 205

1  were pregnant at or around the time that you were
2  pregnant, true?
3      A.  At the time?  I mean, I know there were --
4  yeah, I know of like two, yes.
5      Q.  Who were those?
6      A.  Tina and -- oh, my goodness, I forgot her name.
7  There were so many people that turned over.  May have
8  been Whitney.  Whitney or -- Whitney or -- Christine, I
9  think her name was.
10     Q.  Christina Stout?
11     A.  I believe.
12     Q.  Did you ever get a chance to work with her?
13     A.  No.  But there were -- yeah, there were.
14     Q.  So you would agree that multiple women in the
15  HR department were pregnant at or around the time you
16  were pregnant.
17     A.  Yeah.  Yeah, yes and Tina -- I'm sorry.
18     Q.  No.  Right now, you can think of two of them.
19     A.  Yes.
20     Q.  I didn't mean to interrupt you, go ahead.
21     A.  I was just going to say Tina actually, you
22  know, she wasn't put under the scrutiny that I was put
23  under, but she had a -- I'm like blanking out on the
24  word -- you know, when the -- unfortunately, the baby
25  comes early, a pre-term.

Page 206

1      Q.  Premature?
2      A.  Premature, yes.  And the baby, we did keep in
3  touch after I left the company, and her baby had to stay
4  in the NICU for six months, if not longer, because of
5  complications.
6      Q.  Gosh.  I'm sorry to hear that.  Wow.
7      A.  But I tell you that just so you know just --
8  you know, the job itself was hard, but then to be put
9  through that kind of --
10     Q.  Multiple women in the HR department had been
11  pregnant while working at Santander and had young kids
12  at the time you were pregnant, right?
13     A.  (Witness nods head affirmatively.)
14     Q.  Correct?
15     A.  I believe so, yeah.  Yes.
16     Q.  Okay.  Wasn't Yessica one of them?
17     A.  I don't know the age of her kids, but she did
18  have children, yes.
19     Q.  Anyone else you can think of in the HR
20  department?
21     A.  Sabrina had one son.  I mean, they're all
22  older, now, but -- yeah.
23     Q.  Yeah, I just had one graduate from college.
24  How's that for sobering?
25     A.  Can't wait for that.

Page 207

1      Q.  Are you being sarcastic?
2      A.  No.  Really.  That will be nice.  I can get a
3  job and be self sufficient.
4      Q.  I hear ya.  Well, I miss how old -- you don't
5  have to give me names, but how old is your oldest?
6      A.  16.
7      Q.  Yeah, by then, they're already gone, but I
8  really -- I really miss the eights and tens and -- that
9  was a fun time.  Anyway, I digress.
10         Yessica, Sabrina, who else had been
11  pregnant while working at Santander and had young kids
12  at the time?
13     A.  Young kids?  I can't think of anyone else.  I
14  think everyone else -- Tina may have had -- Tina had
15  other children, but -- yeah.  As far as the others, I
16  think it was like their first.  Yeah.  I think Whitney
17  and Christine, I believe that was their first.
18     Q.  You communicated to a bunch of people at
19  Santander that you were pregnant, in late October, early
20  November.
21     A.  Communicated?  I mean, what do you mean
22  "communicate"?
23     Q.  You told a bunch of people you were pregnant.
24     A.  I don't know that -- no, I did not.  When I
25  started to show, yes.  There were probably questions

Page 208

1  around it.
2      Q.  Okay.
3      A.  But no, I did not voluntarily.  I only told
4  Yessica at week eight, and other people if there started
5  to be a bump and asked, you know, yeah.  But I didn't go
6  out telling people, I'm pregnant, I'm pregnant.
7      Q.  You told Sabrina.
8      A.  I don't recall with Sabrina what I did.  I
9  mean, at some point, yeah, of course I did.
10     Q.  So I don't know when exactly you told
11  everybody.
12     A.  Right.
13     Q.  Or anybody.
14     A.  Yes.
15     Q.  What I'm getting at is, you told or had the
16  discussion, even if they asked you first, you had the
17  discussion that you were pregnant, with many people at
18  Santander.
19     A.  I wouldn't say "many".  I would say -- I would
20  limit it to Lewisville and a couple of other people
21  outside of that.  Now, if we had -- now, we did have
22  like a Christmas -- like an end of the year outing, I
23  remember we went to -- I want to say it was like Hard
24  Eight or something.
25     Q.  Well, I mean, however many people you talked

Page 257

1   A.  You're, you know, you're -- you're -- you're
2   inadvertently trying to get people to kind of, you know,
3   make you look good, in a way.
4   Q.  Have you heard of anyone asking colleagues for
5   points?
6   A.  No.  No.  I don't think anyone was that -- I
7   don't want to use the word "desperate", but we all work
8   pretty hard.
9        MR. HURST:  Did I mess up and not do an
10  Exhibit 9?
11       MR. ULOTH:  There was a nine.
12       MR. HURST:  There was a nine.
13       MR. ULOTH:  It was the declaration, I
14  believe.  No, no, no.  It was the interrogatory answers.
15       MR. HURST:  Thank you very much.
16  A.  May I say something?
17  Q.  (By Mr. Hurst)  Sure.
18  A.  And this is only from the year 2015.  This
19  doesn't even have 2016 on it, so 32 recognitions in one
20  year, so -- and 11 -- almost 12,000 points.  This only
21  accounts for, 25, 27, 3,000 of that.
22  Q.  Greg gave a lot of people points like he gave
23  you, though, didn't he?
24  A.  I wouldn't say a lot of people, no.
25  Q.  He was generous with his points?

Page 258

1   A.  I don't -- I wouldn't say generous.  I mean, I
2   think he, you know, truly appreciated people who helped
3   him.
4        (DEPOSITION EXHIBIT 11 MARKED.)
5   Q.  (By Mr. Hurst)  Okay.  Here's Exhibit No. 11.
6   Again, I'm going to try to go through these fairly
7   quickly.  Here, you gave Yessica points, didn't you?
8   A.  Yes.
9   Q.  Why did you give her points?
10  A.  At the time, you know, just, again, you know,
11  people had doubts about her, and I think I was just
12  trying to, you know, make her feel welcome and, you
13  know, kind of felt bad for her, to be honest, because
14  I think people were questioning her competency and just
15  kind of like, you know, just -- that's who I am.
16  Q.  It was a nice gesture on your part for someone
17  you just started working with, right?
18  A.  Correct.  And this is after my birthday, I was
19  really appreciative of that.  I thought that was, you
20  know, a nice gesture.
21  Q.  That she had extended to you.
22  A.  Stephanie -- from my recollection, Stephanie
23  had sent out the e-mail, so --
24  Q.  So why are you rewarding Yessica, then, if you
25  thought Stephanie had sent it out?

Page 259

1   A.  Just, again, just new.  You know, I think I was
2   just appreciative of just them taking me out, and from
3   what I observed, I don't want to use the word good or
4   nice, but just a good work -- just a healthy working
5   relationship at that point, so --
6   Q.  We spoke earlier today about how you claimed
7   you saw some red flags or little things about Yessica
8   that you didn't care for even before you were receiving
9   the PIP on December 1st, right?
10  A.  Uh-huh.  Uh-huh.
11  Q.  Had you already started seeing those by
12  November 5th?
13  A.  By this time, I mean, I'm sure I probably saw a
14  little, but I didn't think -- I never thought it would
15  go so just south, you know, to the extreme that she took
16  it.  I mean, in hindsight, yes, it's clear, but while
17  you're going through it, I mean, I just -- that's who I
18  am.
19  Q.  Well, now, I think that's going to be your
20  answer to my next question, as well.  This November 5th
21  is a few days after you had told her that you were
22  pregnant.
23  A.  Yes.
24  Q.  So, whatever response that she had to your
25  being pregnant or her asking whether you were going to

Page 260

1   come back after your leave didn't bother you so much
2   that you were going to think less of her and not give
3   her points, right?
4   A.  Correct.  And I only thought that after the
5   PIP, and I think I mentioned that earlier, that I -- in
6   hindsight, then I started thinking about things, like
7   things weren't adding up.
8        (DEPOSITION EXHIBIT 12 MARKED.)
9        MR. HURST:  Here's Exhibit 12.  Oh, hold on
10  just a second.  This has a "Confidential" tag on it, so
11  we recommend that Mr. Mathew --
12       MR. MATHEW:  Step out?
13       MR. ULOTH:  Yes.
14       MR. HURST:  Or I could wait till the end
15  and do it then.
16       MR. ULOTH:  No.  I don't mind asking.  If
17  you just want Phil to step out while you ask a couple
18  questions about this.
19       MR. HURST:  Yeah.  I think there's one or
20  two of these.
21       MR. MATHEW:  Just grab me.  That's fine.
22       (MR. MATHEW LEAVES ROOM.)
23       MR. HURST:  I'll try to get to the other
24  one, as well.  But you and I both agree that we can
25  proceed, now.

**Santander**

| | 2012 Annual Objectives | **B1** |
|---|---|---|

| DIVISION: | Consumer Finance/SC USA | |
|---|---|---|
| PAÍS | USA | |
| DEPT | | |
| TITLE/POSITION: | Sr. HR Generalist | |
| Assessor: | Jason Tomancak | |
| Name and surname: | Reena Mathew | |

**Setting the year's objectives**
Quantitative objectives: results, business, costs, operations, functions ...(complete a minimum of three)

| Objective 1: Drive HR Results | Weighting |
|---|---|
| Quantitative Aspects (how to ensure the quality of results) | 25 % |
| - Provide timely, accurate responses to HR inquiries<br>- Increase knowledge base and understanding in all aspects of HR to function as a SME, including LOA administration, benefits, payroll, employee relations, imaging, FMLA and WC, Current and future HRIS systems.<br>- Colloborate and partner within HR to gain additional exposure and understanding of their business processes (i.e. cross-training) | Assessment<br>2. Meets ▼ |

| Objective 2: Operational Partnership | Weighting |
|---|---|
| Quantitative Aspects (how to ensure the quality of results) | 25 % |
| - Act as a resource to the business and HR dept as a whole in making sound business decisions<br>- Demonstrate proactive solutions/responses to requests<br>- Focus on learning more of the processes of our business partners thru additional training and collaboration. Be available to attend jump starts, training sessions, New Hire Orientation, etc..  This will create a better understanding of the business as a whole. | Assessment<br>2. Meets ▼ |

| Objective 3: Self Development | Weighting |
|---|---|
| Quantitative Aspects (how to ensure the quality of results) | 25 % |
| - Attend internal and external training courses as available ( Leadership training, FMLA training, etc..)<br>- Obtain PHR Certification<br>- Be proactive in identifying areas leading to professional growth; participate in a minimum of 6 webinars during the year | Assessment<br>1. Below ▼ |

| Objective 4: Process improvement | Weighting |
|---|---|
| Quantitative Aspects (how to ensure the quality of results) | 25 % |
| - Auditing process and procedures to assure compliance with new systems<br>- Testing of new systems to provide feedback and perspective on upcoming implementations.<br>- Identify processes that may identify duplication of efforts across businesses | Assessment<br>2. Meets ▼ |

| Objective 5: | Weighting |
|---|---|
| Quantitative Aspects (how to ensure the quality of results) | % |
| -<br>-<br>-<br>- | Assessment<br>▼ |

Página 1 de 1

Confidential

APP286

SC000987

**Santander**

**2012 Annual Objectives**

**B1**

| DIVISION: | Consumer Finance/SC USA |
|---|---|
| PAÍS | USA |
| DEPT | |
| TITLE/POSITION: | Sr. HR Generalist |
| Assessor: | Jason Tomancak |
| Name and surname: | Reena Mathew |

**Objective 6 :** | **Weighting**

Quantitative Aspects (how to ensure the quality of results) | %

**Assessment**

- 
- 
- 
- 

**Overall rating of objective fulfillment level** | 2. Meets ▼

## Assessment of skills

**LEADERSHIP** | 2. Meets ▼

✓Establishes clear, specific & ambitious objectives for him/herself and for each member of his/her team | 0. Not applicable ▼

✓Takes a long-term view; shows outstanding skills for identifying future opportunities and scenarios | 2. Meets ▼

✓Takes decisions at the right time and assumes the inherent risks | 3. Exceeds ▼

✓Is receptive to the opinions of his/her superiors, peers and colleagues | 2. Meets ▼

✓Shows ethical behaviour in line with the Group's code of conduct and the regulations of official bodies | 3. Exceeds ▼

**INNOVATION & RESULTS** | 2. Meets ▼

✓Contributes with high-impact ideas and measures | 2. Meets ▼

✓Foresees the consequences of his/her decisions; anticipates problems | 2. Meets ▼

✓Acts professionally, meets deadlines & commitments, demanding much of him/herself | 3. Exceeds ▼

✓Responds rapidly to his/her clients' demands with appropriate solutions | 2. Meets ▼

✓Seeks balance between short-term action & long-term relationships | 2. Meets ▼

**GROUP VISION** | 2. Meets ▼

✓Contributes to the Group's results, co-operating with Units other than his/her own Area or Unit | 0. Not applicable ▼

✓Uses the Group's global characteristics to create opportunities and improve results | 2. Meets ▼

✓Encourages the transfer of best practices | 3. Exceeds ▼

✓Favours synergies & economies of scale to improve the Group's efficiency | 0. Not applicable ▼

✓Shows responsibility for the impact of his/her actions, both internally and throughout the company | 2. Meets ▼

**Overall Assessment of skills** | 2. Meets ▼

APP287

Confidential

SC000988

**Santander**

**2012 Annual Objectives**

**B1**

| DIVISION: | Consumer Finance/SC USA |
|---|---|
| PAÍS | USA |
| DEPT | |
| TITLE/POSITION: | Sr. HR Generalist |
| Assessor: | Jason Tomancak |
| Name and surname: | Reena Mathew |

### Training and Professional Development Actions

Training Actions  I would like to see Reena acquire her PHR Certification in 2013.  Continue to stay abreast of employment laws and regulations by attending seminars , conferences and webinars.

Possible actions for changing)

| | Description |
|---|---|
| ☐ Functional Change | |
| ☐ Alloc greater responsibilities | |
| ☐ Change of Unit | |
| ☐ Geographical mobility | |
| ☐ Others (give details) | |

### Overall assessment

**Strengths (min of 2)**

1. Excellent customer service skills

2. Ability to handle multiple tasks and deliverables

3. Team Player

**Areas for improvement (min of 2)**

1. Continue to build relationships with other areas of the business outside of Servicing

2. Attention to detail

### Overall rating for the year
(Within the context of the Unit as a whole)



Performance assessment   RE

**Manager / Supervisor Comments**

Confidential

**APP288**

SC000989

**Santander**

2012 Annual Objectives | **B1**

| DIVISIÓN: | Consumer Finance/SC USA | |
|---|---|---|
| PAÍS | USA | |
| DEPT | | |
| TITLE/POSITION: | Sr. HR Generalist | |
| Assessor: | Jason Tomancak | |
| Name and surname: | Reena Mathew | |

Reena has developed a solid understanding of the auto finance business and I would like to see her continue that development by participating consistently in jump starts, team meetings and other on-site trainings (i.e. Life of a Loan, Simple Interest, etc.). She coordinated the HR Generalist monthly meeting which is beneficial to creating consistency amongst the sites. Also, Reena is well perceived by leadership at Lewisville and I want her to build upon those relationships to create proactive business solutions (i.e. identify training opportunties, focus groups, etc.).

**Employee Comments**

RMathew 1/8/13

Jym Tomanca 1/08/13

APP289

Confidential

SC000990

**A/C Privilege**

| | |
|---|---|
| **From:** | Mathew, Reena <rmathew@santanderconsumerusa.com> |
| **Sent:** | Thursday, July 30, 2015 12:48 PM |
| **To:** | Hullum, Angelina |
| **Subject:** | Spreadsheet |

Hey L,

Just so I don't forget, could you pls send me =hat spreadsheet?

I will be sure to do it the week I come back. Sorry = didn't have the 15 min increments on this one…..I thought it =as just more to document what came through for the day.

Thanks!
Reena

**Reena Mathew, PHR**
Santander Consumer USA Inc.
HR Business Partner

| | |
|---|---|
| phone | 214=292.2772 |
| mobile | 214=364.9136 |
| fax | 214=630.0828 |
| email | rmathew@santanderconsumerusa.com |
| web | |

BENEFITS HOTLINE =NBSP;  214.540.2010

1

APP290

SC000837

**From:** Stephanie Elad <selad@santanderconsumerusa.com>
**To:** Scott Dieckmann <sdieckmann@santanderconsumerusa.com>, Mark Mooney
<mmooney@santanderconsumerusa.com>, Mark Nerios
<mnerios@santanderconsumerusa.com>, Antoinette LaRosa
<alarosa@santanderconsumerusa.com>, Brad Denetz
<bdenetz@santanderconsumerusa.com>, Graham Anderson
<ganderson@santanderconsumerusa.com>, Brad Quick
<BQUICK@santanderconsumerusa.com>, Kimberly Thorndyke
<KTHORNDYKE@santanderconsumerusa.com>, Cory Overman
<coverman@santanderconsumerusa.com>, Dominique Doyenard
<ddoyenard@santanderconsumerusa.com>, Tamika Carr
<tcarr@santanderconsumerusa.com>, Linda Vrazel <lvrazel@santanderconsumerusa.com>,
James Hart <jamhart@santanderconsumerusa.com>, Erica Barton
<ebarton@santanderconsumerusa.com>
**Cc:** Angelina Hullum <AHULLUM@santanderconsumerusa.com>, Yessica Adriano
<YADRIANO@santanderconsumerusa.com>, Kristen Lagunes
<klagunes@santanderconsumerusa.com>, Jessica Gleason
<jgleason@santanderconsumerusa.com>, Pamela Blackburn
<pblackburn@santanderconsumerusa.com>, Troy Miller
<tromiller@santanderconsumerusa.com>, Wayne Nightengale
<wnightengale@santanderconsumerusa.com>, Mark Smith
<msmith@santanderconsumerusa.com>, Brent Huisman
<bhuisman@santanderconsumerusa.com>, Jonathan Morse
<JMORSE@santanderconsumerusa.com>
**Subject:** HR Org Change Announcement
**Date:** Mon, 24 Aug 2015 14:16:11 +0000
**Importance:** Normal
**Attachments:** HR_Org_Chart_August_2015.pptx

---

For our call today.

In an effort to more effectively support the business, the HR Advocacy team has realigned our team structure. This means that we will now have a dedicated team to support each site, vs. being aligned by EVP/SVP. The new structure is as follows:

NRH – *Angelina Hullum* will be the HR Manager, dedicated solely to this site. She will no longer have responsibility for Servicing at all sites, but will instead manage all HR matters at NRH. Reporting to Angelina are:

*Whitney Andres, HR Business Partner, (who will continue to support Servicing)*
*Misty Donnell, HR Business Partner (who will support Strategic Ops)*
*Jeanette Rodriguez, HR Generalist*
*Nicole Heinicke, HR Generalist*

Also reporting to Angelina will be *Kristen Lagunes*. You are all aware that Kristen joined SCUSA earlier this year as an HR Manager. Kristen will be transitioning to a Senior HR Business Partner role, at her request, to remain at NRH and support that site. We are excited to be able to leverage Kristen's experience and skill set for escalated Employee Relations issues and special projects.

Angelina's experience with SCUSA, first in CO, and now in TX, positions her well to lead the NRH HR team and support our largest site, especially with the upcoming remodel. Angelina will continue to report to me.

APP291

SC008380

LEW – I'm pleased to announce that *Yessica Aldana* will be transitioning to the LEW site as HR Manager. Yessica joined SCUSA earlier this year as an HR Manager supporting Funding and Credit, and has done a great job assimilating to the organization. Yessica will continue to support the 8585 site as well, until further notice. Reporting to Yessica will be:

> *Hortensia Perez, HR Business Partner*
> *Reena Mathew, HR Business Partner*
> *Sabrina Boyd, HR Generalist*

Yessica will be responsible for all HR activities at both LEW and 8585.

CO – I'm also pleased to announce that *Kayla Liggett* will join SCUSA as the HR Manager for our CO site. Kayla comes to SCUSA with experience in the retail and collections arenas and will be a strong addition to our team. She will have responsibility for all HR matters at the CO site. Reporting to Kayla is:

> *Melissa Lawson, HR Generalist*

Kayla will report to me.

THX – *Jonathan Morse* will continue to serve as HR Manager for Thanksgiving Tower and will manage all HR activities at that building. He will take over the support of all departments physically located at the Tower, that are currently being supported by my team, in addition to all of the Back Office departments that he currently supports. Reporting to Jonathan is:

> *Senior HR Business Partner – Open*
> *HR Business Partner – Tina Mohan*
> *HR Business Partner – Augie Pastrana*
> *HR Business Partner – An Vo*
> *HR Generalist – Fatma Rizvan*

Jonathan has been in the HR Manager role for a year now and has done a great job leading his team and working with the business. He is well positioned to take on this additional responsibility. He will continue to report to Jessica.

All of these org changes, as well as Kayla's start date with SCUSA, are effective 8/31.

Additionally, Jessica and I wanted to inform you that as part of the restructure, and to better reflect the level of support that our teams will be providing to yours, we will now refer to all of those that serve on our teams as "HR Business Partners". This will replace our former "Advocacy" title, which we are phasing out. I will explain in more during our scheduled call, so that you all understand what exactly this means, what remains the same and what will be somewhat different.

I will continue to support all EVP's and SVP's under Brad Martin's org, and Jessica will continue to support all other C-level executives and their direct reports.

Regards,
Stephanie

**Stephanie Elad,** SPHR
Santander Consumer USA Inc.
Director, Human Resources

PHONE     214.237.3713
MOBILE    214.695.1278
EMAIL      selad@santanderconsumerusa.com
WEB        www.santanderconsumerusa.com

SC008381

**From:** "Reena Mathew" </O=D6ORG/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=REENA MATHEW0CB>
**To:** "Yessica Adriano" <YADRIANO@santanderconsumerusa.com>
**Subject:** FW: Summary of Details- Shara Lane- Term Request
**Date:** Mon, 23 Nov 2015 19:01:33 +0000
**Importance:** Normal

---

Hi Yessica,

Could I please get your approval for the term below?

**Recommendation Details:**
- Associate Name:  Shara Lane
- Hire Date:  8/3/15
- DOB(MM/DD Only): 9/17
- DA History:
- 9/17/15—Verbal for Call Model Violation
- 10/14/15—Verbal for Attendance
- 10/14/15—Written Call Model Violation
- 10/16/15—Written for Attendance
- 11/5/15—Final for Call Model Violation
- Investigation Conducted Y/N (If Yes, attach investigation summary): Y
- Have we interviewed the associate? Y
- Policy Violation: Misconduct—Falsification of company systems
- Business Recommendation: Term
- HR Recommendation: Term

**Explain briefly why you are making this recommendation (review the considerations below):** Please see AVP's recap
below. We spoke to Security and there was no record of her on camera coming or leaving the building at the times she
noted.  Issues that came up during the meeting: associate piggybacked into the building after someone else (no badge
swipe for her before 6:59a); associate stated she clocked in and left to go to Wal-Mart (no record on camera, theft of
time); no record of her on camera. Due to theft of time, it is our recommendation to move forward with term for
misconduct.

Brad's approval is below...let me know if you need anything else.

Thanks,
Reena

---

**From:** Brad Denetz
**Sent:** Saturday, November 21, 2015 2:26 PM
**To:** Jorge Munoz
**Cc:** Reena Mathew; Yessica Adriano; Angelina Hullum; Jorge Munoz
**Subject:** Re: Summary of Details- Shara Lane- Term Request

Approved to term.

Sent from my iPad

SC004226

On Nov 20, 2015, at 2:34 PM, "Jorge Munoz" <jmunoz@santanderconsumerusa.com> wrote:

Brad,

Please approve term for Shara Lane for Misconduct: *Falsification of company systems*.  Please see the details below of the events that occurred today with Shara Lane.

Elizabeth Sila, brought to my attention today, while reviewing kronos, that Shara Lane had a clock in of 6:59a but arrived at work at 7:19a. We asked security for a badge swipe, which they confirmed happened seconds before 7:19am. We then asked security to pull video, we confirmed once again that she was not on the premises unit 7:19.

When we brought in Shara to explain our concerns, she stated that she came in the building, clocked in at a resource center desk at 6:59 and then left to go shopping at Walmart. Shara stated that she did not swipe her badge because security allows her to enter the building without badging in. She could not explain why she was not on camera at the time she states she came in the building. In addition, she did not have an explanation as to why she decided to log in at another desk other than hers to clock in. When we asked Shara if she understands that when she clocks in for the day, she is expected to be available for calls and she responded that she did. We asked Shara if anyone gave her permission to clock in and go shopping and she said no.

Throughout the conversation Shara became aggressive, lashing out at Elizabeth, her manager, as to why she brought this issue up to HR/AVP. We then informed Shara that her manager was doing her job and that it is inappropriate to question why her manger would escalate a violation. Shara continued her aggression and became loud as we discussed the inconsistencies in her story. Shara made statements that she was going to get an attorney and contact EOC.

After speaking with Angelina, Reena and myself collected her badge and advised her that she would be suspended until further notice.


**Jorge Munoz**
Chrysler Capital
Assistant Vice President Business Operations

| | |
|---|---|
| **PHONE** | 214.261.1643 |
| **MOBILE** | 469.571.8806 |
| **EMAIL** | jmunoz@santanderconsumerusa.com |
| **WEB** | www.chryslercapital.com |

SC004227

**From:** "Reena Mathew" </O=D6ORG/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=REENA MATHEW0CB>
**To:** "Yessica Adriano" <YADRIANO@santanderconsumerusa.com>
**Subject:** Summary of Details- Shara Lane- Term Request
**Date:** Tue, 24 Nov 2015 15:35:39 +0000
**Importance:** Normal

---

Hi Yessica,

Could I please get your approval for the term below?

**Recommendation Details:**
- Associate Name:  Shara Lane
- Hire Date:  8/3/15
- DOB(MM/DD Only): 9/17
- DA History:
- 9/17/15—Verbal for Call Model Violation
- 10/14/15—Verbal for Attendance
- 10/14/15—Written Call Model Violation
- 10/16/15—Written for Attendance
- 11/5/15—Final for Call Model Violation
- Investigation Conducted Y/N (If Yes, attach investigation summary): N
- Have we interviewed the associate? Y
- Policy Violation: Misconduct—Falsification of company systems
- Business Recommendation: Term
- HR Recommendation: Term

**Explain briefly why you are making this recommendation (review the considerations below):** Manager Elizabeth Sila noticed that associate Shara Lane was clocked into Kronos at 6:59a however only arrived to work at 7:19a. Manager met with associate to see where the discrepancy stemmed from. Associate stated that she clocked in on the other side of the building at the resource cube and then went to Wal-Mart to buy birthday décor for a peer on the team. Jorge then brought it to my attention and we spoke to Security and there was no record of her on camera coming or leaving the building at the times she noted.

Jorge and I then met with the associate and here are the issues that came up during the meeting: associate piggybacked into the building after someone else (no badge swipe for her before 6:59a), she also stated that Security lets her in without her badge at times which we informed her they check everyone; associate stated she clocked in at the Resource Cube and then left to go to Wal-Mart (no record on camera, theft of time) to buy décor for peer on team; no record of her entering or exiting the building on camera. Jorge then reiterated that once an associate is clocked in, the expectation is to be ready to work and to not leave the premises without clocking out nor telling the Manager.

Due to discrepancies in the story and theft of time by going to Wal-Mart while still clocked in, it is our recommendation to move forward with term for misconduct.

Brad's approval is below. Please let me know if you need anything else.

Thanks,
Reena

SC004491

**From:** Brad Denetz
**Sent:** Saturday, November 21, 2015 2:26 PM
**To:** Jorge Munoz
**Cc:** Reena Mathew; Yessica Adriano; Angelina Hullum; Jorge Munoz
**Subject:** Re: Summary of Details- Shara Lane- Term Request

Approved to term.

Sent from my iPad

On Nov 20, 2015, at 2:34 PM, "Jorge Munoz" <jmunoz@santanderconsumerusa.com> wrote:

Brad,

Please approve term for Shara Lane for Misconduct: *Falsification of company systems*.  Please see the details below of the events that occurred today with Shara Lane.

Elizabeth Sila, brought to my attention today, while reviewing kronos, that Shara Lane had a clock in of 6:59a but arrived at work at 7:19a. We asked security for a badge swipe, which they confirmed happened seconds before 7:19am. We then asked security to pull video, we confirmed once again that she was not on the premises unit 7:19.

When we brought in Shara to explain our concerns, she stated that she came in the building, clocked in at a resource center desk at 6:59 and then left to go shopping at Walmart. Shara stated that she did not swipe her badge because security allows her to enter the building without badging in. She could not explain why she was not on camera at the time she states she came in the building. In addition, she did not have an explanation as to why she decided to log in at another desk other than hers to clock in. When we asked Shara if she understands that when she clocks in for the day, she is expected to be available for calls and she responded that she did. We asked Shara if anyone gave her permission to clock in and go shopping and she said no.

Throughout the conversation Shara became aggressive, lashing out at Elizabeth, her manager, as to why she brought this issue up to HR/AVP. We then informed Shara that her manager was doing her job and that it is inappropriate to question why her manger would escalate a violation. Shara continued her aggression and became loud as we discussed the inconsistencies in her story. Shara made statements that she was going to get an attorney and contact EOC.

After speaking with Angelina, Reena and myself collected her badge and advised her that she would be suspended until further notice.

**Jorge Munoz**
Chrysler Capital
Assistant Vice President Business Operations

PHONE    214.261.1643
MOBILE   469.571.8806
EMAIL    jmunoz@santanderconsumerusa.com
WEB      www.chryslercapital.com

APP296

SC004492

**From:** Stephanie Elad <selad@santanderconsumerusa.com>
**To:** Stephen Shaffer <sshaffer@santanderconsumerusa.com>, Angelina Hullum
<AHULLUM@santanderconsumerusa.com>, Yessica Adriano
<YADRIANO@santanderconsumerusa.com>
**Subject:** RE: Headcount
**Date:** Mon, 11 Jan 2016 19:03:14 +0000
**Importance:** Normal

---

Yes and no on NRH being overstaffed. Kristen does other special projects (and does not handle the same amount of day to day tasks as Whitney) and Nicole and Jeanette do other tasks. It's not really an apples to apples comparison.

Agree on your second point – thanks for the further explanation.

**From:** Stephen Shaffer
**Sent:** Monday, January 11, 2016 12:58 PM
**To:** Stephanie Elad; Angelina Hullum; Yessica Adriano
**Subject:** RE: Headcount

I want to be sure I am reading this correctly.

In essence NRH is overstaffed and the other two are understaffed?  It appears to be a difference of around 140 to 160? Correct?

I just saw your question on the other mail pop up.  My point, if you add Yessica to Reena and Sabrina, and you add Angelina to NRH then I expect the difference is close to a wash and the ratio between the overall numbers does not change much?

Thanks

## Stephen Shaffer
Santander Consumer USA Inc.
VP Human Resources Business Partnership

PHONE    214.722.4580
MOBILE   469.236.5931
EMAIL    sshaffer@santanderconsumerusa.com
WEB      www.santanderconsumerusa.com

**From:** Stephanie Elad
**Sent:** Monday, January 11, 2016 12:54 PM
**To:** Angelina Hullum; Yessica Adriano
**Cc:** Stephen Shaffer
**Subject:** RE: Headcount

Thanks! CO should be over 600 in the next few months. And, when 8585 closes, that headcount will transfer primarily to Mesa and THX. So, I think these numbers look ok.

Stephen – let me know if you have a differing perspective.

**APP297**

SC008177

---

**From:** Angelina Hullum
**Sent:** Monday, January 11, 2016 12:50 PM
**To:** Stephanie Elad; Yessica Adriano
**Cc:** Stephen Shaffer
**Subject:** RE: Headcount

Based on current headcount, here is the breakdown:

- LEW/8585      1017/2  =      508      (Reena & Sabrina)
- NRH              1461/4  =      365      (Kristen, Whitney, Jeanette, Nicole)
- COD              524/1   =      524      (AJ)

---

**From:** Stephanie Elad
**Sent:** Monday, January 11, 2016 12:29 PM
**To:** Angelina Hullum; Yessica Adriano
**Cc:** Stephen Shaffer
**Subject:** RE: Headcount

Can we look at it by total headcount by site and then divide by number of BP's and G's at that site?

---

**From:** Angelina Hullum
**Sent:** Monday, January 11, 2016 11:51 AM
**To:** Stephanie Elad; Yessica Adriano
**Cc:** Stephen Shaffer
**Subject:** RE: Headcount

I stand corrected. Reena's group includes 8585, so that number is correct. However, it breaks down to 680 at LEW and 224 at 8585. So, I wouldn't say all of that is Reena's.

---

**From:** Angelina Hullum
**Sent:** Monday, January 11, 2016 11:45 AM
**To:** Stephanie Elad; Yessica Adriano
**Cc:** Stephen Shaffer
**Subject:** RE: Headcount

Something's wrong with the formula. I will have Nicole fix it. Reena only has 680 total.

---

**From:** Stephanie Elad
**Sent:** Monday, January 11, 2016 11:39 AM
**To:** Yessica Adriano; Angelina Hullum
**Cc:** Stephen Shaffer
**Subject:** FW: Headcount

Hi – can you both take a look at this? If it's correct then Reena does have an increased workload compared to Whitney. I realize Whitney is doing double duty right now. We may need to look at moving some groups to Kristen, at least for now. Thoughts?

---

**From:** Nicole Heinicke
**Sent:** Monday, January 11, 2016 10:56 AM
**To:** Kristen Lagunes; Whitney Andres; Jeanette Rodriguez; Reena Mathew; Sabrina Boyd; Melissa Lawson; Andrew

**Cc:** Angelina Hullum; Yessica Adriano; Kayla Liggett; Stephanie Elad; Edward Fabritiis
**Subject:** Headcount

Hello!

We have updated the Headcount report for this week. Please let me know if you have any questions. It can be found in the headcount folder on the G Drive. (G:\HR Site Folders\NRH\Headcount)

Thanks!
Nicole

## Nicole Heinicke
Santander Consumer USA Inc.
HR Generalist

PHONE     214.452.7016
MOBILE    214.212.8260
EMAIL     nheinicke@santanderconsumerusa.com
WEB       www.santanderconsumerusa.com

SC008179

**From:** "Sabrina Boyd" <SBOYD@santanderconsumerusa.com>
**To:** "Sabrina Boyd" <SBOYD@santanderconsumerusa.com>, "Reena Mathew"
      <rmathew@santanderconsumerusa.com>
**Subject:** Conversation with Sabrina Boyd
**Date:** Tue, 08 Mar 2016 18:59:32 +0000
**Importance:** Normal

---

**Sabrina Boyd [9:13 AM]:**
Holly just said to me....
Did you see the look on Jessica's face when I asked her if she's preggers....LOL!  Holly thinks she is just becuase of the lookon her face

**Reena Mathew [9:14 AM]:**
LMAO!!!!!
Dude, at this point, you never know!

**Sabrina Boyd [9:15 AM]:**
Right

**Reena Mathew [9:15 AM]:**
I did see that look too though!

**Sabrina Boyd [9:16 AM]:**
HA!!  Yessica LOVES Jessica
Cant you tell how she just lights up
have you noticed
OMG

**Reena Mathew [9:21 AM]:**
LOLOL!!! YES, totally agree!!!
Girl crush!

**Sabrina Boyd [9:38 AM]:**
Boots
dont start with us this morning

**Reena Mathew [9:38 AM]:**
lmao, I know!!
I thought we were supposed to go to the VP's!
Now he wants to know
lol

**Sabrina Boyd [9:39 AM]:**
BAHAHAHAH!!  I think he's in a power strike now!
I mean now he's telling us how to do our schedules
and now wants to know what's goingon

**Reena Mathew [9:39 AM]:**
Someone is feeling left out!
hahaha
EXACTLY
Too many pieces to these investigations

**Sabrina Boyd [9:40 AM]:**
HAHAHA!!  "Left Out"

**Reena Mathew [9:40 AM]:**
Geesh
lol

**Sabrina Boyd [9:40 AM]:**
Send me the info and I can open the case for this one...Or is it considered investigation?

**Reena Mathew [9:41 AM]:**
I think Yessica has this one......

**APP300**

SC001799

**Sabrina Boyd [9:41 AM]:**
  Oh, ok!
  Well she'll prob not answer for a while

**Reena Mathew [9:42 AM]:**
  LOL, probably!

**Sabrina Boyd [9:42 AM]:**
  Geesh!
  You and I will not have a day alone until Thurs
  LOL

**Reena Mathew [9:43 AM]:**
  lawd!!!!!!!!!!
  Who's here tomm?

**Sabrina Boyd [9:43 AM]:**
  You're WFH, right?

**Reena Mathew [9:43 AM]:**
  Yes....
  Thank God!

**Sabrina Boyd [9:43 AM]:**
  LOL

**Reena Mathew [9:43 AM]:**
  lol

**Sabrina Boyd [9:43 AM]:**
  So Thurs

**Reena Mathew [9:44 AM]:**
  k, cool
  I'm going to swing by Boots' office

**Sabrina Boyd [9:44 AM]:**
  ok, now? why?

**Sabrina Boyd [10:06 AM]:**
  GIRL...IDK why but I yesterday I was sooooo tickled when YA told me that she had to carpool with SE...It was the funniest thing to me!
  OMG
  dont let me forget to tell you about this darn mtg we had yesterday

**Reena Mathew [10:07 AM]:**
  That is hilarious!!!!!!!!!!! It really was....
  I can just see them in the car together
  Too funny
  Ok--yes looking forward!
  Dam*, my hair is a hot mess!

**Sabrina Boyd [10:08 AM]:**
  GIRL no it is not
  it's cute curling up on the ends

**Reena Mathew [10:08 AM]:**
  LOL, ok! Hope it's not too bad--I feel like a poodle
  Speaking of
  lol

**Sabrina Boyd [10:08 AM]:**
  OMG no!  SE's is actually puffy

**Reena Mathew [10:08 AM]:**
  LOL, really!??

**Sabrina Boyd [10:08 AM]:**
  She needs some product

**Reena Mathew [10:09 AM]:**
  Ok, I need to look when she comes out
  I wonder if they shared an umbrella! lmao

**Sabrina Boyd [10:09 AM]:**

and she keeps flicking it sie to side!  You know that thing she does???

**Reena Mathew [10:09 AM]:**

YEEEEEEEEEEEEEEEEEEEEEEEEEEEEEEEES

It's like c'mon now!

lol

**Sabrina Boyd [11:08 AM]:**

OMG

**Reena Mathew [11:08 AM]:**

w

What?

**Sabrina Boyd [11:08 AM]:**

GIRL

hold on

**Reena Mathew [11:08 AM]:**

k

**Sabrina Boyd [11:08 AM]:**

the freaking intern

SE just suggested to YA to have the person come to me!

SHe said "I would just have her to sit with Sabrina"

WTH

I aint got time for that

**Sabrina Boyd [11:17 AM]:**

Sorry to bother...Can you tell me if they decided to rescind a DA for Sharlet Reed?  Orland sent you an email on 02/03 for a Verbal...You sent me the call but the DA is not in WD

**Reena Mathew [11:31 AM]:**

Sorry, just saw you other IM!

LOL

So we have one??

I'm not surprised!!!

Yes, he rescinded the Sharlet one.....

**Reena Mathew [12:39 PM]:**

Hey S, can you pls print out any Insubordination DA's for Monisha?

**Sabrina Boyd [12:40 PM]:**

yep

**Reena Mathew [12:45 PM]:**

Thank you Darling!

**Sabrina Boyd [12:46 PM]:**

OMG

Guess who ELSE is preggers but has not made the announcement yet

in HR

**Reena Mathew [12:46 PM]:**

What the hellllllllllllllllllll

Are you serious?

Who????

**Sabrina Boyd [12:46 PM]:**

Fatma

**Reena Mathew [12:46 PM]:**

OMGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGGG

I can't even deal

**Sabrina Boyd [12:46 PM]:**

BAHAHAHA

It's the year of HR babies

**Reena Mathew [12:46 PM]:**

SE and PB are going to be pissed!

lmao!

**Sabrina Boyd [12:46 PM]:**
BAHAHAHAHAH
Right
No coverage
Oh well

**Reena Mathew [12:47 PM]:**
EXACTLY
Yep!
They'll have to figure something out early
That is insane!

**Sabrina Boyd [12:47 PM]:**
So it's:

Reena
Tina
Fatma
Christina
Whitney

**Reena Mathew [12:47 PM]:**
WOOOOOOOOOOOOOOOOOOOW!
Crazy!

**Sabrina Boyd [12:47 PM]:**
And possibly Jessica

**Reena Mathew [12:47 PM]:**
lmao!
yep
We shall see
That was some look, huh?

**Sabrina Boyd [12:47 PM]:**
LOL
Can she be any louder

**Reena Mathew [12:48 PM]:**
You're making me laugh in here!
It's her hubby
lolol!

**Sabrina Boyd [12:56 PM]:**
What the heck is she rattling in there....sounds like a little mouse trying to get into food!
BAHAHAHA

**Reena Mathew [12:57 PM]:**
LOLOLOL!
Who know with her!

**Sabrina Boyd [12:57 PM]:**
Right

**Reena Mathew [12:57 PM]:**
Remember the keys in the fridge?
lol!!!

**Sabrina Boyd [12:57 PM]:**
OMG yes
weirdo

**Reena Mathew [12:57 PM]:**
lmaooooooooooooooooooooooo

**APP303**

SC001802

**From:** "Reena Mathew" </O=D6ORG/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=REENA MATHEW0CB>
**To:** "Yessica Adriano" <YADRIANO@santanderconsumerusa.com>
**Subject:** Investigation Summary--Brittany Brodie
**Date:** Fri, 08 Apr 2016 16:02:39 +0000
**Importance:** Normal

---

Hi Yessica,

Please see the summary below and notes attached for the Brittany Brodie investigation.

**Date Complaint Received**: 4/1/2016
**Investigator:** Reena Mathew, HR Business Partner; Witness: N/A
**Complainant:** Brittany Brodie; Early Stage Account Manager
**Accused:** Emerial Woods; Latoria Chatman—Early Stage Account Managers
**Witnesses:** Karen Cantu/Bryson Gray—Early Stage Account Managers; Gerald Rahm—Early Stage Manager

**Timeline of Investigation:**
**4/1/2016:** AVP Jorge Munoz receives word from Manager Gerald Rahm that there was an incident during Gerald's jumpstart that morning; Jorge meets with HR Manager Yessica Adriano to discuss; Jorge and Yessica meet with Brittany to get her side of the story and associate is suspended until pending investigation is completed
**4/1/2016:** Reena Mathew meets with Emerial Woods/Karen Cantu to see what information they could provide regarding the incident
**4/7/2016**: Reena Mathew also meets with an additional witness, Bryson Gray, to see what information he could provide

**Final Incident that led Complainant(s) to complain:** On 4/1/2016, Brittany Brodie states she was in their team jumpstart *(Yessica, could you pls fill this part in?)*

**Confirmed Accusations:**
- Question regarding hygiene during jumpstart was made by Latoria
- High five was done between Emerial and Latoria
- Emerial did admit to allowing Latoria and vice versa to use her Workstation to clock herself in when she was running late; stated the last time it happened was a month ago
- Brittany did get assertive and stated 'We can take it outside and you can find out' towards Emerial
- Emerial didn't respond back to Latoria
- One witness stated that Emerial/Latoria were instigating with Brittany as they've had previous issues and that the hygiene comment was directed towards Brittany

**Alleged and Unconfirmed Accusations:**
- Hygiene and high five were directed towards Brittany
- Emerial and Latoria use each other's login information (username/password) to clock each other in and out of Kronos when they're running late
- Emerial stated Latoria bumped her when she and Latoria were coming back into the building (Latoria was the only witness)
- One witness states that he has heard Emerial talking on the phone with Latoria and stating 'hurry up, I think Jerry knows' regarding Emerial clocking Latoria in when Latoria hadn't arrived to work yet; said it's happened

SC004212

numerous times – ever before the team moved to the other side of the building, Reena Mathew asked witness for specific dates so that the business can further look into but hasn't received anything as of yet.

**Recommendation:** Based on confirmed accusations, I would recommend termination at this point in time for Brittany Brodie. We have a Manager and more than one witness say her behavior towards Emerial was aggressive and threatening. Although there seems to be some validity to Emerial/Latoria instigating, we are unable to prove it 100% because no one ever heard Brittany's name mentioned. Based on the Kronos findings, we can determine how to move forward with Emerial/Latoria, if there is in fact anything there.

Let me know if you need any additional information.

Thanks,
Reena

**Reena Mathew, PHR**
Santander Consumer USA Inc.
HR Business Partner

| | |
|---|---|
| PHONE | 214.292.2772 |
| MOBILE | 214.364.9136 |
| FAX | 214.630.0828 |
| EMAIL | rmathew@santanderconsumerusa.com |
| WEB | www.santanderconsumerusa.com |
| BENEFITS HOTLINE | 214.540.2010 |