**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| REENA S. MATHEW, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:23-CV-01494-BW |
| | § | |
| SANTANDER CONSUMER USA INC., | § | |
| | § | |
| *Defendant.* | § | |

# DEFENDANT'S REPLY IN SUPPORT OF ITS
# <u>MOTION FOR SUMMARY JUDGMENT</u>

Monte K. Hurst
State Bar No. 00796802
Monte.Hurst@hallettperrin.com

Clayton S. Carter
State Bar No. 24120750
CCarter@hallettperrin.com

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142

*Counsel for Defendant
Santander Consumer USA Inc.*

# **TABLE OF CONTENTS**

*Page*

I.     SUMMARY ........................................................................................................... 1

II.    ARGUMENTS & AUTHORITIES .................................................................... 2

    A.    The Court Must Disregard Mathew's Numerous Unsupported Assertions. ........... 2

        1.    Mathew's Response is Riddled with Unsupported Allegations................. 2

        2.    Mathew Makes Many Inaccurate Statements that Contradict Her Deposition Testimony and/or Reliable Documentary Evidence. ................................. 2

        3.    Mathew Makes Assertions that are Not Supported by the Cited Evidence. 8

    B.    Mathew's Claims Fail Because She Does Not Present Sufficient Evidence that would Permit a Rational Inference that Santander's Proffered Reasons were Pretext for Discrimination or Retaliation. ........................................................................ 11

        1.    Mathew Wholly Fails to Create a Fact Issue Under the Unworthy of Credence Standard. ................................................................................... 11

        2.    Mathew's unsubstantiated claim that Santander deviated from its policies or procedures does not establish pretext. ................................................... 16

        3.    Mathew's unsubstantiated assertion that Santander tried to create a paper trail after deciding to terminate her fails to establish pretext................... 19

        4.    Mathew's unsupported claim that Santander did not have contemporaneous documentation fails to establish pretext................................................... 21

        5.    Mathew's unsupported claim that she was held responsible for something that was not one of her job duties fails to establish pretext. ..................... 23

        6.    Protecting a company from legal exposure and hiring outside counsel is not evidence of pretext. ................................................................................... 23

        7.    Santander did not present misleading evidence to the EEOC................... 24

        8.    Mathew's Claim that Santander has "Flawed Arguments" is … Flawed. 24

CONCLUSION............................................................................................................ 25

## **TABLE OF AUTHORITIES**

*Page(s)*

### **Cases**

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985)...................................................................................................3

*Bielawski v. Davis Roberts Boeller & Rife, P.A.*,
  No. 2:18-cv-758-FtM-29MRM, 2020 WL 7600688 (M.D. Fla. Dec. 22, 2020)...................25

*Burton v. Freescale Semiconductor, Inc.*,
  798 F.3d 222 (5th Cir. 2015) ......................................................................................20

*Cooper v. Wal-Mart Transp., LLC*,
  662 F. Supp. 2d 757 (S.D. Tex. 2009) ..........................................................................3

*Darden v. Simplicity Fin. Mktg., Inc.*,
  No. 4:18-CV-1737, 2019 WL 6119485 (S.D. Tex. Nov. 18, 2019) .......................................16

*Fisher v. Vassar Coll.*,
  114 F.3d 1332 (2d Cir. 1997)......................................................................................12

*Goudeau v. Nat'l Oilwell Varco*,
  793 F.3d 470 (5th Cir. 2015) ..............................................................................16, 17

*Houston v. Tex. Dep't of Agric.*,
  17 F.4th 576 (5th Cir. 2021) .....................................................................................22

*Jazayeri v. Avaya, Inc.*,
  No. 2:19-cv-06003-JDW, 2021 WL 2186367 (E.D. Pa. May 28, 2021) ..............................25

*Lawrence v. Univ. of Tex. Med. Branch*,
  163 F.3d 309 (5th Cir. 1999) ....................................................................................25

*Laxton v. Gap*,
  333 F.3d 572 (5th Cir. 2003) ..............................................................................22, 24

*McFaul v. Valenzuela*,
  684 F.3d 564 (5th Cir. 2012) ......................................................................................2

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
  934 F.3d 447 (5th Cir. 2019) ..............................................................................16, 24

*Munday v. Recreational Equip. Inc.*,
  No. 5:97-CV-822-F(2), 1999 WL 125507 (E.D.N.C. Jan. 15, 1999) ....................................25

**Cases (cont.)**

*Owens v. Circassia Pharm., Inc.*,
    33 F.4th 814 (5th Cir. 2022) ...........................................................................11, 12, 15, 16, 19

*Pennington v. Tex. Dep't of Family & Protective Servs.*,
    469 F. App'x 332 (5th Cir. 2012) ......................................................................................15

*Perez v. Region 20 Educ. Serv. Ctr.*,
    307 F.3d 318 (5th Cir. 2022) ......................................................................................19, 22

*Ragas v. Tenn. Gap Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ...................................................................................2, 10, 19

*Russell v. McKinney Hosp. Venture*,
    235 F.3d 219 (5th Cir. 2000) ......................................................................................16, 17

*Sandstad v. CB Richard Ellis, Inc.*,
    309 F.3d 893 (5th Cir. 2002) ............................................................................................16

*Taylor v. Peerless Indus. Inc.*,
    322 F. App'x 355 (5th Cir. 2009) (unpublished) ................................................................17

**Other Authorities**

Fed. R. Civ. P. 56.....................................................................................................................2

# I.
# SUMMARY

Through this lawsuit, Plaintiff Reena Mathew ("Mathew") has been given the opportunity to tell her story. She has made dozens of accusations against her former colleagues at Defendant Santander Consumer USA Inc. ("Santander"). She has been heard.

Mathew's Brief in Response to Defendant's Motion for Summary Judgment ("Response") is a 49-page cacophony of juvenile excuses and attempts to blame others for her poor performance. She apparently believes that she can prevail if she simply denies, or presents her subjective reality in response to, many of Santander's reasons for placing her on PIPs and for ultimately terminating her employment. However, her exhausting endeavor does not win the day here. Indeed, Mathew's claims of pregnancy discrimination and retaliation must be dismissed by the Court, because she fails to present any evidence suggesting that Santander's explanations for its employment decisions were somehow pretext for discrimination or retaliation.

Mathew's Response contains numerous instances when she either contradicts her own deposition testimony taken just two months ago or swears to something that is so demonstrably untrue that it can only be regarded as an attempt to manufacture a fact dispute. Notably, Mathew was adamant in her deposition that that the only person at Santander who had discriminated against her because of pregnancy and retaliated against her was her former direct supervisor, Yessica Perez,[1] and that Perez's supervisor, Stephanie Elad, did not have any discriminatory or retaliatory motive against her but went along with Perez's grand discriminatory and retaliatory conspiracy. Now, Mathew argues in her Response that Elad was also out to get her because of her pregnancy. Regardless of which story you pick—the ones Mathew told at her deposition or the ones she tells

---

[1] Yessica Perez previously went by the name Yessica Adriano. Throughout this Reply, Santander refers to Perez by her current last name, Perez, and, to prevent confusion, replaces Mathew's references to "Adriano" with "Perez."

in her Response—she presents *no evidence* to support an inference of discrimination or retaliation.

## II.
## ARGUMENTS & AUTHORITIES

**A.    The Court Must Disregard Mathew's Numerous Unsupported Assertions.**

Mathew's Response is riddled with unsupported allegations, allegations supported only by an inaccurate and sham declaration, and allegations that are not supported by the cited evidence. None of these allegations is competent summary judgment evidence. As such, all of these allegations should be disregarded by the Court.

### 1.    *Mathew's Response is Riddled with Unsupported Allegations.*

Mathew's Response is replete with allegations that fail to cite to evidence. "[U]nsubstantiated assertions are not competent summary judgment evidence." *Ragas v. Tenn. Gap Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998). The "party opposing summary judgment is required to identify specific evidence in the records and to articulate the precise manner in which the evidence supports his or her claim." *Id.* Rule 56 "does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* Accordingly, the Court should disregard Mathew's many unsupported allegations.[2]

### 2.    *Mathew Makes Many Inaccurate Statements that Contradict Her Deposition Testimony and/or Reliable Documentary Evidence.*

A motion for summary judgment "may not be thwarted by conclusory allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela,*

---

[2] In some instances, Mathew's failure to cite to any evidence in support of her assertions is obvious, as there is no citation to any evidence in an entire paragraph. *See e.g.,* Pl.'s Resp. Br. at 17, ECF No. 35 (the first paragraph on this page purports to lay out the "facts" on which Mathew bases the second element of her prima facie case, with no citation to any evidence in support); *id.* at 19–21 (despite making multiple factual allegations on these pages, Mathew fails to include a single citation to the evidence). In other instances, Mathew presents a paragraph of factual allegations but includes one citation to evidence at the end of the paragraph, implying that the entire paragraph is supported by the evidence cited at the end of the paragraph. This is, however, not always the case. For example, neither of the last two sentences in the last paragraph on page 27 of Mathew's Response is supported by the evidence she cites. *See* Pl.'s Resp. Br. at 27, ECF No. 35; Mathew Decl., ¶¶ 45–47, ECF No. 36; Pl.'s App.087, ECF No. 36.

684 F.3d 564, 571 (5th Cir. 2012). Witness testimony made up of conclusional allegations and unsupported assertions may be disregarded when objective documentary evidence contradicts the witness's story, or the story is so internally inconsistent or implausible that a reasonable fact finder would not find it credible. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). Disregarding such "evidence" does not constitute an impermissible credibility determination. *See Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757, 784 (S.D. Tex. 2009).

As illustrated in the chart below, the numerous inaccurate statements in Mathew's Declaration that are disproven by her own deposition testimony (and thus subject to the sham affidavit rule) and/or by reliable documentary evidence should be stricken.[3]

| Mathew's Inaccurate Declaration Statement(s) | Reliable Documentary Evidence Proving Inaccuracy |
|---|---|
| "My reviews were always positive, and they all indicated I was meeting or exceeding expectations." Mathew Decl., ¶ 4, ECF No. 36. | Mathew's 2012 review shows that she was (1) below expectations in the objective of "Self Development," which accounted for 25% of her goals; and (2) she could improve in both building relationships with other areas of the business outside of Servicing and in her attention to detail. *See* Suppl. APP286–289.[4] Mathew's 2014 review includes areas in which she could improve, such as her manager's comment that she: <ul><li>"would like to see Reena be more proactive in walking the floor daily to ensure the managers and Associates know she is available for them;"</li><li>"would like to see Reena step up as a leader among our team, as she has the most tenure and has a lot of knowledge and experience to share across all sites;" and</li><li>"would like to see Reena take her role to the next level by working close with the business to identify trends and training opportunities."</li></ul> *See* Pl.'s App.046–63, ECF No. 39. Mathew's 2015 Mid-Year review includes |

---

[3] *See* Def.'s Mot. to Strike Pl.'s Decl., ECF No. 45; Def.'s App. in Supp. of Its Mot. to Strike Pl.'s Decl., ECF No. 46.
[4] "Suppl. APP" refers to Defendant's Supplemental Appendix in Support of Its Motion for Summary Judgment, which Santander has sought leave to file in this proceeding. *See* ECF No. 47.

| Mathew's Inaccurate Declaration Statement(s) | Reliable Documentary Evidence Proving Inaccuracy |
|---|---|
| | areas in which she could improve, such as her manager's comments that she:<br>• "Would like to see more progress in this area. We have many new managers that need training and guidance. Reena needs to spend more time on the floor with all managers."<br>• "I would like to see her spend more time training our managers and working on her projects."<br>*See* Def.'s APP159–163, ECF No. 25.[5] |
| "Any employee could award Your [sic] Earned It points to another employee for exemplary work, or going above and beyond on something." Mathew Decl., ¶ 5, ECF No. 36. | Employees could receive YouEarnedIt points for a variety of reasons, or simply no reason at all.[6] An employee receiving YouEarnedIt points is not necessarily indicative of their work performance. Mathew received YouEarnedIt points for her birthday and Employee Appreciation Day, neither of which have any relation to Mathew's "exemplary work" or her "going above and beyond on something." *See* Def.'s APP71–108, ECF No. 25. |
| "My relationship with [Perez] and Elad changed right after I told [Perez] that I was pregnant. Before, we would usually say hello in the morning and exchange greetings, but that stopped. Their attitudes changed from being friendly to being cold and distant." Mathew Decl., ¶ 16, ECF No. 36. | Mathew testified in her deposition that she did not have a problem with Elad until after Perez gave her the PIP in December 2015. *See* Mathew Dep. at 109:5–18, Suppl. APP282. Mathew also admitted under oath that she does not believe that Elad actually chose to discriminate against her because of her pregnancy. *See* Mathew Dep. at 222:1–13, Def.'s APP058, ECF No. 25. |
| "Hullum did not ask me to do the time study a second time, and she never told me the time study I submitted was vague." Mathew Decl. ¶ 43(a), ECF No. 36. | • E-mail message from Mathew to Hullum on July 30, 2015, apologizing that she did not do her time study in 15 minute increments and asking for a form spreadsheet. *See* Suppl. APP290.<br>• E-mail message from Mathew to Hullum on August 19, 2015 transmitting her second attempt at the time study. *See* Def.'s APP147, ECF No. 25. |
| "If Hullum thought I needed to do more of anything, she could have said something to me, and I would have done it. Hullum never gave | Mathew's 2014 review includes tasks in which Hullum believed Mathew could be doing more of: |

---

[5] "Def.'s APP" refers to Defendant's Appendix in Support of Its Motion for Summary Judgment. *See* ECF No. 25.
[6] YouEarnedIt is an employee engagement software that facilitates real-time, employee-to-employee recognition and enables custom, meaningful rewards.

| Mathew's Inaccurate Declaration Statement(s) | Reliable Documentary Evidence Proving Inaccuracy |
|---|---|
| me any feedback on any of the monthly recaps I sent her. She never questioned why I had not done more of any one thing, and she never told me to do more." Mathew Decl., ¶ 38, ECF No. 36. | • "I would like to see Reena take her role to the next level by working close with the business to identify trends and training opportunities."<br>• "I encourage Reena to spend more time with new managers to help them develop their knowledge in SCUSA policy and procedures, along with HR systems."<br>• "Reena attends weekly AVP meetings, and I encourge [sic] her to attend jumpstars [sic] to increase her visibility to the Associates."<br>• "I would like to see Reena be more proactive in walking the floor daily to ensure the managers and Associates know she is available for them."<br>• "I encourage Reena to spend more time on the floor, with managers, and external HRBPs."<br>*See* Pl.'s App.046–63, ECF No. 39.<br>Mathew's 2015 Mid-Year also includes tasks in which Hullum believed Mathew could be doing more of:<br>• "Would like to see more progress in this area. We have many new managers that need training and guidance. Reena needs to spend more time on the floor with all managers."<br>• "I would like to see her spend more time training our managers and working on her projects."<br>*See* Def.'s APP159–163, ECF No. 25. |
| "On October 29, 2015, Brad Denetz came into the HR offices to discuss something unrelated to the DAs, and he talked with [Perez] and me. During the conversation, he asked about the status of the DAs, but he did not say he needed them ASAP. Later that day, in an instant message conversation with [Perez], I updated [Perez] on the status of the DAs. She did not say that any of the DAs needed to be done ASAP. She did not advise me that DA's are time sensitive." Mathew Decl., ¶ 46, ECF No. 36. | This statement is contradicted by the following IM to Mathew from Perez: "Hi Reena, Brad just came into the office, he said they have like 10 pending DAs . . . He stated he needs them ASAP."  *See* Def.'s APP174, ECF No. 25. |
| "The standing rule for processing employee resignations was to have them done by the end of the business day following the resignation." Mathew Decl., ¶ 51, ECF No. 36. | Mathew's claim that the "standard expectation for processing employee resignations was to process them no later than the next business day after the resignation, not first thing in the |

| Mathew's Inaccurate Declaration Statement(s) | Reliable Documentary Evidence Proving Inaccuracy |
|---|---|
| | morning" did not align with the expectation of her managers or of another SC HR professional, Holly Hanes. *See* Pl.'s Resp. Br. at 30; *see also* Def.'s APP187–188, ECF No. 25 (Ms. Hanes explains her expectations in her e-mail message to Elad, wherein she writes "I wouldn't expect a term to normally be processed over the weekend … I would have expected it to be completed first thing Monday though."   To which Elad responds "Yes – it is the fact that it was not handled first thing Monday that will be addressed."). |
| "This was a termination due to falsification of time, and my termination request clearly stated the basis for termination. It was not vague. [Perez] did later ask me for my notes from a meeting, and I sent them, but she never asked me to revise and resend the termination request."  Mathew Decl., ¶ 52, ECF No. 36. | Mathew's claim that Perez did not ask Mathew to revise and resend the termination request makes the faulty leap that just because Santander did not address this performance deficiency in its MSJ Brief, there must not be any contemporaneous and time-stamped evidence that substantiates the performance deficiency, and she is therefore safe in claiming it never occurred.  Here, Santander did produce both of the termination requests that Mathew submitted to Perez.  First, Mathew submitted a termination recommendation on November 23, 2015 that includes only one short paragraph explaining the reason for the termination recommendation.  *See* Suppl. APP293–294. Then, on November 24, 2015, Mathew submits a revised termination request that provides a much longer and more thorough explanation for the reason for the termination recommendation. *See* Suppl. APP295–296. |
| "I saw that another part of the HR department was asking us for help with some compliance issues – paperwork we needed to do to comply with regulations that applied to Santander because we did consumer lending. This was not a part of my job."  Mathew Decl., ¶ 53, ECF No. 36. | Santander's HRBP Job Description states that HRBP's must assist with all human resources functions, including, among other things, "Proactively minimizes legal risk by ensuring clients' compliance with company policies and procedures. Makes recommendations, provide solutions, and resolve issues as challenges arise." *See* Pl.'s App.064, ECF No. 36.  In fact, attending to compliance issues was not only part of Mathew's job as an HRBP, but an *essential* function of her job.  *See id.* |

| Mathew's Inaccurate Declaration Statement(s) | Reliable Documentary Evidence Proving Inaccuracy |
|---|---|
| "Elad and [Perez] did not provide extensive coaching about following instructions when conducting an investigation. [Perez] brought this up as an issue later, after the meeting. In my meeting recap, I mentioned Elad's February 12 request asking me to move a piece of text. In her response, [Perez] claims the instruction was to remove the text, and I failed to follow that instruction. [Perez] was wrong about the instruction. I did exactly as instructed, and when I sent the revised meeting summary to Elad, she replied with an email stating 'Approved.'" Mathew Decl., ¶ 66, ECF No. 36. | The very e-mail message that Mathew cites to show that she complied with her understanding of Elad's instructions evidences just how poor her attention to detail was and remains. Indeed, Mathew claims that she was instructed to move the text regarding "John Leavell's wife" from the "Confirmed Allegations" to the "Unconfirmed Allegations." *See* Pl.'s Resp. Br. at 35, ECF No. 35. She then cites to her e-mail message to Elad of February 16, 2016 as evidence that she did make that revision. While it is true that she did move the bullet point regarding Mr. Leavell's wife to the "Unconfirmed Allegations" list, she failed to remove that very point from the basis for her recommendation to terminate an employee. *See id.* Instead, she keeps that unconfirmed allegation in her summary of her recommendation as evidence to support her recommendation. Of course, had Mathew really followed Elad's instructions, she would have removed that unconfirmed allegation from the short list of evidence on which she bases her recommendation to terminate an employee. *See* Pl.'s App.186–188, ECF No. 36. |
| "On February 17, however, there was no additional discussion about providing a new level of detail in the meeting recaps. Therefore, after the meeting, I wrote and sent a recap that was similar to the first recap, which was a general overview of what we discussed. App. 201." Mathew Decl., ¶ 67, ECF No. 36. | Mathew's "recap" of the February 17, 2016 meeting included no reference to the Monisha investigation, even though it was extensively discussed. *See* Pl.'s App.206, ECF No. 36.<br><br>Additionally, Mathew received feedback from Shaffer following Mathew's recap e-mail message to him on January 25, 2016, because her "recap" was incomplete and not what was requested or expected. *See* Def.'s APP224, ECF No. 25. Perez was aware of the coaching/feedback provided by Shaffer and expected Mathew "to extrapolate that the same is required for [her] recaps of our meetings." *See* Pl.'s App.209, ECF No. 36. |
| "I was the only HRBP that was pregnant during this period." Mathew Decl., ¶ 105, ECF No. 36. | Mathew was asked this very question in her deposition and her sworn answer contradicts her statement, as follows:<br><br>Q. Okay. Now, multiple women in the |

| Mathew's Inaccurate Declaration Statement(s) | Reliable Documentary Evidence Proving Inaccuracy |
|---|---|
| | HR department were pregnant at or around the time that you were pregnant, true? <br><br> A. At the time? I mean, I know there were – yeah, I know of like two, yes. <br><br> Excerpts from the Mathew Dep. at 204:25–205:4, Suppl. APP283–284; *see also* Instant Message ("IM") exchange between Mathew and Sabrina Boyd (Mar. 8, 2016), Suppl. APP302–303 (Mathew reacts to Boyd's identifying all of the pregnant women in the HR department). |
| "Santander claims that several female employees were treated well during their pregnancies.  Maybe they were, but none of them worked for [Perez] or Elad during their pregnancies, so the positive experiences of those other employees seem irrelevant." Mathew Decl., ¶ 107, ECF No. 36. | During Whitney Andres' pregnancy in early 2016, she reported to Hullum, who reported to Elad.  *See* Def.'s APP040–41, ECF No. 25; *see also* Suppl. APP291–292. |

### 3.    *Mathew Makes Assertions that are Not Supported by the Cited Evidence.*

When Mathew does cite to evidence to support her assertions, in many instances, the evidence cited does not support those assertions.  This is illustrated in the following chart:

| Mathew's Unsupported Assertion | What the Evidence Cited Actually Shows |
|---|---|
| "In a November 2, 2015 email, Elad described Mathew as 'an amazing detective.' Def's App. 175." *See* Pl.'s Resp. Br. at 2, ECF No. 35. | The e-mail message cited clearly describes *Sabrina Boyd*, not Mathew, as "an amazing detective." *See* Def.'s APP175, ECF No. 25. |
| "[Perez] told Elad she would start building documentation showing past performance problems, and she even said she was going to contact Mathew's prior supervisor in search of incidents before September 1, 2015 that she could add to the documentation.  Pl.'s App. 98–99." *See* Pl.'s Resp. Br. at 5, ECF No. 35. | This statement mischaracterizes the cited e-mail message by suggesting that Perez told Elad she would, retrospectively, create documentation of Mathew's poor performance.  In reality, Perez informed Elad that she would work on preparing a timeline of these poor performances and that she would ask Mathew's previous manager to provide her with the documentation of her poor performance challenges with Mathew so that her timeline would be complete.  *See* Pl.'s App.098–99, ECF No. 36. |
| "Shaffer also spoke to three other Human | The evidence to which Mathew cites includes |

| Mathew's Unsupported Assertion | What the Evidence Cited Actually Shows |
|---|---|
| Resources Managers about performance improvement plans and how those were normally used.  All three told him a PIP was a last straw, to be used only when prior documented attempts to improve performance had failed.  App. 123-132."  Pl.'s Resp. Br. at 9, ECF No. 35. | the following paragraph wherein Shaffer reports what the "three other Human Resources Managers" told him during his investigation:<br><br>PIP Process – I questioned three different HRM level folks.  To me the PIP process, i.e. when it becomes effective, what feedback transpired before it, and how long it goes into effect for is unclear.  My conclusion from my conversations is that a PIP document was a "last straw" reaction, and the timeframe of 30 days is likely too short of a time to determine if a turnaround is effective, and it needs to be restated that this is exactly what it says it is, a performance improvement plan.  It is not a last straw.<br><br>Pl.'s App.127, ECF No. 36.  Notably, this paragraph is inconsistent regarding whether these managers told Shaffer the PIP was a last straw.  *See id.*  Further, there is no indication that these managers told Shaffer that a PIP was to "be used only when prior documented attempts to improve performance had failed," as Mathew claims.  *See id; see also* Pl.'s Resp. Br. at 9, ECF No. 35. |
| "Shaffer wrote a report, and he reviewed his impressions with Blackburn.  They both agreed the first PIP was not warranted, primarily due to the absence of any prior documentation of performance issues."  Pl.'s Resp. Br. at 9, ECF No. 35.<br><br>"Shaffer and Blackburn were nevertheless convinced by [Perez] and [Elad] that something was wrong, and something needed to be done.  [Perez] and Elad both insisted that Mathew was a problem, and even without documentation, they convinced Shaffer her performance had been a problem and needed improvement."  *Id.* | The e-mail message cited by Mathew does not state that the first PIP was not warranted or that there was an "absence of any prior documentation of performance issues."  *See* Pl.'s App.139, ECF No. 36.  Rather, Blackburn writes in this e-mail message, "[e]ssentially, documentation isn't sufficiently robust to take formal action, so extending PIP to end of Q1 with weekly check-ins that will be documented."  *Id.* |
| "As Defendant's brief states, the issue here was a gap in Santander's process, not a | Mathew mischaracterizes Santander's MSJ Brief by claiming that it states that this was a |

| Mathew's Unsupported Assertion | What the Evidence Cited Actually Shows |
|---|---|
| performance issue on Mathew's part.  Def's brief, p.6 ('In reality, the issue was related to a gap in Santander's process.')".  Pl.'s Resp. Br. at 25, ECF No. 35. | gap in Santander's process, and not a performance issue on Mathew's part.  *See* Pl.'s Resp. Br. at 25, ECF No. 35.  Santander actually explains in its MSJ Brief that the issue was that Mathew failed to identify the fact that she should not have blindly followed process, but should have instead critically evaluated the situation before sending the incorrect e-mail message to the employee.  *See* Def.'s MSJ Br. at 6, ECF No. 24.<br><br>Further, at the time this incident occurred, Mathew's own e-mail message to Jeffrey Wiener, the VP involved, evidences Mathew's fault.  *See* Def.'s APP142, ECF No. 25 (e-mail message wherein Mathew writes, "I apologize about the personal data in the email.  It's a template and I should've taken that piece out since it doesn't apply."). |
| "The brief says Elad coached Mathew on this, but there is no contemporaneous documentation of a coaching. The pages cited as support for this alleged coaching consist of (a) Elad's signed declaration (Def's App. At p. 21., ¶7) and an email Elad sent to Shaffer on December 10, 2015 where she defends her decision to put Mathew on a PIP.  Elad tells Shaffer she coached Mathew, and Mathew disputes this.  App. 10."  Pl.'s Resp. Br. at 25, ECF No. 35. | First, Mathew's claim that Elad's declaration was "unsigned" is resoundingly false.  The signature page accompanying Elad's declaration is found at Def.'s APP028.<br><br>Second, Mathew's disputing that she was ever coached by Elad is nowhere to be found in the evidence she cites for this proposition.  *See* Pl.'s Resp. Br. at 25, ECF No. 35; Pl.'s App.010, ECF No. 36. |
| Mathew claims that she provided Perez with an update on the status of disciplinary actions and Perez responded with "ok thank you," which proves that Perez never conveyed to her that disciplinary actions needed to be done "asap." *See* Pl.'s Resp. Br. at 28, ECF No. 35. | A review of the actual document to which Mathew cites shows that Perez's message of "ok thank you" was in response to Mathew sending her an Instant Message about a conversation she had with a man by the name of "Sam," not a supposed update on the status of the disciplinary actions.  *See* Pl.'s App.088, ECF No. 36. |

Unsubstantiated assertions, like those described in the chart above, must not be considered at the summary judgment stage.  *See Ragas,* 136 F.3d at 458.

**B.      Mathew's Claims Fail Because She Does Not Present Sufficient Evidence that would Permit a Rational Inference that Santander's Proffered Reasons were Pretext for Discrimination or Retaliation.**

Regardless of whether the Court chooses to disregard Mathew's grossly inaccurate declaration testimony or other unsubstantiated assertions, there is no doubt that Mathew has failed to show pretext here. While Mathew employs the "throw everything at the kitchen sink, and see what sticks" approach to establishing pretext, none of her various and sundry arguments succeed.

**1.      Mathew Wholly Fails to Create a Fact Issue Under the Unworthy of Credence Standard.**

Mathew primarily focuses her Response on her attempt to show that Santander's reasons for its actions are unworthy of credence. Yet, she fails to present sufficient evidence for a jury to disbelieve Santander's explanation for her being placed on the PIPs or her termination – her ongoing poor performance. Importantly, even if she had presented sufficient evidence for a jury to disbelieve Santander's explanation for her PIPs and termination, Mathew still fails to create a fact dispute as to reasonableness that could give rise to an inference of discrimination or retaliation.

The single most important case to be considered in this summary judgment briefing is *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 820 (5th Cir. 2022). In *Owens,* the Fifth Circuit recently articulated exactly what circumstantial evidence of pretext a plaintiff in an employment-discrimination case must present to survive summary judgment under the "unworthy of credence" standard that Mathew invokes in this case. *See id.* In *Owens,* the court found that even though the plaintiff had presented substantial evidence that could lead a reasonable trier of fact to conclude that the defendant-employer's justification for her termination was false, that was insufficient to survive summary judgment. *See id.* at 820 and 834. The court found that the plaintiff presented "objective evidence that [the defendant-employer] acted in a way that does not logically comport with its assessment of her performance," and that her evidence "directly and specifically

contradicts several factual bases for her placement on the PIP and her eventual termination." *Id.* at 831, 833. However, the plaintiff's substantial evidence that disputed those reasons and more was not enough to survive summary judgment. *See id.* at 834.

The Fifth Circuit recognized that "employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [the employer] made a wise or even correct decision to terminate Owens." *Id.* at 826. The Fifth Circuit explained that the plaintiff failed to meet her burden to evidence that the employer's actions were discriminatory because "a juror could reasonably conclude that [the employer] wanted [the plaintiff] gone for some reason other than her performance, but an 'inference of discrimination [would] be weak or nonexistent.'" *Id.* at 833 (quoting *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1338 (2d Cir. 1997)).

Mathew challenges summary judgment, not by connecting any evidence that Santander's actions were discriminatory or retaliatory, but by arguing that a reasonable juror could disagree with Santander's assessment of her performance based largely on her litany of excuses and finger pointing at her supervisors for their failure to manage her performance to her liking.[7]

As demonstrated in the chart below, Mathew devotes almost her entire Response attempting to downplay the plethora of performance deficiencies on which Santander based its decisions to place her on the PIPs and to ultimately terminate her employment, by claiming that they each fall into one or more of the following categories:

- **Not *That* Bad** – Mathew states that, in her opinion, the performance deficiency was not sufficiently egregious to be considered poor performance;

- **Not Properly Coached** – Mathew claims she was not, at the time of the performance deficiency, formally "coached" on the performance deficiency by her supervisors;[8]

---

[7] *See generally* Pl.'s Resp. Br., ECF No. 35.
[8] *See* Pl.'s Resp. Br. at 23, ECF No. 35 ("If Hullum thought Mathew needed to do more of anything, she could have said something to Mathew and she would have done it."); *id.* at 27–28 (No one told her that the 10 DA's requested by Brad Dentz needed to be done "ASAP"); *id.* at 31–32 (The extensive complaint that a business leader sent to Perez should be disregarded because Perez "should have told her about it and discussed ways to do better."); *id.* at 35–36

- **Not True** – Mathew claims the performance deficiency never happened.[9]

| Mathew's Performance Deficiency | Mathew's Excuse |
|---|---|
| January 2015 – Mathew did not process a termination timely. | • Not *That* Bad<br>*See* Pl.'s Resp. Br. at 22, ECF No. 35. |
| February 11, 2015 – Mathew failed to send a summary that Hullum requested. | • Not True<br>*See* Pl.'s Resp. Br. at 22, ECF No. 35. |
| April 9, 2015 – Mathew's March Recap was deficient and submitted late. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23, ECF No. 35. |
| May 18, 2015 – Mathew's April Recap was deficient. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23, ECF No. 35. |
| July 1, 2015 – Mathew provided last minute notification of leaving early. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23–24, ECF No. 35. |
| August 12, 2015 – Mr. Dieckmann called Elad upset because Mathew's e-mail to an associate who worked for him wrongly gave the business and associate the impression that the associate had done something wrong. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 25, ECF No. 35. |
| August 13, 2015 – Mathew's July Recap was deficient. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23, ECF No. 35. |
| July/August 2015 – Mathew was asked to complete a time study by Hullum, and had to complete it twice because the first time study did not meet expectations. | • Not *That* Bad<br>• Not True<br>*See* Pl.'s Resp. Br. at 24, ECF No. 35. |
| July/August 2015 – Hullum had to complete tasks that Mathew should have completed. | • Not True<br>*See* Pl.'s Resp. Br. at 27, ECF No. 35. |
| September 17, 2015 – Mathew provided last minute notification of leaving early. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23–24, ECF No. 35. |
| October 12, 2015 – Mathew asked for assistance with the investigation checklist. | • Not True<br>*See* Pl.'s Resp. Br. at 27, ECF No. 35. |
| October 29, 2015 – Brad Denetz complained about having approximately 10 disciplinary actions outstanding that he needed as soon as possible. | • Not *That* Bad<br>• Poorly Managed<br>• Not True<br>*See* Pl.'s Resp. Br. at 27–28, ECF No. 35. |
| October 29, 2015 – Mathew provided last minute notification of absence. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23–24, ECF No. 35. |

(Perez did not set an expectation as to the level of specificity she wanted in the recap e-mail message); *id.* at 44 (Elad told her to put "something" together for her review, rather than providing a specific format for Mathew's work).
[9] *See generally* Pl.'s Resp. Br., ECF No. 35.

| Mathew's Performance Deficiency | Mathew's Excuse |
|---|---|
| November 2, 2015 – Mathew exemplified poor time management by spending too much time on a bereavement request. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 28, ECF No. 35. |
| November 16, 2015 – Mathew provided last minute notification of leaving early. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23–24, 29, ECF No. 35. |
| November 20, 2015 – Mathew asked for another HRBP to assist with her workload. | • Not *That* Bad<br>*See* Pl.'s Resp. Br. at 29, ECF No. 35. |
| November 23, 2015 – Mathew failed to timely process a termination request, creating a risk event for the company. | • Not *That* Bad<br>*See* Pl.'s Resp. Br. at 30, ECF No. 35. |
| November 23, 2015 – Perez learned that Mathew, as part of an internal investigation, inappropriately interviewed an employee with the Assistant Vice President ("AVP") about whom the employee had made allegations. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 30, ECF No. 35.; *see also* Mathew Decl., ¶¶ 16–17, ECF No. 36. |
| November 23, 2015 – Mathew submitted a vague termination request and was advised that three people questioning one employee was overwhelming and failed to safeguard the objectivity of the room. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 31, ECF No. 35. |
| November 24, 2015 – Mathew provided last minute notification of taking a long lunch to go to a doctor's appointment. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 23–24, ECF No. 35. |
| November 24, 2015 – Mathew again complained that she felt overwhelmed with her workload. | • Not *That* Bad<br>*See* Pl.'s Resp. Br. at 31, ECF No. 35. |
| December 8, 2015 – A VP and SVP contacted Perez to express their concerns with Mathew's performance regarding an investigation. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 31–32, ECF No. 35. |
| December 28, 2015 – HR Generalist had to be called in on her day off to gather, organize and help solve payroll discrepancies in-order to meet a deadline. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 32–33, ECF No. 35. |
| January 25, 2016 – Mathew failed to timely submit a summary of her meeting with Shaffer, and the summary she did submit did not meet his expectations. | • Not *That* Bad<br>• Poorly Managed<br>• Not True<br>*See* Pl.'s Resp. Br. at 33–34, ECF No. 35. |
| February 2016 – Mathew submitted an investigation report late and fails to remove from that investigation report information that Elad had asked her to remove. | • Not *That* Bad<br>• Poorly Managed<br>• Not True<br>*See* Pl.'s Resp. Br. at 33–34, ECF No. 35. |
| February 18, 2016 – Mathew submitted an outline of a meeting with Perez and Elad that | • Not *That* Bad<br>• Poorly Managed |

| Mathew's Performance Deficiency | Mathew's Excuse |
|---|---|
| failed to meet expectations. | *See* Pl.'s Resp. Br. at 35–37, ECF No. 35. |
| February 2016 – Mathew failed to take sufficient initiative when conducting investigations and relies on Perez too often. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 38–39, ECF No. 35. |
| March 11, 2016 – Mathew exemplified poor time-management skills and makes a misrepresentation to Elad. | • Not *That* Bad<br>*See* Pl.'s Resp. Br. at 37–38, ECF No. 35. |
| April 1, 2016 – Mathew exemplified poor time-management skills by submitting poor work product at 7:17 p.m. on the day it was due and without having Perez review the project as she was explicitly instructed to do prior to submitting the final work product. | • Not *That* Bad<br>• Poorly Managed<br>• Not True<br>*See* Pl.'s Resp. Br. at 33–34, ECF No. 35. |
| April 8, 2016 – Mathew failed to meet a deadline by submitting an investigation report a day after the date on which she and Perez agreed she would submit it, and she failed to attach the investigation summaries to the report (even though her e-mail message to Perez stated she had attached the investigation summaries to her e-mail message). Then, her work had to be revised by Perez. | • Not *That* Bad<br>• Poorly Managed<br>*See* Pl.'s Resp. Br. at 41–42, ECF No. 35. |

Mathew's excuses are irrelevant, and Mathew's claims fail because, at most, she has produced some evidence that would permit a reasonable inference that *some* reason other than the proffered one motived Santander's placing her on the PIPs and ultimately terminating her employment. This is not enough to survive summary judgment. *See Owens,* 33 F.4th at 834; *see also Pennington v. Tex. Dep't of Family & Protective Servs.,* 469 F. App'x 332, 338 (5th Cir. 2012) (affirming the district court's ruling that the plaintiff failed to establish pretext, and noting that the plaintiff "fails to deny the majority of [the performance deficiencies on which the defendant based their employment action], instead providing excuses."). To survive summary judgment, Mathew's evidence must "permit a reasonable inference that the real reason was impermissible discrimination." *See Owens,* 33 F.4th at 834. Indeed, "[e]mployers are 'entitled to be unreasonable' in terminating their employees 'so long as [they] do[ ] not act with discriminatory

animus.'"  *Id.* at 826 (quoting *Sandstad v. CB Richard Ellis, Inc*., 309 F.3d 893, 899 (5th Cir. 2002)).  Mathew's litany of excuses fail to permit a reasonable inference that the real reason for any of Santander's actions here were impermissible discrimination or retaliation.

### 2.    *Mathew's unsubstantiated claim that Santander deviated from its policies or procedures does not establish pretext.*

Mathew's claim that Santander deviated from its policies and practices is unsubstantiated and does not establish pretext.  Mathew makes the unsupported assertion that Santander deviated from its policies and procedures by failing to follow the 2013 Progressive Discipline Policy ("PDP") and failing to follow its usual practices for conducting investigations.[10]  This argument fails because, as explained below, the evidence does not support Mathew's assertion that Santander deviated from its policies or procedures.  Further, even if Santander had deviated from its policies or procedures, this alone does not establish pretext.  Indeed, "an employer's deviation from standard policy or procedure *alone* does not show pretext: 'Plaintiffs ... must connect a departure from or misapplication or procedure to a discriminatory motive.'"  *Darden v. Simplicity Fin. Mktg., Inc.,* No. 4:18-CV-1737, 2019 WL 6119485, at *6 (S.D. Tex. Nov. 18, 2019) (quoting *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 460 (5th Cir. 2019).

In her Response, Mathew cites *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5th Cir. 2000), and *Goudeau v. Nat'l Oilwell Varco*, 793 F.3d 470, 477 (5th Cir. 2015), in support of her assertion that deviating from policies and procedures can be evidence of pretext.[11]  Both *Russell* and *Goudeau* are distinguishable from Mathew's situation.  In *Goudeau*, the Fifth Circuit found there was sufficient evidence of pretext where the employer provided the plaintiff with four written warnings on the same date that he was informed of his termination.  *Goudeau,* 793 F.3d

---

[10] Pl.'s Resp. Br. at 19, ECF No. 35.
[11] *See* Pl.'s Resp. Br. at 19, ECF No. 35.

at 477.  In *Goudeau*, the plaintiff had not been given an opportunity to improve his performance after receiving the warnings.  *Id*.  Unlike the plaintiff in *Goudeau*, Mathew was given ample time—over four months—to improve her job performance after she was placed on a PIP.[12]

In *Russell*, the plaintiff's supervisor "conceded that Russell was not given a formal oral warning, a written warning, or a 'corrective action plan,' ***all of which are required by Homecare's own internal procedures***."  235 F.3d at 224 (emphasis added).  Unlike the employer's policy in *Russell*, Santander's PDP does not "require" any particular steps.  Santander's Policy states that progressive discipline will be followed "[w]here appropriate," Santander "reserves the right to administer discipline in such a matter, as it deems appropriate to the circumstances," and Santander "may, in its sole discretion, eliminate any or all of the steps in the progressive discipline procedure."[13]  Santander's PDP is similar to the policy at issue in *Taylor v. Peerless Industries Inc.*, which took "great pains" to explain that the disciplinary steps in its policy are not mandatory.  *See Taylor v. Peerless Indus. Inc.*, 322 F. App'x 355, 367 (5th Cir. 2009) (unpublished) ("Indeed, Peerless's policy takes great pains to emphasize that the disciplinary measures used in a particular case will be highly dependent on the specific circumstances and that managers 'may employ some, all or none' of the steps.").

### a.  Santander did not deviate from its Progressive Discipline Policy.

As set forth above, Santander's decision to place Mathew on a PIP was consistent with Santander's PDP.[14]  Mathew criticizes Santander for not placing her on the formal disciplinary actions for her performance deficiencies.  While Mathew may have wanted to have received formal

---

[12] *See* Def.'s APP189–192, ECF No. 25 (PIP dated December 1, 2015); *see also* Declaration of Yessica Perez ("Perez Decl."), ¶ 43, Def.'s APP013, ECF No. 25 (confirming Mathew's date of termination was April 19, 2016).
[13] Pl.'s App.043, ECF No. 39.
[14] Santander's PDP explicitly provides that Santander "reserves the right to administer discipline in such a manner, as it deems appropriate to the circumstances, and may, in its sole discretion, eliminate any or all steps in the progressive discipline procedure."  Pl.'s App.043, ECF No. 39.

disciplinary actions instead of being informally coached by her supervisors and then place her on a PIP, the decision to do so was soundly within the discretion of her managers, per the PDP.[15]

       **b.**       **Santander's investigation was consistent with usual practices.**

Mathew's conclusion that Shaffer's investigation of her complaints was not consistent with its policy and procedure because: (1) Shaffer was not sufficiently "independent" and "disinterested" because he was a supervisor over the interested parties; and (2) his final report did not address Mathew's complaint of pregnancy discrimination, are disproven by the evidence.[16]

Mathew's subjective and unsupported assertion that Shaffer was somehow not neutral is nonsensical. Notably, Mathew does *not* allege that Shaffer was involved in any of the decisions that formed the basis of Mathew's complaints, but rather opines that he "may have been reluctant to conclude that his more senior supervisors (Elad and [Perez]) were wrong."[17] This is unsupported by the evidence, which shows that Shaffer did document his criticisms of how Mathew's supervisors had managed her.[18]

Mathew's claim that Shaffer's final report did not address her complaint of pregnancy discrimination is objectively wrong. Shaffer's report explicitly notes Mathew's subjective belief that her pregnancy was the basis for her having received her PIP.[19] Indeed, her pregnancy is referenced four separate times in the report.[20]

Notwithstanding that the two basis of Mathew's purported dissatisfaction with the

---

[15] *See id.*

[16] Pl.'s Resp. Br. at 9, ECF No. 35.

[17] *Id.*

[18] *See* Def.'s APP127, ECF No. 25 (Shaffer writes in his final investigation report that the Operations HR team had "not done a totally effective job in managing Reena Mathew, especially in holding her accountable for her mistakes and poor performance at times.").

[19] *See* Def.'s APP123–124, ECF No. 25.

[20] *See id.* (Noting Mathew "indicated that everything changed once management knew she was pregnant," "Reena emphasized her being pregnant and her desire to be treated fairly," "Reena did express her view that her pregnancy…" and "Reena sends mail to Pam letting her know that she is pregnant and that she is worried this is playing into decisions made.").

investigation conducted by Shaffer are unsupported, the fact that Santander did not conduct the investigation in the manner that she wanted is not evidence of pretext. *See Owens,* 33 F.4th at 829 (holding that while the employer "certainly could have interviewed more or different people, the mere fact that [the employer] did not conduct these investigations as [the plaintiff] might have preferred is not sufficient to show that the investigations were inadequate," … "let alone inadequate in a way that could give rise to a reasonable inference of pretext for discrimination.").

### 3. *Mathew's unsubstantiated assertion that Santander tried to create a paper trail after deciding to terminate her fails to establish pretext.*

Mathew' argument that Elad tried to create a paper trail after deciding to terminate Mathew in November 2015, and that is evidence of pretext, is misguided because: (1) it is directly contradictory to Mathew's own testimony; and (2) it misstates the applicable law.

Mathew makes the following (incorrect and unsupported) factual claim in her Response:

> Elad's mind was made up on or before November 24, 2015 when she sent two emails suggesting the company should offer Mathew severance. [Perez] was in lock-steo [sic] with Elad, and the paper trail that was subsequently created was meant to justify a decision that had already been made.[21]

Notably, Mathew fails to cite any evidence for these assertions, and, as such, these assertions should be disregarded by the Court. *See Ragas*, 136 F.3d at 458. Notwithstanding Mathew's failure to point to any evidence to support her assertions, they are nonetheless directly contradicted by Mathew's own deposition testimony.

Mathew testified in her deposition that she did not believe that Elad chose to discriminate against her because of her pregnancy.[22] Rather, Mathew believed that *Perez* was the only one who chose to discriminate against her based on her pregnancy, and that Elad, Shaffer (VP of HR Business Partners) and Angelina Hullum (HR Manager) all merely went along with Perez's

---

[21] Pl.'s Resp. Br. at 20, ECF No. 35.
[22] Mathew Dep. 222:1–13, Def.'s APP058, ECF No. 25.

discrimination because they wanted to support Perez and/or they wanted to help cover up something that they saw as bad.[23]  To now claim that Elad made a discriminatory decision to terminate Mathew in November 2015 and then spent the next four and a half months creating a paper trail to support that decision is incompatible with Mathew's sworn testimony.

Additionally, Mathew's reliance on *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015) is misplaced.  In support of this decision to overturn summary judgment, the Fifth Circuit concluded that some of the incidents on which the employer claimed to have based its termination decision were "uncovered only *after* [the manager] took steps to retrospectively justify the termination decision."  *Id.* at 232 (emphasis added).  The Fifth Circuit found that "a sudden and unprecedented campaign" to document performance deficiencies to document a decision that had already been made *could* raise an inference of discrimination.  *Id.* at 237.

*Burton* is inapplicable here because no termination *decision* had been made when Elad <u>suggested</u> to Blackburn that Santander <u>consider offering Mathew a severance package</u>.  To the contrary, in the very same e-mail message in which Elad suggested offering Mathew a severance package, Elad informed Blackburn that she had instructed Perez to issue a DA to Mathew.[24] Blackburn disagreed with Elad's recommendation to offer a severance package to Mathew, and recommended that Elad and Perez instead place Mathew on a PIP and give her an opportunity to improve her performance.[25]  Elad and Perez then did just as Blackburn suggested—they placed Mathew on a PIP and gave her more than four months to improve her performance.[26]  Only after Mathew failed to adequately improve her performance, despite being provided more than four

[23] *Id.*
[24] *See* Pl.'s App.096–97, ECF No. 36.
[25] *See* Perez Decl., ¶ 15, Def.'s APP006, ECF No. 25.
[26] *See* Def.'s APP189–192, ECF No. 25 (PIP dated December 1, 2015); Perez Decl., ¶¶ 37–43, Def.'s APP011–13, ECF No. 25 (stating the basis for Mathew's termination on April 19, 2016).

**Defendant's Reply in Support of Its Motion for Summary Judgment** | **Page 20**

months to do so, did Santander make the decision to terminate her employment.[27]

      **4.**     ***Mathew's unsupported claim that Santander did not have contemporaneous documentation fails to establish pretext.***

Ironically, immediately after arguing that Santander embarked on a mission to fabricate documentation to support a decision to terminate her, Mathew argues that Santander's failure to have documentation is somehow evidence of pretext. *See* Pl.'s Resp. Br. at 20, ECF No. 35. Mathew makes the unsupported assertion that "[t]he evidence in this case suffers from an extensive lack of contemporaneously-created documentation." *Id.* This argument is unavailing for two reasons: (1) Santander produced *extensive* contemporaneously created documentation evidencing Mathew's ongoing poor performance; and (2) the case law does *not* require an employer to have contemporaneously created documents to support every instance of poor performance that leads to an employee's termination, as Mathew seeks to convince the Court.

      **a.**     **Santander produced extensive contemporaneously created documentation evidencing Mathew's poor performance.**

Santander's Appendix includes a plethora of contemporaneously created documentation evidencing Mathew's ongoing poor performance.[28] It is perplexing, but predictable, that Mathew would still claim, knowing that all of those pieces of evidence have been filed with the Court, that there are no contemporaneously created documentation.

      **b.**     **An employer need not have contemporaneously created documentation.**

Mathew seeks to impose on Santander a duty to have contemporaneously created documentation for every instance of poor performance that, cumulatively, result in disciplinary

---

[27] *See* Def.'s APP189–192, ECF No. 25 (PIP dated December 1, 2015); Perez Decl., ¶¶ 37–43, Def.'s APP011–13, ECF No. 25 (stating the basis for Mathew's termination on April 19, 2016).

[28] *See* Def.'s APP109–118; APP124; APP134–139; APP142–149; APP159–171; APP173-182; APP187–194; APP202–203; APP210–227; APP244; APP250–258; and APP276–278.

action.[29]  In support, Mathew relies on *Laxton v. Gap,* 333 F.3d 572, 580 (5th Cir. 2003).  However, *Laxton* is readily distinguishable from this case.  The Fifth Circuit overturned the district court's judgment as a matter of law, in addition to other substantial evidence, because Gap's proffered reasons underlined violated its own policy by not having any contemporaneously written documentation of the multiple complaints that Gap alleged employees had lodged against Laxton.  *Id.* at 580.

Clearly, *Laxton* does not stand for the proposition that an employer must document every instance of poor performance.  *See generally Laxton*, 333 F.3d 572.  This is further evidenced by the Fifth's Circuit more recent opinion in *Houston v. Tex. Dep't of Agric.,* 17 F.4th 576, 584 (5th Cir. 2021), wherein it affirmed the district court's summary judgment in favor of the defendant by concluding that the defendant-employer complied with its policy's requirement that "[e]very aspect of the process ... shall be documented," even though it failed to document the "sixty alleged violations prior to [the employee's] written warning."  In reaching this conclusion, the Fifth Circuit noted that "[t]hough the sixty alleged violations were not documented contemporaneously, they were included in her August 2016 written warning, and Houston was given—and took—the opportunity to contest those violations."  *Id.*

Here, Santander has presented extensive evidence of Mathew's poor performance.[30]  While she disagrees as to the severity of her errors and poor judgment, and accuses Santander of poorly managing her by choosing to place her on a PIP instead of issuing disciplinary actions, these gripes are not evidence of pretext.  Indeed, even if Mathew's supervisors could have handled the situation differently or done a better job at managing her, that would not be evidence of pretext.  *See Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 325 (5th Cir. 2022) (noting that neither a management lapse nor an employee's disagreement with their negative performance assessment is sufficient to

---

[29] *See* Pl.'s Resp. Br. at 20, ECF No. 35.
[30] *See supra* note 28.

show pretext.).  The law does not require perfect management; it prohibits discrimination.

> **5.** **_Mathew's unsupported claim that she was held responsible for something that was not one of her job duties fails to establish pretext._**

Mathew claims (again, without citing to the record) that her having been held accountable for her inability to handle a payroll issue that arose in December 28, 2015 somehow evidences pretext because it was not her job.[31]  It speaks volumes that Mathew would bother to make this assertion that is so clearly untrue.  Indeed, this project would clearly fall within the job duties contained in the HRBP job description—HRBPs are expected to assist "with all human resource functions," and "in ongoing administration of recordkeeping in associate files as well as HR system of record."[32]  The HRPB job description also provides that HRBPs are expected to perform "other duties as assigned," and work on "[s]pecial projects as required."[33]

> **6.** **_Protecting a company from legal exposure and hiring outside counsel is not evidence of pretext._**

This Court should think nothing of Mathew's attempt to vilify a Santander executive for referencing the possibility that Mathew, who had already pursued allegations of discrimination to every level in the company's HR chain, might file a lawsuit if she did not get her way.  The Court should think just as little of Mathew's suggestion that a company's decision to hire outside counsel to respond to a demand letter from a lawyer representing a current employee is suggestive of ill intent.[34]  Mathew presents the Court with no authority for these outlandish arguments.

---

[31] _See_ Pl.'s Resp. Br. at 20, ECF No. 35.  Yet, Mathew also makes an unclear statement seemingly agreeing that it _was_ part of her job to assist with administrative tasks as needed.  _See id._  Santander cannot discern how this would support her argument.

[32] _See_ Pl.'s App.064–65, ECF No. 36.

[33] _Id._  Additionally, the very evidence to which Mathew cites regarding this incident evidences that handling the payroll issue _was_ a responsibility of an HRBP.  _See_ Pl.'s App.133–135, ECF No. 36.  Indeed, this e-mail chain shows that Andres (another HRBP) informs Paula Blayney (HRIS Manager) that she has reached out to the HRBP's and HR Generalists ("HRGs") to assist with compiling the list to send to payroll to resolve the issue.  _See id._  While Mathew may believe assisting with this HR matter was beneath her, the evidence shows that was clearly not the perspective of her fellow HRBP, Andres, who took the initiative to respond to Ms. Blayney's e-mail message and articulated her plan to involve the other HRBPs and HRGs in a payroll matter.  _See id._

[34] _See_ Pl.'s Resp. Br. at 47, ECF No. 35.

### 7.    *Santander did not present misleading evidence to the EEOC.*

In what can only be interpreted as a "Hail Mary" attempt to manufacture evidence of pretext, Mathew claims that Santander made erroneous statements to the EEOC.[35]  She supports this argument by claiming that Santander was incorrect when it said that Mathew had the lightest workload of any HRBP who reported to Perez.[36]  Mathew cites to a selective part of an e-mail chain, wherein the HR leaders discussed the headcount of associates assigned to various HR employees.[37]  Had Mathew included the full e-mail chain, it would show that the headcount numbers to which she cites are (1) inaccurate; and (2) not representative of the various HRBP's workloads.[38]  Simply put, Santander did not make any erroneous statements to the EEOC.

### 8.    *Mathew's Claim that Santander has "Flawed Arguments" is … Flawed.*

Mathew concludes her Response with three desperate arguments, which as shown below have no merit.  First, contrary to Mathew's assertion, discriminatory animus *is* necessary in this case.  A plaintiff must show discriminatory animus when, as is the case here, the plaintiff's showing as to pretext is weak and the employer brings "abundant and uncontroverted" evidence that its decision was not motivated by discriminatory animus.  *See Laxton*, 333 F.3d at 585.

Second, again contrary to Mathew's assertion, the fact that Mathew's supervisors were themselves mothers who had children is absolutely relevant.  Whether the alleged discriminators are part of the same protected class as the individual whom they are alleged to have discriminated is relevant.  *See McMichael,* 934 F.3d at 460 ("on numerous occasions, this court has held that discrimination is less likely when the supervisor is in the same protected class as the plaintiff.").

---

[35] Pl.'s Resp. Br. at 47, ECF No. 35.

[36] *Id.*

[37] *See id.*; Pl.'s App.141–142, ECF No. 36.

[38] *See* Suppl. APP297–299 (noting some of the HRBPs do special projects/other tasks, so it's not an "apples to apples comparison," and that, when you consider the Human Resources Managers' work at the various sites, the headcount analysis changes substantially.)

Also, Mathew's reliance on *Jazayeri v. Avaya, Inc.,* No. 2:19-cv-06003-JDW, 2021 WL 2186367, at *6 (E.D. Pa. May 28, 2021) is grossly misplaced and quoted out of context to mislead the Court with its condemning language.  In *Jazayeri,* the court condemned the plaintiff's attempt to convince the court that his supervisor must have had a discriminatory motive against him (a Muslim) because of the supervisor's "Indian heritage, his Hindu religion, and his time living in and family connections to India." *Id.*  The court in *Jazayeri* was appalled at the plaintiff's attempt to use such racial stereotypes to impute discriminatory motive on the defendant. *See id.  Jazayeri* is wholly inapplicable here.  To Santander's knowledge, neither party in this case is seeking to impute a discriminatory intent on the other based on racial or other stereotypes.

Third, how other pregnant women in the same department with the same employer were treated is relevant in a discrimination case such as this one.  *See Munday v. Recreational Equip. Inc.,* No. 5:97-CV-822-F(2), 1999 WL 125507, at *6 (E.D.N.C. Jan. 15, 1999) (considering the fact that the employer employed and accommodated other pregnant employees when determining that plaintiff had failed to demonstrate that the reasons the employer offered for terminating the plaintiff were false or inaccurate); *see also Bielawski v. Davis Roberts Boeller & Rife, P.A.,* No. 2:18-cv-758-FtM-29MRM, 2020 WL 7600688, at *2 (M.D. Fla. Dec. 22, 2020) (holding that evidence of the defendant's history with pregnant employees is relevant in a discrimination case.).

## CONCLUSION

At the end of the day, Mathew has at most only her own subjective suspicion that Perez (per her deposition) or Perez/Elad/Blackburn/others (per her Response) discriminated or retaliated against her.  But, "a subjective belief of discrimination, however genuine, [may not] be the basis of judicial relief." *Lawrence v. Univ. of Tex. Med. Branch*, 163 F.3d 309, 313 (5th Cir. 1999).  As such, Santander respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142

By:   *Monte K. Hurst*
      Monte K. Hurst
      State Bar No. 00796802
      Monte.Hurst@hallettperrin.com

      Clayton S. Carter
      State Bar No. 24120750
      CCarter@hallettperrin.com

      *Counsel for Defendant*
      *Santander Consumer USA Inc.*

## <u>CERTIFICATE OF SERVICE</u>

On October 11, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served Plaintiff's counsel as follows electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Mr. Donald E. Uloth
DONALD E. ULOTH, P.C.
18208 Preston Road, Suite D-9 #261
Dallas, Texas 75248
Don.Uloth@uloth.pro

      *Monte K. Hurst*
      Monte K. Hurst