## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **REENA S. MATHEW,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO. 3:23-CV-01494-N** |
| **v.** | § | |
| | § | |
| **SANTANDER CONSUMER USA INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## JOINT PRETRIAL ORDER

**TO THE CHIEF UNITED STATES DISTRICT JUDGE DAVID C. GODBEY:**

Pursuant to the Court's Order Resetting Trial [Doc. No. 31] and Rule 16.4 of the Local Civil Rules of the United States District Courts for the Northern District of Texas, Plaintiff Reena Mathew ("Plaintiff" or "Mathew") Santander Consumer USA Inc. ("Santander" or "Defendant") (collectively, "Parties") hereby submit the following Joint Pretrial Order:

### A.    SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY

#### Mathew's Summary of Claims and Defenses:

Plaintiff is asserting two Title VII claims: (1) discrimination because of her sex and pregnancy, in violation of 42 U.S.C. § 2000e, and (2) unlawful retaliation, because of Plaintiff's opposition to the company's unlawful discrimination, in violation of 42 U.S.C. § 2000e.

Plaintiff Reena Mathew worked as a Human Resources Business Partner ("HRBP") from February 1, 2015 until she was terminated on April 19, 2016.[1]  Mathew's performance reviews consistently indicated she was meeting or exceeding expectations.  Mathew qualified for and

---

[1] The job title for this position was different when Plaintiff was first hired and the title later changed, but the duties remained the same.

received bonuses each time she was eligible to receive them, and she received pay raises each time she was eligible.

Santander had a Progressive Discipline Policy defining multiple levels of discipline to be used in increments to change behaviors when necessary. Mathew and the other Human Resources employees emphasized to all managers and supervisors the importance of documenting all forms of discipline, including the lowest level of discipline, an informal coaching. Before December 1, 2015, Reena Mathew had never received any form of discipline, not even an informal coaching.

On September 1, 2015, Mathew began reporting to a new supervisor, Yessica Adriano. Things appeared to go well for the first few months.

Mathew became pregnant, and on October 30, 2015, she went to her first pregnancy-related OB/GYN appointment. She was 39 years old at the time, so her pregnancy was high risk, and she wanted to know if things were okay before sharing her news with anyone at work. When she returned to work after her appointment, Mathew told Adriano she was pregnant. Adriano asked Mathew what her plans were for after the baby was born, and Mathew responded that she did not yet know for sure.

Mathew's relationship with Adriano, and her immediate supervisor, Stephanie Elad, changed after Mathew disclosed her pregnancy. Before the disclosure, Adriano and Elad would say hello in the morning and exchange greetings, but this stopped. Mathew perceived that their attitudes towards her changed from being friendly to being colder and more distant.

Unknown to Mathew at the time, Adriano and Elad decided to create a timeline retroactively documenting alleged performance issues that had never even been mentioned as problems before, and they used the alleged performance problems as a basis for putting Mathew on a performance improvement plan ("PIP").

Adriano met with Mathew on December 1, 2015 to tell her she would be receiving a bad performance review (not meeting expectations) and placed on a thirty-day PIP. Mathew was shocked because she had no prior notice of any issues, and she reminded Adriano that it was standard company procedure to document an employee's performance issues before putting an employee on a PIP. Adriano seemed to be surprised and caught off guard by this, and she had no supporting documentation. A bad performance review would mean she was not eligible to receive her bonus that year. She was eligible to get up to ten percent of her base salary (roughly $70,000) so this would be a significant financial impact.

Mathew went up the chain of command protesting the PIP and complaining that it was imposed because of her pregnancy. In late December, two of Adriano's superiors (Stephen Shaffer, a Vice President in HR, and Pamela Blackburn, the Executive Vice President of Human Resources) decided the PIP was unwarranted, primarily due to the absence of any previously documented performance issues. Shaffer and Blackburn agreed Mathew's 2015 performance review would indicate she was meeting expectations, and they agreed Mathew would receive her annual bonus (which she would not have received if her review said she was not meeting expectations).

Adriano and Elad nevertheless convinced Shaffer and Blackburn that Mathew was a problem, and something needed to be done. However, instead of following company policy and starting off with a documented warning or disciplinary action, Santander once again skipped the progressive disciplinary policy and put Mathew on a second PIP, starting as of January 15, 2016. Mathew knew that the company used a PIP as a last straw, only after lesser measures proved unsuccessful, and she knew that going from no documentation to a PIP was unprecedented at Santander. But twice now, in the wake of disclosing her pregnancy, Santander put Mathew on PIPs without prior documentation.

The second PIP was for 90 days. It was short on specific, measurable goals, and instead told Mathew things such as "Manage time and hours efficiently." Along with the PIP, Adriano provided Mathew with a timeline of alleged performance issues going back a full year, to January 2015.

The first item in the timeline was false. It alleged that Mathew failed to send her supervisor something in January 2015, but she had in fact sent it, and she provided the email to prove it. The timeline included several dates when Mathew arrived late or left early, but on each of those dates Mathew obtained approval from her supervisor in advance (and most of the approvals are documented in emails or instant messages).

The timeline also criticized Mathew for telling her supervisor that she had a heavy workload, which was true. Mathew was falsely accused of failing to follow an instruction from Elad. Mathew was criticized for having another HR employee handle an investigation, even though Adriano approved this approach in advance. Mathew was also falsely accused of mishandling an employee investigation she was not responsible for, and making a decision in connection with that investigation that she did not make. None of the alleged performance issues warranted even the mildest form of disciplinary action at the time they occurred, before Mathew's pregnancy, but now the belated documentation was being used to justify a second PIP.

Mathew added her own comments to the timeline, rebutting the criticisms, and she sent it to Shaffer on January 18, 2016. Santander ignored the facts she presented, and considered her rebuttal as a failure to accept accountability for the alleged performance issues that did not exist.

In this posture, Mathew reasonably believed the second PIP was just cover for the company's decision to terminate her employment, so she retained counsel to represent her. On January 29, 2016, Mathew's attorney sent a letter to the company's outside counsel, Monte Hurst,

accusing the company of discrimination in violation of Title VII.  Hurst responded that the company was investigating and would be in touch thereafter, but it never happened.

Meanwhile, Mathew resolved to move forward and do her best to meet the expectations in the PIP.  At no point during the 90-day PIP did Mathew receive any documented disciplinary action pursuant to the Progressive Discipline Policy, which still applied during the PIP.  Mathew easily met the only objective and measurable criteria included in the PIP, such as completing DAs (disciplinary actions) within 24 hours.

Adriano and Elad nevertheless created documentation claiming Mathew had performance problems.  They claimed Mathew failed to meet deadlines which did not exist or were not missed.  They criticized Mathew for failing to meet expectations that had not been communicated.  They falsely accused Mathew of failing to follow an instruction from Elad, when she had in fact complied with the instruction.  On one occasion, Adriano told Mathew to prioritize one task over another, but Adriano later criticized Mathew's judgment because she had not prioritized the subordinate task.  Santander alleged there were complaints about Mathew without providing any specifics that might have informed Mathew of what she had allegedly done wrong.

Mathew did her best to rebut the unwarranted criticisms and accusation, but again her supervisors claimed this was a flaw on Mathew's part – failing to accept responsibility for the things she was (wrongly) accused of.   Meanwhile, Santander slacked off on things it had committed to do as part of the PIP process.  For example, after each PIP meeting (the biweekly meetings and the 30/60/90 day reviews) Mathew was supposed to send a written recap of what was discussed, and by email dated February 22, 2016, Adriano promised to respond within 48 hours.  After the next two meetings, however, Adriano waited 14 days and 22 days, respectively, to respond.

Also, instead of discussing things as they arose, Adriano and Elad saved up and presented alleged performance issues in the next scheduled meeting. For example, Mathew, Adriano, and Elad all met on March 23, 2026, and Mathew submitted her recap of the meeting the next day. Adriano did not respond until handing her two lengthy documents (nine pages of criticisms) at the last meeting, a 90-day review that took place on April 15, 2016.

Unknown to Mathew at the time of this meeting, the decision to terminate her employment had already been made. Shaffer and Blackburn met on April 13, 2016 and agreed Mathew would be fired, a fact confirmed in their email exchange the next day. The meeting, and the criticisms presented on April 15, 2016, were not part of a genuine effort to help improve an employee's performance, they were something else. By letter dated April 19, 2016, Santander informed Mathew she was being terminated, effective immediately.

Mathew is not seeking lost income in this case, but she is seeking compensatory damages for the harm done to her from December 1, 2015 going forward. Also, because Santander's discriminatory and retaliatory actions were committed with malice and/or with reckless indifference to Plaintiff's federally-protected rights, Plaintiff is entitled to an award of punitive damages.

### Santander's Summary of Claims and Defenses:

Santander categorically denies that it discriminated or retaliated against Mathew. As set forth in its Answer and Motion for Summary Judgment, Santander terminated Mathew for her repeated poor job performance and her unwillingness to perform work she felt was beneath her, yet Mathew still refuses to accept responsibility for anything, and instead seeks to vilify her last manager and the business professionals she would now claim conspired with that manager. There is simply no evidence to support Mathew's fantastic allegations of discrimination and retaliation here.

For years, Mathew coasted as an employee in Santander's Human Resources ("HR") department. Then, in 2015, Yessica Perez (formerly Yessica Adriano) assumed the role supervising Mathew and started to hold Mathew accountable. Perez met with Mathew regularly to discuss Mathew's work performance and Perez took notes regarding her concerns with Mathew. Perez would applaud instances when Mathew had done a good job and discuss with Mathew the concerns she had in Mathew's job performance. Despite Perez's repeated attempts to work with Mathew to improve her performance, Mathew's performance simply did not improve. Perez placed Mathew on a 30-day Performance Improvement Plan ("PIP") intended to provide Mathew with written guidance on how she needed to improve her performance.

Instead of accepting the PIP as an opportunity to improve her performance, Mathew instead chose to direct her energy into vilifying Perez by launching allegations that Perez, a young mother herself, was discriminating against Mathew because she was pregnant. Stephen Shaffer, VP Human Resources Business Partners, conducted a thorough investigation into Mathew's allegations against Perez, and found no evidence of discrimination. Shaffer chose to extend Mathew's PIP to 90 days, to ensure that she would have adequate time to improve her performance. Mathew was then given a detailed 90-day action plan.

Sadly, Mathew, who in her own eyes was a model employee, did not utilize this 90-day action plan as an opportunity to improve her performance. Despite Perez and her supervisor, Stephanie Elad (Director, Human Resources), spending extensive time coaching Mathew throughout this 90-day PIP to help her succeed, Mathew's performance simply did not improve. Mathew's continued poor performance was further evidenced by the complaints that Perez and Elad received from the business executives to whom Mathew was responsible for providing HR services. As a result of Mathew's ongoing poor performance, Santander terminated her employment.

Mathew now alleges that Perez both discriminated against her because of her pregnancy, and then convinced numerous business professionals and executives at Santander to lie in a conspiracy to cover up Perez's discrimination. Mathew's case is based solely on her subjective belief that she was somehow subjected to discriminated and retaliation. This subjective belief simply cannot carry the day when weighed against the mountain of evidence supporting Santander's decision to terminate Mathew because of her ongoing poor job performance.

To believe that Mathew was somehow subjected to either pregnancy discrimination or retaliation, one would have to disregard the testimony of every other person with knowledge of relevant facts (notably Mathew's supervisors who tried so hard to lead her to success), reject the perspectives of women in the same department who had also been pregnant and were mothers themselves, and believe that the sole alleged discriminator (who was herself a mother of young children) intentionally discriminated against Mathew because Mathew was pregnant and then convinced everyone else to cover for her discriminatory animus.

In short, with respect to her claim for sex and pregnancy discrimination, Mathew cannot establish a *prima facie* case of discrimination under Title VII. Specifically, (1) Mathew cannot show that two of the actions on which she bases her discrimination claim were adverse employment actions; (2) Mathew cannot show that she was treated less favorably because of her pregnancy than were other similarly situated employees who were not pregnant, under nearly identical circumstances; and (3) Santander presents a legitimate and nondiscriminatory reason for each of its employment decisions, and she cannot show that reason was pretextual.

With respect to her claim for retaliation, (1) Mathew cannot show that two of the actions on which she bases her retaliation claim were adverse employment actions; (2) Mathew cannot show a causal link between the alleged protected activity and the adverse employment actions; and

(3) Santander presents a legitimate and non-retaliatory reason for each of its employment decisions, and she cannot show that reason was pretextual.

Based on the applicable law and evidence, Mathew cannot meet her burden to show that she was discriminated against or retaliated against by Santander. Accordingly, Mathew's claims fail. Lastly, in this litigation, Mathew has disclaimed all back pay and front pay.

## B.    STATEMENT OF STIPULATED FACTS

1.    Mathew is a resident of Dallas County, Texas.

2.    Mathew is a female.

3.    Santander is an Illinois corporation headquartered in Dallas, Texas.

4.    Santander is a consumer finance company focused on vehicle finance and third-party servicing that employs more than 500 employees.

5.    This Court has jurisdiction of the claims asserted by Mathew pursuant to 28 U.S.C. § 1331.

6.    This Court has personal jurisdiction in this matter over the Parties.

7.    Venue is proper in this Court.

8.    Plaintiff has exhausted administrative remedies and complied with all procedural prerequisites to filing this lawsuit by timely filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), and obtaining notice of her right to sue from the EEOC less than 90 days before the filing of her Complaint.

9.    Mathew came to work at Santander in January 2011, as a Human Resources Business Partner ("HRBP").

10.    As an HRBP, Mathew was responsible for, among other things, managing employee relations issues, processing employee disciplinary actions, and

conducting investigations into employee conduct as necessary.

11.    From October 2012 through August 2015, Mathew's immediate supervisor was HR Manager Angelina Hullum.

12.    Santander paid for the training required for Mathew to obtain her Professional in Human Resources ("PHR") certification.

13.    In 2015, Mathew became pregnant while employed by Santander.

14.    In July of 2015, Mathew was temporarily assigned to work at Santander's location in Dallas every other Friday, primarily to support the Credit Card Department.

15.    On September 1, 2015, Yessica Perez replaced Hullum as the HR Manager over the office where Mathew worked, and Perez became Mathew's immediate supervisor.

16.    Santander had a points-based rewards program, Mathew received points through this program, and on one occasion, she received 2,500 points in lump sum.

17.    On December 1, 2015, Perez met with Mathew to inform Mathew she was being placed on a 30-day performance improvement plan (a "PIP").

18.    On December 9, 2015, Mathew met with a Vice President in Human Resources named Stephen Shaffer, who was over Perez in the chain of command.  Mathew told Shaffer about her concerns, and he said he would speak to the HR Managers and get back to her.

19.    On January 15, 2016, Mathew was placed on a 90-day PIP.

20.    On January 18, 2016, Mathew emailed Stephen Shaffer seeking to have another meeting. They met on January 20, 2016, and Mathew explained her most recent concerns about this new 90-day PIP.

21.    On January 19, 2016, an attorney representing Mathew sent a letter to Santander, alleging pregnancy discrimination and demanding that Santander prevent any

further instance of discrimination.

22.     On April 19, 2016, Mathew was called into Perez's office and terminated. When she left the office, she was met by a security guard. He had a box containing Mathew's personal items from her desk, and he walked Mathew all the way to her car.

23.     Boyd was also supervised by Perez during the same time period as Mathew.

24.     On May 4, 2016, Mathew filed a Charge of Discrimination with the EEOC. In her Charge, Mathew claims that she was discriminated against because of her gender and pregnancy, and that she was wrongfully retaliated against.

25.     On April 10, 2023, the EEOC issued a notice to Mathew, a Conciliation Failure and Notice of Rights.

26.     On July 7, 2023, Mathew filed this lawsuit.  Mathew asserts that Santander discriminated against her because of her sex and pregnancy by: (1) placing her on two PIP's; (2) denying her payment of her 2015 year-end bonus and merit pay increase; and (3) terminating her employment.  Mathew also asserts that Santander retaliated against her by: (1) placing her on a second PIP; (2) "assigning her busy-work tasks and extra duties;" (3) "subjecting her to daily (or nearly daily) unwarranted criticisms;" and (4) terminating her employment.

27.     Mathew has disclaimed any request for back pay and front pay.

## C.     LIST OF CONTESTED ISSUES OF FACT

### Mathew's Contested Issues of Fact:

1.     On February 12, 2015, Mathew sent Hullum a summary of the presentation she attended the day before during an HR luncheon.

2.     Santander HRBPs did not have a monthly minimum number of side-by-sides they were required to attend with business partners.

3.     Santander HRBPs did not have a monthly minimum number of jumpstarts they were required to attend.

4.     Santander HRBPs did not have a monthly minimum number of meetings with business leaders they were required to attend.

5.     Mathew's occasional deviations from her regular work schedule (arriving late, longer lunch, leaving early) did not burden other employees except for November 16, 2015 when Adriano agreed to cover something for Mathew (checking in new hires for an orientation class).

6.     Mathew's 2015 Mid-Year Review included mostly favorable comments, and while it mentioned areas for improvement, it did not say that Mathew was failing to met expectations with respect to any aspects of her job.

7.     Mathew was not asked to redo a time study in August 2015.

8.     In August 2015 when Mathew asked an employee to sign a document whether doing so was a performance issue on Mathew's part.

9.     Mathew did not receive any coaching concerning her performance at any time before December 1, 2015.

10.    Hullum did not provide Mathew with reminders to work full shifts.

11.    Hullum did not provide Mathew with reminders to provide sufficient notice when requesting to leave early.

12.    In July-August 2015, Mathew was not advised of the importance in submitting DA's to the business in a timely manner, and was not addressed on not leaving all DA entries solely to the generalist, everyone needed to assist with the workload.

13. Mathew processed DAs in a timely manner, and she processed at least her fair share of DAs, even though doing so was not one of her assigned duties.

14. Hullum never had to step in for Mathew to finalize a DA or process a termination.

15. When Adriano became Mathew's supervisor, she did not meet with Mathew to go over her 2015 Mid-Year Review.

16. Adriano never met with Mathew one-on-one to coach Mathew about performance improvement.

17. In October 2015, Mathew did not ask for help with the investigation checklist.

18. On October 29, 2015, Brad Denetz did not say he needed 10 DAs done ASAP.

19. On or about November 6, 2015, Mathew did not fail to comply with an instruction from Stephanie Elad concerning a bereavement request.

20. Mathew did not spend an inappropriate amount of time on a bereavement request.

21. Adriano did not provide feedback to Mathew on or about November 7, 2015 concerning time management or an alleged failure to follow an instruction from Elad.

22. On November 17, 2015, Adriano did not remind Mathew of the importance of prior notification when wanting to leave early and she said nothing about an alleged impact on the team.

23. On November 20, 2015 when Mathew asked Adriano if Perez could handle an investigation at another location, which Adriano approved, this was not an example of poor performance on Mathew's part.

24. The standard expectation for processing an employee's resignation was to process it by the end of the next business day after the resignation.

25.    Mathew was not responsible for or required to process an employee's resignation on Monday morning, November 21, 2015.

26.    Mathew did not make the decision to interview Deirdre Crouch in the presence of an AVP who made Crouch uncomfortable.

27.    Mathew did not tell Adriano that she had not read Crouch's entire email.

28.    Mathew did not tell Adriano she didn't believe Crouch or that her allegations were unsubstantiated.

29.    Adriano did not reprimand Mathew for anything in connection with her handling of Crouch's complaints.

30.    On November 23, 2015, Mathew submitted a request to terminate an employee for falsification of time; the request was not vague, and no one asked Mathew to redo it.

31.    The compliance emails Mathew and Adriano discussed (via instant messaging) on November 24, 2015 were not Mathew's responsibility to handle, and seeking to spread the work around was not an example of poor performance.

32.    On December 1, 2015, Adriano told Mathew her annual review would say she was failing to meet expectations, which would disqualify her from receiving a year-end bonus of more than $7,000.

33.    In three places, the written performance improvement plan Mathew received said "See Addendum for specifics," but there was no Addendum provided, and no documentation given to support the accusations of poor performance.

34.    Mathew complained that she was being placed on a PIP because of her pregnancy and she went up the chain of command protesting the decision.

35. Mathew never complained that she had been placed on a PIP because she was brown.

36. Mathew never said she wanted a longer PIP.

37. Adriano did not discuss Scott Dieckmann's December 8, 2015 email with Mathew on or about December 8, 2015.

38. Mathew handled the HR issue Dieckmann mentioned in his December 8, 2015 email and it did not have to be assigned to a different HR employee.

39. On December 28, 2015 Whitney Andres alerted Mathew to an issue concerning payroll that could only be resolved by someone who had been trained to complete an audit using the Kronos software, and none of the HR Generalists (the ones who had this training) were working that day.

40. The fact that Sabrina Boyd had to be called in on December 28, 2015 to help with the payroll issue does not show poor performance on Mathew's part.

41. In January 2016, Mathew's supervisor finally realized just how high Mathew's headcount was and how heavy her workload was, and they agreed she would no longer be responsible for the 65 or so employees who worked in a Dallas office.

42. Mathew's January 25, 2016 recap email to Shaffer was not late.

43. Mathew's investigation summary concerning Monisha Hughes-Trigg was not submitted late.

44. Mathew complied with Elad's instructions to move some text in the John Leavell investigation summary.

45. Mathew's February 17, 2016 email recapping a biweekly meeting met previously established expectations, and Mathew had not been told she needed to include significantly more detail.

46.    After Adriano sent Mathew an email on February 22, 2016 explaining the level of detail she wanted in Mathew's meeting recaps, Mathew complied with the expectations and there were no further accusations concerning a lack of detail.

47.    Mathew was not trying to mislead Elad when she stated, in a March 11, 2016 email, that she was partnering with HRIS on something, and the wording of the email does not indicate poor performance on Mathew's part.

48.    After March 8, 2016, when Mathew was first told to start being more independent during investigations, Mathew complied with the instructions and she was never told that she was not meeting this expectation.

49.    Mathew did not constantly interrupt Adriano with questions about ongoing investigations, overwhelm her, or cause her to be less productive.

50.    On April 1, 2016, knowing that Mathew had a deadline to send something to Elad, Adriano told Mathew to prioritize something else (an employee investigation) over working on the thing for Elad.

51.    Mathew did not miss the deadline of "EOD" on April 1, 2016 to provide Elad with talking points for the perfect attendance program; Mathew sent them that day at 7:17 p.m.

52.    Mathew was unable to have Adriano review the talking points for Elad in person on April 1, 2016 because Adriano left early that day without checking with Mathew on the status of the talking points, but Mathew was able to review them by phone before sending them to Elad.

53.    Adriano later criticized Mathew for failing to prioritize completion of the talking points over the employee investigation, but Mathew had no choice because Adriano told her to prioritize the investigation.

54. Regarding the Brittany Brodie investigation: Mathew did not take too long to complete her investigation and submit her summary (which was a preliminary draft because Adriano had not completed her portion); her summary was not missing a section; and not attaching her investigation notes to her April 8, 2016 email to Adriano was not a performance failure because the email was a draft, and the interview notes are added to the final investigation summary.

55. Elad and Shaffer agreed to terminate Mathew on April 13, 2016, two days before the 90 Day Review that was a part of the PIP process.

56. The criticisms and alleged performance issues presented to Mathew during the April 15, 2016 were pretextual excuses intended to mask Santander's pregnancy discrimination and retaliation.

57. On March 10, 2016, Mathew told one of the company's senior officers she would get some information he asked for, and the next day Mathew contacted the department that had the information. Adriano included this as a performance issue justifying termination by claiming Mathew should have contacted the department "much sooner."

58. Mathew did not blame the officer or the department that she contacted for not providing the requested information sooner.

59. Sabrina Boyd did not step in and get the information overcoming obstacles Mathew could not, Boyd simply acted on instructions that Mathew gave her because Mathew was on vacation at the time.

60. During the 90 day PIP, Mathew completed her DAs within 24 hours.

61. Regarding the talking points for the perfect attendance program, Elad asked Mathew for "something." Mathew met the expectation and Santander's after-the-

fact criticisms about changes that were later made (e.g. changing the font) do not indicate poor performance because none of these expectations were communicated in advance.

62.    During the 90 day PIP, Mathew met the expectation regarding teamwork and completing additional administrative tasks.

63.    Santander has provided no evidence supporting its contention that there were 568 DAs for its Lewisville location in March-April 2016, and Mathew contends that she performed her fair share of this work.

64.    Mathew disputes the anonymous comments included in the March 23, 2016 Meeting Recap given to her in the 90 Day Review that took place on April 15, 2016.

65.    Mathew was replaced by one or more employees who were not pregnant.

66.    In its position statement to the EEOC, Santander made misleading statements about Mathew's workload, asserting that Mathew had the lightest workload of any HRBP who reported to Adriano.  Besides Mathew, the only HRBP who reported to Adriano was Hortensia Perez, and her workload was significantly lighter than Mathew's.

**<u>Santander's Contested Issues of Fact:</u>**

1.    Santander is an equal opportunity employer, committed to providing equal opportunity to all persons regardless of race, color, sex, creed, gender (including identity and expression), religion, national origin or ancestry, ethnicity, age, marital status, registered domestic partner status, sexual orientation, disability, physical or mental disability, medical condition including genetic characteristics, veteran status or any other legally protected basis.

2.    Santander has an Anti-Harassment and Anti-Discrimination Policy that prohibits unlawful discrimination or harassment of any kind.

3.      The policy outlines a complaint procedure for associates who feel they have experienced job-related harassment including that if an associate feels that he/she has been treated in an unlawful, discriminatory manner, he/she should promptly report the incident to his/her manager and/or Human Resources.

4.      If an associate feels that he/she is experiencing any job-related harassment from a member of Human Resources, he/she is instructed to go immediately to Santander's Legal Department.

5.      Santander's Anti-Harassment and Anti-Discrimination Policy also specifically states that retaliation is prohibited by Santander's policies and the law.

6.      Associates are informed that if they think they have been retaliated against, they may file a complaint with the appropriate agency and that the nearest office can be located at www.eeoc.gov.

7.      Mathew's poor work was communicated to Mathew on many occasions long before her pregnancy.

8.      Mathew would often make comments that certain HR work, like processing disciplinary forms, was beneath her because she had a graduate's degree.

9.      While she reported to Hullum, Mathew exhibited performance deficiencies.

10.     Hullum noted the many incidents when Mathew's job performance was either brought into question or failed to meet expectations.

11.     In January of 2015, Mathew did not process a termination timely. When Hullum asked her to look into this, Mathew simply stated that she needed to "be more cognizant when Melissa [Lawson] sends those over."

12.    Due to Mathew's ongoing issue of failing to timely process terminations, Elad and Jessica Gleason, another Santander Director, Human Resources, made the decision to have Lawson, an HR Generalist, process all terminations going forward.

13.    On April 9, 2015, Mathew submitted her March recap to Hullum three days late, and only after Hullum followed up with her.

14.    Mathew's late monthly recap reflected significantly less meetings with business personnel than her HRBP counterparts, and failed to quantify the meetings with business leaders as was requested by Hullum.

15.    The recap further reflected that Mathew had participated in only two side-by-side meetings with managers and only four jumpstarts during the month.

16.    On May 18, 2015, Mathew submitted a monthly recap which reflected the fact that she did not attend *any* jumpstarts for the month, did not conduct *any* trainings, and the number of meetings with business leaders was again not included.

17.    On July 1, 2015, Mathew sent an Instant Message ("IM") to Hullum at 9:15 a.m. requesting to leave at 1:00 p.m. that day to attend a doctor's appointment, providing a same day notification.

18.    On July 10, 2015, Hullum asked Mathew to support the Credit Card Department at 8585 due to the shortage of staff and unbalanced workload, to which Mathew asked for assistance felt overwhelmed with current duties.

19.    Mathew received a 2015 mid-year review which identified multiple areas of needed improvement.

20.    The review states, "[w]e have made progress, but have a lot more work to do in this area," and "[w]ould like to see more progress in this area." The review also states

Mathew needed to "[a]ttend more internal meetings such as jump starts and side by sides," and needed to "[b]ecome more HR savvy."

21. On August 12, 2015, Elad received a call from Scott Dieckmann (SVP Loan Servicing, Consumer Lending) because Mathew sent one of his associates an e-mail message requesting that she acknowledge her receipt and understanding of Santander's Security Policy.

22. Dieckmann was upset because Mathew's request was interpreted by the business and associate as if the associate had done something wrong.

23. Elad coached Mathew on this and told her that she must think critically to evaluate situations and not blindly follow process.

24. On August 13, 2015, Mathew's monthly recap reflected that she held *only one* side-by-side meeting, attended three jumpstarts, and she had over 10 meetings with business leaders, and recapped only one training that she had with a manager.

25. Due to Mathew's inability to timely complete her work, in August of 2015, Hullum asked Mathew to complete a time study to determine what she was spending her time on, in light of her insistence that her workload was too heavy.

26. Hullum had to ask Mathew to complete the study twice because Mathew's first attempt did not meet her expectations.

27. The time study revealed inefficiencies, such as Mathew spending 3 hours and 15 minutes to draft the "July Recap," which was an e-mail message consisting of less than one page.

28. Mathew's workload was not heavier than that of other HRBPs.

29. On September 1, 2015, Yessica Perez took over the HR Manager position at Santander's Lewisville, Texas office, and became Mathew's direct supervisor.

30. Shortly after Perez began to supervise Mathew, Hullum shared with Perez many of the incidents in which Mathew's performance did not meet expectations while she was reporting to Hullum.

31. On, or after, October 30, 2015, Mathew informed Perez that Mathew was pregnant.

32. Every single person at Santander that Mathew communicated her pregnancy to expressed their happiness for Mathew.

33. Despite Mathew's history of poor performance, Perez wanted to give her a clean start under her leadership, and, shortly after Perez began to supervise Mathew, Perez met with Mathew one-on-one to discuss her 2015 Mid-Year Review and assess how Perez could help her in reaching her goals and improving.

34. Perez also set up weekly one-on-one coaching meetings with Mathew.

35. During these one-on-one meetings, Perez coached Mathew on areas she was performing poorly and provided guidance on how Mathew could improve.

36. Unfortunately, Mathew's performance did not improve after Perez began to supervise her, despite Perez's efforts to coach her. Rather, Mathew regularly failed to meet performance expectations.

37. On September 17, 2015, Mathew sent Perez an IM at 9:29 a.m. asking if she could leave at 1:00 p.m. or 2:00 p.m. that day, providing same day notification.

38. On September 28, 2015, Mathew informed Perez that she felt overwhelmed with her workload. Perez informed her that the HRBP role requires a high level of efficiency.

39. On October 29, 2015, Brad Denetz, the Site Director, went to Perez's office to discuss having approximately 10 disciplinary actions outstanding that he needed as

soon as possible.  When  Perez asked Mathew about those disciplinary actions, she stated that she would have them to Denetz by that Friday.

40.    On October 29, 2015, Mathew again provided last-minute notification that she would miss work.  Specifically, she informed Perez in the late afternoon that she has a doctor's appointment in the morning.  This late notice required Perez to rearrange her schedule to provide coverage at the office.

41.    When learning Mathew was pregnant, Perez congratulated Mathew.

42.    On November 2, 2015, Elad overheard Mathew and Boyd spend an inappropriate amount of time on a bereavement request.

43.    Elad voiced her concerns that their time could have been better spent on more productive matters.

44.    On November 16, 2015, Mathew sends Perez an IM at 9:53 a.m. asking if she could leave at 3:00 p.m. that day, providing same day notification.

45.    On November 20, 2015, Mathew informed Perez that she felt she was extremely busy and needed help with her workload.

46.    Mathew asked Perez if another HRBP, Hortensia Perez ("Tensya"), could assist her with her workload.

47.     Perez granted her request, and Tensya took over a pending investigation that was originally assigned to Mathew.

48.    On Saturday, November 21, 2015, an associate sent Mathew her resignation notice.  Mathew was responsible for processing the termination first thing the following Monday morning.  Mathew failed to timely process this termination, resulting in a risk event.

49.    Upon reviewing the investigation, Perez learned that the complaining employee alleged that she could not trust her Assistant Vice President ("AVP") because the AVP was good friends with the manager about whom the complaining employee was making allegations.

50.    When Mathew had assumed the responsibility of conducting the investigation into these allegations, she ignored the employee's allegation, demonstrated by the fact that Mathew interviewed the complaining employee and the AVP together.

51.    Mathew then concluded that none of the complaining employee's complaints was substantiated.

52.    After learning about the inadequacies of the initial investigation conducted by Mathew, Perez conducted her own investigation, which resulted in substantiating some of the allegations made by the complaining employee.

53.    When discussing the situation with her, Mathew informed Perez that she (1) did not read the e-mail message sent by the complaining employee in its entirety, and (2) did not believe the complaining employee during the investigation.

54.    In response, Perez reprimanded Mathew, informing her that she must always investigate complaints with an open and fair mind.

55.    On November 24, 2015, Mathew sent Perez an IM at 11:19 a.m. informing her that she would be taking a long lunch to go to a doctor's appointment, providing same day notification.

56.    On November 24, 2015, Mathew again complained about her workload, asking that someone assist her with a pending project.

57.    When Perez explains the busy workloads of the rest of the team members and asked what Mathew has going on, Mathew said she overwhelmed and has to leave to go to a doctor appointment.

58.    Due to Mathew's ongoing performance issues, Perez consulted Elad about next steps regarding Mathew.

59.    Elad then consulted with Pamela Blackburn, Executive Vice President of HR.

60.    Blackburn suggested that Elad and Perez place Mathew on a PIP to provide her with another opportunity to improve her performance.

61.    Santander determined that, based on Mathew's poor performance in a number of categories, a PIP was the appropriate mechanism by which to manage her performance, as a written warning on her poor performance on a specific category would not capture the bigger picture of how she needed to improve her performance in a number of categories.  Santander does not require that employees be provided formal disciplinary actions prior to being placed on a PIP.

62.    On December 1, 2015, Perez met with Mathew to discuss her poor performance and provide her with the 30-day PIP.

63.    Mathew's poor performance was regularly communicated to Mathew well in advance of her pregnancy and prior to her being placed on a PIP.

64.    After receiving this 30-day PIP, Mathew's poor performance continued.

65.    On December 8, 2015, Dieckmann wrote to Perez, expressing his concerns with Mathew's performance as his department's HRBP.  Specially, he described Mathew's behavior as "bullying," complained that Mathew did not involve management in areas in which he believed management should have been involved,

and explained why he believed her investigation into an employee complaint was flawed.

66.     In one particular instance he described, Mathew had told a manager that she was "sure" an event that the complaining employee described occurred, despite having found no corroborating evidence, and in fact being told by witnesses that the event alleged by the complaining employee did not occur.

67.     On December 28, 2015, Santander experienced a payroll issue that required an HR professional from every location to assist in resolving the issue.

68.     Perez asked Mathew to work on this issue.

69.     Mathew was unable to complete this task on her own, resulting in Perez having to ask Sabrina Boyd, the HR Generalist, to work on her day off to assist with the payroll issue.

70.     Boyd worked to find a resolution without difficulty.

71.     Mathew disagreed with the PIP that she received on December 1, 2015, and complained internally about her annual performance review and the PIP.

72.     Mathew even accused Perez of issuing the PIP because of her pregnancy and because she is "Brown."

73.     Shaffer (VP Human Resources Business Partnership) conducted a thorough investigation into Mathew's complaints, including interviewing relevant witnesses and reviewing numerous relevant documents, including those submitted by Mathew.

74.     Shaffer documented his investigation in a six-page, single-spaced report.

75.     Shaffer found that Mathew's performance had been lacking, but that, while "there were good intentions by the management team," they had "not done a totally

effective job in managing Reena Mathew, especially in holding her accountable for her mistakes and poor performance at times."

76.    Mathew requested a longer PIP.

77.    In light of his findings, and Mathew's requests, Shaffer recommended that Santander provide Mathew with a PIP that included a 90-day action plan for her to improve, and have weekly check-in's and monthly reviews.

78.    Shaffer also found that Mathew should receive a "Meets" rating on her 2015 performance evaluation, and that her PIP would not affect her upcoming bonus or merit increase in compensation.

79.    Shaffer explained that, while Mathew did have performance gaps, it would not affect her 2015 rating and compensation.

80.    Consistent with Shaffer's recommendations, on January 15, 2016, Elad and Perez placed Mathew on a 90-day PIP and provided her with a 90-day action plan.

81.    In this PIP, they identified performance standards for Mathew's job, along with a description of how her performance to date had failed to meet those standards and documented many criticisms of Mathew's performance dating back to February 1, 2025.

82.    Despite being placed on a PIP, Santander gave Mathew her year end bonus and a raise for 2015.

83.    The 90-day action plan indicated three areas of focus: attendance; time management/effective work habits; and consulting.

84.    Elad and Perez then provided Mathew with tasks associated with each of these areas of focus, along with a description of any support or resources that were available to assist her in making the necessary improvements to her performance.

85.  They offered to provide Mathew with additional training on a number of topics, and asked her to request the training by February 5, 2016.

86.  Additionally, in light of Mathew's continual complaints that her workload was too heavy to handle, they reassigned the work associated with Santander's Dallas location to another member of the team.

87.  Finally, they informed Mathew that she would have biweekly reviews with Perez to discuss her performance in each of the areas of focus.

88.  On January 20, 2016, Shaffer (VP Human Resources Business Partnership, which was three levels above Mathew) met with Mathew to discuss the 90-day PIP and Action Plan as well as the results of his investigation of her complaints.

89.  During that conversation, Shaffer explained to Mathew that the PIP provided to Mathew on December 1, 2015, had been revoked and now should be considered to have served her with notice of her performance deficiencies.

90.  Shaffer further explained, consistent with Mathew's input that a 30-day PIP was not sufficient time to accomplish the goals, the 30-day PIP had been revoked and she had been placed on a 90-day PIP with an action plan instead.

91.  Shaffer stated Mathew's PIP was *not* a last resort document, but a documented step to put an action plan in place for her to work to improve her performance.

92.  Shaffer informed Mathew she would receive her bonus and merit increase for 2015 because much of the feedback that she received and the consequences that would go along with that feedback were provided late in the review process, and she should not be financially penalized at that point.

93.  Shaffer encouraged Mathew to meet with Perez, Hullum and Elad to discuss her performance and get their feedback.

94.   At the conclusion of this meeting, Shaffer instructed Mathew to send to him a summary of their conversation by 8:00 a.m. on Monday, January 25, 2016.

95.   At 10:58 a.m. on Monday, January 25, 2016, Shaffer sent Mathew an e-mail message noting that she had not sent him the summary, her failure to timely submit the summary was unacceptable, and he expected to see the summary from her no later than noon that day.

96.   At 11:51 a.m., Mathew sent an e-mail message to Shaffer consisting of five sentences, none of which summarized the meeting she had with Shaffer on January 20, 2016.

97.   Within an hour, Shaffer responded to Mathew's e-mail message, informing her that her e-mail message at 11:51 a.m. was not the summary that he had requested and noting that her failure to comply with his request to send a summary of their conversation was an example of the coaching and feedback that she had been receiving regarding her performance.

98.   Shaffer reiterated that her success at Santander was desired and sincerely hoped for, but that she needed to demonstrate the effort and produce the results.

99.   He then asked if her five-sentence e-mail message was her final submission of the summary of their conversation from January 20, 2015.

100.  Mathew responded to Shaffer's e-mail later that day, providing a short summary of their conversation on January 20, 2015.

101.  Shaffer responded to Mathew, providing extensive responses to her short summary.

102.  On January 29, 2016, Perez met with Mathew to discuss her performance at a first biweekly follow-up meeting following the start of the 90-day PIP.

103.    Mathew claimed that she had been properly providing Perez with 48 hours'-notice before taking time off, which Perez found met expectations as to the focus area of attendance.

104.    Perez and Mathew then discussed Mathew's time study, in which Mathew had documented what she did throughout the day and how much time she devoted to each item.

105.    Perez reminded Mathew that when she received a project, it was important to respond timely, and further, if she found herself unable to complete an assignment on time, she needed to provide an update or explanation of what occurred, along with a new estimated time of completion.

106.    During the January 29, 2016, meeting, Perez asked Mathew if she would like to attend any type of class to assist her in meeting her PIP objectives, and asked her to identify any courses she would like to attend no later than February 5, 2016.

107.    Mathew responded by telling Perez that if she came across any classes she wanted to take, she would let her know.

108.    During the course of the next two weeks, Mathew failed to fully meet Perez's expectations in completing her work on a timely basis, and in following instructions.

109.    For example, Elad had instructed Mathew to eliminate specific information from an investigation report.  Yet, the investigation report submitted by Mathew contained the very information that Elad had asked her to not include.

110.    Additionally, the deficient report was submitted late.

111.    Accordingly, on February 17, 2016, Elad and Perez met with Mathew to further discuss her performance during a second biweekly follow-up meeting.

112.    In this conversation, Elad and Perez conveyed their observations that Mathew was still not completing her work on a timely basis, and that she had failed to follow instructions regarding employee investigations as she submitted the report containing the very information that Elad asked her to remove.

113.    Elad and Perez coached Mathew regarding their expectation that she timely complete her work and that she follow instructions when completing employee investigations.

114.    They also pointed out that Mathew submitted the (deficient) report after the deadline.

115.    Also at the February 17, 2016, meeting, Elad and Perez asked Mathew to provide them with more detail when identifying for them how she was utilizing her time.

116.    In particular, they asked that she identify the number of disciplinary actions and investigations that she completes each week, the process that she follows to intake disciplinary actions, and descriptions of other tasks that she completes throughout the week.

117.    This was necessary because Mathew continued to complain, in the meeting, that her workload was too heavy, despite the fact that she had one of the lightest, if not *the* lightest, workload of any of Santander's HRBP's.

118.    After the February 17, 2016, meeting, Perez asked Mathew to provide her with a written summary detailing their meeting.

119.    Perez made this request to ensure that Mathew understood and grasped the key takeaways from their meeting.

120.    This practice is not uncommon when administering a performance improvement plan.

121.  Mathew provided to Perez a very cursory outline of their conversation, which fell below Perez's expectations.

122.  This outline did not even note the extensive coaching that Elad and Perez provided to Mathew regarding timeliness of her work and following instructions when conducting an investigation.

123.  Despite the coaching that Elad and Perez provided to Mathew regarding timely submitting projects, Mathew continued to miss deadlines.

124.  This untimeliness was not only burdensome to Perez, but also it impacted the business clients whom they served.

125.  Perez also found that, while Mathew was continuing to work on employee investigations as instructed, she was asking Perez to direct her in her own investigations far more frequently than someone at Mathew's level should have been.

126.  While Perez appreciated that Mathew was trying to ensure that she did not make any mistakes, Perez was constantly interrupted by Mathew, each time taking Perez away from whatever she was working on, to answer questions about investigations that she had expected Mathew to know.

127.  As a result of these unnecessary interruptions, Perez was far less productive than she could otherwise be in her own job duties.

128.  On February 26, 2016, Elad and Perez met with Mathew to provide her with a 30-day review.

129.  In this meeting, Elad and Perez again focused on Mathew's need to improve on her time management and effective work habits.  In doing so, they discussed a recent

instance when Mathew failed to submit the information requested of her by the deadline, and how her untimeliness impacted the business that they serve.

130. Also at this February 26, 2016 meeting, Elad and Perez discussed with Mathew that she needed to take more initiative when conducting investigations.

131. In particular, they discussed how Mathew had needlessly interrupted Perez in her work, while performing each of the four investigations that she conducted over the past 30 days.

132. Elad and Perez told Mathew that they expected her to demonstrate more proficiency and confidence in conducting these investigations, and that Perez would remain available for consultation as needed.

133. They further noted that, consistent with Mathew's PIP, they had offered her training opportunities, in which Mathew had not even expressed any interest.

134. Unfortunately, Mathew did not grasp Elad and Perez's instruction that she should demonstrate more proficiency and confidence in conducting investigations.

135. Rather, she continued to go to Perez seeking guidance at, what seemed to Perez, every juncture during Mathew's ongoing investigations.

136. Accordingly, on March 8, 2016, during Elad and Perez's third biweekly follow-up meeting with Mathew, they noted that Mathew asked for guidance from Perez every step of the way while conducting investigations.

137. They told her that it was their expectation that Mathew would be able to make sound judgment calls on her own, and that she would begin to move toward managing her investigations on her own without constantly asking Perez for guidance.

138. In this meeting, they also recognized that Mathew had made some improvements in handling administrative tasks and in being more thorough in investigations.

139.    Three days later, on Friday, March 11, 2016, Mathew engaged in behavior which Perez believe exemplified her poor time-management skills and called into question her integrity.

140.    Specifically, Mathew was working on a project related to rewarding perfect attendance for Santander associates.

141.    As part of that project, Mathew sent an e-mail message to Elad at 4:28 p.m., in which she told Elad that she was "partnering" with another department, HRIS, to obtain specific data related to the project.

142.    In this e-mail message, Mathew told Elad that she wanted to provide Elad with a "status update" before leaving for vacation that same day.

143.    Mathew asked Elad if it was okay if she sent Elad the requested data when she returned from her vacation.

144.    Elad responded to this e-mail message minutes later, asking if Mathew could get the data to her earlier, as she wanted to get the data to their business client the next week if possible.

145.    Elad and Perez later learned that Mathew had not actually "partnered" with HRIS to get the data, as Mathew had represented in her e-mail message.

146.    Rather, Mathew did not request the data from HRIS until *after* she received Elad's e-mail message requesting her to get the data to her by the next week.

147.    In addition to her poor time management, Perez found that Mathew did not improve in conducting and managing her own employee investigations.

148.    Rather, despite Elad and Perez's continued instruction that she begin to manage her investigations on her own, Mathew continued to constantly seek Perez's assistance.

149. On March 23, 2016, Elad and Perez met with Mathew for their fourth biweekly meeting.

150. In this meeting, Elad and Perez expressed their continued expectation that, as an HRBP, Mathew make independent judgment calls when handling investigations.

151. They informed Mathew that they expected her to formulate a plan at the beginning of an investigation, and to then make a recommendation to Perez at the end of the investigation.

152. They explained to her that, at this point, she was still seeking Perez's guidance more than they expected for someone at her level.

153. At the March 23, 2016, meeting, Elad and Perez also addressed the situation in which Mathew communicated to Elad that she had "partnered" with HRIS, when in fact she had not yet contacted that department at all.

154. When Elad and Perez pointed this discrepancy out to Mathew, she did not accept responsibility for her poor time management or her misleading communication.

155. Instead, Mathew blamed HRIS for not getting the data to her as quickly as she would have liked.

156. Despite Perez's continued counseling and coaching, Mathew's performance simply did not improve.

157. Rather, Mathew continued to seek Perez's guidance more than was appropriate, failed to timely submit work, and Perez received negative feedback from their business clients regarding Mathew's work for them.

158. On April 15, 2016, Elad and Perez met with Mathew to provide her with her 90-day review.

159.    During this meeting, they discussed with Mathew her overall performance for the past 90 days, focusing on the three areas of focus that were identified in her 90-day action plan: attendance; time management/effective work habits; and consulting.

160.    They informed Mathew that they felt she met expectations as to attendance, but failed to meet expectations as to time management/effective work habits and consulting.

161.    They identified Mathew's performance failures in the following areas: (1) providing detail in the work she submitted;| (2) submitting accurate work product; (3) meeting deadlines; (4) timely following up when working on a project; (5) providing thorough and quality work product; and (6) contributing to the team by completing administrative tasks as needed.

162.    They also informed Mathew that they felt she did not meet expectations in her consulting, as exemplified by her (1) failure to push back on the business when necessary to complete her job, (2) demonstrating a lack of accountability for her own behaviors, and (3) inappropriately addressing the business clients after they provided Perez with negative feedback regarding her performance, by challenging the feedback the business clients provided to Perez.

163.    Elad and Perez concluded the April 15, 2016, meeting by providing Mathew with some feedback they received from the business clients regarding her performance, which included the following:

164.    "Limited interactions, but it has been better since January.  I'd rather just go to someone else on the HR team to get it done right.  They are always helpful and on point."

165. "I am getting [disciplinary actions] within 2 days.  I never get it within 24 hours though, which is what I thought the expectation was."

166. "I enjoy working with her but notice that with difficult conversations she is timid and struggles.  She asked me to sit in on a conversation and when it got difficult she said that I would take over.  This wasn't my Associate and I was unprepared."

167. "She doesn't like making decisions without checking with her manager.  She isn't confident when dealing with issues.  She is scared to make decisions."

168. "I had to sit in on a term that [Mathew] was supposed to handle.  [Mathew] got flustered and turned it back to me to handle.  It's obvious that she can't handle conflict."

169. "She has had to ask for an extension (beyond 2 days) for a [disciplinary action]."

170. "I'm much more comfortable and confident working with others on the HR team because they respond timely and are confident in their decision making process."

171. "She is very nice.  Just don't ask her for anything."

172. Throughout this meeting, Mathew was defensive and claimed that she was getting picked on for every mistake.

173. Rather than accept responsibility for any of her actions, she blamed Perez, accusing her of being a bad manager.

174. Mathew said that Perez failed to check her work before sending it to Elad, did not ensure she met her deadlines, and did not often enough help her or remind her of things.

175. As a result of Mathew's ongoing performance issues and her failure to improve her performance despite receiving a 90-day action plan and a PIP, Elad, Shaffer, and Perez decided to terminate Mathew's employment.

176.    On April 19, 2016, Elad and Perez met with Mathew to inform her that her employment with Santander was terminated because of her ongoing performance issues.

177.    Mathew was replaced by Boyd, who, thereafter, consistently met Perez's expectations as an Employee Relations Consultant (formerly HRBP).

178.    Additionally, Mathew claims that three of the Santander employees from the group for which Perez provided HR services conspired with Perez to allow Perez to discriminate against Mathew.

179.    Tina Mohan, another HRBP at Santander who worked under Perez for a period of time learned she was pregnant around the same time as Mathew and was due in July of 2016.

180.    Early in Mohan's pregnancy, she informed her colleagues at Santander that she was pregnant.

181.    Her colleagues treated her with kindness and compassion during her pregnancy.

182.    In any instance when Mohan was not feeling well or had a doctor's appointment, her team was very accommodating and supported her.

183.    There were times during her pregnancy when Mohan felt stress from her job. The stress was due to the pressure associated with the HR position itself, and not from any of Mohan's colleagues. The work Mohan was assigned at Santander, both before and during her pregnancy, was a fair amount based on her qualifications and experience.

184.    After Mohan's baby was born, Santander continued to be very accommodating and compassionate toward Mohan and her needs.

185. Mohan's son was born approximately three months premature, and Mohan could not be happier with how she was treated by Santander during that stressful time.

186. Mohan ultimately made the decision to resign from Santander after having her son, so that she could stay home and care for his needs. Mohan's decision to resign was based solely on her son and family's needs at the time.

187. Mohan never witnessed any women at Santander being mistreated because of their pregnancy.

188. To the contrary, based on her personal experience being pregnant at Santander, Mohan has nothing but positive thing to say about how she was treated by Santander, both during and after her pregnancy.

189. Fatma Rizvan, a Human Resources Generalist, learned she was pregnant in 2016.

190. Early in Rizvan's pregnancy, she informed her colleagues at Santander that she was pregnant.

191. Her colleagues treated her with kindness and compassion during her pregnancy.

192. In any instance when Rizvan was not feeling well or had a doctor's appointment, her team was very accommodating and supported her.

193. After Rizvan's baby was born, Santander continued to be very accommodating and compassionate toward Rizvan and her needs.

194. Rizvan ultimately made the decision to resign from Santander, in 2017, after having her baby, to accept a job closer to her house. Rizvan's decision to resign was based solely on her commute and family's needs at the time.

195. Rizvan never witnessed any women at Santander being mistreated because of their pregnancy.

196.    To the contrary, based on her personal experience being pregnant at Santander, Rizvan has nothing but positive thing to say about how she was treated by Santander, both during and after her pregnancy.

197.    Christina Stout began working for Santander in 2013 as a Human Resources ("HR") Clerk and was promoted to other roles within the HR department, including Document Specialist, and Senior Specialist Immigration and Mobility, the latter of which is the position she holds today.

198.    In late 2015, Stout learned that she was pregnant and shared that she was pregnant with her colleagues at Santander shortly after she learned that she was pregnant.

199.    Stout had numerous complications throughout her pregnancy, one of which resulted in her spending several days in the hospital.

200.    Stout's colleagues at Santander were amazing and very supportive. Her supervisor made it possible for her to work from home when she needed to do so due to pregnancy-related complications.

201.    After Stout's baby was born, Santander continued to be very accommodating and compassionate toward Stout and her needs.

202.    Stout returned to her position in the Human Resources department after taking maternity leave.

203.    As a mother of a small child, Stout has, of course, had days that she had to take unexpected absences to care for her child's needs.

204.    Stout have never felt uncomfortable asking about taking time off to care for her child.

205.    To the contrary, Stout feels everyone at Santander has always been very kind and accommodating of her needs.

206. Multiple other women within the Human Resources department were pregnant at or around the time that Stout was pregnant in 2016.

207. Based on what Stout personally observed over the past decade, she has never witnessed anyone at Santander being mistreated because of her pregnancy.

208. To the contrary, based on her personal experience being pregnant at Santander, Stout has nothing but positive things to say about how she was treated by Santander, both during and after her pregnancy.

209. Whitney Andres began working for Santander in May 2013 as a HR Generalist in the Human Resources department.

210. Andres has worked for Santander for nearly nine years.

211. In addition to the HR Generalist role, Andres has also worked as an HRBP and as an Employee Relations Consultant.

212. In February 2016, Andres learned that she was pregnant. She was working as an HRBP at the time.

213. Andres shared that she was pregnant with her colleagues at Santander, all of whom treated her with kindness and compassion during her pregnancy.

214. In any instance when Andres was not feeling well or had a doctor's appointment, her team was very accommodating and supported her.

215. Andres's supervisors in 2016 were Angelina Hullum and Kristen Lagunes.

216. Both Hullum and Lagunes were very supportive of Andres through-out her pregnancy.

217. After Andres' baby was born, Santander continued to be very accommodating and compassionate toward Andres and her needs.

218.  Andres returned to her position in the Human Resources department after taking maternity leave.

219.  Andres continues, to this day, to work in Santander's Human Resources department.

220.  Multiple other women within the Human Resources department were pregnant at or around the time that Andres was pregnant.

221.  Based on what Andres has personally observed over the nearly past nine years, she has never witnessed anyone at Santander being mistreated because of her pregnancy.

222.  To the contrary, based on her personal experience being pregnant at Santander, Andres has nothing but positive things to say about how she was treated by Santander, both during and after her pregnancy.

223.  Sabrina Boyd began her employment with Santander in November 2004, as a Front End Account Manager.

224.  From 2004 until 2011, Boyd held three roles in Santander's Servicing Department, including Front End Manager and Customer Service Manager.

225.  In October 2011, Boyd transitioned to Santander's Human Resources Department, as a Training Specialist III.

226.  In July 2013, Boyd transitioned to the role of HR Generalist.

227.  In May 2016, Boyd was promoted to the role of HR Business Partner to replace Mathew.

228.  In July 2016, Boyd's job title changed to Employee Relations Consultant. This is the position she holds today.

229.  Boyd was pregnant and had a child while working at Santander.

230. Boyd never felt as though anyone at Santander treated her poorly or discriminated against her because of her pregnancy.

231. Multiple other women within the Human Resources department were pregnant at or around the time that Mathew was pregnant in 2016.

232. Based on what Boyd has personally observed over the past 20 years at Santander, she has never witnessed anyone in Santander's HR department or elsewhere being mistreated because of her pregnancy.

233. To the contrary, based on her personal experience being pregnant at Santander and her observations of how other pregnant employees have been treated, Boyd has nothing but positive things to say about how she and those other expecting mothers were treated by Santander, both during and after their pregnancies.

234. Nicole Prior began working for Santander in 2012 as a Recruiting Coordinator.

235. In October 2016, Prior moved into the Human Resources department as an HRBP.

236. Prior remains in a similar role now, although the name of the position has changed overtime.

237. In late 2016, Prior learned that she was pregnant while she was working as an HRBP.

238. Prior shared that she was pregnant with her colleagues at Santander in approximately November 2016.

239. All of her colleagues at Santander were wonderful, celebrated her pregnancy, and treated her very well during her pregnancy.

240. Prior's supervisor was very supportive and flexible when Prior needed to be out of the office due to her pregnancy.

241. After Prior's baby was born, Santander continued to be very accommodating and compassionate toward Prior and her needs.

242. Prior returned to her position in the Human Resources department after taking maternity leave.

243. In late 2018, Prior learned that she was pregnant with her second child.

244. Prior shared that she was pregnant with her colleagues at Santander.

245. Her colleagues and supervisor were, just as they were with her first pregnancy, very accommodating and wonderful.

246. Based on Prior's positive experiences working at Santander while pregnant and after returning from her first maternity leave, Prior returned to work at Santander after taking her second maternity leave.

247. Prior continues to work at Santander now, while mothering two young children.

248. Multiple other women within the Human Resources department were pregnant at or around the time that Prior was pregnant in 2016 and 2017.

249. Based on what Prior personally observed over the past decade, she has never witnessed anyone at Santander being mistreated because of her pregnancy.

250. To the contrary, based on Prior's personal experience being pregnant at Santander, Prior has nothing but positive things to say about how she was treated by Santander, both during and after her pregnancy.

251. Mathew had other deficiencies in her job performance and other instances in which she asked to miss work without sufficient notice.

252. "You Earned It" points can be given for a number of reasons and are not indicative of an individual being a good employee.

253. Between February 20, 2015, and March 4, 2016, Boyd received more than double the number of "You Earned It" points than Mathew.

254. Between February 20, 2015, and March 4, 2016, Andres received 24,315 "You Earned It" points compared to Mathew's 15,462 "You Earned It" points.

255. Brad Denetz, the Site Director who gave Mathew 2,000 "You Earned It" points on February 17, 2016, also gave 2,000 "You Earned It" points to Boyd that same day, and between February 20, 2015, and March 4, 2016 gave out a total of 3,442,200 "You Earned It" points.

256. While Mathew testified that the 2,500 points given to her by Greg Vinson was "a lot of points," and that he did not give a lot of people that many points, this is untrue as between February 20, 2015, and March 4, 2016, Vinson gave out a total of 195,076 "You Earned It" points, and gave between 2,500 and 10,000 points to one person at one time on 32 occasions.

257. On November 5, 2015, Mathew gave Ms. Perez 500 "You Earned It" points for "being a great leader.

258. Perez was less willing to overlook Mathew's performance deficiencies than Hullum.

## D.   LIST OF CONTESTED ISSUES OF LAW

### Mathew's Contested Issues of Law:

1. Whether Mathew's sex/gender/pregnancy was a motivating factor in Defendant's decision to terminate her employment.

2. Whether Defendant would have terminated Mathew's employment even had it not improperly considered her sex/gender/pregnancy.

3.      Whether Santander retaliated against Mathew because she opposed Santander's unlawful discrimination.

4.      Whether Defendant's wrongful actions, if any, caused Mathew damages.

5.      If Defendant's wrongful actions, if any, caused Mathew damages, what amount of money, if paid now in cash, would fairly and reasonably compensate her for those damages.

6.      Whether Defendant's conduct was done with malice or reckless indifference to Mathew's federally protected rights.

7.      Whether punitive damages should be assessed against Defendant.

**Santander's Contested Issues of Law:**

1.      Santander did not discriminate against Mathew for her sex, pregnancy, or any other reason, and did not commit any violation of Title VII, and Mathew cannot meet her burden establishing such a claim.

2.      Santander did not retaliate against Mathew or commit any violation of Title VII's anti-retaliation provisions, and Mathew cannot meet her burden establishing such a claim.

3.      Even though Mathew cannot prove a prima facie case of discrimination or retaliation, Mathew's habitual poor performance constitutes a legitimate, non-discriminatory reason for placing her on a PIP and terminating her employment.

4.      Mathew is not entitled to recover any type or amount of damages from Santander.

5.      Mathew is not entitled to compensatory damages for emotional pain or mental anguish as she has failed to show that the alleged discrimination or alleged retaliation manifests a discernable injury to her emotional state.

6.      Mathew's alleged mental anguish is a result of post-partum depression and not

related to Santander.

7.    Mathew is not entitled to punitive damages because Santander did not act with malice or reckless indifference to Mathew's rights.

8.    Mathew is not entitled to attorneys' fees.

9.    Even had Mathew not disclaimed seeking back pay and front pay, Mathew would not be entitled to same as she failed to mitigate her damages.

10.    Being asked to complete a time study and alleged scrutiny over work performance are not adverse employment actions.

## E.    ESTIMATED LENGTH OF TRIAL

The parties estimate the trial will last four days including jury selection, but excluding jury deliberation.

## F.    LIST OF ANY ADDITIONAL MATTERS THAT MIGHT AID IN THE DISPOSITION OF THE CASE

**Mathew's Additional Matters:**

1.  A ruling on Defendant's motion for summary judgment.

2.  Rulings on each party's motion in limine.

**Santander's Additional Matters:**

Pending before the Court is Santander's Motion for Summary Judgment [Doc. No. 23] as well as Brief in Support of its Motion for Summary Judgment and Appendix. [Doc. Nos. 24–25]. Related to Santander's Motion for Summary Judgment is Santander's Motion to Strike Plaintiff's Declaration and Brief in Support thereof and Santander's Motion for Leave to Submit Supplemental Evidence in Support of its Motion for Summary Judgment. [Doc. Nos. 45, 47]. Based on the applicable law and summary judgment evidence, Santander is entitled to summary judgment on Plaintiff's only two claims: (1) Sex and pregnancy discrimination; and (2) retaliation. Accordingly, Santander respectfully requests that prior to trial, the Court: (1) grant Santander's

Motion to Strike Plaintiff's Declaration; (2) grant Santander's Motion for Leave to Submit Supplemental Evidence in Support of its Motion for Summary Judgment; and (3) grant Santander's Motion for Summary Judgment, thereby dismissing with prejudice all pending claims that Mathew asserts against Santander.

Santander will also be filing the other required pre-trial filings and, where applicable, requests a ruling on same prior to trial.

SIGNED this _____ day of _____, 2024.

_____
DAVID C. GODBEY
Chief United States District Judge

Respectfully submitted,

*Counsel for Defendant, Santander Consumer USA Inc.*

By: *Monte K. Hurst*
Monte K. Hurst
State Bar No. 00796802
Monte.Hurst@hallettperrin.com

Clayton S. Carter
State Bar No. 24120750
CCarter@hallettperrin.com

**HALLETT & PERRIN, P.C.**
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
214.953.0053
(f) 214.922.4142

*Counsel for Plaintiff Reena Mathew*

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Donald E. Uloth, P.C.
18208 Preston Road, Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Fax: (972) 777-6951
Email: don.uloth@uloth.pro
Counsel for Plaintiff